# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MAX-PLANK-GESELLSCHAFT ZUR
FÖRDERUNG DER WISSENSCHAFTEN E.V.,
a corporation organized under the laws of Germany;
et al.,

                              Plaintiffs,

          v.                                    Civil Action No. 1:09-cv-11116-PBS

WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH, a Delaware corporation; et al.,

                              Defendants.

**DEFENDANT WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH'S
OPPOSITION TO MAX PLANCK'S AND ALNYLAM'S MOTIONS FOR TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

INTRODUCTION .......................................................................................... 1

STATEMENT OF FACTS ............................................................................. 3

The Technology and the Patent Applications ............................................... 3

The Agreements Between the Four Institutions............................................ 7

The Parties' Interests Diverge:  Alnylam / Planck vs. UMass and Its Licensees ........................ 10

The Current Status of the Applications........................................................ 11

ARGUMENT ............................................................................................... 12

I.      THE COURT LACKS AUTHORITY TO GRANT THE RELIEF
        REQUESTED. ................................................................................... 12

II.     THERE IS NO SHOWING OF IMMINENT IRREPARABLE HARM......................... 13

III.    PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS. ............... 14

        A.      Plaintiffs' Claims Cannot Succeed Because Planck Agreed to the
                Inclusion of the Information; Inclusion of the Information Was Proper;
                Inclusion of the Information Does Not Affect Whether Tuschl II Is
                Patentable; and Plaintiffs Waited Too Long To Sue. .......................... 14

        B.      Plaintiffs Cannot Show a Breach of Contract That Proximately Caused
                Harm. ...................................................................................... 16

        C.      Plaintiffs Cannot Show a Breach of the Implied Covenant of Good
                Faith and Fair Dealing. .............................................................. 17

        D.      Plaintiffs Cannot Show a Breach of Fiduciary Duty. ......................... 18

        E.      Plaintiffs Cannot Prevail on Their Chapter 93A Claim. ..................... 19

IV.     THE BALANCE OF HARMS DOES NOT FAVOR AN INJUNCTION....................... 19

V.      PUBLIC POLICY DOES NOT FAVOR AN INJUNCTION. ........................................ 20

CONCLUSION............................................................................................. 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)......................................................................................12

*Bowdoin Constr. Corp. v. R.I. Hosp. Trust Nat'l Bank*,
   869 F. Supp. 1004 (D. Mass. 1994) ...............................................................................14

*Emerson Elec. Co. v. Davoil, Inc.*,
   88 F.3d 1051 (Fed. Cir. 1996)........................................................................................12

*Guckenberger v. Boston Univ.*,
   974 F. Supp. 106 (D. Mass. 1997) .................................................................................16

*In re Continental General Tire, Inc.*,
   81 F.3d 1089 (Fed. Cir. 1995).......................................................................................12

*In re Kaplan*,
   789 F.2d 1574 (Fed. Cir. 1986).................................................................................6, 15

*In re Vogel*,
   422 F.2d 438 (C.C.P.A. 1970) .......................................................................................15

*K-Mart Corp. v. Oriental Plaza, Inc.*,
   875 F.2d 907 (1st Cir. 1989)..........................................................................................15

*M/A-Com Security Corp. v. Galesi*,
   904 F.2d 134 (2d Cir. 1990)...........................................................................................18

*McKart v. United States*,
   394 U.S. 185 (1969).......................................................................................................20

*McLain v. City of Somerville*,
   424 F. Supp. 2d 329 (D. Mass. 2006) ...........................................................................15

*Singer Co. v. P.R. Mallory & Co.*,
   671 F.2d 232 (7th Cir. 1982) .........................................................................................20

*Speakman v. Allmerica Financial Life Ins. & Annuity Co.*,
   367 F. Supp. 2d 122 (D. Mass. 2005) ...........................................................................17

### STATE CASES

*Boylston Dev. Group, Inc. v. 22 Boylston Street Corp.*,
   591 N.E.2d 157 (Mass. 1992) ........................................................................................14

*Chokel v. Genzyme Corp.*,
   867 N.E.2d 325 (Mass. 2007) ................................................................18

*Di Marzo v. Am. Mut. Ins. Co.*,
   449 N.E.2d 1189 (Mass. 1983) ..............................................................14

*Eigerman v. Putnam Investments, Inc.*,
   877 N.E.2d 1258 (Mass. 2007) ..............................................................17

*Knapp v. Neptune Towers Assocs.*,
   892 N.E.2d 820 (Mass. App. Ct. 2008) ................................................18

*Lattuca v. Robsham*,
   812 N.E.2d 877 (Mass. 2004) ................................................................15

*Mass. LNG Inc. v. Indus. Nat'l Leasing Corp.*,
   8 Mass. L. Rptr. 604, 1998 WL 374930 (Mass. Super. Ct. July 1, 1998) ..............18

*PMP Associates, Inc. v. Globe Newspaper Co.*,
   321 N.E.2d 915 (Mass. 1975) ................................................................19

*Szalla v. Locke*,
   657 N.E.2d 1267 (Mass. 1995) ..............................................................19

## OTHER AUTHORITIES

35 U.S.C. § 112 ....................................................................................14

37 C.F.R. § 1.311 ..................................................................................19

II FARNSWORTH ON CONTRACTS § 7.17b (3d ed. 2004) ..........................18

MASS. GEN. LAWS ch. 93A, § 2 ..............................................................19

MASS. GEN. LAWS ch. 260, § 2 ..............................................................15

MASS. GEN. LAWS ch. 260, § 5A ............................................................15

Defendant the Whitehead Institute ("Whitehead") hereby opposes the motion for preliminary injunction filed by Plaintiffs Max-Planck-Gesellschaft zur Forderung der Wissenschaften E.V., Max-Planck-Innovation GmBH (collectively "Planck") and Alnylam Pharmaceuticals, Inc. ("Alnylam").

## INTRODUCTION

More than eight years ago, Whitehead and Planck agreed to prosecute the Tuschl I and Tuschl II patent applications on parallel tracks. Planck specifically agreed that Whitehead's Tuschl I applications could claim the priority date Plaintiffs now challenge and could contain the very information Plaintiffs now contend was misappropriated. The parties' agreement was documented in two separate agreements, both of which recited that the assignees of the Tuschl I applications owned the inventions described in those applications, which were to be prosecuted by Whitehead, and that Planck owned and would prosecute the Tuschl II applications.

