**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN E.V., a corporation organized under the laws of Germany; et al., <br><br> Plaintiffs, <br><br> v. <br><br> WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation; et al., <br><br> Defendants. | Civil Action No. 1:09-cv-11116-PBS <br><br> **JURY TRIAL REQUESTED AS TO ALL COUNTERCLAIMS** |

## DEFENDANT WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH'S ANSWER AND COUNTERCLAIMS TO THE COMPLAINT

Defendant Whitehead Institute for Biomedical Research ("Whitehead"), having its principal place of business at Nine Cambridge Center, Cambridge, Massachusetts, hereby answers and counterclaims as follows:

1.     To the extent that Paragraph 1 describes Plaintiffs' action, no response is required. In all other respects, Paragraph 1 is denied.

2.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 2 of the Complaint.

3.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 3 of the Complaint.

4.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 4 of the Complaint.

5.     Whitehead admits that it is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.

6.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6 of the Complaint.

7.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7 of the Complaint.

8.     Paragraph 8 of the Complaint states a legal conclusion to which no response is required.  To the extent that a response is required, Whitehead admits that this Court has personal jurisdiction over Whitehead.

9.     Paragraph 9 of the Complaint states a legal conclusion to which no response is required.  To the extent that a response is required, Whitehead admits that venue for this action is proper in this Court under 28 U.S.C. § 1391.

10.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 10 of the Complaint.

11.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 of the Complaint.

12.     Whitehead admits that Thomas Tuschl, Phillip Sharp, Philip Zamore, and David Bartel collaborated on research that yielded groundbreaking inventions in the field of RNA interference ("RNAi").  Whitehead admits that these persons developed a series of inventions and proprietary technologies now known as the "Tuschl I inventions."  Whitehead admits that Tuschl performed work at Whitehead and assigned his interest in Tuschl I to Whitehead and Max Planck; that Sharp assigned his interest in Tuschl I to MIT; that Bartel assigned his interest in Tuschl I to Whitehead; and that Zamore assigned his interest in Tuschl I

2

to the University of Massachusetts (UMass).  Whitehead denies that Sharp assigned his interest in Tuschl I to Whitehead.  Whitehead denies that Bartel assigned his interest in Tuschl I to MIT. Whitehead is without knowledge or information sufficient to form a belief as to the truth of the other allegations set forth in paragraph 12 of the Complaint.

13.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the Complaint.  Paragraph 13 also states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 13 of the Complaint are denied.

14.    Whitehead admits that Max Planck, Max-Planck Innovation, Whitehead, MIT, and UMass entered into a Joint Invention and Joint Marketing Agreement (the so-called "Old Agreement") on or about September 19, 2001.  The "Old Agreement" speaks for itself. Whitehead denies any and all other allegations set forth in paragraph 14 of the Complaint.

15.    Whitehead admits that the "Old Agreement" provides that Whitehead has primary responsibility for securing patent protection for the Tuschl I inventions, subject to the right of the other co-owners to offer advice and comments.  Whitehead admits that the "OId Agreement" provides that Max Planck authorizes Max-Planck-Innovation to act as its sole and exclusive agent for licensing purposes.  Whitehead denies any and all other allegations set forth in paragraph 15 of the Complaint

16.    Whitehead admits that the "Old Agreement" provides that:  "Whitehead shall manage the patent filing, prosecution and maintenance of the [Tuschl I invention].  MIT, U. Mass., and MPG [Max Planck] will be copied on all patent correspondence.  The prosecution, filing and maintenance of all [Tuschl I invention] patent applications and patents will be the primary responsibility of Whitehead; provided, however, MIT, U. Mass, and MPG will have

reasonable opportunities to advise Whitehead and will cooperate with Whitehead in such prosecution, filing and maintenance."

17.    Whitehead admits that Max Planck, Max-Planck Innovation, Whitehead, and MIT entered into a Joint Invention and Joint Marketing Agreement (the so-called "Therapeutic Use Agreement") on or about July 30, 2003.  The "Therapeutic Use Agreement" speaks for itself.  Whitehead denies any and all other allegations set forth in paragraph 17 of the Complaint.

