UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAX-PLANCK-GESELLSCHAFT ZUR
FÖRDERUNG DER WISSENSCHAFTEN
E.V., MAX-PLANCK-INNOVATION
GMBH, and ALNYLAM
PHARMACEUTICALS, INC.,

                     Plaintiffs,

v.

WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH,
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and BOARD OF
TRUSTEES OF THE UNIVERSITY OF
MASSACHUSETTS,

                     Defendants.

Civil Action No.  09-CV-11116-PBS

## ANSWER TO COMPLAINT AND
## COUNTERCLAIM OF THE UNIVERSITY OF MASSACHUSETTS

The University of Massachusetts ("UMass") answers the Complaint as follows:

1.      UMass denies the allegations in paragraph 1 of the Complaint (hereafter referred to by its paragraphs).

2.      UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 2.

3.      UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 3.

4.      UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 4.

5.      UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5.

6.      UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 6.

7.      UMass denies the allegations in paragraph 7 of the Complaint.  UMass further avers that it is a public institution of higher learning within the Massachusetts system of public higher education, established as the Massachusetts state university under M.G.L. ch. 75, having a principal place of business in Boston, Massachusetts.

8.      UMass states that the allegations of paragraph 8 are conclusions of law to which no response is required.  UMass further avers that this Court lacks subject matter jurisdiction over Plaintiffs' claims seeking monetary damages.

9.      UMass states that the allegations of paragraph 9 are conclusions of law to which no response is required.

10.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10.

11.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11.

12.     UMass admits that Phillip Zamore, Thomas Tuschl, Phillip Sharp, and David Bartel collaborated on research in the therapeutically promising field of RNA interference ("RNAi") and that they developed a series of inventions relating to RNAi.   UMass further admits that it is a co-owner of these inventions.  UMass denies the remaining allegations in Paragraph 12.

13.     UMass denies the allegations in paragraph 13.

14.     UMass admits that in or about September 2001 it entered a "Joint Invention and Joint Marketing Agreement" with the Whitehead Institute for Biomedical Research ("Whitehead"), Massachusetts Institute of Technology ("MIT"), Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. ("Max-Planck"), and Garching Innovation GMBH.  UMass further states that the agreement is a writing that speaks for itself, and denies the remaining allegations in paragraph 14.

15.     UMass states that the agreement is a writing that speaks for itself and denies the allegations in paragraph 15 to the extent they do not accurately describe the agreement.

16.     UMass states that the agreement is a writing that speaks for itself and denies the allegations in paragraph 16 to the extent they do not accurately describe the agreement.

17.     UMass admits that, in or about July 2003, Whitehead, MIT, Max-Planck and Garching Innovation entered into a "Joint Invention and Joint Marketing Agreement for RNAI Therapeutic Purposes."  UMass further states that the agreement is a writing that speaks for itself, and denies the remaining allegations in paragraph 17 to the extent they do not accurately describe the agreement.

18.     UMass admits that it did not enter into the "Joint Invention and Joint Marketing Agreement for RNAI Therapeutic Purposes."  UMass further states that the agreement speaks for itself and denies the remaining allegations in paragraph 18.

19.     UMass states that the agreement is a writing that speaks for itself and denies the allegations in paragraph 19 to the extent they do not accurately describe the agreement.

20.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 20.

21.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 21.

22.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 22.

23.     UMass admits that it entered into a license agreement with Sirna Therapeutics and that it did not enter a license agreement with Alnylum.  UMass denies the remaining allegations in paragraph 23.

24.     UMass denies the allegations in paragraph 24.

25.     UMass denies the allegations in paragraph 25.

26.     UMass denies the allegations in paragraph 26.

27.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 27.

28.     UMass denies that Whitehead seeks patent protection for aspects of the "Tuschl II inventions" for the benefit of the co-owners of the Tuschl I inventions.  UMass is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 28.

29.     UMass denies the allegations in paragraph 29.

30.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations as to Plaintiffs' communications with Whitehead, and denies the remaining allegations in paragraph 30.

31.     UMass denies the allegations in paragraph 31.

32.     UMass admits that Plaintiffs' Complaint seeks a preliminary and permanent injunction against Defendants.  UMass denies the remaining allegations in paragraph 32.

