UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
─────────────────────────────────
                                  )
MAX-PLANCK-GESELLSCHAFT ZUR       )
FÖRDERUNG DER WISSENSCHAFTEN E.V.,)
a corporation under the laws of   )
Germany; MAX-PLANCK-INNOVATION    )
GMBH, a corporation organized     )
under the laws of Germany; and    )
ALNYLAM PHARMACEUTICALS, INC., a  )
Delaware corporation,             )
                                  )
            Plaintiffs,           )
                                  )
            v.                    ) CIVIL ACTION NO.09-11116-PBS
                                  )
WHITEHEAD INSTITUTE FOR BIOMEDICAL)
RESEARCH, a Delaware corporation; )
MASSACHUSETTS INSTITUTE OF        )
TECHNOLOGY, a Massachusetts       )
corporation; BOARD OF TRUSTEES OF )
THE UNIVERSITY OF MASSACHUSETTS,  )
a Massachusetts corporation,      )
                                  )
            Defendants.           )
─────────────────────────────────)
```

**MEMORANDUM AND ORDER**

September 1, 2009

Saris, U.S.D.J.

## I.   INTRODUCTION

This dispute is about a process called "RNA interference" that can be used to "silence" genes and has potentially huge therapeutic value.  Plaintiffs are Max-Planck Society for the Advancement of Science, a non-profit academic research

institution located in Germany[1] and Alnylam Pharmaceuticals,
Inc., a Delaware corporation with a principal place of business
in Cambridge, Massachusetts.  They claim that the defendants
Whitehead Institute for Biomedical Research ("Whitehead"),
Massachusetts Institute of Technology ("MIT") and the Board of
Trustees of the University of Massachusetts ("UMass")
misappropriated an invention owned by Max-Planck.[2]

Among other things, plaintiffs allege that defendants have
filed a patent application (the so-called Tuschl I patent
application) with the United States Patent and Trademark Office
("USPTO") that contains plaintiffs' invention, which is itself
the subject of another pending patent application (the so-called
Tuschl II patent application).  Plaintiffs seek a preliminary
injunction pursuant to Fed. R. Civ. P. 65 enjoining defendants
from prosecuting the Tuschl I patent applications and from paying
the issuance fee in the event that the USPTO issues a notice of
allowance.

After hearing and a review of the voluminous submissions,

---

[1] Its German name is Max-Planck-Gesellschaft zur Förderung
der Wissenschaften E.V., and the technology-transfer arm is Max-
Planck-Innovation GmbH.

[2] Plaintiffs assert breach of contract (Count 1); breach of
the implied covenant of good faith and fair dealing (Count 2);
breach of fiduciary duty (Count 3); waste (Count 4); interference
with advantageous business relations (Count 5); unjust enrichment
(Count 6); violation of Mass. Gen. Laws ch. 93A (Count 7); and
negligence (Count 9); and also pursue a declaratory judgment
(Count 8).

the Court **DENIES** the request for preliminary relief on the ground
that plaintiffs have not shown a substantial likelihood of
success on the merits.

## II.   BACKGROUND FACTS

The record contains evidence of the following facts, which
are undisputed except where noted.

### A.   A Primer on RNA Interference

The parties provided a tutorial to explain the scientific
background of RNA interference: genes in a cell are regions of
DNA that hold codes for directing the synthesis of proteins.  DNA
is a double-stranded structure: two chains, oriented in opposite
directions, which are bound together.  When a gene is active, it
is transcribed into a single stranded chain called messenger RNA
("mRNA").  The code contained in the mRNA is then translated into
a protein.  The chains of DNA and mRNA are composed of
nucleotides.  One end of these DNA and RNA strands is referred to
as the 3-prime (3') end, and the other is referred to as the 5-
prime (5') end.

RNA interference, RNAi, is a process in which a double-
stranded RNA (dsRNA) is used to silence a specific gene in a cell
by directing the destruction of mRNA produced by that gene before
it is translated into a protein.  The process works because when
a dsRNA molecule is introduced into a normal cell, the cell will
recognize it as abnormal or foreign to the cell because mRNA is

3

ordinarily composed of a single chain.  As a result, the cell will direct the destruction of the dsRNA and all other RNA in the cell.

