## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN E.V., a corporation organized under the laws of Germany; MAX-PLANCK-INNOVATION GMBH, a corporation organized under the laws of Germany; and ALNYLAM PHARMACEUTICALS, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation; MASSACHUSETTS INSTITUTE OF TECHNOLOGY, a Massachusetts corporation; and BOARD OF TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, a Massachusetts corporation, <br><br> Defendants. | Civil Action No. 2009-11116-PBS <br><br> **LEAVE TO FILE GRANTED ON JANUARY 21, 2010** <br><br> **REDACTED** |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      This action seeks redress for the wrongful use of and damage to important property rights in a series of inventions.  Plaintiff Max-Planck-Gesellschaft zur Förderung der Wissenschaften e. V. ("Max Planck Society") is the owner of valuable intellectual property that is being irreparably harmed by Defendants' wrongful acts.  These wrongful acts stem from Defendants' insistence on exploiting intellectual property developed at and owned exclusively by Max Planck Society.  Defendants' misconduct has caused Max Planck Society (and Alnylam Pharmaceuticals, Inc., its exclusive licensee) substantial harm and threatens to prevent Max Planck Society from obtaining the full scope of patent protection to which it is entitled for its invention.

2.      The dispute arises from the prosecution of two sets of patent applications that are directed to inventions that came out of separate lines of research, performed by separate groups of investigators, in the field of RNA interference, a recently discovered process by which genes can be silenced, thereby opening up an entirely new realm of therapies for serious diseases. Dr. Thomas Tuschl is the first named inventor and only common inventor on both sets of patent applications, which are referred to herein as the "Tuschl I" and "Tuschl II" patent applications.

3.      The Tuschl I applications were jointly assigned by the four named inventors— Dr. Thomas Tuschl, Dr. Phillip Sharp, Dr. David Bartel, and Dr. Phillip Zamore—to Max Planck Society, and to defendants Whitehead Institute for Biomedical Research ("Whitehead"), Massachusetts Institute of Technology ("MIT"), and the Board of Trustees of the University of Massachusetts ("UMass") (although, as discussed below, the assignment to UMass was improper and UMass should not be a co-assignee of the Tuschl I patent family).  Pursuant to inter-institutional agreements among the parties, Whitehead assumed responsibility for prosecuting the Tuschl I applications on behalf of the other co-assignees of the applications.  In contrast, the Tuschl II applications are owned exclusively by Max Planck Society and, accordingly, Max Planck Society has responsibility for prosecuting the Tuschl II applications.  Plaintiff Alnylam Pharmaceuticals, Inc. ("Alnylam") has received an exclusive license to the Tuschl II applications from Max Planck Society, and has received an exclusive license to the Tuschl I patents and applications from Max Planck Society, Whitehead, and MIT—but not UMass.

4.      In March 2001, at Whitehead's request, Max Planck Society allowed Whitehead to incorporate into the specification of a Tuschl I application a description of significant aspects of the invention encompassed by the Tuschl II applications.  Max Planck agreed to Whitehead's request with the understanding that the Tuschl I and Tuschl II inventions would be patented separately so that the commercial value of the Tuschl II invention would be reserved for Max Planck Society alone.  That agreement is confirmed by a written representation by Whitehead and MIT in May 2004 that the Tuschl II information will not be used to support claims in the Tuschl I invention and by an Information Disclosure Statement ("IDS") filed with the United

States Patent and Trademark Office ("USPTO") in 2005 stating that Defendants do not rely on the Tuschl II information to support then-pending claims in the Tuschl I applications.

5.      Beginning in or around 2005, notwithstanding the IDS filed that same year and letter sent in May 2004, in complete disregard of their contractual, common-law, and statutory obligations, Defendants began conspiring with each other to implement a scheme to use the Tuschl II invention to support claims in the Tuschl I applications and thereby take from Max Planck Society the commercial value of the Tuschl II invention.  Specifically, Defendants are irreparably compromising Max Planck Society's ownership and Alnylam's licensing rights by refusing to concede that the invention rightfully belongs exclusively to Max Planck Society and cannot be patented in the Tuschl I applications.  As a direct result of this wrongful use, Plaintiffs have been and will continue to be damaged by Defendants' actions in depriving Plaintiffs of the value of the Tuschl II patent estate.

## THE PARTIES

6.      Plaintiff Max Planck Society is a corporation organized and existing under the laws of Germany with a principal place of business in Munich, Germany.  The English translation of the corporation's full name is "Max Planck Society for the Advancement of Science."

7.      Plaintiff Max-Planck-Innovation GmbH ("Max-Planck-Innovation"), formerly known as Garching Innovation GmbH, is a corporation organized and existing under the laws of Germany with a principal place of business in Munich, Germany.  Max-Planck-Innovation is the technology-transfer arm of Max Planck Society.  Max Planck Society and Max-Planck-Innovation are collectively referred to herein as "Max Planck."

8.      Plaintiff Alnylam is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.

9.      Plaintiffs are informed and believe, and on that basis allege, that Defendant Whitehead is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.

10.     Plaintiffs are informed and believe, and on that basis allege, that Defendant MIT is a Massachusetts corporation with a principal place of business in Cambridge, Massachusetts.

11.     Plaintiffs are informed and believe, and on that basis allege, that Defendant UMass is a Massachusetts corporation with a principal place of business in Worcester, Massachusetts.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1367.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

### *Max Planck Society and its Technology-Transfer Arm, Max-Planck-Innovation*

14.     Plaintiff Max Planck Society is a non-profit academic research institution in Germany whose mission is to perform scientific research in the interest of the public good.  For more than half a century, it has been an icon of cutting-edge research in the life sciences, the natural sciences and the humanities.  In particular, the Max Planck Society takes up new and innovative research areas that many universities are not in a position to accommodate.  These interdisciplinary research areas often do not fit into the university organization, or they require more funds for personnel and equipment than those available at universities.  The variety of topics in the natural sciences and the humanities at Max Planck Society complements the work done at universities and other research facilities in important research fields of innovation.

15.     Plaintiff Max-Planck-Innovation is Max Planck Society's technology-transfer arm and manages Max Planck Society's patenting and commercialization endeavors.  Max-Planck-Innovation was created in order to promote the transfer of Max Planck Society's proprietary technology to the marketplace and thereby further Max Planck Society's mission to make its technological advances available to the public.

### *Ownership of the Tuschl I and II Intellectual Property*

16.     During the late 1990s, scientists from Max Planck Society and two other academic institutions—MIT and Whitehead—collaborated on research that yielded groundbreaking inventions in the therapeutically promising field of RNA interference ("RNAi"). Drs. Thomas Tuschl, Phillip Sharp, Phillip Zamore and David Bartel (collectively referred to herein as the "Inventors") developed a series of inventions relating to RNAi (the "Tuschl I invention"). Tuschl performed part of his work while employed at Whitehead, and part of his work while employed at Max Planck Society, and he assigned his respective interest in the Tuschl I invention to both Whitehead and Max Planck Society. Sharp and Bartel assigned their interests in the Tuschl I invention to MIT and Whitehead, respectively. Although Zamore performed his work while employed at Whitehead, he later joined UMass as a professor and improperly assigned his interests in the Tuschl I invention to UMass, which claims to be a co-assignee of the Tuschl I invention along with Max Planck Society, Whitehead, and MIT.

