**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

MAX-PLANCK-GESELLSCHAFT ZUR
FÖRDERUNG DER WISSENSCHAFTEN E.V.,
a corporation organized under the laws of Germany;
et al.,

Plaintiffs,

v.

WHITEHEAD INSTITUTE FOR BIOMEDICAL
RESEARCH, a Delaware corporation; et al.,

Defendants.

Civil Action No. 1:09-cv-11116-PBS

---

**DEFENDANT WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH'S
ANSWER AND COUNTERCLAIMS TO THE FIRST AMENDED COMPLAINT**

Defendant Whitehead Institute for Biomedical Research ("Whitehead") has filed a

motion to dismiss all claims against Whitehead set forth in the First Amended Complaint filed by

Max-Planck-Gesellschaft zur Förderung der Wissenschaften e. V. ("Max Planck"), Max-Planck-

Innovation GmbH ("Max-Planck-Innovation"), and Alnylam Pharmaceuticals, Inc ("Alnylam").

Whitehead's motion is pending before the Court.  Without waiving any arguments or defenses

set forth in that motion, Defendant Whitehead, having its principal place of business at Nine

Cambridge Center, Cambridge, Massachusetts, hereby answers the First Amended Complaint

and asserts counterclaims as follows:

    1.      To the extent that paragraph 1 describes Plaintiffs' action, no response is

required.  In all other respects, paragraph 1 is denied.

2.    To the extent that paragraph 2 describes Plaintiffs' action, no response is required.  In all other respects, paragraph 2 is denied.

3.    To the extent that paragraph 3 describes Plaintiffs' action, no response is required.  In all other respects, paragraph 3 is denied.

4.    To the extent that paragraph 4 describes Plaintiffs' action, no response is required.  In all other respects, paragraph 4 is denied.

5.    To the extent that paragraph 5 describes Plaintiffs' action, no response is required.  In all other respects, paragraph 5 is denied.

6.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 6.

7.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7.

8.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 8.

9.    Whitehead admits that it is a Delaware corporation with a principal place of business in Cambridge, Massachusetts.

10.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 10.

11.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11.

12.    Paragraph 12 states a legal conclusion to which no response is required. To the extent that a response is required, Whitehead admits that this Court has jurisdiction over the subject matter of the First Amended Complaint.

13.     Paragraph 13 states a legal conclusion to which no response is required. To the extent that a response is required, Whitehead admits that venue for this action is proper in this Court.

14.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14.

15.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15.

16.     Whitehead admits that Thomas Tuschl, Phillip Sharp, Phillip Zamore, and David Bartel collaborated on research that yielded groundbreaking inventions in the field of RNA interference ("RNAi").  Whitehead admits that these persons developed a series of inventions described in certain patent applications on which they are named as the inventors ("the Tuschl I applications").  Whitehead admits that Tuschl performed work at Whitehead and assigned his interest in the Tuschl I applications to Whitehead and Max Planck; that Sharp assigned his interest in the Tuschl I applications to Massachusetts Institute of Technology ("MIT"); that Bartel assigned his interest in the Tuschl I applications to Whitehead; and that Zamore assigned his interest in the Tuschl I applications to the University of Massachusetts ("UMass").  Whitehead denies any and all other allegations set forth in paragraph 16.

17.     Whitehead admits that certain findings of the Tuschl I inventors were published on March 31, 2000.  Whitehead admits that the first Tuschl I U.S. provisional patent application, USSN 60/193,594 (the "'594 application") was filed in the United States Patent and Trademark Office ("USPTO") on March 30, 2000, and that Tuschl, Sharp, Bartel, and Zamore were named as inventors on this application.  Whitehead denies any and all other allegations set forth in paragraph 17.

18.     Whitehead denies the allegations set forth in paragraph 18.

19.     Whitehead admits that a patent application was filed in the European Patent Office on December 1, 2000 and was assigned application number 00126325.0 ("the Tuschl II EP '325 application").  Whitehead denies any and all other allegations set forth in paragraph 19.

20.     Whitehead admits that Patricia Granahan was a U.S. patent attorney employed by Whitehead at the time the first Tuschl I provisional application was filed in March 2000.  Whitehead admits that Granahan was involved in the prosecution of the Tuschl I applications during the time she served as Whitehead's in-house patent counsel.  Whitehead denies any and all other allegations set forth in paragraph 20.

21.     Whitehead admits that, in March 2001 after speaking with representatives of Max Planck, Granahan was in possession of a copy of the Tuschl II EP '325 application and at least a portion of a manuscript which was later published in *Nature*.  Whitehead admits that Granahan contacted Torsten Mummenbrauer and spoke with Dr. Wolfgang Weiss in March 2001 and that Mummenbrauer and Weiss both recommended that Dr. Granahan include in the Tuschl I nonprovisional application a claim of priority to the Tuschl II EP '325 application and that they both told her that they intended to include in the Tuschl II nonprovisional application a claim of priority to the Tuschl I application.  Whitehead denies any and all other allegations set forth in paragraph 21.

22.     Whitehead admits that Max Planck agreed that information relating to 3' overhangs and RNAi in mammalian cells could be included in the Tuschl I utility application.  Whitehead denies any and all other allegations set forth in paragraph 22.

23.     Whitehead admits that Max Planck, Max-Planck-Innovation (then called Garching Innovation GmbH), Whitehead, MIT, and UMass entered into a Joint Invention and Joint Marketing Agreement (the "2001 Joint Agreement") on or about September 19, 2001. Whitehead denies any and all other allegations set forth in paragraph 23.

24.     Whitehead admits that the 2001 Joint Agreement refers to the inventions described in certain specified patent applications as the "Joint Invention." Whitehead admits that the 2001 Joint Agreement recites that Max Planck, Whitehead, MIT, and UMass jointly own by assignment the Joint Invention. Whitehead denies that Max Planck was unaware of Dr. Zamore's assignment obligations, denies that Whitehead was ever the sole rightful equitable owner of Dr. Zamore's interest in the Joint Invention, and further denies any and all other allegations set forth in paragraph 24.

25.     Whitehead admits that an excerpt from the 2001 Joint Agreement is accurately quoted in paragraph 25. Whitehead denies any and all other allegations set forth in paragraph 25.

26.     Whitehead admits that the 2001 Joint Agreement provides that "Whitehead shall manage the patent filing, prosecution and maintenance of the Joint Invention" and that "[t]he prosecution, filing and maintenance of all Joint Invention patent applications and patents will be the primary responsibility of Whitehead" provided, however, MIT, UMass and Max Planck will have reasonable opportunities to advise Whitehead. Whitehead admits that the 2001 Joint Agreement provides that Max Planck authorizes Max-Planck-Innovation to act as its sole and exclusive agent for licensing purposes. Whitehead denies any and all other allegations set forth in paragraph 26.