Only much later, in late 2003, after another assignee of Tuschl I (University of Massachusetts ("UMass")) chose to pursue a unilateral licensing strategy which gave it and Planck conflicting incentives, did Planck begin to complain about the content of Tuschl I applications and its possible impact on Tuschl II. Whitehead was caught in the middle between the competing claims of UMass, on one hand, and Planck, on the other. In response, it has simply done what the parties' agreements entitle it – indeed, obligate it – to do: prosecute Tuschl I, in the form and manner to which Planck previously agreed.

Now, remarkably, more than eight years after it agreed that Tuschl I could include the relevant information and priority claims, after signing two contracts that expressly recite that the Tuschl I assignees own the applications that included that information, and after more than five years of debate among the parties, Planck has rushed to court seeking unprecedented relief on an emergency basis and claiming that the Tuschl I applicants misappropriated the information in the

1

Tuschl I applications.  Plaintiffs cannot succeed, under any legal theory, on that claim, or on the claim that Whitehead otherwise has a duty to remove the information in question from the Tuschl I applications.  Plaintiffs have not shown that any court has authority to grant such relief, and in any event Plaintiffs are not entitled to it because (among other reasons) (1) Planck agreed to the inclusion of the information; (2) it was proper to include the information; (3) removing the information would not solve Tuschl II's problems but would threaten severe and irreparable harm to Tuschl I; and (4) Planck has waited too long to bring its claims.

Moreover, Plaintiffs have failed to make out a case of imminent irreparable harm. Although Planck asserts that issuance of a Tuschl I patent is imminent and will inevitably lead to a rejection of Tuschl II, the reality is far less clear.  There is no certainty that issuance of a Tuschl I patent will result in rejection of all Tuschl II patent claims by the PTO; if Planck is correct that Tuschl II represents a distinct invention, a double-patenting rejection would be legally improper.  Even if the PTO rejects Tuschl II over Tuschl I, Planck can appeal to the Board of Patent Appeals, and then (if necessary) to the Federal Circuit.  Plaintiffs have no basis to ask this Court to interject itself into this situation now.

Finally, the balance of hardships here does not favor a preliminary injunction.  An injunction preventing Whitehead from paying the issuance fee on Tuschl I could cause the PTO to declare the patent abandoned.  Moreover, such an injunction could result in a Tuschl II patent issuing before Tuschl I, which would then raise a double-patenting problem for Tuschl I that could be impossible to overcome.  Thus, a preliminary injunction threatens to cause Whitehead irreparable harm.

## STATEMENT OF FACTS

### The Technology and the Patent Applications

In the nucleus of every human cell is found the nucleic acid DNA, which encodes our genes. In order for a gene to function, it is first copied into another nucleic acid called messenger RNA ("mRNA"). RNA Interference ("RNAi") is the concept that certain molecules of RNA turn off specifically targeted genes by interfering with their mRNA.[1]

In the late 1990s, four scientists – Phillip Zamore, Thomas Tuschl (both of whom were post-doctoral fellows at Whitehead), Phillip Sharp of MIT, and David Bartel of Whitehead – undertook important research in the field of RNAi. Declaration of Martin Mullins ("Mul.") ¶ 6; Declaration of Patricia Granahan ("Gran.") ¶ 4. These researchers ultimately produced groundbreaking results showing that double-stranded RNA ("dsRNA") is chopped to segments about 21-23 nucleotides long, and that these fragments direct targeted mRNA degradation. Mul. ¶¶ 6-7. This discovery had profound implications for research and for developing treatments for many of the most serious human diseases. Because an article describing this work was scheduled to appear in the prestigious scientific journal *Cell* on March 31, 2000, Whitehead decided to file a provisional patent application prior to that date. Gran. ¶ 5.

This application (the "Tuschl I First Provisional"), filed on March 30, 2000, was the first of what became known as the "Tuschl I" applications, which were assigned to Whitehead, MIT, UMass, and Planck. Gran. ¶ 5; Mul. ¶ 6-7. It broadly claimed "[i]solated RNA of from about 21 to 23 nucleotides which mediates RNA interference." Ex. 1 to Gran. Claim 1. It also

---

[1] For the Court's convenience, attached as an appendix hereto is a true and correct copy of an October 2, 2006 press release issued by The Nobel Assembly at Karolinska Institutet that provides helpful background information on RNAi.

specifically described and claimed the use of isolated RNA fragments to mediate RNAi in mammalian cells. Gran. ¶ 15.

At the time, it was known in the field that double-stranded RNA could have strands whose ends are aligned or strands with an "overhang" of nucleotides on one end (called the 3' end) or the other (called the 5' end). Gran. ¶ 27. The invention disclosed and claimed in the Tuschl I First Provisional was not limited to strands of RNA with any particular type of ends. *Id.*

After the initial work at Whitehead, Dr. Tuschl returned to Germany and performed additional work at Planck. Mul. ¶ 8. Some of Dr. Tuschl's subsequent work involved a particular species of short RNA molecules, specifically, double-stranded molecules with a 2-nucleotide overhang on the 3' ends of each of the dsRNA strands. *Id.* This work was published in January 2001. *Id.* Other subsequent work involved the use of short synthetic RNA molecules to mediate RNAi in mammalian cells. *Id.* This mammalian work was described in another article, published in May 2001. *Id.*

Unbeknownst to Whitehead, on December 1, 2000, Planck filed a European Patent Application ("the Tuschl II EPO application"), the first of what are known as the "Tuschl II" applications, which was assigned solely to Planck. Mul. ¶ 9; Gran. ¶ 20. This application described the additional work focused on the 3' overhang species of short RNA molecules, but it also broadly claimed an "[i]solated double-stranded RNA molecule, wherein each RNA strand has a length from 19-23 nucleotides, wherein said RNA molecule is capable of target-specific nucleic acid modifications." Mul. ¶ 9; Gran. ¶ 11. This broad claim clearly overlapped with the Tuschl I First Provisional application filed approximately eight months earlier. Gran. ¶ 12.