18.    Whitehead admits that the "Therapeutic Use Agreement" provides that Whitehead has primary responsibility for the filing of patent applications based on the Tuschl I inventions, subject to the right of the other co-owners to offer advice and comments.  Whitehead admits that the "Therapeutic Use Agreement" provides that Max Planck authorizes Max-Planck-Innovation to act as its sole and exclusive agent for licensing purposes.  Whitehead admits that the "Therapeutic Use Agreement" provides that Max Planck, Whitehead, and MIT jointly authorize Max-Planck-Innovation to grant two non-exclusive licenses to their ownership interests in the Tuschl I inventions for therapeutic purposes.  Whitehead admits that UMass did not enter into the "Therapeutic Use Agreement."  Whitehead denies any and all other allegations set forth in paragraph 18 of the Complaint.

19.    Whitehead admits that the "Therapeutic Use Agreement" provides that the filing of patent applications based on the Tuschl I inventions "shall be managed by and be the primary responsibility of Whitehead.'  Whitehead admits that the "Therapeutic Use Agreement" provides that: "Whitehead shall (i) keep the Remaining Joint Owners and the Therapeutic Licensees reasonably informed as to the filing, prosecution, maintenance and abandonment of the Remaining Joint Invention, (ii) furnish the Remaining Joint Owners and the Therapeutic

Licensees copies of documents relevant to any such filing, prosecution, maintenance and abandonment, and (iii) allow the Remaining Joint Owners and the Therapeutic Licensees reasonable opportunity to comment and advise on patent attorneys to be used and on documents to be filed with any patent office which would affect the Remaining Joint Invention, and (iv) give good faith consideration to the comments and advice of the Remaining Joint Owners and the Therapeutic Licensees."

20.    Whitehead admits that on or about December 20, 2002, Max-Planck-Innovation, on behalf of Max Planck, entered into a co-exclusive license agreement with Alnylam relating to the Tuschl I inventions.  With respect to the second sentence of paragraph 20, the "Therapeutic Use Agreement" speaks for itself.  Whitehead denies any and all other allegations set forth in paragraph 20 of the Complaint.

21.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21 of the Complaint.

22.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 22 of the Complaint.

23.    Whitehead admits that UMass licensed its property rights in the Tuschl I inventions to companies other than Alnylam.  Whitehead denies that any Defendant misappropriated anything.  The remainder of paragraph 23 states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 23 of the Complaint are denied.

24.    The allegations in paragraph 24 of the Complaint are denied.

25.    The allegations in paragraph 25 of the Complaint are denied.

26.    The allegations in paragraph 26 of the Complaint are denied.

27.     The allegations in paragraph 27 of the Complaint are denied.

28.     The allegations in paragraph 28 of the Complaint are denied.

29.     The allegations in paragraph 29 of the Complaint are denied.

30.     Whitehead admits that Plaintiffs have complained about the inclusion of certain information in the body of the Tuschl I patent applications.  All other allegations in paragraph 30 of the Complaint are denied.

31.     The allegations in paragraph 31 of the Complaint are denied.

32.     The allegations in paragraph 32 of the Complaint are denied.

33.     The allegations in paragraph 33 of the Complaint are denied.

34.     Whitehead incorporates each of the preceding paragraphs 1 to 33 as if fully set forth herein.

35.     Whitehead admits that a written contract, the so-called "Old Agreement," exists between Garching Innovation GmbH, the asserted predecessor of Max-Planck-Innovation and agent of Max-Planck, Whitehead, MIT and U Mass.

36.     Whitehead admits that a written contract, the so-called "Therapeutic Use Agreement," exists between Garching Innovation GmbH, the asserted predecessor of Max-Planck-Innovation and agent of Max-Planck, Whitehead and MIT.

37.     The allegations in paragraph 37 of the Complaint are denied.

38.     The allegations in paragraph 38 of the Complaint are denied.

39.     The allegations in paragraph 39 of the Complaint are denied.

40.     Whitehead incorporates each of the preceding paragraphs 1 to 39 as if fully set forth herein.

41.     Paragraph 41 of the Complaint states a legal conclusion to which no response is required.

42.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 42 of the Complaint.

43.     The allegations in paragraph 43 of the Complaint are denied.

44.     The allegations in paragraph 44 of the Complaint are denied.

45.     Whitehead incorporates each of the preceding paragraphs 1 to 44 as if fully set forth herein.

46.     Paragraph 46 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 46 are denied.

47.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 47 of the Complaint.  Paragraph 47 also states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 47 of the Complaint are denied.