33.     UMass admits that Plaintiffs' Complaint seeks a temporary restraining order against Defendants.  UMass denies the remaining allegations in paragraph 33.

**COUNT I**

34.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-33, above.

35.     UMass admits that, in or about September 2001, it entered a "Joint Invention and Joint Marketing Agreement" with Whitehead, MIT, Max-Planck, and Garching Innovation GMBH.  UMass further states that the agreement is a writing that speaks for itself.

36.     UMass admits that, in or about July 2003, Whitehead, MIT, Max-Planck and Garching Innovation entered into a "Joint Invention and Joint Marketing Agreement for RNAI Therapeutic Purposes."  UMass further states that the agreement speaks for itself.

37.     UMass denies the allegations in paragraph 37.

38.     UMass denies the allegations in paragraph 38.

39.     UMass denies the allegations in paragraph 39.

## COUNT II

40.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-39, above.

41.     UMass states that the allegations of paragraph 41 are conclusions of law to which no response is required.

42.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 42.

43.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 43.

44.     UMass denies the allegations in paragraph 44.

## COUNT III

45.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-44, above.

46.     UMass denies the allegations in paragraph 46.

47.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 47.

48.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 48.

49.     UMass denies the allegations in paragraph 49.

50.     UMass denies the allegations in paragraph 50.

51.     UMass denies the allegations in paragraph 51.

**COUNT IV**

52.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-51, above.

53.     UMass denies the allegations in paragraph 53.

54.     UMass denies the allegations in paragraph 54.

55.     UMass denies the allegations in paragraph 55.

56.     UMass denies the allegations in paragraph 56.

57.     UMass denies the allegations in paragraph 57.

**COUNT V**

58.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-57, above.

59.     UMass denies the allegations in paragraph 59.

60.     UMass is without knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 60.

61.     UMass denies the allegations in paragraph 61.

62.     UMass denies the allegations in paragraph 62.

## COUNT VI

63.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-62, above.

64.     UMass denies the allegations in paragraph 64.

65.     UMass denies the allegations in paragraph 65.

66.     UMass denies the allegations in paragraph 66.

## COUNT VII

67.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-66, above.

68.     UMass denies the allegations in paragraph 68.

69.     UMass denies the allegations in paragraph 69.

70.     UMass denies the allegations in paragraph 70.

71.     UMass denies the allegations in paragraph 71.

## COUNT VIII

72.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-71, above.

73.     UMass states that the allegations in paragraph 73 are conclusions of law to which to response is required.

74.     UMass denies the allegations in paragraph 74.

75.     UMass denies the allegations in paragraph 75.

## COUNT IX

76.     UMass incorporates by reference, as if set forth fully herein, the allegations of paragraphs 1-75, above.

77.     UMass denies the allegations in paragraph 77.

78.     UMass denies the allegations in paragraph 78.

79.     UMass denies the allegations in paragraph 79.

80.     UMass denies that Plaintiffs are entitled to any of the relief requested in Paragraphs A through H of their Prayer for Relief.

81.     UMass generally denies all allegations of the Complaint except those specifically admitted.

### FIRST AFFIRMATIVE DEFENSE

UMass is misnamed.  The University of Massachusetts, not the "Board of Trustees of the University of Massachusetts," is the proper named party in this action.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim upon which relief may be granted.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims against UMass for monetary damages are barred by the Eleventh Amendment of the United States Constitution.

### FOURTH AFFIRMATIVE DEFENSE

The Court lacks subject matter jurisdiction over Plaintiffs' claims for damages against UMass.

### FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the applicable statute of limitations.

### SIXTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of waiver.

### SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of laches.

### EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of estoppel.

### NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of acquiescence.

### TENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of unclean hands.

### ELEVENTH AFFIRMATIVE DEFENSE

The actions of which Plaintiffs complain were authorized by Plaintiffs.

### TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by their failure to mitigate damages.

### THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by their failure to exhaust administrative remedies.

### FOURTEENTH AFFIRMATIVE DEFENSE

The Court lacks jurisdiction and authority to intervene in ongoing patent prosecution before the United States Patent and Trademark Office.

### FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are not ripe for review.

### SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are preempted by federal patent law.

### SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by privilege.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff Alnylam lacks standing to sue.

### NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claim for unjust enrichment is barred because Plaintiffs' relationship with UMass is based on a written contract.

### TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims fail, in whole or in part, for lack of proximate cause.

### TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims fail for lack of cognizable damages.

### TWENTY-SECOND AFFIRMATIVE DEFENSE

Max Planck's claims for damages are barred by paragraph 6(a) of the Joint Invention and Joint Marketing Agreement dated September 19, 2001.


WHEREFORE, defendant UMass respectfully requests that this Court dismiss this action with prejudice, that it deny all relief to Plaintiffs, that it enter judgment for UMass, that it award UMass the costs of this action and its expenses including reasonable attorneys' fees, and that it grant to UMass such other and further relief as it deems just in the circumstances.


### COUNTERCLAIM

UMass brings this counterclaim against Max-Planck-Gesellschaft zur Föerderung der Wissenschaften e.V., Max-Planck-Innovation GmbH, and Alnylam Pharmaceuticals, Inc. alleging as follows:

1.     In this Counterclaim, UMass asserts claims for breach of contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual and advantageous relations, and correction of inventorship under 35 U.S.C. § 256.

**The Parties**

2.      UMass is a public institution of higher learning within the Massachusetts system of public higher education, established as the Massachusetts state university under M.G.L. c. 75, having its principal place of business in Boston, Massachusetts.

3.      On information and belief, Max-Planck-Gesellschaft zur Föerderung der Wissenschaften e.V. is a corporation organized and existing under the laws of Germany with its principal place of business in Munich, Germany.

4.      On information and belief, Max-Planck Innovation GmbH, formerly known as Garching Innovation, is a corporation organized and existing under the laws of Germany with its principal place of business in Munich, Germany.  Max-Planck-Gesellschaft zur Föerderung der Wissenschaften e.V. and Max-Planck Innovation GmbH are collectively referred to herein as "Max Planck."

5.      On information and belief, Alnylam Pharmaceuticals, Inc. ("Alnylam") is a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

**Jurisdiction and Venue**

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**Factual Allegations**

8.      Since the fall of 1999, Phillip D. Zamore, Ph.D., has been an Assistant Professor in the Department of Biochemistry and Molecular Pharmacology of the University of Massachusetts Medical School.  Dr. Zamore obtained his Ph.D. in Biochemistry and Molecular Biology from Harvard University in 1992, where he focused his research on RNA.  In 1993, Dr. Zamore joined the Whitehead Institute as a post-doctoral research fellow in the laboratory of Dr.

Ruth Lehman to study *Drosophila*. *Drosophila*, also known as fruit flies, are a valuable animal model for studying human biology, and provide one of the best animal models available for studying the process of RNA interference ("RNAi").

9.    In January 1998, Dr. Zamore joined the laboratory of Dr. David P. Bartel at Whitehead. Dr. Bartel is a leading researcher in the field of RNA, including RNAi.

10.    Soon thereafter, Dr. Zamore began a research collaboration with Dr. Bartel, Dr. Phillip Sharp of M.I.T., and Dr. Thomas Tuschl, a post-doctoral fellow working jointly with Dr. Bartel and Dr. Sharp (collectively referred to herein as the "Inventors"). The collaboration sought to build upon the knowledge that long double-stranded RNAs ("dsRNA") direct the sequence-specific degradation of messenger RNA ("mRNA") by way of the RNAi process.

11.    Dr. Zamore continued collaborating with Dr. Bartel, Dr. Sharp, and Dr. Tuschl after Dr. Zamore became employed by UMass in the fall of 1999.

12.    Using an *in vitro Drosophila* lysate system developed by Dr. Zamore, the Inventors demonstrated that long dsRNAs are processed by cellular mechanisms into short RNA fragments of 21-23 nucleotides in length. They further showed that these short RNA fragments guide sequence-specific mRNA degradation; in other words, the 21-23 nucleotides RNA fragments are the sequence-specific mediators of RNAi. Based upon this pioneering work, the Inventors conceived that small interfering RNA ("siRNA") molecules of about 21 to about 23 nucleotides in length had the ability to silence genes, including genes in mammalian cells. They further conceived that these fragments, or chemically synthesized oligonucleotides of the same or similar nature, could be used in therapeutic applications in mammalian cells to target specific mRNAs for degradation.