**B.   <u>The First Patent Application – Tuschl I</u>**

Dr. Thomas Tuschl, Ph.D., is the first named inventor for the Tuschl I patent application.  (Tuschl Aff. [Docket No. 51] ¶ 3.)  He is currently an Associate Professor and the head of the Laboratory of RNA Molecular Biology at the Rockefeller University in New York.  (<u>Id.</u> ¶ 1.)  He is also the co-founder of plaintiff Alnylam.  (<u>Id.</u>)  His co-inventors on the Tuschl I patent are Philip Sharp of MIT, David Bartel of Whitehead, and Philip Zamore.  (<u>Id.</u> ¶ 3.)  Tuschl and Zamore were post-doctoral fellows at Whitehead.  (<u>Id.</u> ¶ 10.)  Their work involved a system for studying the process of RNAi in a test tube using the contents from inside certain cells of the fruit fly, Drosophila.  (<u>Id.</u>)  They discovered that introducing long dsRNA into their Drosophila system led to RNAi.  (<u>Id.</u>)  The inventors also determined that during the process, the dsRNA inserted into the cell was breaking into 21-23 nucleotide fragments.  (<u>Id.</u> ¶ 12.)  These fragments turned out to be capable of initiating RNAi.  (<u>Id.</u>)

Because an article describing their work was scheduled to appear in the scientific journal <u>Cell</u>, on March 31, 2000,

Whitehead decided to file the first Tuschl I provisional[3] patent application ("the '594 application") in the USPTO.  (Id. ¶ 13.) The application was assigned to Whitehead, MIT, UMass and Max-Planck.  (Granahan Aff. [Docket No. 36] ¶ 5.)  It claimed "Isolated RNA of from about 21 to about 23 nucleotides which mediates RNA interference."  (Haberny Aff. [Docket No. 15] Ex. A at 41.)

### C.   The Second Patent Application – Tuschl II

In late 1999, Dr. Zamore and Dr. Tuschl left Whitehead to become independent investigators in their own laboratories. (Tuschl Aff. ¶ 16.)  Dr. Tuschl started his laboratory at Max-Planck and hired the two other Tuschl II inventors Sayda Elbashir and Winfried Lendeckel.  (Id. ¶¶ 3, 16.)  These inventors assert that they were the first to invent a synthetic dsRNA molecule with features that allow it to perform RNAi in mammalian cells -- as opposed to fruit flies.  (Id. ¶ 38.)  In plaintiffs' view, this was "groundbreaking" "because it opens the door for using RNAi technology as a human therapeutic agent."  (Id.)

In the fall of 2000, the Tuschl II inventors discovered a

_____

[3] A provisional application is a type of application that does not need to contain all the details necessary to demonstrate patentability and does not mature into an issued patent unless a non-provisional application that includes those details is filed within 12 months.  If a patent is later granted, it will relate back to the filing of the provisional application.  See 35 U.S.C. § 111(b).

particular species of short RNA molecules, specifically, double-stranded molecules with a 1-3 nucleotide "overhang" on the 3' ends of the dsRNA strands. (<u>Id.</u> ¶ 24.) On October 25, 2000 they submitted the discovery to the scientific journal, <u>Genes & Development</u>, which published it in January 2001. (<u>Id.</u>) On December 1, 2000, Max-Planck filed a patent application ("the '325 application") in the European Patent Office ("EPO"). (<u>Id.</u> ¶ 25.) It claimed an "[i]solated double-stranded RNA molecule, wherein each RNA strand has a length from 19-23 nucleotides, wherein said RNA molecule is capable of target-specific nucleic acid modifications." (Granahan Aff. ¶ 11.) The '325 application is directed to the isolated, synthetic 21-23 nucleotide strands of RNA having at least one 3' overhang, which had been demonstrated to produce RNAi. (Tuschl Aff. ¶ 26.) Whitehead asserts that it did not know Max-Planck was filing this patent application with the EPO. (Mullins Aff. [Docket No. 34] ¶ 9.)

Shortly thereafter, the inventors learned that the synthetically produced, 21-nucleotide strands of RNA with 3' overhangs could cause RNAi in mammals. (Tuschl Aff. ¶ 27.) The data was subsequently published by the Tuschl II inventors in a May 2001 article in <u>Nature</u> entitled "Duplexes of 21-Nucleotide RNAs Mediate RNA Interference in Cultured Mammalian Cells." (<u>Id.</u> ¶ 28.)