17.     The critical findings of the Tuschl I inventors were published on March 31, 2000. One day earlier, the first Tuschl I U.S. provisional patent application, USSN 60/193,594 (the "'594 application"), was filed in the USPTO, naming Tuschl, Sharp, Bartel, and Zamore as inventors. In general, the Tuschl I inventors determined that, when long double-stranded RNA (commonly abbreviated dsRNA) was introduced into an *in vitro* system (which used cell extracts from the embryos of fruit flies, called *Drosophila*, in a test tube), the cellular machinery in the test tube somehow chopped up the long dsRNA into much shorter RNA fragments. These shorter RNA fragments were observed to mediate in some fashion the destruction of a special kind of RNA found in cells known as messenger RNA (commonly abbreviated as mRNA), but only the mRNA that had a corresponding sequence of nucleotides (the building blocks of RNA) to the long dsRNA. It is mRNA that is ordinarily "read" by certain cellular processes to produce the particular protein that is encoded by that mRNA. Destruction of the mRNA results in what is called gene silencing (as it is the DNA of a gene that is "transcribed" by a cell into mRNA for subsequent protein production).

18.     Also during late 1999 and 2000, a separate set of inventors—Thomas Tuschl, Sayda Elbashir, and Winfried Lendeckel, who were all scientists at Max Planck Society—developed a separate series of inventions also relating to RNAi (the "Tuschl II invention").  The Tuschl II inventors isolated the small interfering RNA fragments (which were eventually named siRNAs), determined their genetic sequence through a series of complex experiments, created their own siRNA molecules through chemical synthesis (instead of through the process of having long dsRNA chopped up into smaller fragments by cellular machinery), and introduced them into the same *in vitro* system used by the Tuschl I inventors.  The Tuschl II inventors determined that short double-stranded fragments having an "overhang" of 1 or 2 nucleotides at one particular end of the siRNA called the 3 prime end (abbreviated 3' end) were most effective in mediating RNAi.  They subsequently introduced chemically synthesized siRNA molecules into human tissue culture and observed that they, too, mediated RNAi—an extraordinary breakthrough that opened the door to human therapeutics using RNAi technology.  The Tuschl II invention revolutionized the field of RNA interference, as is reflected by the co-inventors' 2001 publications in the journal *Genes & Development* and in the prestigious scientific journal *Nature*.  Tuschl, Elbashir, and Lendeckel all assigned their interests in the Tuschl II invention to Max Planck Society.  MIT, Whitehead, and UMass raised no objection to these assignments.  Max Planck Society therefore is the sole owner of the Tuschl II invention.  Thomas Tuschl is the only scientist who made inventive contributions to both the Tuschl I and Tuschl II inventions.

19.     On December 1, 2000, a European patent application, EP 00126325.0 ("the Tuschl II EP '325 application") was filed in the European Patent Office naming Tuschl as the inventor.  Elbashir and Lendeckel were subsequently added as inventors to this application.

### Incorporation of Tuschl II Information Into Tuschl I Applications

20.     Patricia Granahan was a U.S. patent attorney employed by Whitehead at the time the first Tuschl I provisional application was filed in March 2000.  Granahan remained involved in the prosecution of the Tuschl I applications as Whitehead's in-house patent attorney until her departure from Whitehead in 2006, when she moved to the law firm of Wolf, Greenfield &

Sacks, which was outside patent prosecution counsel for the applicants of the Tuschl I applications.

21.     In February or March 2001, Granahan received a copy of both the Tuschl II EP '325 application and an unpublished manuscript of the *Nature* paper.  She then contacted Torsten Mummenbrauer, an employee of Max-Planck-Innovation who was overseeing the licensing of the Tuschl inventions on behalf of Max Planck Society, and informed him that she intended to file a utility application for the Tuschl I invention on March 30, 2001, and she asked him whether Max Planck Society would agree to combine the jointly owned Tuschl I applications with the Tuschl II EP '325 application, which was solely owned by Max Planck Society. Mummenbrauer and Max Planck's German patent counsel, Dr. Wolfgang Weiss, told Granahan that the two patent applications could not be combined, as they included different inventive subject matter and were invented by different inventive entities, but suggested that the Tuschl I and Tuschl II applications could claim priority to each other, if possible, solely to eliminate prior art rejections that might arise during prosecution.

22.     Granahan also said that she intended to include Tuschl II information relating to 3' overhangs and RNAi in mammalian cells in the Tuschl I utility application.  Max Planck agreed to this based on Granahan's representation that doing so would enhance the value of, and strengthen, both the Tuschl I applications and the Tuschl II applications.  However, Max Planck emphasized that the commercial value of the Tuschl II information belonged exclusively to Max Planck Society.  No one ever discussed or believed at that time that including this information in the Tuschl I applications would have any adverse impact on the patentability of the Tuschl II invention.  The sole purpose for including the information was to advance the prosecution of both families of patent applications.  And it was clear from Max Planck Society's insistence on keeping the prosecution of the two patent families separate that Max Planck did not agree—and would not agree—to do anything in connection with prosecution to impair the Tuschl II invention as a separate patentable invention or that would harm any Tuschl II application.

### *Max Planck's Joint Invention and Marketing Agreements with the Defendants*

23.     On or about September 19, 2001, Max Planck Society, Max-Planck-Innovation
(then called Garching Innovation), Whitehead, MIT, and UMass entered into a Joint Invention
and Joint Marketing Agreement (the "2001 Joint Agreement") to jointly license the Tuschl I and
Tuschl II inventions for research reagents and internal research use.  Despite being the sole
assignee of the Tuschl II invention, in the 2001 Joint Agreement, Max Planck Society agreed to
pool royalties from licensing of the Tuschl I and Tuschl II applications in an effort to increase
the value of both patent estates.  Because of this pooling arrangement, it was Max Planck's
expectation that all parties would work together to secure valuable patents in both estates and
that none of the parties would use their rights under this agreement, or their participation in this
agreement, to harm the other participants' interests.  Had Max Planck been aware that the other
parties to this agreement intended to deny any obligation to take reasonable steps to avoid
harming Max Planck's interest in its Tuschl II invention, Max Planck never would have entered
into this agreement.

24.     The 2001 Joint Agreement recites that Max Planck Society, Whitehead, MIT, and
UMass jointly own the Tuschl I invention (referred to in the 2001 Joint Agreement as the "Joint
Invention").  At the time it entered into the 2001 Joint Agreement, Max Planck was unaware that
Whitehead was the rightful equitable owner of Zamore's entire interest in the Tuschl I invention
and was entitled to require that Zamore assign his interest in the Tuschl I invention to
Whitehead.

25.     The parties to the 2001 Joint Agreement, including UMass, further acknowledged
that Max Planck Society was the sole owner by assignment of the Tuschl II invention (referred to
in the 2001 Joint Agreement as the "MPG [Max Planck Society] Invention"), including the
Tuschl II "EP '325 application" which serves as the priority application for the Tuschl II
invention.  In particular, the 2001 Joint Agreement recites that:

> MPG owns by assignment the invention referred to as the patent application entitled
> "RNA Interference Mediating Small RNA Molecules," by Thomas Tuschl, Sayda
> Elbashir and Winfried Lendeckel, European Serial Number 00126325, and any

divisionals, continuations, continuation-in-part applications directed to the same subject matter, and continued prosecution applications (and their relevant international equivalents) of the patent applications (hereinafter "MPG Invention").

26.    In general terms, the 2001 Joint Agreement provides that (a) Whitehead assumes primary responsibility for securing patent protection for the Tuschl I invention (i.e., the Joint Invention), subject to advice and comment by the other co-assignees, (b) Max-Planck-Innovation assumes exclusive responsibility for securing patent protection for the Tuschl II invention (i.e., the MPG Invention), (c) Max Planck Society authorizes Max-Planck-Innovation to act as its sole and exclusive agent for licensing purposes, (d) Max Planck Society, Max-Planck-Innovation, Whitehead, and UMass jointly authorize MIT to license the Tuschl I and II inventions to distributors for the sale and use of research reagents (but not for therapeutic purposes); and (e) that royalties from licensing of the Joint Invention and the MPG Invention are to be pooled and shared among the parties.