27.     Whitehead denies the allegations set forth in paragraph 27.

28.     Whitehead admits that an excerpt from the 2001 Joint Agreement is accurately quoted in paragraph 28.  Whitehead denies any and all other allegations set forth in paragraph 28.

29.     Whitehead admits that Max Planck, Max-Planck-Innovation, Whitehead, and MIT entered into a Joint Invention and Joint Marketing Agreement (the "Therapeutic Use Agreement") on or about July 30, 2003.  Whitehead denies any and all other allegations set forth in paragraph 29.

30.     Whitehead admits that the Therapeutic Use Agreement provides that, "[t]he patent filing, prosecution and maintenance of the Remaining Joint Invention shall be managed by and be the primary responsibility of Whitehead."  Whitehead admits that the Therapeutic Use Agreement provides that, "[t]he patent filing, prosecution and maintenance of the MPG Invention shall be managed by and be the primary responsibility of GI."  Whitehead admits that the Therapeutic Use Agreement provides that Max Planck authorizes Max-Planck-Innovation to act as its sole and exclusive agent for licensing purposes.  Whitehead admits that the Therapeutic Use Agreement provides that Max Planck, Whitehead, and MIT jointly authorize Max-Planck-Innovation to grant two non-exclusive licenses to their ownership interests in the Tuschl I patent applications for therapeutic purposes.  Whitehead admits that UMass did not enter into the Therapeutic Use Agreement.  Whitehead denies any and all other allegations set forth in paragraph 30.

31.     Whitehead denies the allegations set forth in paragraph 31.

32.     Whitehead denies the allegations set forth in paragraph 32.

33.     Whitehead admits that on or about December 20, 2002, Max-Planck-Innovation, on behalf of Max Planck, entered into a co-exclusive license agreement with

Alnylam relating to the Tuschl I and Tuschl II patent applications (the "Alnylam License"). Whitehead admits that it agreed and approved the Alnylam License pursuant to a Letter Agreement dated July 30, 2003. Whitehead denies any and all other allegations set forth in paragraph 33.

34.     Whitehead admits that on or about July 30, 2003, Max-Planck-Innovation, on behalf of Max Planck, entered into a co-exclusive license agreement with Ribopharma relating to the Tuschl I and Tuschl II patent applications (the "Ribopharma License"). Whitehead denies any and all other allegations set forth in paragraph 34.

35.     Whitehead admits that it has not licensed its rights in the Tuschl I applications for therapeutic purposes to any entities other than Alnylam and Ribopharma and admits that, as far as it is presently aware, Alnylam is effectively Max-Planck's exclusive licensee of the Tuschl II applications for therapeutic purposes. Whitehead is without knowledge or information sufficient to form a belief as to the truth of any and all other allegations set forth in paragraph 35.

36.     Whitehead admits that by agreeing to the terms of the 2001 Joint Agreement and the Therapeutic Use Agreement, Whitehead agreed to act in good faith to file, prosecute and maintain the Tuschl I patent applications so as to obtain the broadest, legally appropriate patent(s) based on Tuschl I applications for the benefit of all of the co-owners of those applications. Whitehead denies any and all other allegations set forth in paragraph 36.

37.     Whitehead denies the allegations set forth in paragraph 37.

38.     Whitehead denies the allegations set forth in paragraph 38.

39.     Whitehead denies the allegations set forth in paragraph 39.

40.     A response by Whitehead to the allegations set forth in paragraph 40 is not required because the allegations do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 40 to which a response is required, Whitehead denies any and all such allegations.

41.     Whitehead denies the allegations set forth in paragraph 41.

42.     Whitehead admits that Lita Nelsen of MIT and John Pratt of Whitehead wrote a letter to Chester A. Bisbee of UMass in May 2004 (the "Nelsen-Pratt letter") at Max Planck's and Alnylam's request.  Whitehead admits that the Nelsen-Pratt letter includes the following sentences:  "The data was given to us contingent upon our not using it to claim nor provide support for claims to RNAi agents having 3' overhangs and their use.  Claims containing the inventive subject matter of 3' overhangs were to be reserved for MPG's own patent."  Whitehead denies any and all other allegations set forth in paragraph 42.

43.     Whitehead admits that it filed an Information Disclosure Statement ("IDS") with the USPTO in July 2005.  Whitehead admits that the IDS includes a statement that the Tuschl I applicants "do not rely on the above-described text [at page 14 line 25 – page 15 line 13 and in example 5] for supporting any of the currently pending claims."  Whitehead denies any and all other allegations set forth in paragraph 43.

44.     Whitehead denies the allegations set forth in paragraph 44.

45.     Whitehead denies the allegations set forth in paragraph 45.

46.     Whitehead denies that it engaged in any "secret communications and meetings" with MIT and UMass.  A response by Whitehead to the remainder of the allegations of paragraph 46 is not required because these allegations do not relate to Whitehead, and

Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 46 to which a response is required, Whitehead denies any and all such allegations.

47.     A response by Whitehead to the allegations of paragraph 47 is not required because the allegations do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 47 to which a response is required, Whitehead denies any and all such allegations.

48.     Whitehead admits that, in September 2004, Max Planck asked Whitehead to withdraw the cross-claim of priority in the Tuschl I applications to the Tuschl II EP '325 application.  Whitehead admits that, in January 2005, MIT forwarded to Alnylam and/or Max Planck a memorandum prepared by Helen Lockhart, the attorney retained to represent Whitehead in prosecuting the Tuschl I applications.  Whitehead denies any and all other allegations set forth in paragraph 48.

49.     Whitehead admits that Max Planck asked that its attorneys be permitted to participate in an October 12, 2006 interview with the patent examiner for the Tuschl I application with serial number 09/821,832.  Whitehead admits that it declined Max Planck's offer for its attorneys to attend the interview.  Whitehead admits that the October 12, 2006 Interview Summary indicates that Louis V. Wollenberger, Sean McGarry, Helen Lockhart, and Debra Milasincic participated in the interview.  Whitehead denies any and all other allegations set forth in paragraph 49.

50.     Whitehead denies the allegations set forth in paragraph 50.

51.     Whitehead admits that it has been unwilling to remove from the Tuschl I applications, without the consent of all of the co-owners of the applications, the cross-claim of priority to the Tuschl II EP '325 application and certain data regarding the 3' overhang

embodiment, both of which Max Planck agreed, and in the case of the priority claim, suggested, should be included in the Tuschl I applications.  Whitehead admits that Plaintiffs have complained on various occasions about Whitehead's unwillingness to remove this information. Whitehead denies any and all other allegations set forth in paragraph 51.

52.     Whitehead admits that, in 1993, Dr. Philip Zamore became  a post-doctoral research fellow in the laboratory of Dr. Ruth Lehmann at Whitehead.  Whitehead denies any and all other allegations set forth in paragraph 52.