In March 2001, the Tuschl I applicants faced a deadline to turn their First Provisional application into a non-provisional application. *Id.* Patricia Granahan, an attorney representing

Whitehead, was responsible for preparing the non-provisional application and a corresponding

PCT application (the "'832 application" and the "Tuschl I PCT application," respectively). *Id.*

During this process, Ms. Granahan was provided with certain experimental data regarding

mammalian cells, which she understood had been generated by Dr. Tuschl after the filing of the

Tuschl I First Provisional application. *Id.* ¶ 14. Ms. Granahan believed that the mammalian data

provided additional support for the Tuschl I applications. *Id.* ¶ 16. Because she understood that

the data resulted from work at least partially funded by Planck, she contacted Planck to discuss

inclusion of the data in the Tuschl I applications' specifications. *Id.*

In her discussions with Planck, Ms. Granahan (and Whitehead) learned for the first time

about Planck's Tuschl II EPO application. Gran. ¶ 21; Mul. ¶ 10. She suggested that the Tuschl

I and Tuschl II applications be combined because they shared a common inventor and all were

related to isolated RNA molecules of 21-23 nucleotides that mediated RNAi. Gran. ¶ 22; Mul. ¶

10. Planck rejected this approach. *Id.* Dr. Wolfgang Weiss, representing Planck, suggested that,

instead of combining the applications, Whitehead and Planck prosecute them separately, but

claim priority to each other's applications. *Id.* Specifically, Dr. Weiss requested that the Tuschl

I PCT application would claim priority to the Tuschl II EPO application, and that the then-

contemplated Tuschl II PCT application, due to be filed on or before December 1, 2001, would

claim priority to the Tuschl I PCT application. *Id.* Whitehead agreed to this strategy, although it

did not believe that Tuschl I and Tuschl II necessarily were distinct inventions, since they clearly

overlapped. Gran. ¶¶ 12, 22; Mul. ¶ 10.

The content of the applications also was discussed. Gran. ¶ 17; Mul. ¶ 10. Dr. Weiss

told Ms. Granahan that Planck agreed that it was appropriate to include the mammalian data in

the specification of the Tuschl I PCT application. *Id.* That data appears in the Tuschl I PCT and

'832 applications in Example 5 and Figure 14 and its related discussion.  Gran. ¶ 17.  The

mammalian data in Example 5 and Figure 14 also contains a discussion of 2-nucleotide 3'

overhangs.  *Id.* ¶ 26.  Planck knew and agreed that it was appropriate to include that overhang

data in the Tuschl I PCT and '832 applications.  *Id.*

     Although Dr. Weiss now claims that he was unaware of the "nature of this new data"

that he agreed could be included in the Tuschl I applications, in fact, Dr. Weiss appears to have

been fully aware of it, because he caused the identical mammalian data to be included in a

provisional Tuschl II patent application that was filed on the same day that the Tuschl I PCT and

'832 applications were filed.  *Id.* ¶ 18.

     Ms. Granahan believed that it was appropriate to include additional description of

overhangs, including 3' overhangs, because that would provide additional support for the

invention of the Tuschl I applications.  *Id.* ¶¶ 27-29.  Indeed, because the overhang data may

have reflected the best mode of practicing the Tuschl I invention, its inclusion may have been

required.  Declaration of Kenneth J. Burchfiel ("Burch.") ¶¶ 14-28.  (For at least that reason,

removing that information from the applications now could endanger the patentability of Tuschl

I.  *Id.*)  The Federal Circuit has recognized, in a case involving remarkably similar facts, that it is

common and appropriate to include such best-mode information, even if the best mode was

generated by a different group of scientists.  *Id.* ¶¶ 18-20.  The case law also indicates that this

practice does not constitute double patenting, even though the inventive groups overlap.  *In re

Kaplan*, 789 F.2d 1574, 1577-78 (Fed. Cir. 1986); Burch. ¶¶ 20, 34-36.

     The (identical) Tuschl I PCT and '832 applications were filed on March 30, 2001, and

were assigned to MIT, UMass (where Dr. Zamore now worked), Planck, and Whitehead.  Gran.

¶¶ 2, 7; Mul. ¶ 7.  These applications were published, and thus became publicly available, in October 2001 and July 2002, respectively.  Gran. ¶ 9.

On April 10, 2001, Whitehead sent a copy of the Tuschl I '832 application to each of the inventors, including Dr. Tuschl, as well as to representatives of each of the assignees, including Planck.  *Id.* ¶ 8.  Although it received a copy of the complete Tuschl I PCT application, including Example 5 and Figure 14, Planck never communicated that it believed the inclusion of Example 5 and Figure 14 was improper until more than two years later.  *Id.* ¶ 19.  Similarly, Planck never communicated that it believed that the claim of priority in the Tuschl I PCT application was inappropriate until more than two years later.  *Id.* ¶ 24.  Nor did Planck communicate, until more than two years later, that it believed that information relating to 3' overhangs should not have been included in the application.  *Id.* ¶ 30.

## The Agreements Between the Four Institutions

On September 19, 2001, Whitehead, MIT, UMass, and Planck entered into a Joint Invention and Joint Marketing Agreement ("2001 Agreement").  Mul. ¶ 14.  Under this Agreement, Whitehead was responsible for managing the prosecution of the Tuschl I applications (referred to as the "Joint Invention" in the Agreement), and Planck had responsibility to prosecute the Tuschl II applications (referred to as the "MPG Invention" in the Agreement).  Mul. ¶¶ 15-16; Gran. ¶ 32.  The 2001 Agreement also provided that all parties would have "reasonable opportunities to advise" Whitehead with respect to prosecution, and that each would cooperate with Whitehead.  Ex. 5 to Mul. at 2.

The 2001 Agreement defined the Tuschl I invention – owned by Whitehead, MIT, UMass and Planck – as the invention "as described in" the Tuschl I '832 application, a second Tuschl I provisional application, and the Tuschl I PCT application, "and any divisionals, continuations, continuation-in-part applications directed to the same subject matter . . . ."  Mul. ¶ 24 and Ex. 5

to Mul. at 1.  It defined Tuschl II as the invention "referred to as the patent application [the Tuschl II EPO application] and any divisionals, continuations, continuation-in-part applications directed to the same subject matter . . . ."  Mul. ¶ 25 and Ex. 5 to Mul. at 1.

The 2001 Agreement does not reflect an agreement among the parties that the "invention" that is jointly owned by Whitehead, MIT, UMass and Max Planck and the "invention" that is solely owned by Planck constitute "distinct" inventions.  Mul. ¶ 27.  To the contrary, there was clearly overlap between Tuschl I and Tuschl II.  Mul. ¶ 26; Gran. ¶ 12.  The Agreement conclusively demonstrates, however, that Planck understood and agreed that the mammalian data and the description of 3' overhangs was properly included in the Tuschl I applications, since the Agreement recited that the assignees of Tuschl I own the subject matter described in specifically identified applications that contain that information.[2]  Mul. ¶ 24.