48.     The allegations in paragraph 48 of the Complaint are denied.

49.     The allegations in paragraph 49 of the Complaint are denied.

50.     The allegations in paragraph 50 of the Complaint are denied.

51.     The allegations in paragraph 51 of the Complaint are denied.

52.     Whitehead incorporates each of the preceding paragraphs 1 to 51 as if fully set forth herein.

53.     Paragraph 53 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 53 are denied.

54.     The allegations in paragraph 54 of the Complaint are denied.

55.     The allegations in paragraph 55 of the Complaint are denied.

56.     The allegations in paragraph 56 of the Complaint are denied.

57.     The allegations in paragraph 57 of the Complaint are denied.

58.     Whitehead incorporates each of the preceding paragraphs 1 to 57 as if fully set forth herein.

59.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 59 of the Complaint.  Paragraph 59 also states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 59 of the Complaint are denied.

60.     Whitehead admits that it is aware that plaintiffs have licensed the Tuschl II applications to Alnylam and Ribopharma AG.   To the extent a further response is required, the allegations of paragraph 60 of the Complaint are denied.

61.     The allegations in paragraph 61 of the Complaint are denied.

62.     The allegations in paragraph 62 of the Complaint are denied.

63.     Whitehead incorporates each of the preceding paragraphs 1 to 62 as if fully set forth herein.

64.     The allegations in paragraph 64 of the Complaint are denied.

65.     The allegations in paragraph 65 of the Complaint are denied.

66.     The allegations in paragraph 66 of the Complaint are denied.

67.     Whitehead incorporates each of the preceding paragraphs 1 to 66 as if fully set forth herein.

68.     Paragraph 68 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 68 are denied.

69.     The allegations in paragraph 69 of the Complaint are denied.

70.     The allegations in paragraph 70 of the Complaint are denied.

71.     The allegations in paragraph 71 of the Complaint are denied.

72.     Whitehead incorporates each of the preceding paragraphs 1 to 71 as if fully set forth herein.

73.     Paragraph 73 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 73 are denied.

74.     The allegations in paragraph 74 of the Complaint are denied.

75.     The allegations in paragraph 75 of the Complaint are denied.

76.     Whitehead incorporates each of the preceding paragraphs 1 to 75 as if fully set forth herein.

77.     Paragraph 77 of the Complaint states legal conclusions to which no response is required.  To the extent a response is required, the allegations in paragraph 77 are denied.

78.     The allegations in paragraph 78 of the Complaint are denied.

79.     The allegations in paragraph 79 of the Complaint are denied.

80.    The "WHEREFORE" paragraph following paragraph 79 of the Complaint and the eight lettered paragraphs that follow it state Plaintiffs' prayer for relief, to which no response is required.  To the extent a response is required to the "WHEREFORE" paragraph following paragraph 79 of the Complaint and the eight lettered paragraphs that follow it, Whitehead denies the allegations set forth in those paragraphs and denies that Plaintiffs are entitled to any of the relief requested therein, or to any relief whatsoever.

81.    Any allegation of the Complaint not expressly admitted herein is hereby denied.

Whitehead sets forth the following affirmative and other defenses.  Whitehead does not intend hereby to assume the burden of proof with respect to those matters as to which, pursuant to law, Plaintiffs bear the burden.

## First Defense

The Complaint fails to state a claim upon which relief may be granted.

## Second Defense

Plaintiffs' claims are barred in whole or in part by the applicable statutes of limitations.

## Third Defense

Plaintiffs' claims are barred by the doctrines of waiver and estoppel.

## Fourth Defense

Plaintiffs' equitable claims are barred by laches.

## Fifth Defense

Plaintiffs' equitable claims are barred by unclean hands.

**Sixth Defense**

This Court lacks the authority to grant the injunctive relief sought by Plaintiffs because the Court is barred from intervening in an ongoing patent prosecution before the U.S. Patent and Trademark Office.

**Seventh Defense**

Plaintiffs' claims are barred by the doctrine of ripeness.

**Eighth Defense**

Plaintiffs' Chapter 93A claims are barred because Whitehead and Plaintiffs were involved in the same venture.