13.     On March 2, 2000, the Inventors submitted to the journal *Cell* for publication a paper entitled "RNAi:  Double-Stranded RNA Directs the ATP-Dependent Cleavage of mRNA at 21-23 Nucleotide Intervals."  This paper was published by *Cell* on March 31, 2000.

14.     On March 21, 2000, Dr. Bartel and Dr. Sharp submitted to Whitehead an Invention Disclosure entitled "The uses of 21-23 nucleotides sequence-specific mediators of double-stranded RNA interference as a tool to study gene function and as a gene-specific therapeutic," which identified the four Inventors and summarized their joint invention.  By this time Dr. Zamore was employed by UMass and Dr. Tuschl was employed by Max-Planck.

15.     On March 30, 2000, Whitehead, M.I.T., UMass, and Max-Planck jointly filed a provisional U.S. patent application describing the Inventors' invention of isolated siRNA that mediates RNAi.  On January 31, 2001, they filed a second provisional patent application directed to this subject matter.

16.     As of 2000, it was known in the field of RNA research that the ends of dsRNA molecules could be aligned exactly or could have an "overhang" of one or more nucleotides on one end of a strand (called the 3' end) or the other (called the 5' end).  A few weeks after publication of the *Cell* paper, scientist Brenda Bass of the University of Utah School of Medicine published a review paper in *Cell* in which she suggested that that the dsRNA fragments isolated by the Inventors and reported in their *Cell* paper likely had 3' overhangs, based upon the known biology of Rnase III enzymes.

17.     Later in 2000, Dr. Tuschl sequenced the dsRNA fragments obtained using the Drisophila lysate system used by the Inventors in their research and confirmed that the structure of these fragments comprised 3' overhangs, as Dr. Bass had hypothesized.

18.     In January 2001, it was reported that an evolutionarily conserved RNase III enzyme known as "Dicer" cleaves long dsRNA into siRNA during the process of RNAi.  Like

most enzymes in the RNase III family, Dicer cleaves dsRNA so as to generate siRNA molecules that have 3' overhangs of 2 nucleotides in length. It is now known that it was the Dicer enzyme present in the *Drosophila* lysate used by the Inventors that catalyzed the cleavage of long dsRNA to generate the target specific short 21-23 nucleotides RNA fragments that the Inventors recognized as the mediators of RNAi.

19.    The siRNA produced by the Inventors using the Dicer-containing *Drosophila* lysate system in the experiments described in their March 30, 2000 provisional patent application inherently comprised molecules with 3' overhangs.

20.    Unbeknownst to UMass, Whitehead, and M.I.T., on December 1, 2000, Max-Planck filed a European Patent Application that included broad claims overlapping with the claims in the pending applications jointly filed by all four institutions on behalf of the four Inventors. This application included claims, for example, directed to isolated dsRNA molecules of 19-23 nucleotides in length. The application named as inventors Dr. Tuschl and two other Max-Planck employees. It omitted as inventors Dr. Zamore, Dr. Bartel, and Dr. Sharp.

21.    On March 30, 2001, on behalf of the Inventors, Whitehead converted the pending provisional applications into a U.S. utility application (the "'832 application") and a PCT application.

22.    On September 19, 2001, Whitehead, M.I.T., UMass and Max-Planck entered into a Joint Invention and Joint Marketing Agreement (the "Agreement"). The Agreement provided that Whitehead would manage the prosecution of the pending, jointly-filed applications. The Agreement provided that the other parties, including Max-Planck, would cooperate with the Whitehead's prosecution of the applications. The Agreement further provided that if a party to the Agreement wished to cease prosecution of any of the pending, jointly-owned patent

applications, it would notify the others, who would have the right to continue prosecution at their discretion.