Max-Planck, the sole assignee of the Tuschl II applications,

exclusively licensed its right in the Tuschl II applications to
Alnylam for therapeutic purposes.  (Erselius Aff. [Docket No. 26]
¶¶ 7, 14-16.)

### D. **Mammalian Data**

In March 2001, the Tuschl I inventors faced the deadline to
turn their provisional application into a non-provisional
application.  (Granahan Aff. ¶ 7.)  Patricia Granahan, an
attorney representing Whitehead, received experimental data
regarding the use of isolated RNA segments of about 21 to 23
nucleotides to mediate RNAi in mammalian cells.  (Id. ¶ 14.)  She
believed the data were generated by Tuschl subsequent to the
filing of the Tuschl I provisional applications.  (Id. ¶ 16.)
Tuschl says he gave a manuscript of the journal article
containing the mammalian data to Dr. Bartel, a Tuschl I inventor.
(Tuschl Aff. ¶ 29.)  When Bartel asked for permission to include
the data in the Tuschl I patent application, Tuschl told him he
did not have the authority to do so.  (Id.)  To get the authority
to use the data in the Tuschl I patent application, Granahan
discussed the inclusion of the mammalian data with Dr. Torsten
Mummenbrauer, the representative of Max-Planck responsible for
the patenting and commercialization of Tuschl I and II, and Dr.
Wolfgang Weiss, a German Patent attorney representing Max-Planck.
(Granahan Aff. ¶¶ 16-17.)  Weiss agreed that she could include
the mammalian data in the Tuschl I applications, and she received

a confirmatory letter.  (<u>Id.</u> ¶ 17; <u>Id.</u> Ex. 8.)  Weiss now asserts

he did not fully understand the genesis of that data.  (Weiss

Aff. [Docket No. 12] ¶¶ 4-5.)

On March 30, 2001, the mammalian data was included in the

Tuschl I applications as Example 5 and Figure 14.  (Granahan Aff.

¶ 16.)  This data contains a discussion of the 3' overhangs.

(Tuschl Aff. ¶ 36.)  Dr. Tuschl claims that the disclosures in

the Tuschl I applications relating to the 3' overhangs, synthetic

RNA, and mammalian cell activity are really the inventions of the

Tuschl II inventors.  (<u>Id.</u> ¶¶ 35-41.)

Simultaneously, on March 30, 2001, Weiss included the

identical mammalian data in the specification of a provisional

Tuschl II patent application (the '661 application).  (Granahan

Aff. ¶ 18.)

Granahan claims that she believed that the Tuschl I

applications encompassed RNA molecules with 3' overhangs.  (<u>Id.</u>

¶¶ 26-30.)  Both sides were aware that one of the licensees was

worried about an "overlap" in the patent applications.  (<u>Id.</u> ¶

22.)  While Granahan suggested combining the applications, Weiss

nixed the idea.  (<u>Id.</u>)  Instead, Whitehead and Max-Planck

ultimately agreed to prosecute them separately, but claim

priority to each other's applications.  (<u>Id.</u>)

In March of 2001, Whitehead sent a copy of the Tuschl I

applications to Max-Planck.  (<u>Id.</u> ¶ 24.)  Max-Planck did not

8

protest the inclusion of the mammalian data or any other information in the Tuschl I applications for two years.  (<u>Id.</u>)

### E.   <u>The Agreements</u>

On September 19, 2001, Whitehead, MIT, UMass and Max-Planck entered into a "Joint Invention and Joint Marketing Agreement." (<u>Id.</u> ¶ 32; Erselius Aff. ¶¶ 9-10.)  Under this agreement, Whitehead was responsible for managing the prosecution of the Tuschl I applications, and Max-Planck had responsibility to prosecute the Tuschl II applications.  (Granahan Aff. ¶ 32; Erselius Aff. ¶¶ 9-10; Erselius Aff. Ex. B at 2.)  The agreement also provided that all parties would have "reasonable opportunities to advise" Whitehead with respect to prosecution, and that each would cooperate with Whitehead.  (Erselius Aff. Ex. B at 2.)