27.    More particularly, the 2001 Joint Agreement provides that: "Whitehead shall manage the patent filing, prosecution and maintenance of the [Tuschl I invention].  MIT, UMass, and MPG [Max Planck Society] will be copied on all patent correspondence.  The prosecution, filing and maintenance of all [Tuschl I invention] patent applications and patents will be the primary responsibility of Whitehead; provided, however, MIT, UMass, and MPG will have reasonable opportunities to advise Whitehead and will cooperate with Whitehead in such prosecution, filing and maintenance."  2001 Joint Agreement ¶ 1(a) (the "patent-management clause").

28.    The 2001 Joint Agreement provides that "[a]ll parties agree that rights to license the JOINT INVENTION and the MPG INVENTION for therapeutic purposes and other uses such as vaccines are not covered by this Agreement.  Rights to license the JOINT INVENTION and/or the MPG INVENTION for therapeutic purposes shall be covered under a separate agreement."

29.    On or about July 30, 2003, Max Planck and Max-Planck-Innovation (then still called Garching Innovation) entered into a second agreement with Whitehead and MIT (but not

UMass, which declined to participate)—the Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes (the "Therapeutic Use Agreement")—to jointly license the Tuschl I and Tuschl II inventions as a patent package for therapeutic purposes. Again, although Max Planck Society is the exclusive assignee of the Tuschl II invention, it once again agreed to pool royalties from licensing the Tuschl II invention together with the Tuschl I invention for therapeutic purposes.

30.    In general terms, the Therapeutic Use Agreement provides that (a) Whitehead assumes primary responsibility for the filing of patent applications based on the Tuschl I invention, subject to advice and comment by Max Planck Society and MIT, (b) Max-Planck-Innovation assumes primary responsibility for the filing of patent applications based on the Tuschl II invention, subject to advice and comment by Whitehead and MIT, (c) Max Planck Society authorizes Max-Planck-Innovation to act as its sole and exclusive agent for licensing purposes, and (d) Max Planck, Whitehead, and MIT jointly authorize Max-Planck-Innovation to grant two semi-exclusive licenses, with the right to sublicense, to the Tuschl I and II inventions for therapeutic purposes—one license to Alnylam, and the other license to a European based company, Ribopharma AG ("Ribopharma"). UMass did not enter into this second agreement, although it was invited to do so, but instead opted to license its purported ownership interest in the Tuschl I invention for therapeutic purposes to other companies.

31.    More particularly, the Therapeutic Use Agreement provides that the filing of patent applications based on the Tuschl I invention "shall be managed by and be the primary responsibility of Whitehead," subject to the following provisions:  "Whitehead shall

a.    (i) *keep the Remaining Joint Owners* [Max Planck Society and MIT] *and the Therapeutic Licensees* [Alnylam and Ribopharma] *reasonably informed* as to the filing, prosecution, maintenance and abandonment of the Remaining Joint Invention [the Tuschl I invention],

b.    (ii) *furnish the Remaining Joint Owners and the Therapeutic Licensees copies of documents* relevant to any such filing, prosecution, maintenance and abandonment, and

   c.      (iii) *allow the Remaining Joint Owners and the Therapeutic Licensees reasonable opportunity to comment and advise* on patent attorneys to be used and on documents to be filed with any patent office which would affect the Remaining Joint Invention, and

   d.      (iv) *give good faith consideration to the comments and advice* of the Remaining Joint Owners and the Therapeutic Licensees."  Therapeutic Use Agreement ¶ 1(a) (the "patent-management clause") (emphasis added).

   32.     Because royalties generated by licensing the Tuschl I and Tuschl II applications pursuant to the Therapeutic Use Agreement were to be pooled, such that Max Planck, Whitehead and MIT were to receive consideration from the licensing of both Tuschl I and Tuschl II as a patent package, it was Max Planck's expectation that all parties would work together to secure valuable patents in both estates and that none of the parties to this agreement would use their rights under this agreement, or their participation in this agreement, to harm the other participants' interests.  Had Max Planck been aware that the other parties to this agreement intended to deny any obligation to take reasonable steps to avoid harming Max Planck's interest in its Tuschl II invention, Max Planck never would have entered into this agreement.

### The License Agreements with Alnylam

   33.     On or about December 20, 2002, Max-Planck-Innovation, on behalf of Max Planck Society, entered into a first co-exclusive license agreement with Alnylam relating to the Tuschl I and Tuschl II inventions (the "Alnylam License").  Pursuant to the Therapeutic Use Agreement and a Letter Agreement dated July 30, 2003, Whitehead and MIT also agreed to be bound by this co-exclusive license agreement with Alnylam.  Whitehead and MIT thereupon received an equity interest in Alnylam, and are entitled to receive other consideration in exchange for the Tuschl I and Tuschl II applications licensed to Alnylam under the Alnylam License.

   34.     On or about July 30, 2003, Max-Planck-Innovation, on behalf of Max Planck Society, also entered into a second co-exclusive license agreement with Ribopharma relating to the Tuschl I and Tuschl II inventions.

35.     As a result of Alnylam's acquisition of Ribopharma on or about July 31, 2003, Alnylam is effectively the exclusive licensee of the Tuschl II invention for therapeutic purposes, and is the exclusive licensee of the rights belonging to Whitehead, MIT, and Max Planck Society (but not UMass) in the Tuschl I invention for therapeutic purposes.

### *Defendants' Wrongful Use of Max Planck's Property Interest in the Tuschl II Invention*

36.     By agreeing to the terms of both the 2001 Joint Agreement and the Therapeutic Use Agreement, Whitehead affirmatively assumed a duty to act in good faith on Max Planck's behalf for the benefit of Max Planck and in Max Planck's best interests in securing patent protection for the parties' respective intellectual property.

37.     By agreeing to the terms of the Therapeutic Use Agreement and the Alnylam License, Whitehead also affirmatively assumed a duty to act in good faith on Alnylam's behalf for the benefit of Alnylam and in Alnylam's best interests in securing patent protection for the co-assignees' respective intellectual property licensed to Alnylam.

38.     By agreeing to the terms of both the 2001 Joint Agreement and the Therapeutic Use Agreement in which Max Planck Society tied its interests in the Tuschl II applications to the Tuschl I applications, and by paying a portion of Whitehead's prosecuting attorney's fees, Max Planck Society entrusted its intellectual-property rights to Whitehead and reposed faith, confidence, and trust in Whitehead's judgment and advice in securing patent protection for the parties' respective intellectual property.  Whitehead accepted that reposed faith, confidence, and trust.

39.     Max Planck Society, by virtue of receipt of monies from Alnylam, has paid Whitehead to apply for patent protection of its ownership interest in the Tuschl I invention on Max Planck's and the other Tuschl I co-assignees' behalf.  Whitehead knows that Plaintiffs reposed faith, confidence, and trust in its judgment and advice, and accepted that reposed faith, confidence and trust.  Nonetheless Whitehead continues to seek, to Plaintiffs' detriment, patent protection for aspects of the Tuschl II invention for the benefit of the co-assignees of the Tuschl I invention.