53.     Whitehead admits that it has a "Policy Statement Regarding Patents, Copyrights and Other Intellectual Property" (hereinafter "Whitehead IP Policy").  Whitehead admits that on or about January 5, 1993, Dr. Zamore signed an "Intellectual Property Agreement."  Whitehead admits that the "Intellectual Property Agreement" signed by Dr. Zamore includes the following sentence: "I understand that the execution of this Agreement is a condition of my employment by [Whitehead] or my participation in any research conducted at or funded by or under the auspices of [Whitehead], or funded by any other organization pursuant to any agreement with Whitehead, and I am executing the Agreement in consideration of such employment or participation."  Whitehead denies any and all other allegations set forth in paragraph 53.

54.     Whitehead admits that Section 2.02 of the Whitehead IP Policy includes the following sentence:  "[t]his policy applies to every invention, discovery, composition, computer program, data base, process, design, literary work (except nonscientific works of fiction or nonfiction), and other items of intellectual property, whether patentable or copyrightable or not, conceived, reduced to practice, made or created by: (a) every member of the faculty or professional staff of [Whitehead] during the course of, arising out of or relating to

his or her professional activities, and (b) every other member of the [Whitehead] Community during the course of his or her duties for [Whitehead] or during the course of work funded by [Whitehead] or a Sponsor." Whitehead admits that Section 2.01 of the Whitehead IP Policy includes the statement that the Whitehead IP Policy "applies to every member of the faculty, the professional staff, technical employees, clerical employees and other employees of [Whitehead] . . . ." Whitehead admits that Section 2.01 of the Whitehead IP Policy includes the statement that "[t]he class of persons to whom the [Whitehead IP Policy] applies, as described above, will be referred to in this Statement as the '[Whitehead] Community.'" Whitehead denies any and all other allegations set forth in paragraph 54.

55.     Whitehead admits that paragraph 55 accurately quotes Section 3.02(a) of the Whitehead IP Policy. Whitehead denies any and all other allegations set forth in paragraph 55.

56.     Whitehead admits that Dr. Zamore joined the laboratory of Dr. David P. Bartel at Whitehead in January 1998. Whitehead admits that Dr. Bartel is a leading researcher in the field of RNA, including RNAi.

57.     Whitehead admits that Drs. Zamore, Bartel, Sharp, and Tuschl collaborated on research in the field of RNAi. Whitehead denies any and all other allegations set forth in paragraph 57.

58.     Whitehead admits that Dr. Zamore conducted research in Dr. Bartel's laboratory until on or about February 29, 2000. Whitehead admits that it is aware that Dr. Zamore was appointed a salaried faculty member at UMass on November 1, 1999. Whitehead admits that, from about November 30, 1999 through about February 29, 2000, Dr. Zamore was a Visiting Scientist/Fellow at Whitehead. Whitehead admits that the first Tuschl I provisional U.S.

patent application, the '594 application, was filed on March 30, 2000, describes short interfering

RNA molecules that mediate RNA interference, and does not contain any data obtained after

March 2000.  Whitehead denies any and all other allegations set forth in paragraph 58.

       59.      Whitehead is without knowledge or information sufficient to form a belief

as to the truth of the allegations set forth in the first sentence of paragraph 59.    Whitehead

denies any and all other allegations set forth in paragraph 59.

       60.      Whitehead admits that Dr. Zamore's appointment as a Visiting

Scientist/Fellow at Whitehead ended on or about February 29, 2000.  Whitehead admits that the

forwarding address listed on Dr. Zamore's notice of termination was the UMass Medical School

in Worcester, Massachusetts.  Whitehead denies any and all other allegations set forth in

paragraph 60.

       61.      Whitehead admits that the first Tuschl I U.S. utility patent application,

USSN 09/821,832 (the "'832 application") was filed on March 30, 2001.  Whitehead admits that

the '832 application claims the benefit of the filing date of the '594 application.  Whitehead

denies any and all other allegations set forth in paragraph 61.

       62.      Whitehead admits that a Notice of Recordation of Assignment Document

dated July 9, 2001 indicates that Dr. Zamore's assignment of his interest in USSN 60/265,232 to

UMass was recorded by the Assignment Division of the USPTO on April 16, 2001.  Whitehead

admits that it requested that Dr. Zamore execute a joint assignment of his interest in the Tuschl I

applications in favor of UMass and Whitehead.  Whitehead admits that, to the best of

Whitehead's present knowledge, Dr. Zamore has not executed such a joint assignment.

Whitehead denies any and all other allegations set forth in paragraph 62.

63.     Whitehead admits that UMass licensed its rights in the Tuschl I patent applications for therapeutic purposes to Sirna and CytRx.  Whitehead admits that the Therapeutic Use Agreement provides that Max Planck, Whitehead, and MIT jointly authorize Max-Planck-Innovation to grant two non-exclusive licenses to their ownership interests in the Tuschl I patent applications for therapeutic purposes—one license to Alnylam and one license to Ribopharma AG.  Whitehead admits that it has not licensed its rights in the Tuschl I applications for therapeutic purposes to any entities other than Alnylam and Ribopharma and admits that, as far as it is presently aware, Alnylam is effectively Max-Planck's exclusive licensee of the Tuschl II applications for therapeutic purposes.  Whitehead is without knowledge or information sufficient to form a belief as to the truth of any and all other allegations set forth in paragraph 63.

64.     Whitehead admits that John Maraganore wrote to Susan Lindquist of Whitehead on September 5, 2003 regarding Dr. Zamore's assignment to UMass and admits that the third sentence of paragraph 64 contains an accurate quotation of an excerpt of that letter. Whitehead admits that Dr. Lindquist responded to Mr. Maraganore's letter on September 12, 2003 and advised him, in part, that: "your letter misstates Whitehead's patent policy.  Under Whitehead's patent policy, whether an invention is made in Whitehead's laboratories is not determinative of ownership. . . . We are actively looking into the question of when inventions related to the [Alnylam License] agreements were made and the source of funding for those inventions.  Until we have concluded this investigation, and especially in light of the fact that there is a written assignment of rights to UMass on file at the US Patent Office, it seems premature to conclude that any UMass claims are invalid."  Whitehead denies any and all other allegations set forth in paragraph 64.

65.     Whitehead admits that Mr. Maraganore spoke with John Pratt of Whitehead on November 20, 2003 regarding Dr. Lindquist's September 12, 2003.  Whitehead admits that Mr. Pratt sent an email to Thomas Ittelson of Whitehead on November 20, 2003 asking about the status and conclusions of the investigation.  Whitehead admits that Mr. Ittelson forwarded Mr. Pratt's email to Lita Nelsen of MIT on November 20, 2003.  Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the last sentence of paragraph 65.  Whitehead denies any and all other allegations set forth in paragraph 65.