The 2001 Agreement provided that the patents for Tuschl I and Tuschl II "shall be licensed together as a single package" for research purposes.  Mul. ¶ 17.  MIT was appointed as the exclusive licensing agent for the sale of licenses to non-European companies for research purposes, and Planck was appointed as the exclusive agent to issue licenses to European companies for research purposes.  *Id.*  The Agreement included a revenue sharing arrangement that divided the licensing revenue amongst the four institutions and four inventors.  *Id.*  Licenses for therapeutic uses were not included.  *Id.*

Nearly two years later, on July 30, 2003, three of the four parties executed a Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes ("2003 Agreement").

---

[2] Plaintiffs assert that Whitehead admitted in a July 2005 submission to the PTO that the Tuschl I assignees do not own the "Tuschl II inventions" which they allege have been incorporated into Tuschl I applications.  That is an inaccurate description of the submission.  Declaration of Helen Lockhart ("Lock.") ¶¶ 5-16; Burch. ¶¶ 52-53.  Whitehead has not admitted that the overhang data included in the Tuschl I applications is a distinct or separate invention, nor has it admitted that it was improper to include that information in the Tuschl I applications.  *Id.*

Mul. ¶ 18. This Agreement specified that the Tuschl I and Tuschl II patents "shall be commercialized together as a single package" for therapeutic purposes, and it provided for a sharing of revenues among the three parties and four inventors. *Id.* It also provided that Whitehead would continue to be responsible for prosecuting Tuschl I, and Planck would continue to prosecute Tuschl II. Mul. ¶¶ 19-20; Gran. ¶ 33. Each party would have "a reasonable opportunity to comment and advise" on documents to be filed with the PTO, and Whitehead and Planck would "give good faith consideration" to such comments. Mul. ¶¶ 19-20.

Like the 2001 Agreement, the 2003 Agreement recited that Whitehead, MIT, UMass and Planck owned what was described in specific Tuschl I applications that included the mammalian data and overhang information. *Id.* ¶¶ 24, 28. Nearly two years had passed since the Tuschl I PCT application had been filed and sent to Planck, and Planck had had numerous opportunities to voice objection to the content of Tuschl I, but it never did so. *Id.* ¶ 31. Like the 2001 Agreement, the 2003 Agreement did not reflect an agreement that Tuschl I and Tuschl II were distinct inventions. *Id.* ¶ 27.

UMass declined to join in the 2003 Agreement and instead granted a license under its rights to Tuschl I for therapeutic purposes to Sirna Therapeutics, Inc., now a division of Merck & Co. ("Merck"), and a license for limited purposes to a company called CytRX (now RXi). *Id.* ¶ 21. The other three owners of Tuschl I – Whitehead, MIT, and Planck – granted a license for therapeutic purposes to Alnylam in December 2002, and to another entity that was eventually acquired by Alnylam. *Id.* ¶ 22. In exchange, Alnylam agreed to pay royalties to Planck, which, pursuant to the 2003 Agreement, is obligated to share this revenue among Planck, Whitehead, and MIT, which, in turn, share some of it with the inventors. *Id.*

**The Parties' Interests Diverge:  Alnylam / Planck vs. UMass and Its Licensees**

UMass's decision to not join in the 2003 Agreement and to instead grant a license to Merck created a situation where UMass's two therapeutic licensees have rights to the jointly-owned Tuschl I, and the other therapeutic licensee, Alnylam, has a license to both Tuschl I and the Planck-owned Tuschl II.  Mul. ¶ 39.  Because of this, the co-owners of Tuschl I have different incentives regarding prosecution of the Tuschl I applications.  *Id.* ¶ 41.  It was this development that led Planck to change its position and begin complaining about the manner in which Whitehead was prosecuting the Tuschl I applications, after more than two years of agreement.

Planck owns the largest shares of licensing revenue from, and of any equity granted by, Alnylam.  *Id.* ¶ 42.  It therefore has an incentive to broaden Tuschl II at the expense of Tuschl I, in order to place Alnylam (which pays royalties to Planck for therapeutic uses) at a competitive advantage over Merck (which does not).  *Id.*  On the other hand, UMass – which receives no royalties from Alnylam for therapeutic uses, but does receive license fees and royalties from Merck and RXi – has the opposite incentive.  *Id.* ¶ 44.  Therefore UMass and its licensees would benefit if broad claims issue from the Tuschl I applications and narrow (or no) claims issue from the Tuschl II applications.  *Id.*  The net result is that, since late 2003, there has been nearly continuous disagreement among the co-owners of Tuschl I.  *Id.* ¶ 47-48; Erselius Amend. Aff. ¶ 19.  Whitehead is thus caught in the middle between Planck and UMass.  Mul. ¶ 46.

Whitehead takes seriously its obligations under the 2001 and 2003 Agreements, and it has endeavored to maximize the lawful patent protection for Tuschl I, for the benefit of all of the co-owners of Tuschl I.  *Id.* ¶ 33.  It has kept all of the co-owners, including Planck and UMass, as well as Alnylam, reasonably informed about the prosecution of the Tuschl I applications.  *Id.*; Lock.  ¶ 3.  It has given all parties a reasonable opportunity to comment and advise on the

prosecution, and it has considered in good faith the comments and advice of Planck and Alnylam.  Mul. ¶ 33.

Despite the sharp disagreement between the parties, Whitehead has the ultimate responsibility under the parties' agreements to make the final decisions on prosecution of Tuschl I in good faith.  *Id.* ¶¶ 34, 46.  It has done so without regard for any impact, positive or negative, that its actions might have on patent protection for the Tuschl II applications.  *Id.* ¶ 35.  It therefore has declined to agree to Planck's demands that information be removed from the Tuschl I applications, because Planck agreed to the inclusion of that information, it was proper to include it, and removing it could endanger the patentability of Tuschl I.  *Id.* ¶ 36; Burch. ¶¶ 14-28, 65-67.  Whitehead has done so in good faith.  Mul. ¶ 37.

## The Current Status of the Applications

Although Plaintiffs assert that issuance of a Tuschl I patent is imminent, this is speculation.  Lock. ¶ 24.  Meanwhile, a number of Tuschl II applications have received rejections on numerous grounds, but Planck continues to argue against these rejections, and they could be withdrawn by the PTO.  Burch. ¶¶ 44-45, 48.  If Planck is correct that Tuschl II claims a distinct invention from Tuschl I, a double-patenting rejection is legally improper.  *Id.* ¶ 48.  The inclusion of information about overhangs in the Tuschl I application specifications (as opposed to in the claims) and the Tuschl I priority claim is irrelevant to the double-patenting analysis under Federal Circuit law.  *Id.* ¶¶ 32-38.  If the Examiner does not accept that argument, Planck can appeal to the Board of Patent Appeals or to a United States District Court, and from either of those, if necessary, to the Federal Circuit.  *Id.* ¶¶ 46-47.