**Ninth Defense**

Plaintiffs' claims are preempted by federal law.

**Tenth Defense**

Plaintiff Alnylam lacks standing to sue.

**Eleventh Defense**

Plaintiffs' claims fail in whole or in part for lack of proximate cause.

**Twelfth Defense**

Plaintiffs' claims fail for lack of cognizable damages.

**Thirteenth Defense**

Plaintiff's Negligence claims are barred by the economic loss doctrine.

**Fourteenth Defense**

Plaintiffs' claims are barred by the doctrine of exhaustion of administrative remedies.

**Fifteenth Defense**

Some or all of Max Planck's claims for damages may be barred by contractual limitations on recoverable damages in both the 2001 Agreement and the 2003 Agreement.

**COUNTERCLAIMS**

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant the Whitehead Institute for Biomedical Research ("Whitehead") asserts the following counterclaims as Counterclaim Plaintiff against Plaintiffs Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V., Max-Planck-Innovation GmbH and Alnylam Pharmaceuticals, Inc. as Counterclaim Defendants. Whitehead alleges as follows:

**Parties**

1.    Counterclaim-Plaintiff Whitehead is a Delaware corporation having its principal place of business at Nine Cambridge Center, Cambridge, Massachusetts.

2.    Counterclaim-Defendant Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. is, upon information and belief, a corporation duly organized and existing under the laws of Germany and having its principal place of business at Hofgartenstrasse 8, 80539 Muenchen, Germany.

3.    Counterclaim-Defendant Max-Planck-Innovation GmbH, formerly known as Garching Innovation GmbH, is, upon information and belief, a corporation duly organized and existing under the laws of Germany and having its principal place of business at Hofgartenstrasse 8, 80539 Muenchen, Germany. Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. and Max-Planck-Innovation GmbH are jointly referred to as "Max Planck."

4.    Counterclaim-Defendant Alnylam Pharmaceuticals, Inc. ("Alnylam") is, upon information and belief, a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

## Jurisdiction and Venue

5.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367, and the patent laws of the United States, including Title 35 of the United States Code.

6.    This Court has personal jurisdiction over Max Planck on the basis of, inter alia, its contacts with Massachusetts relating to the subject matter of this action, including having filed suit.

7.    Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## Background

### The Technology and the Patent Applications

8.    The Whitehead Institute is a leading, non-profit research and educational institution that has defined the cutting edge of biomedical science, creating a legacy of research excellence and academic eminence since 1982.  Whitehead shares a teaching affiliation with the Massachusetts Institute of Technology ("MIT") and provides scientists with the resources and freedom to follow their scientific curiosity, form novel collaborations and conduct ground-breaking research.  While probing basic biological processes, 14 faculty members and 5 fellows develop innovative technologies and lay the foundation for projects that improve human health. They run pioneering programs in cancer research, immunology, developmental biology, stem cell research, regenerative medicine, genetics and genomics — programs with a record of success.

9.      In 1990, the Institute for Scientific Information in Philadelphia identified Whitehead as the top research institution in the world in molecular biology and genetics based on the impact of its scientific publications.  Science Watch ranked Molecular Biology and Genetics Research at Institutions from 2002-2006 (based on citations in high impact journals only, e.g., *Cell*, *Nature*, *Science*): (1) Howard Hughes Medical Institute (2) Harvard University (3) MIT (4) Whitehead Institute.  Whitehead has emerged as a major force in fields ranging from cancer research to transgenic science.  Whitehead scientists shaped the emerging field of genomics by making the single largest contribution to the Human Genome Project.

10.     In the late 1990s, four scientists – Phillip Zamore, Thomas Tuschl (both of whom were post-doctoral fellows at Whitehead), Phillip Sharp of MIT, and David Bartel of Whitehead – undertook important research in the field of RNA Interference ("RNAi").  RNAi is the concept that certain molecules of the nucleic acid RNA turn off specifically targeted genes by interfering with their messenger RNA, which is essential for genes to function.  These researchers ultimately produced groundbreaking results showing that double-stranded RNA ("dsRNA") is chopped to segments about 21-23 nucleotides long, and that these fragments direct targeted mRNA degradation.  This discovery had profound implications for research and for developing treatments for many of the most serious human diseases.