23.     In December 2008, the United States Patent and Trademark Office ("USPTO") issued a provisional double-patenting rejection of a continuation application filed on behalf of the Inventors over the parent '832 application.  A rejection of this nature may be overcome by filing a terminal disclaimer in the continuation proceeding.  The deadline for responding to this office action and submitting a terminal disclaimer was June 18, 2009.

24.     In January 2009, Whitehead prepared a proposed terminal disclaimer and sent it to M.I.T., UMass and Max-Planck for execution.  Whitehead, M.I.T., and UMass all duly executed the terminal disclaimer.  On June 17, 2009, one day before the deadline for responding to the rejection, Max-Planck notified Whitehead that Max-Planck refused to sign the terminal disclaimer.

25.     In July 2009, Max-Planck filed, in each of the cases that were prosecuting the jointly-owned applications, a Petition to Revoke Power of Attorney, seeking to revoke the power attorney it previously gave to Whitehead's patent prosecution attorney, Wolf Greenfield.  Max-Planck's Petition did not disclose to the USPTO that under the Agreement, Max-Planck does not have the right to appoint its own patent attorney to prosecute the applications.  By filing the Petition to Revoke, Max-Planck intended unilaterally to stop the ongoing prosecution of the jointly-owned applications.

**Counterclaims**

**Count I – Breach of Contract (Max-Planck)**

26.     UMass hereby repeats and incorporates herein by reference the foregoing paragraphs of this Counterclaim as if fully set forth herein.

27.     The Joint Invention and Joint Marketing Agreement ("the Agreement") is a valid and enforceable agreement among Whitehead, M.I.T., UMass and Max-Planck.

28.     At all relevant times, Whitehead, M.I.T. and UMass have performed, or been ready, willing, and able to perform, their obligations under the Agreement.

29.     Max-Planck has breached, and is continuing to breach the Agreement, by refusing to cooperate with Whitehead in the prosecution of the jointly-owned applications and seeking to prevent issuance of a jointly-owned patent, including, among other acts:

  a.  refusing to execute a terminal disclaimer with respect to the continuation application, as requested by Whitehead; and

  b.  seeking to revoke the power of attorney it gave to Whitehead's prosecution attorney and thereby block the ongoing prosecution of the jointly-owned applications; and

  c.  failing to notify Whitehead of its wish to cease prosecution of the jointly-owned applications and failing to permit Whitehead, M.I.T., and UMass to continue the prosecution of said applications.

30.     As a direct and proximate cause of these acts, UMass is suffering and will continue to suffer substantial and irreparable injury.

## Count II – Breach of Implied Covenant of Good Faith and Fair Dealing (Max Planck)

31.     UMass hereby repeats and incorporates herein by reference the foregoing paragraphs of this Counterclaim as if fully set forth herein.

32.     In entering into the Agreement, Max-Planck understood that one of its purposes was to maximize the value of the intellectual property arising from the Inventors' inventions and discoveries, as described and claimed in the jointly-owned applications.

33.     The aforesaid acts of Max-Planck were conducted in bad faith, to secure undue economic advantage and to deprive UMass of the benefit of the Agreement.

34.     In violation of the implied covenant of good faith and fair dealing, and as a direct and proximate cause, Max-Planck has damaged, and is continuing to damage, the value of UMass's property interest in, and business prospects with respect to, the inventions and discoveries described and claimed in the jointly-owned applications, thereby causing irreparable injury.

**Count III—Tortious Interference with Contractual and Advantageous Relations (Alnylam)**

35.     UMass hereby repeats and incorporates herein by reference the foregoing paragraphs of this Counterclaim as if fully set forth herein.

36.     With full knowledge of the Agreement, Alnylam conspired and agreed with Max-Planck to refuse to cooperate with Whitehead in the prosecution of the jointly-owned applications.  Alnylam thereby induced Max-Planck to breach the Agreement and intentionally interfered with UMass's contractual rights under the Agreement, through improper motives or means.

37.     As a direct and proximate result of Alnylam's misconduct, UMass's rights under the Agreement may be irretrievably destroyed.  UMass, therefore, has suffered and will continue to suffer substantial and irreparable injury.