The 2001 agreement provided that the patents for Tuschl I and Tuschl II "shall be licensed together as a single package" for research purposes.  (<u>Id.</u>)  MIT was appointed as the exclusive licensing agent for the sale of licenses to non-European companies for research purposes, and Max-Planck was appointed as the exclusive agent to issue licenses to European companies for research purposes.  (<u>Id.</u>)  The agreement included a revenue sharing arrangement that divided the licensing revenue among the four institutions and four inventors.  (<u>Id.</u> Ex. B at 3.) Licenses for therapeutic uses were not included.  (<u>Id.</u>)

On July 30, 2003, three of the four parties (excluding UMass) executed a "Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes." (Id. ¶ 11.)  This agreement specified that the Tuschl I and Tuschl II patents "shall be commercialized together as a single package" for therapeutic purposes, and it provided for a sharing of revenues among the three parties and four inventors. (Id. Ex. C at 5-6.)  It also provided that Whitehead would continue to be responsible for prosecuting Tuschl I, and Max-Planck would continue to prosecute Tuschl II. (Id. Ex. C at 2-3.)  Each party would have a "reasonable opportunity to comment and advise" on documents to be filed with the USPTO, and Whitehead and Max-Planck would "give good faith consideration" to such comments. (Id.)

UMass declined to join in the 2003 agreement and instead granted a license under its rights to Tuschl I for therapeutic purposes to Sirna Therapeutics, Inc., now a division of Merck & Co., and a license for limited purposes to a company called CytRx (now Rxi). (Id. ¶ 17; Mullins Aff. ¶ 21.)  The other three owners of Tuschl I – Whitehead, MIT and Max-Planck – granted a license for therapeutic purposes to Alnylam in December 2002, and to another entity that was eventually acquired by Alnylam. (Erselius Aff. ¶¶ 14-16.)  In exchange, Alnylam agreed to pay royalties to Max-Planck, which, pursuant to the 2003 agreement, is obligated to share this revenue among Max-Planck, Whitehead,

and MIT, which, in turn, must share some of it with the
inventors. (Mullins Aff. ¶ 22.)  Sirna is a competitor of
Alnylam.  (Erselius Aff. ¶ 17.)

**F.   Dissonance**

UMass's decision not to join in the 2003 agreement and
instead to grant a license to Sirna and CytRx created a situation
where UMass's two therapeutic licensees have rights to the
jointly-owned Tuschl I, and the other therapeutic licensee,
Alnylam, has a license to both Tuschl I and the Max-Planck-owned
Tuschl II.  (Mullins Aff. ¶ 39.)  Because of this, as Whitehead
points out, the co-owners of Tuschl I have different incentives
regarding prosecution of the Tuschl I applications than the co-
owners of Tuschl II.  (Id. ¶¶ 40-46.)

In late 2003, Max-Planck complained for the first time about
the inclusion of the 3' overhangs and mammalian data in the
Tuschl I applications.  (Pls.' Letter of Aug. 3, 2009 [Docket No.
66] 2-3.)  On May 3, 2004, John Pratt of the Whitehead Institute
and Lita Nelsen, Director of the MIT Technology Licensing Office,
sent a letter (the so-called Nelsen/Pratt letter) to UMass which
stated:

> We have been asked by Garching Innovation,
> the technology transfer of Max Planck Society
> (MPG) to confirm our understanding of the
> "overhang data" in the patent jointly owned
> by MPG, UMass, Whitehead and MIT.
>
> The data relating to the overhangs originated

> at MPG, who allowed us to use the data to
> strengthen the specification of the patent.
> The data was given to us contingent upon our
> not using it to claim nor provide support for
> claims to RNAi agents having 3' overhangs and
> their use.  Claims containing the inventive
> subject matter of 3' overhangs were to be
> reserved for MPG's own patent.  The attached
> letter from Garching sets that forth.
>
> Given this requirement, we have never
> anticipated that we could/would draft and
> prosecute claims reciting 3' overhangs in our
> jointly owned patent application(s).

(Supplemental Haberny Aff. [Docket No. 50] Ex. A.)