40.     As discussed in more detail below, in September 2003, UMass licensed its interests in the Tuschl I applications for therapeutic purposes to CytRx Corporation ("CytRx") and Sirna Therapeutics, Inc. ("Sirna").  To the surprise of both Max Planck and Alnylam, Sirna then held itself out as having the right to the commercial value of not only the Tuschl I applications, but also the Tuschl II applications.

41.     After learning of these false representations by Sirna, both Max Planck and Alnylam contacted the other Defendants to emphasize that the inventive content of the two families of applications was to be kept separate and not combined.  None of the Defendants or their representatives—including UMass—expressed disagreement with these statements.

42.     Max Planck continued to demand that Defendants preserve the separateness of the inventions, and Defendants reassured Max Planck that they would do so.  Thus, in May 2004, at Max Planck's and Alnylam's request, Lita Nelsen of MIT and John Pratt of Whitehead wrote a letter to Chester A. Bisbee of UMass (the "Nelsen-Pratt letter") in which they confirmed that the 3' overhang data generated at Max Planck Society belonged to Max Planck Society, that "[t]he data was given to us contingent upon our not using it to claim nor provide support for claims to RNAi agents having 3' overhangs and their use," and that "[c]laims containing the inventive subject matter of 3' overhangs were to be reserved for MPG's own patent."  Although the Nelsen-Pratt letter generally refers to 3' overhang data, the purpose of the letter was to confirm the terms pursuant to which Max Planck Society allowed Whitehead to incorporate Tuschl II information into the Tuschl I applications.

43.     Then, on July 11, 2005, Whitehead filed an IDS with the USPTO, in which it affirmatively represented that the Tuschl I applicants were not relying on the Tuschl II information "for . . . any of the currently pending claims" in the Tuschl I applications.

44.     Unbeknownst to Max Planck, however, at the same time that Defendants were outwardly purporting to address Max Planck's concerns, Whitehead and the other Defendants began implementing a scheme to persuade the USPTO to issue a patent in the Tuschl I family of applications containing Tuschl II information in the specification and broad claims that, when construed in light of and considered along with the Tuschl II inventive subject matter included in

the Tuschl I specification, now threatens the very existence of the entire Tuschl II family of patent applications, particularly in the United States.  This strategy was designed to appropriate for Defendants themselves the commercial value of the Tuschl II invention, which they previously agreed was to be reserved for Max Planck Society.  Although UMass was not a party to the Therapeutic Use Agreement, Whitehead and MIT included UMass in the group implementing this strategy.  No one ever informed Max Planck that Defendants were even considering, let alone pursuing, this strategy.

45.     In addition, Defendants began secretly communicating with each other and with Zamore and his personal attorney concerning methods of dealing with Max Planck's growing concern about the use of the Tuschl II information and the priority claim in the Tuschl I applications to the date of the first Tuschl II application, the Tuschl II EP '325 application. Although UMass was not a party to the Therapeutic Use Agreement, Whitehead and MIT included UMass in these secret meetings, while Max Planck was not invited and was not even told about these meetings.  The underlying purpose of these secret communications was to coordinate Defendants' efforts to lull Plaintiffs into a false belief that they needed to take no further steps to protect their rights.  In fact, unbeknownst to Plaintiffs, but as John Pratt of Whitehead explained at his deposition, Whitehead had a policy to try to get the Tuschl I applications issued before Tuschl II applications, because Whitehead was of the view that if Tuschl II applications were to issue, it would be unlikely that Tuschl I applications would issue. Plaintiffs were not aware, and Defendants never informed them, that Whitehead viewed the issuance of Max Planck's Tuschl II applications as a threat to Tuschl I.

46.     Also unbeknownst to Max Planck and Alnylam, at the time of Whitehead and MIT's secret communications and meetings with UMass,

47.

48.     In late 2004, Max Planck asked Whitehead to withdraw the cross-claim of priority by the Tuschl I applications to the Tuschl II EP '325 application.  In January 2005, MIT forwarded to Alnylam and Max Planck a memorandum prepared by Helen Lockhart, the co-assignees' attorney in connection with the prosecution of Tuschl I, in which Lockhart explained that she was unaware of any reason to maintain the cross-claim of priority.  Nevertheless, Defendants refused to take any steps to withdraw the priority claim of the Tuschl I applications to the Tuschl II EP '325 application—or to give Max Planck and Alnylam any reason at all for why this priority claim should be maintained.

49.     In 2006, Max Planck asked that its attorneys be permitted to participate in an interview with the patent examiner for the Tuschl I applications during which the issue of the cross-claim to priority was to be discussed.  Whitehead refused to allow Max Planck's attorneys to participate, but invited UMass, Zamore, and MIT to participate and they did, in fact, participate in the interview.

50.     Defendants' actions are also in direct contravention of their obligations under both the 2001 Joint Agreement and the Therapeutic Use Agreement as well as their statutory and common-law duties, as they are wrongfully seeking to obtain the commercial value of the Tuschl II invention that was conceived by the Tuschl II inventors by including in Tuschl I patent applications critical information regarding that invention.  The "consent" that Max Planck gave in 2001 to the use of Tuschl II information in Tuschl I applications was conditioned on reserving

the commercial value of the Tuschl II invention for Max Planck.  Defendants' efforts to usurp that commercial value are contrary to the conditions of Max Planck's consent, thereby vitiating that consent and eliminating any legitimate basis for Defendants to import Max Planck's property interests in the Tuschl II invention into Tuschl I patent applications.

51.     Max Planck and Alnylam have repeatedly informed Whitehead that refusing to remove the Tuschl II invention from the Tuschl I patent applications impermissibly broadens the scope of the patent protection to embrace the Tuschl II property that rightfully belongs only to Max Planck Society, and that such refusal by Whitehead could endanger the patentability of both the Tuschl I and Tuschl II inventions.  This concern has turned out to be true in light of the USPTO's rejections of Tuschl I and Tuschl II claims on obviousness-type double patenting grounds.  Whitehead has failed, and affirmatively refused, to remove the Tuschl II invention from the Tuschl I patent applications and the priority claim in the Tuschl I applications to the Tuschl II EP '325 application, and has failed to offer any justification to Plaintiffs for failing and refusing to direct prosecution counsel to do so.

### Dr. Zamore's Assignment to UMass

52.     In 1993, Zamore joined the Whitehead Institute as a post-doctoral research fellow in the laboratory of Dr. Ruth Lehman to study *Drosophila*, also known as fruit flies.

53.

56.     In January 1998, Zamore joined the laboratory of Dr. David P. Bartel at Whitehead.  Bartel is a leading researcher in the field of RNA, including RNAi.

57.     Soon thereafter, Zamore began a research collaboration with Bartel, Dr. Phillip Sharp of MIT, and Dr. Thomas Tuschl, a post-doctoral fellow working jointly with Bartel and Sharp.  The purpose behind this collaboration was to conduct research in the field of RNA interference using a cell-free system based upon cell extracts (referred to as a lysate) from *Drosophila* embryos.

58.     Zamore continued working in Bartel's laboratory until February 29, 2000.  From January 1998 through February 29, 2000, Zamore's work in Bartel's laboratory was covered by the Whitehead IP Policy.  Although Zamore accepted a position at UMass in late 1999, he did not begin his work at a laboratory at UMass until February 29, 2000.  Specifically, from November 30, 1999, through February 29, 2000, Zamore was a Visiting Scientist/Fellow at Whitehead.  During that time, Zamore continued to use scientific resources at Whitehead, including laboratory space and supplies, reagents and materials owned by Whitehead.  He continued to use his Whitehead email address for his professional correspondence.  Zamore also used Whitehead computing resources, such as FTP sites, to transfer data to his collaborators. The Whitehead IP Policy applies to anyone working at Whitehead, including Visiting Scientists/Fellows.  Lita Nelsen of MIT  confirmed that Zamore's appointments at Whitehead as postdoctoral fellow and postdoctoral associate "would obligate him to assign to Whitehead."  On March 30, 2000, Whitehead, MIT, UMass, and Max Planck Society jointly filed the first Tuschl I

provisional U.S. patent application, the '594 application.  This patent application described the Inventors' invention of small, isolated RNA molecules that mediate RNAi.  The '594 application contains no data obtained after March 2000.