66.     Whitehead denies the allegations set forth in paragraph 66.

67.     Whitehead admits that a meeting took place between Mr. Maraganore and representatives of Whitehead in January 2004 regarding the propriety of Dr. Zamore's assignment to UMass.  During the meeting Mr. Maraganore was advised that Whitehead had investigated the work that led to the Tuschl I patent applications and had concluded that Dr. Zamore was properly named as an inventor on the applications.  Mr. Maraganore was also advised that Whitehead had determined that Dr. Zamore was supported by UMass during the period he did work included in the patent applications and, based on that support, Whitehead could not conclude that UMass had no rights in the Tuschl I applications.  Mr. Maraganore was further advised that based on the course of dealing among UMass, Whitehead, MIT, and Max Planck and the fact that an assignment from Dr. Zamore to UMass was recorded at the Patent Office, Whitehead did not believe that UMass's ownership could be successfully challenged. Whitehead denies any and all other allegations set forth in paragraph 67.

68.     Whitehead denies the allegations set forth in paragraph 68.

69.     Whitehead denies the allegations set forth in paragraph 69.

70.     A response by Whitehead to the allegations of paragraph 70 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 70 to which a response is required, Whitehead denies those allegations.

71.     A response by Whitehead to the allegations of paragraph 71 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 71 to which a response is required, Whitehead denies those allegations.

72.     A response by Whitehead to the allegations of paragraph 72 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 72 to which a response is required, Whitehead denies those allegations.

73.     A response by Whitehead to the allegations of paragraph 73 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 73 to which a response is required, Whitehead denies those allegations.

74.     A response by Whitehead to the allegations of paragraph 74 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 74 to which a response is required, Whitehead denies those allegations.

75.     A response by Whitehead to the allegations of paragraph 75 is not required because the allegations assert legal conclusions to which no response is required or do not relate

to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 75 to which a response is required, Whitehead denies those allegations.

76.     A response by Whitehead to the allegations of paragraph 76 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 76 to which a response is required, Whitehead denies those allegations.

77.     A response by Whitehead to the allegations of paragraph 77 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 77 to which a response is required, Whitehead denies those allegations.

78.     A response by Whitehead to the allegations of paragraph 78 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 78 to which a response is required, Whitehead denies those allegations.

79.     A response by Whitehead to the allegations of paragraph 79 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 79 to which a response is required, Whitehead denies those allegations.

80.     A response by Whitehead to the allegations of paragraph 80 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 80 to which a response is required, Whitehead denies those allegations.

81.     A response by Whitehead to the allegations of paragraph 81 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 81 to which a response is required, Whitehead denies those allegations.

82.     Whitehead denies the allegations set forth in paragraph 82.

83.     Whitehead denies the allegations set forth in paragraph 83.

84.     Whitehead incorporates each of the preceding paragraphs 1 to 83 as if fully set forth herein.

85.     Whitehead admits that a written contract, the 2001 Joint Agreement, exists between between Whitehead, MIT, UMass and Garching Innovation GmbH, the asserted predecessor of Max-Planck-Innovation and agent of Max-Planck.

86.     Whitehead admits that a written contract, the Therapeutic Use Agreement, exists between Garching Innovation GmbH, the asserted predecessor of Max-Planck-Innovation and agent of Max-Planck, Whitehead and MIT.

87.     Whitehead denies the allegations set forth in paragraph 87.

88.     Whitehead denies the allegations set forth in paragraph 88 and in each subparagraph thereof.

89.     Whitehead denies the allegations set forth in paragraph 89.

90.     Whitehead incorporates each of the preceding paragraphs 1 to 89 as if fully set forth herein.

91.     Paragraph 91 of the First Amended Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Whitehead admits that

contracts governed by Massachusetts law are construed to include an implied covenant of good faith and fair dealing.  Whitehead denies any and all other allegations set forth in paragraph 91.

92.     Whitehead denies the allegations set forth in paragraph 92.

93.     Whitehead denies the allegations set forth in paragraph 93.

94.     Whitehead denies the allegations set forth in paragraph 94.

95.     Whitehead incorporates each of the preceding paragraphs 1 to 94 as if fully set forth herein.

96.     Paragraph 96 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 96.

97.     Whitehead denies the allegations set forth in paragraph 97.

98.     Whitehead denies the allegations set forth in paragraph 98.

99.     Whitehead denies the allegations set forth in paragraph 99.

100.    Whitehead denies the allegations set forth in paragraph 100.

101.    Whitehead denies the allegations set forth in paragraph 101.

102.    Whitehead incorporates each of the preceding paragraphs 1 to 101 as if fully set forth herein.

103.    Paragraph 103 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 103.

104.    Whitehead denies the allegations set forth in paragraph 104.

105.    Whitehead denies the allegations set forth in paragraph 105.

106.    Whitehead denies the allegations set forth in paragraph 106.

107.   Whitehead denies the allegations set forth in paragraph 107.

108.   Whitehead incorporates each of the preceding paragraphs 1 to 107 as if fully set forth herein.

109.   Paragraph 109 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 109.

110.   Whitehead denies the allegations set forth in paragraph 110.

111.   Whitehead denies the allegations set forth in paragraph 111.

112.   Whitehead denies the allegations set forth in paragraph 112.

113.   Whitehead incorporates each of the preceding paragraphs 1 to 112 as if fully set forth herein.

114.   Whitehead denies the allegations set forth in paragraph 114.

115.   Whitehead denies the allegations set forth in paragraph 115.

116.   Whitehead denies the allegations set forth in paragraph 116.

117.   Whitehead incorporates each of the preceding paragraphs 1 to 116 as if fully set forth herein.

118.   Paragraph 118 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 118.

119.   Whitehead denies the allegations set forth in paragraph 119.

120.   Whitehead denies the allegations set forth in paragraph 120.

121.   Whitehead denies the allegations set forth in paragraph 121.

122.    Whitehead incorporates each of the preceding paragraphs 1 to 121 as if fully set forth herein.

123.    Paragraph 123 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 123.

124.    Whitehead denies the allegations set forth in paragraph 124.

125.    Whitehead denies the allegations set forth in paragraph 125.

126.    Whitehead incorporates each of the preceding paragraphs 1 to 125 as if fully set forth herein.

127.    Whitehead denies the allegations set forth in paragraph 127.

128.    Whitehead denies the allegations set forth in paragraph 128.

129.    Whitehead denies the allegations set forth in paragraph 129.

130.    Whitehead incorporates each of the preceding paragraphs 1 to 129 as if fully set forth herein.

131.    Whitehead admits that a written contract, the Therapeutic Use Agreement, exists between Whitehead, MIT and Garching Innovation GmbH, the asserted predecessor of Max-Planck-Innovation and agent of Max-Planck.