However, Tuschl II has been provisionally rejected on double-patenting grounds not only on the basis of the overhang information in the specification of Tuschl I applications, but also because the Examiner has indicated that the invention claimed in Tuschl I inherently produces

molecules with overhangs. *Id.* ¶¶ 39-41. Accordingly, removal of the overhang information from the Tuschl I application specifications would not overcome the double-patenting rejection. *Id.* ¶¶ 42-43. Plaintiffs do not seek any relief in this Court that would resolve this second double-patenting rejection.

## ARGUMENT

The burden is on Plaintiffs to establish their right to a preliminary injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). In order to obtain the "extraordinary relief" of a preliminary injunction, *id.* at 1359, Plaintiffs must establish: "(1) reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest," *id.* at 1350. Here, all four factors militate strongly against issuance of the injunction.

## I.    THE COURT LACKS AUTHORITY TO GRANT THE RELIEF REQUESTED.

As an initial and dispositive matter, this Court lacks the authority to provide the relief plaintiffs seek – first, an order instructing Whitehead not to pay an issuance fee and, ultimately, an order requiring Whitehead to remove material from a patent application. Nothing in the patent statute authorizes intervention by courts in ongoing prosecution before the PTO, nor have plaintiffs proffered any case law suggesting that courts have such authority. The Federal Circuit repeatedly has reversed district courts that have tried to exert similar authority in analogous contexts. *See, e.g.*, *In re Continental General Tire, Inc.*, 81 F.3d 1089, 1092-93 (Fed. Cir. 1995) (granting mandamus and ordering the district court to vacate its order requiring Continental to file a request for reexamination, on the basis that federal courts do not have "a broad inherent power" that extends to compelling patentees to seek reexamination or reissue); *Emerson Elec.*

*Co. v. Davoil, Inc.*, 88 F.3d 1051, 1054 (Fed. Cir. 1996) (district court lacked statutory or inherent authority to direct patentee to file documents in a reexamination proceeding).

## II.     THERE IS NO SHOWING OF IMMINENT IRREPARABLE HARM.

Plaintiffs' assertion that a Tuschl I patent will issue imminently and that its issuance will bar subsequent Tuschl II patents is highly speculative.  Even if a Tuschl I patent issues, that will not necessarily be the death knell for Tuschl II applications.  Even if the PTO's provisional rejections on double-patenting grounds become final before the examiner, Planck would still have substantial additional avenues to challenge that ruling – including appeals to the Patent Board of Appeals, a federal district court, and the Federal Circuit.  Burch. ¶¶ 45-47.

There is good reason to believe that Planck would have substantial arguments against any rejection based on the inclusion of overhang data in Tuschl I or on Tuschl I's priority claim.  Double patenting turns on a comparison of claims with claims, not claims with specifications.  *Id.* ¶¶ 32, 37.  Thus, the content of the Tuschl I specifications should be irrelevant.[3]  *Id.* ¶¶ 36-37.  Presumably Planck recognized this when it agreed that information about overhangs should appear in Tuschl I applications in 2001.  In addition, the essence of the Tuschl II claims is the alleged discovery that RNA fragments with specific overhangs on their 3' ends are most effective at cleaving mRNA.  *Id.* ¶ 49.  If Planck is correct that this is a distinct invention that is not obvious over Tuschl I, this type of claim should be patentable.  *Id.* ¶¶ 48-49.  Only the PTO and the bodies that review its decisions can ultimately say whether Planck is correct.  There is no good reason for this Court to intervene now, while the PTO still has all the applications under advisement.

---

[3] For the same reason, granting Planck the relief it ultimately seeks – removal of the information from the Tuschl I specifications – should not affect whether it can obtain the claims it seeks.

III.    **PLAINTIFFS HAVE NO LIKELIHOOD OF SUCCESS ON THE MERITS.**

Plaintiffs are exceedingly unlikely to prevail on any of the four substantive claims

underlying their motion for preliminary injunction.[4]

   A.    **Plaintiffs' Claims Cannot Succeed Because Planck Agreed to the Inclusion of
         the Information; Inclusion of the Information Was Proper; Inclusion of the
         Information Does Not Affect Whether Tuschl II Is Patentable; and Plaintiffs
         Waited Too Long To Sue.**

Plaintiffs' claims fail for many reasons (*see* Sections III.B-E *infra*), but most

fundamentally because of four overarching realities.  First, Planck agreed to the inclusion of the

information at issue in the Tuschl I applications in March 2001 and for more than two years

thereafter, with full information as to the applications' content.  Gran. ¶¶ 17-18, 26, 30.

Whitehead reasonably relied on Planck's representation that it approved of Whitehead's course

of prosecution of the Tuschl I applications.  Under the equitable doctrines of both waiver and

estoppel, Planck is barred from asserting, years later, that the information should be removed

from the applications.  *See Di Marzo v. Am. Mut. Ins. Co.*, 449 N.E.2d 1189, 1206 (Mass. 1983);

*Boylston Dev. Group, Inc. v. 22 Boylston Street Corp.*, 591 N.E.2d 157, 163 (Mass. 1992).

Second, inclusion of the overhang information in the Tuschl I applications was proper to

support those applications, and it may well have been legally required.  *See* 35 U.S.C. §112

(specification "shall set forth the best mode contemplated by the inventor of carrying out his

invention"); *see also* Burch. ¶¶ 14-28.  This, along with Planck's agreement, refutes any claim

based on lack of good faith or unfairness.

---

[4] Plaintiffs also cite their claim for a declaratory judgment in support of the motion (Mem. at 16-
17), but where a party's substantive causes of action fail, a court ordinarily will not entertain its
related claim for declaratory relief.  *See, e.g.*, *Bowdoin Constr. Corp. v. R.I. Hosp. Trust Nat'l
Bank*, 869 F. Supp. 1004, 1010-11 (D. Mass. 1994).  In any event, a declaratory judgment is
merely a remedy, and entitlement to a declaration cannot support entry of a preliminary
injunction.