11.     This research formed the basis for a series of patent applications, which became known as the "Tuschl I" applications, relating to isolated RNA molecules of about 21 to about 23 nucleotides in length that mediate RNAi.  Because of funding sources and other affiliations, the four scientists – Dr. Tuschl, Dr. Sharp, Dr. Zamore and Dr. Bartel – assigned their interests in the applications to Max Planck and Whitehead, MIT, UMass, and Whitehead, respectively.  By

virtue of the inventors' assignment, the Tuschl I applications are jointly owned by Whitehead, MIT, UMass, and Max Planck, who share an equal and undivided interest in the applications.

### The Agreements Between the Four Institutions

12.    On September 19, 2001, Whitehead, MIT, UMass, and Max Planck entered into a Joint Invention and Joint Marketing Agreement ("2001 Agreement") (referred to in the Complaint as the "Old Agreement").  Under this Agreement, Whitehead was responsible for managing the prosecution of the Tuschl I applications (referred to as the "Joint Invention" in the Agreement) on behalf of all four institutions, and Max Planck had responsibility to prosecute, through its licensing agent, the Tuschl II applications (referred to as the "MPG Invention" in the Agreement).  Max Planck is referred to as "MPG" in this Agreement.  The Agreement states:

> 1.  Patent Management
>
> (a)    WHITEHEAD shall manage the patent filing, prosecution and maintenance of the JOINT INVENTION.  M.I.T., UMASS and MPG will be copied on all patent correspondence.  The prosecution, filing and maintenance of all JOINT INVENTION patent applications and patents will be the primary responsibility of WHITEHEAD; provided, however, M.I.T., UMASS and MPG will have reasonable opportunities to advise WHITEHEAD and will cooperate with WHITEHEAD in such prosecution, filing and maintenance.

13.    The 2001 Agreement also provided that all parties, including Max Planck, would "cooperate" with Whitehead in the "prosecution, filing and maintenance" of the Tuschl I applications.  *Id.*

14.    On July 30, 2003, three of the four parties – Whitehead, MIT, and Max Planck – executed a Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes ("2003 Agreement") (referred to in the Complaint as the "Therapeutic Use Agreement").  This Agreement also provided that Whitehead would continue to be responsible for prosecuting

Tuschl I (referred to as the "REMAINING JOINT INVENTION" in the Agreement) on behalf of the three parties (in addition to UMass), and that Max Planck, through its licensing agent, would continue to prosecute Tuschl II: "The patent filing, prosecution and maintenance of the REMAINING JOINT INVENTION shall be managed by and be the primary responsibility of WHITEHEAD."

15.    The 2003 Agreement also provided that each party would have "a reasonable opportunity to comment and advise on the patent attorneys to be used and on documents to be filed" with the PTO pertaining to the Tuschl I applications, and that Whitehead would "give good faith consideration" to such "comments and advice." *Id.*

### Max Planck's Petition to Revoke Power of Attorney

16.    On July 20, 2009, Max Planck filed a Petition to Revoke Power of Attorney under 37 C.F.R. § 1.36(a) with the USPTO in the pending Tuschl I patent applications.  In those petitions, Max Planck requested "that the [USPTO] revoke the current Power of Attorney from [Max Planck], and authorize new counsel to represent [Max Planck's] interests."  Petition to Revoke Power of Attorney in U.S. Patent Application Ser. No. 09/821,832, attached as Exhibit 1 to Supplemental Burchfiel Declaration (filed July 28, 2009), at 2; Petition to Revoke Power of Attorney in U.S. Patent Application Ser. No. 10/255,568, attached as Exhibit 2 to Supplemental Burchfiel Declaration (filed July 28, 2009), at 2.

17.    If these petitions are granted, Whitehead's chosen patent attorneys for the Tuschl I patent prosecutions, Wolf Greenfield, would no longer be able to manage the patent filing, prosecution and maintenance of these applications in accordance with the 2001 Agreement and 2003 Agreement.

18.    Max Planck's attempt to revoke its power of attorney breaches the 2001 Agreement and 2003 Agreement because it violates Max Planck's obligation to allow Whitehead to "manage" the "prosecution, filing and maintenance" of the Tuschl I applications and to "cooperate with WHITEHEAD in such prosecution, filing and maintenance." Rejecting Whitehead's choice of patent attorneys is a complete repudiation of Max Planck's duty of cooperation vis a vis the Tuschl I patent prosecutions.