**Count IV – Tortious Interference with Advantageous Relations (Max-Planck and Alnylam)**

38.     UMass hereby repeats and incorporates herein by reference the foregoing paragraphs of this Counterclaim as if fully set forth herein.

39.     In 2003, UMass granted an exclusive license of its rights in the pending, jointly-owned patent applications to Sirna Therapeutics, now Merck and Co. ("Merck"), for therapeutic

and other purposes.  Based upon this license agreement, UMass possesses a prospective economic advantage in the marketplace for siRNA therapeutics.

40.     On information and belief, Max-Planck and Alnylam have known of the existence of the UMass license agreement since 2003.

41.     Upon information and belief, Max-Planck and Alnylam have intentionally conspired and agreed to interfere with UMass's relationship with Merck by attempting, through improper motives and by improper means, to diminish the value of the jointly-owned patent applications and thereby enhance the value of Max-Planck's applications licensed to Alnylam.

42.     As a direct and proximate result of Alnylam's misconduct, the value of UMass's rights under its license agreement with Merck may be irretrievably destroyed.  UMass, therefore, has suffered and will continue to suffer substantial and irreparable injury.

### Count V –  Correction of Inventorship under 35 U.S.C. § 256

43.     UMass hereby repeats and incorporates herein by reference the foregoing paragraphs of this Counterclaim as if fully set forth herein.

44.     On June 6, 2006, the USPTO issued to Max-Planck U.S. Patent No. 7,056,704 (the "'704 patent"), a copy of which is attached hereto as Exhibit A.  The '704 patent claims priority to Max-Planck's European Patent Application filed December 1, 2000.  The patent names as inventors Dr. Tuschl and two other Max Planck employees, Sayda Elbashir and Winifried Lendeckel.  It omits Dr. Zamore, Dr. Bartel and Dr. Sharp as inventors (the "Omitted Inventors").

45.     On July 18, 2006, the USPTO issued to Max-Planck U.S. Patent No. 7,078,196 (the "'196 patent"), a copy of which is attached hereto as Exhibit B.  The '196 patent likewise claims priority to Max-Planck's European Patent Application filed December 1, 2000.  The '196

patent names as inventors only Dr. Tuschl, Dr. Elbashir and Dr. Lendeckel, and does not name the Omitted Inventors.

46.     The Omitted Inventors made significant contributions to the conception of subject matter claimed in both the '704 and '196 patents.  Under United States patent law, the Omitted Inventors are properly joint inventors of the '704 and '196 patents.  The omission of the Omitted Inventors arose without deceptive intention on their part.

47.     Pursuant to 35 U.S.C. § 256, inventorship of the '704 and '196 patents should be corrected to add Dr. Zamore, Dr. Bartel, and Dr. Sharp as inventors.  Absent correction of inventorship, the '704 and '196 patents are invalid.

**Prayer for Relief**

Wherefore, UMass requests that the Court grant the following relief:

A.     Specific performance of the Agreement, including an order directing Max-Planck to cooperate with Whitehead's prosecution of the jointly-owned applications by executing the requested terminal disclaimer and by withdrawing its Petitions to Revoke Power of Attorney;

B.     Correction of inventorship of the '704 and '196 patents as requested herein;

C.     Actual damages against Max-Planck and Alnylam, plus interest;

D.     UMass's costs and reasonable attorneys' fees; and

E.     Such other and further relief as this Court may deem just and proper.

Respectfully submitted,
By their attorneys


*/s/ Donald R. Ware* _____
Donald R. Ware (BBO No. 516260)
Barbara A. Fiacco (BBO No. 633618)
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
(617) 832-1000

Deirdre Heatwole, Esq. (BBO No. 228245)
Interim General Counsel
Jean Marie Kelley, Esq. (BBO No. 265540)
Associate Counsel
University of Massachusetts
33 South Street - 4th Floor
Shrewsbury, MA  01545
(774) 455-7303


Dated:  August 25, 2009

## **Certificate of Service**

I, Donald R. Ware, counsel for the Defendant Board of Trustees of the University of Massachusetts, hereby certify that the above Answer to Complaint and Counterclaim and Certificate of Service filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on August 25, 2009.

*/s/ Donald R. Ware*
Donald R. Ware