The record is unclear as to whether this letter was sent to Max-Planck, but it was sent to Alnylam.  (Pls.' Letter of Aug. 3, 2009, 2.)  Joern Erselius, a managing director at Max-Planck, states that since 2003 he has "repeatedly" asked Whitehead to remove the information in the Tuschl II applications from the Tuschl I applications "to make clear to the USPTO that the Tuschl I and Tuschl II patent applications have distinct inventive subject matter and distinct inventors."  (Erselius Aff. ¶ 19.)

On July 11, 2005, Whitehead filed an Information Disclosure Statement representing to the USPTO that the assignees of the Tuschl I applications did not rely on the 3' overhang data or the mammalian cell data.  (Id. ¶ 20; Id. Ex. F.)

G.   **Patent Problems**

In September 2007, the USPTO informed all owners of the Tuschl I and Tuschl II applications that it would not grant more than one patent on the same invention, and rejected both

applications on "obviousness-type double patenting" grounds.
(<u>Id.</u> ¶ 21.)  Max-Planck continues to argue against the rejections
at the USPTO.

In April 2008, a joint meeting was held among
representatives of Max-Planck, MIT, Whitehead, and Alnylam to
resolve the problem, to no avail.  (<u>Id.</u> ¶ 22.)  Max-Planck has
continually requested that Whitehead remove the Tuschl II
invention from the Tuschl I patent applications to overcome the
USPTO double patenting rejections of the Tuschl II applications.
(<u>Id.</u> ¶ 19.)  Whitehead has refused to delete the information.
(<u>Id.</u>)

In January 2009, Whitehead, MIT, and UMass demanded that
Erselius sign a document that would permit a Tuschl I patent
containing the contested information to issue.  (<u>Id.</u> ¶ 23.)
Erselius declined.  (<u>Id.</u>)  On May 29, 2009, defendants again
demanded that Max-Planck sign a document to permit a Tuschl I
patent containing the information to issue.  (<u>Id.</u>)  Max-Planck
refused.  (<u>Id.</u>)

On June 18, 2009, Whitehead filed documents with the USPTO
arguing that (1) the USPTO should allow one of the Tuschl I
patent applications because it was filed earlier than the Tuschl
II patent applications, and (2) any rejections based on double
patenting should not be made to the Tuschl I patent applications.
(Lockhart Aff. [Docket No. 31] Ex. 2 at 8-13.)  Whitehead did not

13

consult with Max-Planck before submitting these arguments, although it did send a draft of the submission beforehand.  (Id. ¶¶ 19-21.)

On June 26, 2009, Max-Planck filed this suit.  The once-friendly inventors are now warring.  There is stalemate.

### III.   DISCUSSION

#### A.   Standard of Review

It is well-settled that, when considering a motion for a preliminary injunction, a district court must weigh four factors: (1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) whether issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs (i.e., a balancing of the equities); and (4) the effect, if any, on the public interest.  United States v. Weikert, 504 F.3d 1, 5 (1st Cir. 2007).  A preliminary injunction is a "potent weapon." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004).  Therefore, the party seeking the injunction bears the burden of demonstrating each factor.  See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70, 415 U.S. 423, 441 (1974).

The first two factors - likelihood of success on the merits and irreparable harm - are threshold issues; a plaintiff who is unable to demonstrate either must fail in his quest for

preliminary injunctive relief.  See <u>Weikert</u>, 504 F.3d at 5 ("[I]f
the moving party cannot demonstrate that he is likely to succeed
in his quest, the remaining factors become matters of idle
curiosity.") (quoting <u>New Comm Wireless Servs., Inc. v.</u>
<u>SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002)); <u>Ross-Simons of</u>
<u>Warwick, Inc. v. Baccarat, Inc.</u>, 217 F.3d 8, 13 (1st Cir. 2000)
("Irreparable harm is an essential prerequisite for a grant of
injunctive relief.").

**B.  <u>Likelihood of Success</u>**

Plaintiffs argue that they have a likelihood of success on
their common law and statutory claims based on defendants'
"deliberate" and "flagrant" efforts to misappropriate Max-
Planck's intellectual property and their misrepresentation of the
ownership of the Tuschl II inventions to the USPTO.  Among other
things, Max-Planck argues that Whitehead breached their
agreements by refusing its request to exclude the Tuschl II
information from the Tuschl I applications.