59.     On February 22, 2000, Zamore moved into the laboratory that UMass had prepared for him.  By this point, Zamore had completed all of the inventive work that he ultimately contributed to the '594 application.  The entirety of these experiments took place prior to February 22, 2000, in Whitehead's laboratory utilizing Whitehead laboratory space and resources.

60.     On February 29, 2000, Zamore's appointment at Whitehead officially came to an end.  The forwarding address listed on his notice of termination was the UMass Medical School in Worcester, Massachusetts.

61.     Within one year of filing of the '594 provisional application, Whitehead, MIT, UMass and Max Planck Society jointly filed the first Tuschl I U.S. utility patent application, USSN 09/821,832 (the "'832 application").  Each of the claims in the '832 application purports to draw full support from, and claims priority to, the '594 application.

62.     On April 6, 2001, a Notice of Recordation of Assignment Document was submitted to the USPTO, wherein Zamore purported to assign his interest in the Tuschl I invention to UMass.  At some point thereafter, Whitehead requested that Zamore re-record his assignment as a joint assignment to Whitehead and UMass.  Zamore never did so.  As a result, UMass remains the sole recorded assignee of Zamore's interest in the Tuschl I invention.

63.     Unlike the other co-assignees, UMass licensed its claimed property rights in the Tuschl I invention to companies other than Alnylam.  One such company is Sirna, subsequently acquired by Merck & Co., Inc. ("Merck").  Sirna is a direct competitor of Alnylam in the field of RNAi research and therapeutics.  Accordingly, Alnylam is the exclusive licensee of all rights of Max Planck Society, Whitehead, and MIT in the Tuschl I invention for therapeutic purposes, while Sirna/Merck and CytRx are the licensees of the therapeutic rights of UMass in the Tuschl I invention, if any.

64.     In early September 2003,  Alnylam's CEO John Maraganore questioned UMass's claimed ownership interest in the Tuschl I applications on the grounds that UMass's interest rightfully belonged only to Whitehead because Zamore's inventive work took place entirely within Whitehead's laboratories.  Maraganore demanded that Whitehead take action to challenge UMass's claim to an ownership interest in the Tuschl I applications.  On September 5, 2003, Maraganore wrote to Susan Lindquist, Director at Whitehead:  "As the exclusive licensee to Whitehead's ownership of the Joint Patent Rights, we believe you have an obligation to us to defend the ownership interest licensed to us, and we request that you inform UMass of their misunderstanding in this matter and assert your rightful claim to full ownership of all interests in the Joint Patent rights based on Dr. Zamore's work."  Lindquist responded to Maraganore's letter on September 12, 2003, saying that Whitehead "was actively looking into the question" of the validity of Zamore's assignment to UMass but that it was "premature to conclude that any UMass claims are invalid."  Whitehead said it "was not in a position to contact UMass about this matter at this time," but promised that it was undertaking an "investigation."

65.     On November 20, 2003, Maraganore spoke with John Pratt of Whitehead to follow up on Lindquist's promise that Whitehead was conducting an investigation on the issue. On the same day, Pratt emailed Thomas Ittelson, the Director of Whitehead's Intellectual Property Office, asking for an update on where Whitehead's investigation stood and what its conclusions were.  Ittelson forwarded Pratt's email to Lita Nelsen of MIT.

Plaintiffs were not aware of this email prior to discovery in this case.

66.     Unbeknownst to either Alnylam or Max Planck, UMass and Whitehead had a series of meetings to discuss UMass's alleged rights in the Tuschl I invention.  Despite Max Planck's and Alnylam's valuable interest in the resolution of the question Alnylam had raised about the propriety of Zamore's assignment to UMass, neither Max Planck nor Alnylam was included in any of the discussions.  Further, Whitehead's decision not to challenge Zamore's

assignment to UMass was based on Whitehead's own self interest—to avoid a "political" issue and potential litigation—without taking into account the valuable interests of Max Planck and Alnylam to whom Whitehead owed a duty of utmost loyalty.

67.     In January 2004, a meeting took place between Maraganore and Whitehead to discuss the issue of the propriety of Zamore's assignment to UMass.  During this meeting, Whitehead told Maraganore that it had investigated the matter and had decided not to take any action.  While Whitehead promised to send a report detailing the findings of the investigation, no report was ever given to Maraganore.

68.     At the time of these investigations and meetings, Whitehead remained a party to the Therapeutic Use Agreement.  Under the terms of the Agreement, Whitehead agreed with Max Planck to license all of its rights collectively with Max Planck and MIT, and Alnylam was effectively the sole licensee of Whitehead's rights in the Tuschl I invention for therapeutic purposes.

69.     Whitehead's decision to allow Zamore's assignment of his interest in the Tuschl I invention to UMass to stand was made solely for Whitehead's own benefit, to avoid any public dispute with UMass.  UMass effected this result using the threat of litigation and bad publicity.

### The UMass-Sirna License Agreement

70.     On or about September 8, 2003, UMass entered into a license agreement with Sirna (the "UMass-Sirna License").

2174889.1 03

2174889.1  03

78.

UMass apparently had full knowledge of Sirna's sublicense agreements, including the Sirna-Protiva and Sirna-Allergan Agreements, in which Sirna purported to sublicense the Tuschl II patent estate. UMass was also in frequent contact with Sirna during this period concerning the Tuschl I and Tuschl II applications.

79.

80.

81.     For example, at the time of and subsequent to Sirna's purported sublicense of the Tuschl II applications to Protiva and Allergan, Alnylam has been actively engaged in seeking collaborators and/or sublicensees to whom it can sublicense the Tuschl II estate for valuable consideration.  One such potential sublicensee for the Tuschl II estate that Alnylam approached was Allergan.  Allergan told Alnylam that it did not believe that it needed a license from Alnylam to the Tuschl II estate.  Unbeknownst to Alnylam, at the time of its discussions with Allergan, Sirna had already purported to have licensed Allergan to the Tuschl II estate.

has deprived Alnylam of the opportunity to exploit its exclusivity in the Tuschl II invention in the marketplace, including with potential collaborators and sublicensees such as Allergan, and has thereby damaged the value of the Tuschl II patent estate to the detriment of Plaintiffs.

**THE NEED FOR INJUNCTIVE RELIEF**

82.     Injunctive relief is necessary to protect Max Planck Society's and Alnylam's valuable intellectual-property rights in the Tuschl II invention.  In the absence of injunctive relief, Defendants will continue to request that the USPTO grant them patents in the Tuschl I family that include the Tuschl II invention, thereby irreparably misappropriating that invention from Max Planck Society and its exclusive licensee, Alnylam.  In short, Defendants seek to wrongfully capitalize on and reap the benefits of Max Planck Society's property rights.

83.     Plaintiffs have no plain, speedy, and adequate remedy at law and will suffer irreparable damage, injury, and harm unless equitable relief is granted.  Plaintiffs, therefore, seek a permanent injunction against Defendants, ordering them as set forth below.