132.    Whitehead admits that section 4(a) of the Therapeutic Use Agreement provides that: "Patents for the Remaining Joint Invention and the MPG Invention shall be commercialized together as a single package (hereinafter the 'PATENT PACKAGE')." Whitehead denies any and all other allegations set forth in paragraph 132.

133.    Whitehead admits that an excerpt from the Therapeutic Use Agreement is accurately quoted in paragraph 133.  Whitehead denies any and all other allegations set forth in paragraph 133.

134.    Whitehead denies the allegations set forth in paragraph 134.

135.    Whitehead denies the allegations set forth in paragraph 135.

136.    Whitehead denies the allegations set forth in paragraph 136.

137.    Whitehead denies the allegations set forth in paragraph 137.

138.    Whitehead denies the allegations set forth in paragraph 138.

139.    Whitehead incorporates each of the preceding paragraphs 1 to 138 as if fully set forth herein.

140.    Paragraph 140 of the First Amended Complaint states a legal conclusion to which no response is required.  To the extent a response is required, Whitehead admits that contracts governed by Massachusetts law are construed to include an implied covenant of good faith and fair dealing.  Whitehead denies any and all other allegations set forth in paragraph 140.

141.    Whitehead denies the allegations set forth in paragraph 141.

142.    Whitehead denies the allegations set forth in paragraph 142.

143.    Whitehead denies the allegations set forth in paragraph 143.

144.    Whitehead denies the allegations set forth in paragraph 144.

145.    Whitehead incorporates each of the preceding paragraphs 1 to 144 as if fully set forth herein.

146.    Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 146.

147.     Whitehead is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 147.

148.     Whitehead denies the allegations set forth in paragraph 148.

149.     Whitehead denies the allegations set forth in paragraph 149.

150.     Whitehead denies the allegations set forth in paragraph 150.

151.     Whitehead denies the allegations set forth in paragraph 151.

152.     Whitehead denies the allegations set forth in paragraph 152.

153.     Whitehead incorporates each of the preceding paragraphs 1 to 152 as if fully set forth herein.

154.     Paragraph 154 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 154.

155.     Paragraph 155 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 155.

156.     Whitehead denies the allegations set forth in paragraph 156.

157.     Whitehead denies the allegations set forth in paragraph 157.

158.     Whitehead denies the allegations set forth in paragraph 158.

159.     Whitehead incorporates each of the preceding paragraphs 1 to 158 as if fully set forth herein.

160.     A response by Whitehead to the allegations of paragraph 160 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are

factual allegations in paragraph 160 to which a response is required, Whitehead denies those allegations.

161.    A response by Whitehead to the allegations of paragraph 161 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 161 to which a response is required, Whitehead denies those allegations.

162.    A response by Whitehead to the allegations of paragraph 162 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 162 to which a response is required, Whitehead denies those allegations.

163.    A response by Whitehead to the allegations of paragraph 163 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 163 to which a response is required, Whitehead denies those allegations.

164.    A response by Whitehead to the allegations of paragraph 164 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 164 to which a response is required, Whitehead denies those allegations.

165.    Whitehead incorporates each of the preceding paragraphs 1 to 164 as if fully set forth herein.

166.    A response by Whitehead to the allegations of paragraph 166 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 166 to which a response is required, Whitehead denies those allegations.

167.    A response by Whitehead to the allegations of paragraph 167 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 167 to which a response is required, Whitehead denies those allegations.

168.    A response by Whitehead to the allegations of paragraph 168 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 168 to which a response is required, Whitehead denies those allegations.

169.    Whitehead incorporates each of the preceding paragraphs 1 to 168 as if fully set forth herein.

170.    A response by Whitehead to the allegations of paragraph 170 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are

factual allegations in paragraph 170 to which a response is required, Whitehead denies those allegations.

171.     A response by Whitehead to the allegations of paragraph 171 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 171 to which a response is required, Whitehead denies those allegations.

172.     A response by Whitehead to the allegations of paragraph 172 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 172 to which a response is required, Whitehead denies those allegations.

173.     A response by Whitehead to the allegations of paragraph 173 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 173 to which a response is required, Whitehead denies those allegations.

174.     Whitehead incorporates each of the preceding paragraphs 1 to 173 as if fully set forth herein.

175.     Paragraph 175 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 175.

176.     Whitehead denies the allegations set forth in paragraph 176.

177.    Whitehead denies the allegations set forth in paragraph 177.

178.    Whitehead denies the allegations set forth in paragraph 178.

179.    Whitehead incorporates each of the preceding paragraphs 1 to 178 as if fully set forth herein.

180.    Paragraph 180 of the First Amended Complaint states legal conclusions to which no response is required.  To the extent a response is required, Whitehead denies the allegations set forth in paragraph 180.

181.    Whitehead denies the allegations set forth in paragraph 181.

182.    Whitehead denies the allegations set forth in paragraph 182.

183.    A response by Whitehead to the allegations of paragraph 183 is not required because the allegations assert legal conclusions to which no response is required or do not relate to Whitehead, and Whitehead thereby denies the same.  To the extent that there are factual allegations in paragraph 183 to which a response is required, Whitehead denies those allegations.

184.    Paragraph 184 of the First Amended Complaint and the seven lettered paragraphs that follow it state Plaintiffs' prayer for relief, to which no response is required.  To the extent a response is required to paragraph 184  and/or the seven lettered paragraphs that follow it, Whitehead denies the allegations set forth in each of those paragraphs and denies that Plaintiffs are entitled to any of the relief requested therein, or to any relief whatsoever.

185.    Any allegation of the First Amended Complaint not expressly admitted herein is hereby denied.

Whitehead sets forth the following affirmative and other defenses.  Whitehead does not intend hereby to assume the burden of proof with respect to those matters as to which, pursuant to law, Plaintiffs bear the burden.

### First Defense

The First Amended Complaint fails to state a claim upon which relief may be granted.

### Second Defense

Plaintiffs' claims are barred in whole or in part by the applicable statutes of limitations.

### Third Defense

Plaintiffs' claims are barred by the doctrines of waiver and estoppel.

### Fourth Defense

Plaintiffs' equitable claims are barred by laches.

### Fifth Defense

Plaintiffs' equitable claims are barred by unclean hands.

### Sixth Defense

This Court lacks the jurisdiction and authority to grant the injunctive relief sought by Plaintiffs because the Court is barred from intervening in an ongoing patent prosecution before the U.S. Patent and Trademark Office.

### Seventh Defense

Plaintiffs' claims are barred by the doctrine of ripeness.

### Eighth Defense

Plaintiffs' claims are preempted by federal law.

## Ninth Defense

Plaintiffs' claims are barred by the doctrine of exhaustion of administrative remedies.

## Tenth Defense

Plaintiffs' claims fail in whole or in part for lack of proximate cause.

## Eleventh Defense

Plaintiffs' claims fail for lack of cognizable damages.