<u>Third</u>, the inclusion of the information and the priority claim is not relevant to double patenting under Federal Circuit law, *see In re Vogel*, 422 F.2d 438, 441 (C.C.P.A. 1970) (proper obviousness-type double patenting analysis compares *claims*, not *specification*, of application to invention disclosed and claimed in the patent); *Kaplan*, 789 F.2d at 1579 (same); Burch. ¶¶ 32-33, 36-38, and thus there is no proximate causal connection between that conduct and the harm of which Plaintiffs complain. Moreover, inclusion of that information is not the only basis on which the Tuschl II applications have been provisionally rejected, and thus granting the relief Plaintiffs seek would not solve their problem. Burch. ¶¶ 39-43.

<u>Fourth</u>, Planck knew that the Tuschl I applications contained the relevant information as early as 2001, Gran. ¶¶ 17-18, 26, 30, and by its own admission it began to complain about this fact in late 2003. Amend. Erselius Aff. ¶ 19. Yet Plaintiffs unaccountably waited until June 26, 2009 to file this lawsuit. To allow this case to proceed after such unreasonable delay would severely prejudice Whitehead. Plaintiffs should thus be barred from bringing any of their claims under the equitable doctrine of laches. *See K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989); *McLain v. City of Somerville*, 424 F. Supp. 2d 329, 336 (D. Mass. 2006). Separately and independently, the applicable statutes of limitations bar plaintiffs entirely from bringing their fiduciary duty and chapter 93A claims, and from bringing their breach of contract and breach of implied covenant of good faith and fair dealing claims to the extent that those claims are based on conduct before June 26, 2003. *See Lattuca v. Robsham*, 812 N.E.2d 877, 884 (Mass. 2004) (three-year statute of limitations for breach of fiduciary duty claims); MASS. GEN. LAWS ch. 260, § 5A (four-year statute of limitations for chapter 93A claims); MASS. GEN. LAWS ch. 260, § 2 (six-year statute of limitations for contract claims).

**B.     Plaintiffs Cannot Show a Breach of Contract That Proximately Caused Harm.**

To prevail on a claim of breach of contract, Plaintiffs must show, "at a minimum, that there was a valid contract, that [Whitehead] breached its duties under its contractual agreement, and that the breach caused [Planck] damage." *Guckenberger v. Boston Univ.*, 974 F. Supp. 106, 150 (D. Mass. 1997). Here, Planck can show neither breach nor proximate causation.

Plaintiffs allege that Whitehead breached purely procedural provisions that ultimately require only that Whitehead give good-faith consideration to Planck's "comments and advice" in prosecuting Tuschl I, Mem. at 12-13 – but there was no such breach. Planck's Dr. Erselius picks out one of many interactions between the parties (an April 2008 meeting) and asserts that Whitehead never provided a "substantive response" to its concerns. Amend. Erselius Aff. ¶ 22. But since that meeting Whitehead and Planck have had numerous communications in which Whitehead has responded to Planck's concerns in a good-faith effort to resolve the disagreements about how the Tuschl I applications should be prosecuted. Mul. ¶ 49. Planck makes much of a single instance in which Whitehead allegedly made a submission to the PTO on June 18, 2009, without consulting Planck. Mem. at 8. But in fact, Whitehead provided Planck with a draft of that submission. Lock. ¶ 19. The only portions of the submission that were not shown to Planck in advance either did not affect Tuschl II or were similar to other statements made by Whitehead in the past, to which Planck did not object. *Id.* ¶ 21.

Even if there were a breach, moreover, it did not proximately cause the harm of which Plaintiffs complain. Providing Planck with additional opportunity to offer "comments and advice" on the June 2009 submission would not have resulted in any change. Whitehead has known of Planck's position for more than five years. Whitehead had no contractual obligation to honor Planck's request that it alter important aspects of the Tuschl I applications, and it would

16

not have done so.  There was no lack of good faith in rejecting such "comments and advice" that directly contradicted Planck's earlier agreement.  (*See also* Section III.C. *infra*, addressing the covenant of good faith and fair dealing).

      **C.**    **Plaintiffs Cannot Show a Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Because Whitehead has unquestionably carried out the terms of the parties' agreements exactly as the parties agreed – by prosecuting the Tuschl I application according to the approach expressly agreed to by Planck – it has not breached the covenant of good faith and fair dealing. The covenant of good faith and fair dealing "is only as broad as the contract that governs the particular relationship." *Eigerman v. Putnam Investments, Inc.*, 877 N.E.2d 1258, 1264 (Mass. 2007) (quotation omitted).  "The covenant does not supply terms that the parties were free to negotiate, but did not." *Id.* (quotation omitted).  "[N]or does it create rights and duties not otherwise provided for in the contract." *Id.* (quotation omitted).  Thus, the covenant does not apply "where the defendant has exercised an express contractual power in good faith – that is, in a manner that comports with the parties' reasonable expectations as to performance." *Speakman v. Allmerica Financial Life Ins. & Annuity Co.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005).

Here, Whitehead has exercised an express contractual power – indeed, obligation – in good faith.  Planck could have negotiated for veto power over submissions to the PTO, but it did not.  No reasonable expectation on Planck's part has gone unmet; certainly Planck could not reasonably expect Whitehead to depart from prosecuting Tuschl I in the exact form Planck expressly agreed to on multiple occasions.  Planck has no right now to insist that Whitehead remove important parts of Tuschl I that Planck expressly agreed should be included.

"A duty of good faith does not mean that a party vested with a clear right is obligated to exercise that right to its own detriment for the purpose of benefiting another party to the

contract." E. Allan Farnsworth, II FARNSWORTH ON CONTRACTS § 7.17b at 399-400 (3d ed. 2004) (quotation omitted). Planck's position changed only after it and UMass came to have different incentives, and it now insists that Whitehead act detrimentally to its own interests (and the interests of the other Tuschl I assignees, including Planck) in favor of Tuschl II. The covenant of good faith and fair dealing does not require that. *See Mass. LNG Inc. v. Indus. Nat'l Leasing Corp.*, 8 Mass. L. Rptr. 604, 1998 WL 374930, at *5 (Mass. Super. Ct. July 1, 1998) ("[P]arties to a contract are generally entitled to act in their own interest in a way that may incidentally lessen the other party's anticipated fruits of the contract.") (citing *M/A-Com Security Corp. v. Galesi*, 904 F.2d 134 (2d Cir. 1990)).[5]