19.    Under both the 2001 Agreement and the 2003 Agreement, Whitehead retains "primary responsibility" for prosecuting the Tuschl I patents, which includes the selection of "patent attorneys to be used," subject only to the requirement that it give "good faith consideration" to the advice of the other owners. Max Planck's decision to attempt to unilaterally change prosecution counsel for the Tuschl I applications represents a breach of the 2001 and 2003 Agreements.

20.    As a result of Max Planck's petitions to revoke its power of attorney on the Tuschl I patents, Whitehead has incurred and continues to incur additional fees, costs and delays associated with the prosecution of those patents.

**Max Planck's Refusal to Sign A Terminal Disclaimer**

21.    On or about December 18, 2008, the United States Patent and Trademark Office ("PTO") issued an Office Action on Tuschl I Application No. 10/255,568 containing provisional non-statutory obviousness-type double patenting rejections of certain claims in that Application over claims filed in co-pending Tuschl I Applications, including Application No. 09/821,832.

22.    Because there is complete identity among the owners of the Tuschl I applications, the PTO indicated that the objection could be overcome via a terminal disclaimer signed by all

four owners of the Tuschl I patents.  MIT and UMass agreed to and signed the terminal

disclaimers.

23.    On January 21, 2009 and again on March 6, 2009 and on May 21, 2009, as well as

in a conference call, attorneys at Wolf Greenfield sought a terminal disclaimer from counsel for

Max Planck on Application No. 10/255,568, to no avail.

24.    The failure to consent to the terminal disclaimer was and is (i) a breach of Max

Planck's obligations under the 2001 Agreement and 2003 Agreement to "cooperate" with

Whitehead in the prosecution of the Tuschl I patents, and (ii) a cessation of prosecution and/or

abandonment of the Tuschl I applications pursuant to paragraph 3(b) of the 2001 Agreement and

paragraph 2(b) of the 2003 Agreement.

## First Counterclaim

### (Breach of Contract Against Max Planck)

25.    Whitehead repeats and realleges each of the allegations contained in Counterclaim

paragraphs 1 through 24 as if fully set forth herein.

26.    The 2001 Agreement was a binding, enforceable contract between Whitehead and

Max Planck, and remains in effect.

27.    The 2003 Agreement was a binding, enforceable contract between Whitehead and

Max Planck, and remains in effect.

28.    Whitehead began to perform, performed, and at all times stood and stands ready

to further perform its obligations under both the 2001 Agreement and the 2003 Agreement.

29.    Max Planck accepted Whitehead's performance under the 2001 Agreement and

2003 Agreement.

30. Counterclaim-Defendant Max Planck breached both the 2001 Agreement and the 2003 Agreement:

(a) By filing, on July 20, 2009, a Petition to Revoke Power of Attorney under 37 C.F.R. § 1.36(a) with the PTO in the pending Tuschl I patent applications.

(b) By refusing, in January 2009 and again in March 2009 and May 2009, to consent to the filing of a terminal disclaimer with respect to co-pending Tuschl I patent applications, including Application No. 10/255,568.

31. As a direct and proximate result of these breaches, Whitehead has been, and continues to be, harmed by, among other things, additional fees, costs and delays associated with the prosecution of the Tuschl I patents.

## Second Counterclaim

### (Breach of Implied Covenant of Good Faith and Fair Dealing Against Max Planck)

32. Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 31 as if fully set forth herein.

33. The 2001 Agreement was a binding, enforceable contract between Whitehead and Max Planck, and remains in effect. Counterclaim-Plaintiff Whitehead possessed a prospective economic advantage derived from the 2001 Agreement.

34. The 2003 Agreement was a binding, enforceable contract between Whitehead and Max Planck, and remains in effect. Counterclaim-Plaintiff Whitehead possessed a prospective economic advantage derived from the 2003 Agreement.

35. Under Massachusetts law, the 2001 and 2003 Agreements are subject to an implied covenant of good faith and fair dealing, the purpose of which is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract and that, when

performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract.

36.     Whitehead began to perform, performed, and at all times stood and stands ready to further perform its obligations under both the 2001 Agreement and the 2003 Agreement.