Max-Planck's opening thrust is that defendants, who dealt
only with the Drosophila fruit fly, misappropriated its 3'
overhangs and mammalian data in the Tuschl I applications.  This
argument will not fly, as Max-Planck's lawyer, Mr. Weiss,
unconditionally authorized Whitehead in writing to include the
information and data.  While Mr. Weiss suggests that Whitehead's
counsel did not act in good faith because she did not fully

explain the origins of the data, there is no evidence of fraudulent misrepresentation or any bad faith.  Moreover, even if there had been a misunderstanding by Mr. Weiss as to who generated the data, which is unlikely, the full patent application with the disputed information was sent to Max-Planck before it was filed, and Max-Planck did not protest the inclusion of the information for two years.

As for refusing Max-Planck's requests, Whitehead points out that it did give good-faith consideration to Max-Planck's "comments and advice" in prosecuting the Tuschl I patent, but is not required by the agreements to follow Max-Planck's instructions to the detriment of Whitehead and the other assignees.  The agreements do not give Max-Planck veto power over Whitehead's decisions in prosecuting the patent so long as the decisions are in good faith, as these appear to have been.  See Eigerman v. Putnam Invs., Inc., 877 N.E. 2d 1258, 1264 (Mass. 2007) ("The covenant does not supply terms that the parties were free to negotiate, but did not").

A harder question involves the claims of breach of fiduciary duty and the covenant of good faith and fair dealing.  This dispute began to simmer in late 2003, when plaintiffs first complained about the 3' overhangs and mammalian data in the Tuschl I applications.  In the "Nelsen/Pratt letter," MIT and Whitehead stated that the "overhang data" was given to them "to

16

strengthen the specification of the patent" and was "contingent upon our not using it to claim nor provide support for claims to RNAi agents having 3' overhangs and their use."  Max-Planck argues that Whitehead has violated this specific promise by claiming ownership of the 3' overhangs before the USPTO.  The evidence in the record is muddled on this point.  In its most recent filings before the USPTO, Whitehead did not make a claim of ownership of the 3' overhangs.  (Erselius Aff. Ex. I at 11 ("The claims of the instant invention are silent as to the occurrence of a 3' overhang").)  In this litigation, Whitehead has reiterated that "the Tuschl I inventors have not claimed 3' overhangs here." (Def. Whitehead's Sur-reply [Docket No. 58] 8.) Despite this disclaimer, in letters recently filed in this Court, Whitehead has appeared to backpedal, asserting that they only agreed not to assert "species" claims to the 3' overhangs.  (Def. Whitehead's Letter of Aug. 6, 2009 [Docket No. 74] 4 ("Whitehead did agree that Tuschl I applications would not include claims that expressly recited 3' overhangs as a species of the claimed genus."); Id. at 5 (contending that "Whitehead never committed that it would not prosecute genus claims that encompass embodiments with 3' overhangs").)  MIT similarly writes:

> MIT agreed only that it would not use the data relating to the overhangs to support seeking *species* claims to the 3' overhang species in the Tuschl I application and, to date, Plaintiffs have never complained that such claims have been pursued.

17

(Def. MIT's Letter of Aug. 5, 2009 [Docket No. 71] 4.)   The
Nelsen/Pratt letter, though, draws no distinction between genus
and species claims.   Rather, it plainly states, "claims
containing the inventive subject matter of 3' overhangs were to
be reserved for [Max-Planck's] own patent."   (Supplemental
Haberny Aff. Ex. A.)

    Whitehead, MIT, and Max-Planck appear to agree that Tuschl
II is a "species" claim that is allowable after the issuance of
the "genus claim" in the Tuschl I provisional application.   This
is a plausible argument because the PTO's rules state that a
species claim can be patentably distinct from an earlier genus
claim.   See 37 C.F.R. § 1.146.   Still, Max-Planck voices the
concern that the overhangs and mammalian data will be used to
support the broadly worded Claim One in the Tuschl I application.
This concern is valid because a later species claim may
constitute double-patenting and would not be patentable if it is
obvious in light of the claims of the earlier genus, see In Re
Kaplan, 789 F.2d 1574 (Fed. Cir. 1986), and the patent examiner
here rejected the Tuschl II applications on obviousness-type
double patenting grounds.