## COUNT I

## Breach of Contract

## (Against Defendant Whitehead)

84.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

85.     A written contract, the 2001 Joint Agreement, exists between Plaintiffs Max Planck Society and Max-Planck-Innovation and Defendants Whitehead, MIT, and UMass.

86.     A second written contract, the Therapeutic Use Agreement, exists between Plaintiffs Max Planck Society and Max-Planck-Innovation and Defendants Whitehead and MIT.

87.     At all relevant times, Plaintiffs performed, or stood ready, willing, and able to perform its obligations under both Agreements.

88.     Whitehead has breached, and continues to breach, these agreements by, among other acts:

    e.     failing to keep Max Planck reasonably informed as to the patent prosecution of the Tuschl I invention as required by both the 2001 Joint Agreement and the Therapeutic Use Agreement;

    f.     failing to furnish Max Planck with copies of documents relevant to the patent prosecution of the Tuschl I invention as required by both the 2001 Joint Agreement and the Therapeutic Use Agreement;

    g.     refusing to provide Max Planck an opportunity to comment and advise on patent attorneys to be used and on documents to be filed with the USPTO as required by both the 2001 Joint Agreement and the Therapeutic Use Agreement (collectively, the "Agreements");

    h.     failing to give good faith consideration to the comments and advice of Max Planck as required by the Therapeutic Use Agreement;

    i.     implementing a strategy to promote the allowance of a Tuschl I application containing the Tuschl II material in the specification and broad claims that, when construed in light of and considered along with the Tuschl II inventive subject matter included in the Tuschl I specification, threaten the very existence of the entire Tuschl II family;

j.      failing to inform Max Planck that Defendants were meeting secretly with themselves and Zamore to develop their strategy to have a broad Tuschl I patent to issue containing Tuschl II information before the issuance of any further Tuschl II patents, thereby undermining the patentability of the entire Tuschl II estate; and

k.      participating in a conspiracy to lull Max Planck into refraining from exercising legal rights that would prevent Defendants from usurping the commercial value of the Tuschl II inventions by the acts alleged herein.

89.     As a direct and proximate result of these and other violations, Max Planck has suffered and will continue to suffer substantial and irreparable injury.

## COUNT II

## Breach of the Implied Covenant of Good Faith and Fair Dealing

## (Against Defendant Whitehead)

90.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

91.     All contracts in Massachusetts include an implied covenant of good faith and fair dealing, which requires that neither party take any action that will deprive the other of the benefit of the contract.

92.     Plaintiffs Max Planck Society and Max-Planck-Innovation entered into the Therapeutic Use Agreement and the 2001 Joint Agreement in order to, among other things, benefit from the development and commercialization of the parties' respective intellectual-property rights without damaging Plaintiffs' property rights.

93.     Whitehead understood that at least one of the purposes of these agreements was for the parties to the contract to benefit from the development and commercialization of their respective intellectual-property rights without favoring any of the parties' rights to the detriment of the other parties.  Whitehead further understood that Plaintiffs Max Planck Society and Max-Planck-Innovation wanted to further the commercialization of—and maximize the value of its

property interest in—both the Tuschl I and Tuschl II inventions by entering into these agreements.

94.     In violation of this implied covenant of good faith and fair dealing, and as a direct and proximate cause, Whitehead has damaged and is continuing to damage the value of Max Planck's property interest in, and business prospects with respect to, the Tuschl II invention, thereby causing irreparable injury.

## COUNT III

## Breach of Fiduciary Duty

## (Against Defendant Whitehead)

95.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

96.     As the party contractually responsible under the Agreements for securing patent protection for the Tuschl I invention, Whitehead has a fiduciary duty to act in Plaintiffs' best interests as to matters relating to the patent prosecution and not to take actions that might be to Plaintiffs' detriment.

97.     Pursuant to the Agreements, Plaintiffs reposed and continue to repose faith, confidence, and trust in Whitehead's judgment and advice in matters relating to securing patent protection, and accepted that reposed faith, confidence and trust.

98.     Whitehead knew that Plaintiffs reposed and continue to repose faith, confidence, and trust in Whitehead's judgment and advice in matters relating to securing patent protection.

99.     Whitehead breached its fiduciary duty to Plaintiffs by wrongfully using the Tuschl II invention; by attempting to derive improper personal benefit in the process of securing patent protection for the Tuschl I invention; by engaging in self-dealing to the detriment of Max Planck Society's property rights and economic interests in the Tuschl II patent estate; and by reason of other acts or omissions not in good faith or involving intentional misconduct.

100.    As a direct and proximate result of Whitehead's breach of fiduciary duty, Plaintiffs have suffered and will continue to suffer irreparable injury.

101.    In acting as alleged herein, Defendants acted with malice, fraud and oppression. Accordingly, Plaintiffs are entitled to recover punitive damages.

## COUNT IV

### Waste

### (Against Defendant Whitehead)

102.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

103.    Whitehead owed and continues to owe a fiduciary duty to Plaintiffs to secure patent protection for the Tuschl I invention for the benefit of all co-assignees, as well as for Alnylam.

104.    Whitehead committed waste upon the assets that Max Planck entrusted to Whitehead—the Tuschl II invention—in order to secure patent protection for the Tuschl I invention that would include critical information from the Tuschl II invention.

105.    Whitehead has spent and continues to spend Max Planck's assets in order to secure patent protection of the Tuschl I invention in a manner that fails to protect, and affirmatively injures, Max Planck's property rights in the Tuschl II invention.  Indeed, Whitehead has caused counsel to accept payment from Alnylam, on behalf of Max Planck, in order to prosecute the patent applications for the Tuschl I invention in a way that is contrary to the Plaintiffs' instructions and against their explicitly stated interests.

106.    Whitehead has diverted and continues to divert Plaintiffs' assets for the improper purpose of transferring to Defendants' own intellectual property estate the Tuschl II invention, which rightfully belongs to Max Planck Society and is exclusively licensed to Alnylam.

107.    As a direct and proximate result of Whitehead's waste, Plaintiffs have been and continue to be significantly and irreparably damaged.

## COUNT V

### Interference with Advantageous Business Relations

### (Against All Defendants)

108.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

109.    Plaintiffs Max Planck Society, Max-Planck-Innovation, and Alnylam possessed a prospective economic advantage in the marketplace derived from their exclusive license agreements relating to the Tuschl II invention.

110.    Defendants knew of Plaintiffs' exclusive licensing of the Tuschl II invention.

111.    Defendants intentionally interfered with the prospective advantages of Plaintiffs' license agreements through improper motives or means.

112.    As a direct and proximate result of Defendants' misconduct, Plaintiffs' prospective business advantage may be irretrievably lost.  Plaintiffs therefore have suffered and will continue to suffer substantial and irreparable harm.

## COUNT VI

### Unjust Enrichment

### (Against All Defendants)

113.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

114.    Defendants have been and continue to be unjustly enriched by reaping the benefits of the wrongful conduct described in the preceding paragraphs of this Complaint.  In particular, Defendants have made wrongful use of the Tuschl II invention, thereby broadening the scope of their property rights in the Tuschl I invention to encroach on the Tuschl II property and deriving an unjust benefit from these additional property rights.

115.    Plaintiffs have incurred and continue to incur unjust detriment in the form of loss of time, money, and property as a result of Defendants' wrongful use of the Tuschl II invention.

116.    The harm to Plaintiffs is and continues to be substantial and irreparable.

## COUNT VII

## Violation of Mass. Gen. Laws c. 93A

## (Against All Defendants)

117.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

118.    At all relevant times, Defendants were engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A, §§ 1 and 11.

119.    Defendants' unfair acts and practices pursuant to Mass. Gen. Laws. c. 93A include, without limitation, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, waste, unjust enrichment, and intentional interference with advantageous business relations, as set forth in this Complaint.