## Twelfth Defense

Plaintiffs' negligence claims are barred by the economic loss doctrine.

## Thirteenth Defense

Plaintiffs' claims are barred by the doctrine of acquiescence.

## Fourteenth Defense

Plaintiffs' claims are barred by their failure to mitigate damages.

## Fifteenth Defense

Some or all of Plaintiffs' claims for damages are barred by contractual limitations on recoverable damages in both the 2001 Agreement and the Therapeutic Use Agreement.

## Sixteenth Defense

Some or all of Plaintiffs' claims for damages are limited by the Massachusetts limited charitable immunity statute, Mass. Gen. Laws c. 231, § 85K.

### Seventeenth Defense

Plaintiffs' claim for unjust enrichment is barred because Plaintiffs' relationship with Whitehead is based on written contracts, the 2001 Joint Agreement, the Therapeutic Use Agreement, and the Alnylam License.

### Eighteenth Defense

Plaintiff Alnylam lacks standing to bring any of its claims.

### COUNTERCLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant the Whitehead Institute for Biomedical Research ("Whitehead") asserts the following counterclaims as Counterclaim Plaintiff against Plaintiffs Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V., Max-Planck-Innovation GmbH, and Alnylam Pharmaceuticals, Inc. as Counterclaim Defendants.  Whitehead alleges as follows:

### Parties

1.      Counterclaim-Plaintiff Whitehead is a Delaware corporation having its principal place of business at Nine Cambridge Center, Cambridge, Massachusetts.

2.      Counterclaim-Defendant Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. is, upon information and belief, a corporation duly organized and existing under the laws of Germany and having its principal place of business at Hofgartenstrasse 8, 80539 Muenchen, Germany.

3.      Counterclaim-Defendant Max-Planck-Innovation GmbH, formerly known as Garching Innovation GmbH, is, upon information and belief, a corporation duly organized and existing under the laws of Germany and having its principal place of business at Hofgartenstrasse

8, 80539 Muenchen, Germany.  Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. and Max-Planck-Innovation GmbH are jointly referred to as "Max Planck."

4.        Counterclaim-Defendant Alnylam Pharmaceuticals, Inc. ("Alnylam") is, upon information and belief, a Delaware corporation with its principal place of business in Cambridge, Massachusetts.

## Jurisdiction and Venue

5.        This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367, and the patent laws of the United States, including Title 35 of the United States Code.

6.        This Court has personal jurisdiction over Counterclaim-Defendants on the basis of, inter alia, their contacts with Massachusetts relating to the subject matter of this action, including having filed suit.

7.        Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## Background

### The Technology and the Patent Applications

8.        The Whitehead Institute is a leading, non-profit research and educational institution that has defined the cutting edge of biomedical science, creating a legacy of research excellence and academic eminence since 1982.  Whitehead shares a teaching affiliation with the Massachusetts Institute of Technology ("MIT") and provides scientists with the resources and freedom to follow their scientific curiosity, form novel collaborations and conduct ground-breaking research.  While probing basic biological processes, 14 faculty members and 5 fellows develop innovative technologies and lay the foundation for projects that improve human health.  They run pioneering programs in cancer research, immunology, developmental biology, stem

cell research, regenerative medicine, genetics and genomics — programs with a record of success.

9.      In 1990, the Institute for Scientific Information in Philadelphia identified Whitehead as the top research institution in the world in molecular biology and genetics based on the impact of its scientific publications.  Science Watch ranked Molecular Biology and Genetics Research at Institutions from 2002-2006 (based on citations in high impact journals only, e.g., *Cell*, *Nature*, *Science*): (1) Howard Hughes Medical Institute (2) Harvard University (3) MIT (4) Whitehead Institute.  Whitehead has emerged as a major force in fields ranging from cancer research to transgenic science.  Whitehead scientists shaped the emerging field of genomics by making the single largest contribution to the Human Genome Project.

10.      In the late 1990s, four scientists – Phillip Zamore, Thomas Tuschl (both of whom were post-doctoral fellows at Whitehead), Phillip Sharp of MIT, and David Bartel of Whitehead – undertook important research in the field of RNA Interference ("RNAi").  RNAi is the concept that certain molecules of the nucleic acid RNA turn off specifically targeted genes by interfering with their messenger RNA, which is essential for genes to function.  These researchers ultimately produced groundbreaking results showing that double-stranded RNA ("dsRNA") is chopped to segments about 21-23 nucleotides long, and that these fragments mediate targeted mRNA degradation.  This discovery had profound implications for research and for developing treatments for many of the most serious human diseases.

11.      This research formed the basis for a series of patent applications, which became known as the "Tuschl I" applications, relating to isolated RNA molecules of about 21 to about 23 nucleotides in length that mediate RNAi.  Because of funding sources and other affiliations, the four scientists – Dr. Tuschl, Dr. Sharp, Dr. Zamore and Dr. Bartel – assigned their interests in the

applications to Max Planck and Whitehead, MIT, UMass, and Whitehead, respectively.  By

virtue of the inventors' assignment, the Tuschl I applications are jointly owned by Whitehead,

MIT, UMass, and Max Planck, who share an equal and undivided interest in the applications.

### The Agreements Between the Four Institutions

12.     On September 19, 2001, Whitehead, MIT, UMass, and Max Planck entered into

a Joint Invention and Joint Marketing Agreement ("2001 Agreement") (referred to in the First

Amended Complaint as the "2001 Joint Agreement").   Under this Agreement, Whitehead was

responsible for managing the prosecution of the Tuschl I applications (referred to as the "Joint

Invention" in the Agreement) on behalf of all four institutions, and Max Planck had

responsibility to prosecute, through its licensing agent, the Tuschl II applications (referred to as

the "MPG Invention" in the Agreement).   Max Planck is referred to as "MPG" in this

Agreement.   The Agreement states:

> 1.   <u>Patent Management</u>
>
> (a)     WHITEHEAD shall manage the patent filing, prosecution
> and maintenance of the JOINT INVENTION.   M.I.T., UMASS
> and MPG will be copied on all patent correspondence.   The
> prosecution, filing and maintenance of all JOINT INVENTION
> patent applications and patents will be the primary responsibility of
> WHITEHEAD; provided, however, M.I.T., UMASS and MPG will
> have reasonable opportunities to advise WHITEHEAD and will
> cooperate with WHITEHEAD in such prosecution, filing and
> maintenance.