### D.    Plaintiffs Cannot Show a Breach of Fiduciary Duty.

Even assuming Whitehead owes Planck a fiduciary duty, Plaintiffs have no likelihood of success. Planck cannot prove that Whitehead breached any fiduciary duty because Whitehead has complied fully with the terms of the parties' agreements. Where the rights of a beneficiary arise under a contract, as here, "the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would otherwise govern." *See Chokel v. Genzyme Corp.*, 867 N.E.2d 325, 330-31 (Mass. 2007); *accord Knapp v. Neptune Towers Assocs.*, 892 N.E.2d 820, 824 (Mass. App. Ct. 2008). Any obligations the fiduciary owes "derive from and are limited by the terms agreed to" in the parties' contract. *Chokel*, 867 N.E.2d at 331. Thus, any duty here would be limited to the task contractually entrusted to Whitehead, namely, prosecuting Tuschl I to further the interests of Tuschl I's owners, including Planck. It would not encompass – and in fact would bar – acting to favor Tuschl II over Tuschl I. As described

---

[5] It is worth noting that Planck has not hesitated to prosecute Tuschl II in a manner that is harmful to Tuschl I. Mul. ¶ 38.

above, Whitehead has been faithful to the agreements and prosecuted the Tuschl I applications in
an appropriate manner, which was agreed to by Planck.

       **E.**       **Plaintiffs Cannot Prevail on Their Chapter 93A Claim.**

       Plaintiffs cannot prevail on their claim that Whitehead is in violation of chapter 93A of
the Massachusetts General Laws because it is well-established that 93A does not apply to
disputes between parties in the same venture. *Szalla v. Locke*, 657 N.E.2d 1267, 1269 (Mass.
1995). Here, the dispute is between parties that share an interest in prosecuting Tuschl I, which
they jointly own, and is thus outside the scope of 93A.

       In any event, Planck cannot establish that Whitehead has engaged in an "unfair" trade
practice as required by the statute. *See* MASS. GEN. LAWS ch. 93A, § 2; *see also PMP
Associates, Inc. v. Globe Newspaper Co.*, 321 N.E.2d 915, 917-18 (Mass. 1975) (describing
factors considered under 93A). Whitehead has fully and faithfully carried out its obligations
under both the 2001 and 2003 Agreements. It has kept Planck fully abreast of its actions in
prosecuting the Tuschl I applications before the PTO, and has given "good faith and
consideration to the comments and advice" of both Planck and Alnylam, as required by the
Agreements. Moreover, Whitehead's allegedly "unfair" conduct has caused Planck no injury,
and stands only a speculative chance of doing so in the future.

**IV.**       **THE BALANCE OF HARMS DOES NOT FAVOR AN INJUNCTION.**

       An injunction would cause Whitehead truly substantial harm, for multiple reasons. *See*
Burch. ¶¶ 58-67. First, Planck has requested an order "that no issuance fee shall be paid on any
Tuschl I application unless all co-assignees of the application agree that the fee shall be paid."
Mem. at 3. If no issuance fee is paid within three months from the date of mailing of a Notice of
Allowance, the application goes abandoned. 37 C.F.R. § 1.311; Burch. ¶ 59. The three-month
period is "not extendable." *Id*. If one of the Tuschl I applications goes abandoned, Whitehead

would be forced to re-file it, and in so doing would at least lose valuable time in the life of the

patent, and could lose all rights in the allowed subject matter.  Burch. ¶¶ 60-62.  Second, the

injunction may result in a Tuschl II application issuing prior to a Tuschl I application; because

the Tuschl II claims describe an embodiment within the scope of the generic Tuschl I claims, the

prior issuance of a Tuschl II patent could destroy the patentability of the Tuschl I applications.

*Id.* ¶ 63.

## V.    PUBLIC POLICY DOES NOT FAVOR AN INJUNCTION.

Public policy favors denial of Planck's motion because courts should not interfere with

pending decisions of administrative agencies such as the PTO.  *See Singer Co. v. P.R. Mallory &*

*Co.*, 671 F.2d 232, 236 (7th Cir. 1982) (district court's injunction of PTO from conducting a re-

exam was "contrary to public policy" because it sought "to interfere with the course of

administrative agency action"); *see also McKart v. United States*, 394 U.S. 185, 193 (1969)

("[S]ince agency decisions are frequently of a discretionary nature or frequently require

expertise, the agency should be given the first chance to exercise that discretion or to apply that

expertise.").

<u>**CONCLUSION**</u>

For the foregoing reasons, the Court should deny Max Planck's and Alnylam's Motions

for Temporary Restraining Order and Preliminary Injunction.


Dated: July 14, 2009


                                        Respectfully submitted,

                                        /s/  Christopher M. Morrison
                                        HANIFY & KING, P.C. (BBO 651335)
                                        One Beacon Street, 21st Floor
                                        Boston, MA  02108-3107
                                        (617) 226-3465

Glenn J. Pfadenhauer (*admitted pro hac vice*)
David C. Kiernan (*admitted pro hac vice*)
George A. Borden (BBO 552302)
Kendra P. Robins (*pro hac vice pending*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000

*Counsel for Defendant Whitehead Institute
for Biomedical Research*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 14, 2009.


/s/  Christopher M. Morrison

# APPENDIX







## The Nobel Prize in Physiology or Medicine 2006



English
Swedish

# Press Release

2 October 2006

The Nobel Assembly at Karolinska Institutet has today decided to award
The Nobel Prize in Physiology or Medicine for 2006 jointly to

**Andrew Z. Fire** and **Craig C. Mello**

for their discovery of **"RNA interference – gene silencing by double-stranded RNA"**

## Summary

This year's Nobel Laureates have discovered a fundamental mechanism for controlling the flow of genetic information. Our genome operates by sending instructions for the manufacture of proteins from DNA in the nucleus of the cell to the protein synthesizing machinery in the cytoplasm. These instructions are conveyed by messenger RNA (mRNA). In 1998, the American scientists Andrew Fire and Craig Mello published their discovery of a mechanism that can degrade mRNA from a specific gene. This mechanism, RNA interference, is activated when RNA molecules occur as double-stranded pairs in the cell. Double-stranded RNA activates biochemical machinery which degrades those mRNA molecules that carry a genetic code identical to that of the double-stranded RNA. When such mRNA molecules disappear, the corresponding gene is silenced and no protein of the encoded type is made.

RNA interference occurs in plants, animals, and humans. It is of great importance for the regulation of gene expression, participates in defense against viral infections, and keeps jumping genes under control. RNA interference is already being widely used in basic science as a method to study the function of genes and it may lead to novel therapies in the future.