37.     Max Planck accepted Whitehead's performance under the 2001 Agreement and 2003 Agreement.

38.     Counterclaim-Defendant Max Planck breached the implied covenants of good faith and fair dealing in both the 2001 Agreement and the 2003 Agreement:

(a) By filing, on July 20, 2009, a Petition to Revoke Power of Attorney under 37 C.F.R. § 1.36(a) with the PTO in the pending Tuschl I patent applications.

(b) By refusing, in January 2009 and again in March 2009 and May 2009, to consent to the filing of a terminal disclaimer with respect to co-pending Tuschl I patent applications, including Application No. 10/255,568.

39.     As a direct and proximate result of these breaches, Whitehead has been, and continues to be, harmed by, among other things, additional fees, costs and delays associated with the prosecution of the Tuschl I patents.

## Third Counterclaim

### (Interference With Advantageous Business Relations Against Alnylam)

40.     Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 39 as if fully set forth herein.

41.     Counterclaim-Plaintiff Whitehead possessed a prospective economic advantage derived from the 2001 and 2003 Agreements.

42.    Counterclaim-Defendant Alnylam Pharmacetuicals, Inc. knew of Whitehead's economic interests in the 2001 and 2003 Agreements.

43.    On information and belief, Counterclaim-Defendant Alnylam intentionally interfered with the 2001 and 2003 Agreements by, through improper motive and improper means, encouraging, inducing and directing Counterclaim-Defendant Max Planck to breach its obligations under the 2001 and 2003 Agreements.

44.    As a direct and proximate result of these breaches, Whitehead has been, and continues to be, harmed by, among other things, additional fees, costs and delays associated with the prosecution of the Tuschl I patents.

## Fourth Counterclaim

### (Violation of Mass. Gen. Laws c. 93A
### Against Alnylam)

45.    Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 44 as if fully set forth herein.

46.    At all relevant times, Counterclaim-Plaintiff Whitehead was engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A §§ 1 and 11.

47.    At all relevant times, Counterclaim-Defendant Alnylam was engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A §§ 1 and 11.

48.    Whitehead has suffered a loss of money or property, real or personal, as a result of the use or employment by Alnylam of an unfair method of competition or an unfair or deceptive act or practice within the meaning of Mass. Gen. Laws. c. 93A § 2, including without limitation Alnylam's encouraging, inducing and directing Counterclaim-Defendant Max Planck to breach its obligations under the 2001 and 2003 Agreements.

21

49.     As a direct and proximate result of the foregoing knowing and willful unfair or deceptive acts or practices of Alnylam, Whitehead has been, and continues to be, harmed by, among other things, additional fees, costs and delays associated with the prosecution of the Tuschl I patents.

WHEREFORE, Defendant Whitehead prays that this Court grant the following relief:

A.     Equitable relief, including but not limited to:

(a) specific performance of the 2001 and 2003 Agreements, including an order directing Max Planck to cooperate with Whitehead's prosecution of the jointly-owned applications by executing the requested terminal disclaimers and by withdrawing its Petitions to Revoke Power of Attorney, and/or a declaration that Max Planck has ceased to join in the prosecution of the Tuschl I patent applications and has therefore abandoned them, entitling the remaining joint owners to continue prosecution at their discretion; and

(b) an injunction enjoining the Counterclaim-Defendants Max Planck and Alnylam and their agents, servants, and employees from taking any further actions in violation of the 2001 and 2003 Agreements;

B.     Money damages against Max Planck and Alnylam, plus interest;

C.     Whitehead's costs and attorney's fees in this action; and

D.     Such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Counterclaimant Whitehead requests a trial by jury on all of its counterclaims.

Dated: August 25, 2009

   /s/ Christopher M. Morrison
HANIFY & KING, P.C. (BBO 651335)
One Beacon Street, 21st Floor
Boston, MA  02108-3107
(617) 226-3465

Glenn J. Pfadenhauer (*admitted pro hac vice*)
David C. Kiernan (*admitted pro hac vice*)
George A. Borden (BBO 552302)
Kendra P. Robins (*admitted pro hac vice*)
Amer S. Ahmed (*admitted pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000

*Counsel for Defendant Whitehead Institute
for Biomedical Research*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 25, 2009.

  /s/ Christopher M. Morrison