    Recently, in Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.,
518 F.3d 1353 (Fed. Cir. 2008), the Federal Circuit clarified the
law in this area, stating "obviousness-type double patenting
analysis" involves a two step process: (1) the "court construes

the claim[s] in the earlier patent and the claim[s] in the later patent and determines the differences;" and (2) the court "determines whether those differences render the claims patentably distinct." Id. at 1363.  A court may "examine[] the specifications of both patents to ascertain any overlap in the claim scope for the double patenting comparison." Geneva Pharm., Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373, 1385 (Fed. Cir. 2003).  A later species claim may not be patentable if practicing the prior claim inherently produces the subject matter of the later claim.  See, e.g., Eli Lilly & Co., v. Barr Labs., Inc., 251 F.3d 955, 968-72 (Fed. Cir. 2001).  No doubt this is a complicated, arcane area of patent law fraught with land mines. Both sides have had experienced patent counsel, and realized that both applications have broad initial claims which might overlap in ways troubling to the USPTO.  Both sides knowingly took the risk based on genus/species law and rolled the dice, rather than combining the patents, the safer bet.

Furthermore, the dispute concerning the Tuschl I applications has been percolating for years.  Max-Planck knew that the Tuschl I applications contained the relevant information as early as 2001, and by its own admission it began to complain about this fact only late in 2003.  It knew UMass continued to disagree with Max-Planck's position in July 2004.  (Def. Whitehead's Letter of Aug. 6, 2009, Ex. 3.)  By 2007, it knew

that the USPTO had rejected both applications on double patenting grounds.

Trying to swat away the lapse in years, plaintiffs state without persuasive facts that after the USPTO indicated for the first time in 2007 that it would reject both applications on obviousness-type double patenting grounds, they "expected that Defendants would agree to withdraw the Tuschl II material from the Tuschl I applications without the need for judicial assistance." (Pls.' Letter of Aug. 3, 2009 [Docket No. 66] 5.) They vaguely claim that the April 2008 meeting gave them reason to "hope" for a resolution. (Id.) Still plaintiffs waited over a year after that meeting to file this lawsuit to require Whitehead to delete the information in an application pending before the USPTO. This highly complex suit was filed in state court, which has little or no patent expertise, just before the July Fourth weekend, seeking an emergency injunction. A party cannot delay the initiation of litigation and then use an "emergency" created by its own decisions concerning timing to support a motion for preliminary injunction. See Baer v. Nat'l Bd. of Med. Exam's, 392 F. Supp. 2d 42, 48-49 (D. Mass. 2005).

More substantively, defendants argue that plaintiffs' claims are barred by the doctrine of laches because of this delay. See K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989). Whitehead contends that requiring it to amend its

application by deleting the information at such a late date in
the USPTO proceedings might prejudice Whitehead, which has the
contractual authority to prosecute the Tuschl I patent.  It
states that it needs this information because it is necessary to
comply with the best mode requirements of 35 U.S.C. § 112.  (See
Burchfiel Aff. [Docket No. 35] ¶¶ 14-28.)  This argument is
somewhat difficult to credit fully as Whitehead stated in its
July 11, 2005 Information Disclosure Statement that it did not
rely on the overhangs or the mammalian data to support its claims
and it has eschewed claims to inventorship of the '3 overhangs.
Nevertheless, Whitehead has a persuasive argument that requiring
it to amend the application after so many years of patent
prosecution would be prejudicial.

The Court thus **DENIES** plaintiffs' motion for a preliminary
injunction.  Plaintiffs have not demonstrated a likelihood of
success on their core claim that defendants misappropriated their
invention by putting the overhang and mammalian data in the
Tuschl I applications and refusing to take it out because
plaintiffs specifically authorized defendants to do so.
Likewise, plaintiffs have not demonstrated a likelihood of
success on their claims that Whitehead breached its common law or
statutory duties by filing a claim which may include the 3'
overhangs because both sides knowingly took the risk in a complex
area of law of filing separate overlapping patents and because,

21

under the doctrine of laches, plaintiffs have likely unduly delayed pressing their claims.  In light of this resolution, the Court does not address the defendants' numerous other arguments.

### **ORDER**

The motion for preliminary injunction [Docket No. 9] is **DENIED**.


<u>**S/PATTI B. SARIS**</u>
United States District Judge