120.    The wrongful actions described herein were willful and knowing.

121.    As a direct and proximate result of the foregoing knowing and/or willful unfair acts and practices of Defendants, Plaintiffs have suffered and will continue to suffer significant harm in the form of loss of money and property, including but not limited to loss of value of the Tuschl II patent estate and the revenues derived from a license to that property.

## COUNT VIII

## Declaratory Judgment

## (Against All Defendants)

122.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

123.    An actual controversy exists within the meaning of G.L. c. 231, §6A as set forth in the foregoing counts.

124.    Defendants' acts as set forth in the foregoing counts have caused Plaintiffs to suffer irreparable injury.

125.    This Court should issue a judgment declaring that Defendants are required to specifically include only the invention of the Tuschl I inventors and not those of the Tuschl II

inventors in their applications for patent protection for their property rights in the Tuschl I invention.

## COUNT IX

## Negligence

## (Against All Defendants)

126.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

127.    Whitehead, as a consequence of its fiduciary duties, owed a duty to Plaintiffs to act reasonably in avoiding harm to them.

128.    Whitehead acted negligently when prosecuting the Tuschl I applications by including the Tuschl II invention in those applications, even when it became clear that by doing so Plaintiffs would be deprived of the commercial value of the Tuschl II invention.

129.    As a direct and proximate result of Whitehead's negligence, Plaintiffs have been harmed in an amount to be determined at trial.

## COUNT X

## Breach of Contract

## (Against Defendant Whitehead)

130.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

131.    A written contract, the Therapeutic Use Agreement, exists between Max Planck and defendants Whitehead and MIT.

132.    Section 4(a) of the Therapeutic Use Agreement provides that "Patents for the [Tuschl I invention] … shall be commercialized together as a single package (hereinafter the "PATENT PACKAGE)."

133.    Section 4(b) of the Therapeutic Use Agreement provides that "[Max Planck Society, Whitehead and MIT] hereby appoint [Max-Planck-Innovation] as their exclusive agent

to issue licenses or options to their rights to the PATENT PACKAGE for therapeutic purposes[.]"

134.   At all relevant times, Max Planck performed, or stood ready, willing, and able to perform, its obligations under the Therapeutic Use Agreement.

135.   All parties to the Therapeutic Use Agreement, including Whitehead, agreed to license their entire interests in the Tuschl I applications on a co-exclusive basis to Alnylam and Ribopharma.  Although Max Planck Society is the exclusive assignee of the Tuschl II invention, Max Planck agreed to jointly license the Tuschl II applications with the Tuschl I applications and to pool royalties from jointly licensing such applications to Alnylam and Ribopharma for therapeutic purposes.  Max Planck agreed to do so in reliance on Whitehead's agreement that it would license its entire interests in the Tuschl I applications to Alnylam and Ribopharma, as Max Planck viewed it as more profitable and more beneficial for the parties to pool their entire interests in the Tuschl I and Tuschl II patent estates.  Max Planck entered into the Therapeutic Use Agreement, in part, as a result.

137.   Rather than licensing its entire interest in the Tuschl I invention for therapeutic purposes to Alnylam as required by the Therapeutic Use Agreement and related agreements, Whitehead relinquished its rightful sole ownership of Zamore's interest in the '594 application and thus licensed only a portion of its interest in the Tuschl I applications, in violation of its contractual obligations under the Therapeutic Use Agreement.  Instead, Whitehead allowed UMass to hold itself out as the rightful assignee of Zamore's interest in the '594 application, thus acquiescing in UMass's purported license of Whitehead's own rightful interest in the Tuschl I invention to Sirna and CytRx.

138.   As a direct and proximate result of these and other violations, Max Planck has suffered and will continue to suffer substantial and irreparable injury.

## COUNT XI

### Breach of Implied Covenant of Good Faith and Fair Dealing

### (Against Defendant Whitehead)

139.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

140.     All contracts in Massachusetts include an implied covenant of good faith and fair dealing, which requires that neither party take any action that will deprive the other of the benefit of the contract.

141.     Max Planck entered into the Therapeutic Use Agreement in order to, among other things, benefit from the pooling of revenue from the licensing of the interests in the Tuschl I and Tuschl II inventions to a common licensee, which was intended to be the company founded by the Tuschl I inventors: Alnylam.

142.     Whitehead understood that at least one of the purposes of the 2001 joint Agreement and Therapeutic Use Agreement was for the parties to benefit from the pooling of revenue from the licensing of the interests in Tuschl I and Tuschl II to a common licensee.

143.     In violation of this implied covenant of good faith and fair dealing, Whitehead has decided not to claim its rightful ownership of Zamore's interest in the '594 application.  Instead, Whitehead has allowed UMass to hold itself out as the rightful assignee of Zamore's interest in the '594 application, thus acquiescing in UMass's purported license of Whitehead's own rightful interest in the Tuschl I invention to Sirna and CytRx.

144.     As a direct and proximate cause, Whitehead has damaged and is continuing to damage the value of Max Planck's property interest in, and business prospects with respect to, the Tuschl I invention, thereby causing irreparable injury.

## COUNT XII

## Negligent Misrepresentation

## (Against Defendants UMass and Whitehead)

145.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

146.     Both prior to, during, and after the signing of the 2001 Joint Agreement, UMass has represented to Plaintiffs that it is the rightful owner of a valid interest in the '594 patent application.

147.     At the time UMass made these representations to Plaintiffs, it had no reasonable grounds for believing them to be true and should have known them to be false.  Nonetheless, UMass made these representations with both knowledge and intent that Plaintiffs would rely upon them.

148.     Whitehead has continued to represent to Plaintiffs that its entire interests in the '594 patent application were licensed to Alnylam pursuant to the Therapeutic Use Agreement, even though Whitehead relinquished, for "political" reasons having nothing to do with proper allocation of ownership rights, a portion of its ownership interest in the Tuschl I patent applications.

149.     At the time Whitehead made these representations to Plaintiffs, it had no reasonable grounds for believing them to be true and should have known them to be false. Nonetheless, Whitehead made these representations with both knowledge and intent that Plaintiffs would rely upon them.

150.     Plaintiffs have continued to reasonably rely upon UMass's representations of a valid interest in the '594 patent application.  This reliance, among other things, has affected the prosecution of the Tuschl I patent applications.   For example, UMass has been given the opportunity to comment on, advise, and influence the prosecution of the Tuschl I patent applications to benefit the interests of its licensee Sirna despite the fact that UMass does not have a legitimate ownership interest in those applications.  Max Planck also agreed to share licensing revenues with UMass under the 2001 Joint Agreement in reliance upon UMass's representations.

151.    Plaintiffs similarly relied upon Whitehead's representations of having licensed the entirety of their interest in the '594 patent application to Alnylam.  This reliance, among other things, has affected the prosecution of the Tuschl I patent applications.   For example, UMass has been given the opportunity to comment on, advise and influence the prosecution of the Tuschl I patent applications to benefit the interests of its licensee Sirna despite the fact that UMass does not have a legitimate ownership interest in those applications.  Max Planck also agreed to share licensing revenues with UMass under the 2001 Joint Agreement in reliance upon Whitehead's representations.

152.    As a direct and proximate result of UMass's and Whitehead's negligent misrepresentations, Plaintiffs have suffered and will continue to incur damages and suffer irreparable injury.