13.     The 2001 Agreement also provided that all parties, including Max Planck,

would "cooperate" with Whitehead in the "prosecution, filing and maintenance" of the Tuschl I

applications.   *Id.*

14.     On July 30, 2003, three of the four parties – Whitehead, MIT, and Max Planck –

executed a Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes

("2003 Agreement") (referred to in the First Amended Complaint as the "Therapeutic Use Agreement").  This Agreement also provided that Whitehead would continue to be responsible for prosecuting Tuschl I (referred to as the "REMAINING JOINT INVENTION" in the Agreement) on behalf of the three parties (in addition to UMass), and that Max Planck, through its licensing agent, would continue to prosecute Tuschl II:  "The patent filing, prosecution and maintenance of the REMAINING JOINT INVENTION shall be managed by and be the primary responsibility of WHITEHEAD."

15.     The 2003 Agreement also provided that each party would have "a reasonable opportunity to comment and advise on the patent attorneys to be used and on documents to be filed" with the PTO pertaining to the Tuschl I applications, and that Whitehead would "give good faith consideration" to such "comments and advice."  *Id.*

### Max Planck's Petition to Revoke Power of Attorney

16.     On July 20, 2009, Max Planck filed a Petition to Revoke Power of Attorney under 37 C.F.R. § 1.36(a) with the United States Patent and Trademark Office ("USPTO") in the pending Tuschl I patent applications.  In those petitions, Max Planck requested "that the [USPTO] revoke the current Power of Attorney from [Max Planck], and authorize new counsel to represent [Max Planck's] interests."  Petition to Revoke Power of Attorney in U.S. Patent Application Ser. No. 09/821,832, attached as Exhibit 1 to Supplemental Burchfiel Declaration (filed July 28, 2009), at 2; Petition to Revoke Power of Attorney in U.S. Patent Application Ser. No. 10/255,568, attached as Exhibit 2 to Supplemental Burchfiel Declaration (filed July 28, 2009), at 2.

17.     On September 3, 2009, the USPTO Office of Petitions granted Max Planck's petitions in the Tuschl I patent applications.  In these decisions, the USPTO stated: "All parties

are reminded that dual correspondence is not permitted, and will not be undertaken by the USPTO." *See, e.g.*, Grant of Petition to Revoke Power of Attorney in U.S. Patent Application Ser. No. 09/821,832, at 3.

18.     On November 23, 2009, the USPTO Office of Petitions dismissed Whitehead's request for reconsideration, requesting that the USPTO vacate the decisions on Max Planck's petitions.  In these decisions, the USPTO again explained that "further correspondence to the [USPTO] in this application – or resultant patent – must be signed by both: (1) a registered practitioner representing Max-Planck; and (2) a registered practitioner representing the interests of the other co-assignees." *See, e.g.*, Dismissal of Request for Reconsideration in U.S. Patent Application Ser. No. 09/821,832, at 2.

19.     Because the USPTO has granted Max Planck's petitions, Whitehead's chosen patent attorneys for the Tuschl I patent prosecutions, Wolf Greenfield, are no longer be able to manage the patent filing, prosecution and maintenance of these applications in accordance with the 2001 Agreement and 2003 Agreement.

20.     Max Planck's revocation of its power of attorney and the filing of its petitions with the USPTO constitute material breaches of the 2001 Agreement and 2003 Agreement because they violates Max Planck's obligation to allow Whitehead to "manage" the "prosecution, filing and maintenance" of the Tuschl I applications and to "cooperate with WHITEHEAD in such prosecution, filing and maintenance."  Rejecting Whitehead's choice of patent attorneys is a complete repudiation of Max Planck's duty of cooperation vis a vis the Tuschl I patent prosecutions.

21.     Under both the 2001 Agreement and the 2003 Agreement, Whitehead retains "primary responsibility" for prosecuting the Tuschl I patents, which includes the selection of

"patent attorneys to be used," subject only to the requirement that it give "good faith consideration" to the advice of the other owners.  Max Planck's actions to unilaterally change prosecution counsel for the Tuschl I applications represents a material breach of the 2001 and 2003 Agreements.

22.     As a result of Max Planck's petitions to revoke its power of attorney on the Tuschl I patents, Whitehead has incurred and continues to incur additional fees, costs and delays associated with the prosecution of those patents.

**Max Planck's Refusal to Sign A Terminal Disclaimer**

23.     On or about December 18, 2008, the USPTO issued an Office Action on Tuschl I Application No. 10/255,568 containing provisional non-statutory obviousness-type double patenting rejections of certain claims in that Application over claims filed in co-pending Tuschl I Applications, including Application No. 09/821,832.

24.     Because there is complete identity among the owners of the Tuschl I applications, the PTO indicated that the objection could be overcome via a terminal disclaimer signed by all four owners of the Tuschl I patents.  MIT and UMass agreed to and signed the terminal disclaimers.

25.     On January 21, 2009 and again on March 6, 2009 and on May 21, 2009, as well as in a conference call, attorneys at Wolf Greenfield sought a terminal disclaimer from counsel for Max Planck on Application No. 10/255,568, to no avail.

26.     The failure to consent to the terminal disclaimer was and is (i) a material breach of Max Planck's obligations under the 2001 Agreement and 2003 Agreement to "cooperate" with Whitehead in the prosecution of the Tuschl I patents, and (ii) a cessation of prosecution and/or

abandonment of the Tuschl I applications pursuant to paragraph 3(b) of the 2001 Agreement and paragraph 2(b) of the 2003 Agreement.

### Whitehead's Notice of Termination of the 2001 and 2003 Agreements

27.     On January 15, 2010, Whitehead sent a notice to Max Planck, MIT, and UMass that Whitehead intended to terminate the 2001 and 2003 Agreements based on Max Planck's material breach of the 2001 and 2003 Agreements by filing the petitions to revoke its power attorney.  In this letter, Whitehead gave Max Planck notice that, pursuant to the 2001 and 2003 Agreements, Max Planck had sixty days to cure its breach and that if it did not do so, Whitehead would terminate the agreements effective on March 16, 2010.

28.     On February 12, 2010, Whitehead sent to Max Planck, MIT, and UMass notice of additional material breaches of the 2001 and 2003 Agreements by Max Planck.  In this letter, Whitehead cited Max Planck's refusal to sign the terminal disclaimer as an example of these additional breaches.

29.     On March 9, 2010, Whitehead sent a letter to Max Planck, MIT, and UMass notifying them that, as a result of the delay in the start of the trial of this dispute from February 22, 2010 until June 1, 2010, Whitehead would defer terminating the 2001 and 2003 Agreements until five days after the Court enters an order declaring that Max Planck has materially breached the agreements.

30.     The time for Max Planck to cure its breaches of the 2001 and 2003 Agreements by filing the petitions to revoke its power of attorney expired on March 16, 2010 and Max Planck did not take any action to cure the breaches prior to that date.

31.     As of March 30, 2010, Max Planck had not cured any of its additional breaches.

32.     As a result of Max Planck's failure to cure its material breaches of the 2001 and 2003 Agreements, Whitehead has the right to terminate the 2001 and 2003 Agreements.

## First Counterclaim

### (Breach of Contract Against Max Planck)

33.     Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 32 as if fully set forth herein.