## The flow of information in the cell: from DNA via mRNA to protein

The genetic code in DNA determines how proteins are built. The instructions contained in the DNA are copied to mRNA and subsequently used to synthesize proteins (Fig 1). This flow of genetic information from DNA via mRNA to protein has been termed the central dogma of molecular biology by the British Nobel Laureate Francis Crick. Proteins are involved in all processes of life, for instance as enzymes digesting our food, receptors receiving signals in the brain, and as antibodies defending us against bacteria.

Our genome consists of approximately 30,000 genes. However, only a fraction of them are

used in each cell. Which genes are expressed (*i.e.* govern the synthesis of new proteins) is controlled by the machinery that copies DNA to mRNA in a process called transcription. It, in turn, can be modulated by various factors. The fundamental principles for the regulation of gene expression were identified more than 40 years ago by the French Nobel Laureates François Jacob and Jacques Monod. Today, we know that similar principles operate throughout evolution, from bacteria to humans. They also form the basis for gene technology, in which a DNA sequence is introduced into a cell to produce new protein.

Around 1990, molecular biologists obtained a number of unexpected results that were difficult to explain. The most striking effects were observed by plant biologists who were trying to increase the colour intensity of the petals in petunias by introducing a gene inducing the formation of red pigment in the flowers. But instead of intensifying the colour, this treatment led to a complete loss of colour and the petals turned white! The mechanism causing these effects remained enigmatic until Fire and Mello made the discovery for which they receive this year's Nobel Prize.

## The discovery of RNA interference

Andrew Fire and Craig Mello were investigating how gene expression is regulated in the nematode worm *Caenorhabditis elegans* (Fig. 2). Injecting mRNA molecules encoding a muscle protein led to no changes in the behaviour of the worms. The genetic code in mRNA is described as being the 'sense' sequence, and injecting 'antisense' RNA, which can pair with the mRNA, also had no effect. But when Fire and Mello injected sense and antisense RNA together, they observed that the worms displayed peculiar, twitching movements. Similar movements were seen in worms that completely lacked a functioning gene for the muscle protein. What had happened?

When sense and antisense RNA molecules meet, they bind to each other and form double-stranded RNA. Could it be that such a double-stranded RNA molecule silences the gene carrying the same code as this particular RNA? Fire and Mello tested this hypothesis by injecting double-stranded RNA molecules containing the genetic codes for several other worm proteins. In every experiment, injection of double-stranded RNA carrying a genetic code led to silencing of the gene containing that particular code. The protein encoded by that gene was no longer formed.

After a series of simple but elegant experiments, Fire and Mello deduced that double-stranded RNA can silence genes, that this RNA interference is specific for the gene whose code matches that of the injected RNA molecule, and that RNA interference can spread between cells and even be inherited. It was enough to inject tiny amounts of double-stranded RNA to achieve an effect, and Fire and Mello therefore proposed that RNA interference (now commonly abbreviated to RNAi) is a catalytic process.

Fire and Mello published their findings in the journal *Nature* on February 19, 1998. Their discovery clarified many confusing and contradictory experimental observations and revealed a natural mechanism for controlling the flow of genetic information. This heralded the start of a new research field.

## The RNA interference machinery is unraveled

The components of the RNAi machinery were identified during the following years (Fig 3). Double-stranded RNA binds to a protein complex, Dicer, which cleaves it into fragments. Another protein complex, RISC, binds these fragments. One of the RNA strands is eliminated but the other remains bound to the RISC complex and serves as a probe to detect mRNA molecules. When an mRNA molecule can pair with the RNA fragment on RISC, it is bound to the RISC complex, cleaved and degraded. The gene served by this particular mRNA has been

silenced.

## RNA interference – a defense against viruses and jumping genes

RNA interference is important in the defense against viruses, particularly in lower organisms. Many viruses have a genetic code that contains double-stranded RNA. When such a virus infects a cell, it injects its RNA molecule, which immediately binds to Dicer (Fig 4A). The RISC complex is activated, viral RNA is degraded, and the cell survives the infection. In addition to this defense, higher organisms such as man have developed an efficient immune defense involving antibodies, killer cells, and interferons.

Jumping genes, also known as transposons, are DNA sequences that can move around in the genome. They are present in all organisms and can cause damage if they end up in the wrong place. Many transposons operate by copying their DNA to RNA, which is then reverse-transcribed back to DNA and inserted at another site in the genome. Part of this RNA molecule is often double-stranded and can be targeted by RNA interference. In this way, RNA interference protects the genome against transposons.

## RNA interference regulates gene expression

RNA interference is used to regulate gene expression in the cells of humans as well as worms (Fig 4B). Hundreds of genes in our genome encode small RNA molecules called microRNAs. They contain pieces of the code of other genes. Such a microRNA molecule can form a double-stranded structure and activate the RNA interference machinery to block protein synthesis. The expression of that particular gene is silenced. We now understand that genetic regulation by microRNAs plays an important role in the development of the organism and the control of cellular functions.

## New opportunities in biomedical research, gene technology and health care

RNA interference opens up exciting possibilities for use in gene technology. Double-stranded RNA molecules have been designed to activate the silencing of specific genes in humans, animals or plants (Fig 4C). Such silencing RNA molecules are introduced into the cell and activate the RNA interference machinery to break down mRNA with an identical code.

This method has already become an important research tool in biology and biomedicine. In the future, it is hoped that it will be used in many disciplines including clinical medicine and agriculture. Several recent publications show successful gene silencing in human cells and experimental animals. For instance, a gene causing high blood cholesterol levels was recently shown to be silenced by treating animals with silencing RNA. Plans are underway to develop silencing RNA as a treatment for virus infections, cardiovascular diseases, cancer, endocrine disorders and several other conditions.

**Reference:**
Fire A., Xu S.Q., Montgomery M.K., Kostas S.A., Driver S.E., Mello C.C. Potent and specific genetic interference by double-stranded RNA in *Caenorhabditis elegans*. Nature 1998; 391:806-811.

**Andrew Z. Fire**, born 1959, US citizen, PhD in Biology 1983, Massachusetts Institute of Technology, Cambridge, MA, USA. Professor of Pathology and Genetics, Stanford University School of Medicine, Stanford, CA, USA.

**Craig C. Mello**, born 1960, US citizen, PhD in Biology 1990, Harvard University, Boston, MA, USA. Professor of Molecular Medicine and Howard Hughes Medical Institute Investigator, Program in Molecular Medicine, University of Massachusetts Medical School, Worcester, MA, USA.



Case 1:09-cv-11116-PBS     Document 30     Filed 07/14/2009     Page 32 of 32

High resolution image (pdf 2,5 Mb) »