## COUNT XIII

### Breach of Fiduciary Duty

### (Against Defendant Whitehead)

153.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

154.    Whitehead owes fiduciary duties to Max Planck by virtue of the terms of the 2001 Joint Agreement and the Therapeutic Use Agreement, under which they took on certain responsibilities—including the prosecution of the Tuschl I patent applications—and the nature of their relationship with Plaintiffs.

155.    These fiduciary duties required Whitehead to discharge its obligations with respect to Max Planck in good faith—a standard that requires a high degree of honesty, loyalty, integrity, impartiality, and the most faithful service—and with reasonable care.

156.    Whitehead breached the fiduciary duties they owed Max Planck by determining not to challenge Zamore's purported assignment of his ownership interest to UMass, and further not to disclose to Max Planck that any ownership issue existed.  Whitehead made this determination for "political" reasons having nothing to do with proper allocation of ownership

rights.  Far from demonstrating honesty, integrity and impartiality, Whitehead chose to favor UMass over Max Planck, and to conceal its decision to do so.

157.    In its continued dealings with Whitehead, including but not limited to the prosecution of the Tuschl I patent applications, Max Planck has reasonably relied on Whitehead to uphold its fiduciary duties of prudence, good faith, honesty, loyalty, and integrity.

158.    As a direct and proximate result of Whitehead's breach of its fiduciary duties, Max Planck's interests in the Tuschl I patents and applications have been diluted, which has caused damages and will continue to cause irreparable injury.

**COUNT XIV**

**Slander of Title**

**(Against Defendant UMass)**

159.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

160.

163.    UMass's false and malicious statements have damaged the value of the Tuschl II patent estate, including the Tuschl II EP '325 application, to the detriment of Plaintiffs.  In particular, UMass's false and malicious statements resulted in the usurpation, for the benefit of UMass and its licensees, of revenues that rightfully belonged to Plaintiffs.  UMass's false and malicious statements also deprived Alnylam of the opportunity to exploit its exclusivity in the Tuschl II invention in the marketplace and investor community.

2174889.1 03

164.    As a direct and proximate result of UMass's slander of title, Plaintiffs have suffered and will continue to incur damages and suffer irreparable injury.

## COUNT XV

## Unjust Enrichment

## (Against Defendant UMass)

165.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

168.    UMass's unjust enrichment has been to the detriment of Plaintiffs.  As a direct and proximate result of UMass's actions, Plaintiffs have suffered and continue to suffer damages and irreparable injury, including the loss of licensing and sublicensing revenue and the loss of opportunity to exploit the exclusivity of the Tuschl II invention in the marketplace and investor community.

## COUNT XVI

## Intentional Interference with Contractual and Business Relations

## (Against Defendant UMass)

169.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

170.    Alnylam and Max Planck have a contractual and business relationship whereby Max Planck Society is the sole owner of the Tuschl II invention and Alnylam is Max Planck Society's exclusive licensee of the Tuschl II invention.  This contractual and business relationship contemplated an economic benefit for both Alnylam and Max Planck.  For example,

Alnylam would receive the opportunity to exploit the exclusivity of the Tuschl II invention in the marketplace, and Max Planck would receive licensing revenue based on Alnylam's success.

171.    UMass had knowledge of the contractual and business relationship between Alnylam and Max Planck.

173.    As a direct and proximate result of UMass's intentional interference, Plaintiffs have suffered and continue to suffer damages and irreparable injury, including the loss of licensing and sublicensing revenue, the loss of opportunity to exploit the exclusivity of the Tuschl II invention in the marketplace and investor community, and the loss of revenue for both Alnylam and Max Planck under the contractual and business relationship between them.

## COUNT XVII

## Violation of Mass. Gen. Laws c. 93A

## (Against Defendants UMass and Whitehead)

174.    Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

175.    At all relevant times, defendants UMass and Whitehead were engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A, §§ 1 and 11.

176.     Defendants' unfair acts and practices pursuant to Mass. Gen. Laws. c. 93A include, without limitation, breach of contract, breach of the implied covenant of good faith and fair dealing, negligent misrepresentation, breach of fiduciary duty, intentional interference with contractual and business relations, slander of title and unjust enrichment as set forth in this complaint.  For example, UMass has held itself out as having an ownership interest in the Tuschl I invention even though it knew or should have known that Whitehead, not UMass, is the rightful owner of Zamore's interest in the Tuschl I patent applications.

In addition, Whitehead has continued to represent to Plaintiffs that its entire interests in the '594 patent application were licensed to Alnylam pursuant to the Therapeutic Use Agreement, even though Whitehead relinquished, for "political" reasons having nothing to do with proper allocation of ownership rights, a portion of its ownership interest in the Tuschl I patent applications.

177.     The wrongful actions described herein were willful and knowing.

178.     As a direct and proximate result of the foregoing knowing and/or willful unfair acts and practices of UMass and Whitehead, Plaintiffs have suffered and will continue to suffer significant harm in the form of loss of money and property, including but not limited to: (1) loss of licensing revenues under the 2001 Joint Agreement that Max Planck has shared with UMass even though UMass had no valid interest in the Tuschl I invention; (2) loss of value of Whitehead's interest in the '594 patent application through Zamore, which Whitehead was obligated to license to Alnylam but instead relinquished to UMass; and (3) loss of value in and licensing opportunities for Plaintiffs' interests in the Tuschl II EP '325 application and other Tuschl II patent applications.

## COUNT XVIII

### Declaratory Judgment

### (Against Defendants UMass and Whitehead)

179.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of the Complaint as if fully set forth herein.

180.     An actual controversy exists within the meaning of G.L. c. 231, §6A as set forth in the foregoing counts.

181.     Defendants' acts as set forth in the foregoing counts have caused Plaintiffs to suffer damages and irreparable injury.

182.     This Court should issue a judgment declaring that Whitehead is the rightful owner of Zamore's interest in the '594 patent application, and that consequently UMass's interest in the '594 patent is subject to Whitehead's equitable ownership.

183.     Further, this Court should issue a judgment declaring that Max Planck Society is sole owner of the Tuschl II EP '325 application, and that consequently

### PRAYER FOR RELIEF

184.     Wherefore, Plaintiffs request that the Court grant the following relief:

A.     A permanent injunction enjoining Defendants and their agents, servants, and employees, and all persons acting under, in concert with or for, any of them from taking any action whatsoever with respect to the prosecution of the Tuschl I patent applications without further order of this Court;

B.     A permanent injunction enjoining Defendants and their agents, servants, and employees, and all persons acting under, in concert with or for, any of them from paying the issuance fee in the event that the USPTO issues a Notice of Allowance for any Tuschl I application;

C.     A declaratory judgment as requested herein;

D.     Money damages against Defendants, plus interest;

E.     Up to treble damages for Defendants' willful and knowing violations of Mass.

Gen. Laws c. 93A;

F.     Plaintiffs' costs and attorneys' fees; and

G.     Such other and further relief as this Court may deem just and proper.


Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V.; Max-Planck-Innovation GmbH; and Alnylam Pharmaceuticals, Inc.

By their attorneys,


Of counsel                                     /s/ Thomas F. Maffei
Morgan Chu (70446) *pro hac*                   Thomas F. Maffei (BBO 313220)
David I. Gindler (117824) *pro hac*            Scott McConchie (BBO 634127)
Michael H. Strub, Jr. (153828) *pro hac*       GRIESINGER, TIGHE & MAFFEI, LLP
Alan J. Heinrich (212782) *pro hac*            176 Federal Street
IRELL & MANELLA LLP                            Boston, Massachusetts 02110
1800 Avenue of the Stars, Suite 900            (617) 542-9900
Los Angeles, California 90067-4276
(310) 277-1010


Dated:  January 22, 2010