34.     The 2001 Agreement was a binding, enforceable contract between Whitehead and Max Planck, and remains in effect.

35.     The 2003 Agreement was a binding, enforceable contract between Whitehead and Max Planck, and remains in effect.

36.     Whitehead began to perform, performed, and at all times stood and stands ready to further perform its obligations under both the 2001 Agreement and the 2003 Agreement.

37.     Max Planck accepted Whitehead's performance under the 2001 Agreement and 2003 Agreement.

38.     Counterclaim-Defendant Max Planck breached both the 2001 Agreement and the 2003 Agreement:

(a)     By filing, on July 20, 2009, a Petition to Revoke Power of Attorney under 37 C.F.R. § 1.36(a) with the PTO in the pending Tuschl I patent applications;

(b)     By thereafter revoking the Power of Attorney it had previously given to Whitehead's designated law firm to prosecute the Tuschl I patent applications; and

(c)     By refusing, in January 2009 and again in March 2009 and May 2009, to consent to the filing of a terminal disclaimer with respect to co-pending Tuschl I patent applications, including Application No. 10/255,568.

39.     As a direct and proximate result of these breaches, Whitehead has been, and continues to be, harmed.

## Second Counterclaim

### (Breach of Implied Covenant of Good Faith and
### Fair Dealing Against Max Planck)

40.     Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 39 as if fully set forth herein.

41.     The 2001 Agreement was a binding, enforceable contract between Whitehead and Max Planck, and remains in effect.  Counterclaim-Plaintiff Whitehead possessed a prospective economic advantage derived from the 2001 Agreement.

42.     The 2003 Agreement was a binding, enforceable contract between Whitehead and Max Planck, and remains in effect.  Counterclaim-Plaintiff Whitehead possessed a prospective economic advantage derived from the 2003 Agreement.

43.     Under Massachusetts law, the 2001 and 2003 Agreements are subject to an implied covenant of good faith and fair dealing, the purpose of which is to ensure that neither party interferes with the ability of the other to enjoy the fruits of the contract and that, when performing the obligations of the contract, the parties remain faithful to the intended and agreed expectations of the contract.

44.     Whitehead began to perform, performed, and at all times stood and stands ready to further perform its obligations under both the 2001 Agreement and the 2003 Agreement.

45.     Max Planck accepted Whitehead's performance under the 2001 Agreement and 2003 Agreement.

46.     Counterclaim-Defendant Max Planck breached the implied covenants of good faith and fair dealing in both the 2001 Agreement and the 2003 Agreement:

(a)        By filing, on July 20, 2009, a Petition to Revoke Power of Attorney under 37 C.F.R. § 1.36(a) with the PTO in the pending Tuschl I patent applications;

(b)        By thereafter revoking the Power of Attorney it had previously given to Whitehead's designated law firm to prosecute the Tuschl I patent applications; and

(c)        By refusing, in January 2009 and again in March 2009 and May 2009, to consent to the filing of a terminal disclaimer with respect to co-pending Tuschl I patent applications, including Application No. 10/255,568.

47.        As a direct and proximate result of these breaches, Whitehead has been, and continues to be, harmed.

### Third Counterclaim

**(Interference With Advantageous Business
Relations Against Alnylam)**

48.        Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 47 as if fully set forth herein.

49.        Counterclaim-Plaintiff Whitehead possessed a prospective economic advantage derived from the 2001 and 2003 Agreements.

50.        Counterclaim-Defendant Alnylam Pharmacetuicals, Inc. knew of Whitehead's economic interests in the 2001 and 2003 Agreements.

51.        On information and belief, Counterclaim-Defendant Alnylam intentionally interfered with the 2001 and 2003 Agreements by, through improper motive and improper means, encouraging, inducing and directing Counterclaim-Defendant Max Planck to breach its obligations under the 2001 and 2003 Agreements.

52.        As a direct and proximate result of these breaches, Whitehead has been, and continues to be, harmed.

### Fourth Counterclaim

### (Violation of Mass. Gen. Laws c. 93A
### Against Alnylam)

53.     Whitehead repeats and realleges each of the allegations contained in Counterclaim paragraphs 1 through 52 as if fully set forth herein.

54.     At all relevant times, Counterclaim-Plaintiff Whitehead was engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A §§ 1 and 11.

55.     At all relevant times, Counterclaim-Defendant Alnylam was engaged in trade or commerce within the meaning of Mass. Gen. Laws c. 93A §§ 1 and 11.

56.     Whitehead has suffered a loss of money or property, real or personal, as a result of the use or employment by Alnylam of an unfair method of competition or an unfair or deceptive act or practice within the meaning of Mass. Gen. Laws. c. 93A § 2, including without limitation Alnylam's encouraging, inducing and directing Counterclaim-Defendant Max Planck to breach its obligations under the 2001 and 2003 Agreements.

57.     As a direct and proximate result of the foregoing knowing and willful unfair or deceptive acts or practices of Alnylam, Whitehead has been, and continues to be, harmed.


WHEREFORE, Defendant Whitehead prays that this Court grant the following relief:

A.     A declaratory judgment that Max Planck materially breached the 2001 and 2003 Agreements breached the implied covenants of good faith and fair dealing and that Whitehead has the right to terminate the 2001 Agreement and 2003 Agreement as a result of such breaches;

B.     A declaratory judgment that Alnylam has unlawfully intentionally interfered with the 2001 Agreement and the 2003 Agreement by encouraging, inducing and/or directing Max Planck to breach the agreements;

C.      A declaratory judgment that Whitehead has suffered a loss of money or property,

real or personal, as a result of the use or employment by Alnylam of an unfair method of

competition or an unfair or deceptive act or practice within the meaning of Mass. Gen. Laws. c.

93A § 2;

D.      Whitehead's costs and attorney's fees in this action; and

E.      Such other and further relief as this Court may deem just and proper.

Dated:  April 8, 2010

                                            /s/ Christopher M. Morrison
                                           HANIFY & KING, P.C. (BBO 651335)
                                           One Beacon Street, 21st Floor
                                           Boston, MA  02108-3107
                                           (617) 226-3465

                                           Glenn J. Pfadenhauer (*admitted pro hac vice*)
                                           David C. Kiernan (*admitted pro hac vice*)
                                           George A. Borden (BBO 552302)
                                           James L. Tuxbury (*admitted pro hac vice*)
                                           Kendra R. Ervin (*admitted pro hac vice*)
                                           WILLIAMS & CONNOLLY LLP
                                           725 Twelfth Street, NW
                                           Washington, DC 20005
                                           (202) 434-5000

                                           *Counsel for Defendant Whitehead Institute*
                                           *for Biomedical Research*

**CERTIFICATE OF SERVICE**

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 8, 2010.


 /s/ Christopher M. Morrison