# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN E.V., a corporation organized under the laws of Germany; MAX-PLANCK-INNOVATION GMBH, a corporation organized under the laws of Germany; and ALNYLAM PHARMACEUTICALS, INC., a Delaware corporation, | Civil Action No. 2009-11116-PBS<br><br>**REDACTED VERSION** |
| Plaintiffs, | **HEARING REQUESTED** |
| v. | |
| WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation; BOARD OF TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, a Massachusetts corporation, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT UNIVERSITY OF MASSACHUSETTS' MOTION FOR SUMMARY JUDGMENT ON COUNTS VII, XV, XVII, AND XVIII

## TABLE OF CONTENTS

Page

I.       INTRODUCTION ........................................................................................1

II.      FACTUAL BACKGROUND ......................................................................2

III.     ARGUMENT ..............................................................................................5

    A.   Standard Of Review .................................................................................5

    B.   UMass Is Not Entitled To Summary Judgment On Plaintiffs' Chapter
         93A Claims (Counts VII and XVII) ..........................................................5

         1.   UMass Licensed The Tuschl II '325 Application To Sirna ..............6

         2.   It Is Immaterial Whether UMass Was Aware Of Sirna's
              Presentations And Licensing Activities ..........................................9

         3.   UMass Was Unjustly Enriched, To Plaintiffs' Detriment, Under
              The Sirna License .........................................................................10

         4.   UMass Is Subject To Suit Under Chapter 93A. ..............................13

    C.   UMass Is Not Entitled To Summary Judgment On Plaintiffs' Unjust
         Enrichment Claim Against UMass (Count XV) .........................................17

    D.   UMass Is Not Entitled To Summary Judgment On Plaintiffs'
         Declaratory Judgment Claim Against UMass (Count XVIII) .....................18

IV.      CONCLUSION ..........................................................................................20

## TABLE OF AUTHORITIES

Page(s)

**Cases**

Barranco v. Milford Hous. Auth.,
408 Mass. 502 (1990) ............................................................................................ 15

Baumgardner v. City of Boston,
304 Mass. 100 (1939) ............................................................................................ 16

Begelfer v. Najarian,
381 Mass. 177 (1980) ............................................................................................ 15

Bonan v. Boston,
398 Mass. 315 (1986) ............................................................................................ 18

City of Boston v. Aetna Life Ins. Co.,
399 Mass 569 (1987) ............................................................................................ 13

City of Boston v. Keene Corp.,
406 Mass. 301 (1989) ............................................................................................ 18

City of Revere v. Boston/Logan Airport Assocs., LLC,
416 F. Supp. 2d 200 (D. Mass. 2005) ...................................................................... 12

City of Revere v. Boston/Logan Airport Assocs., LLC,
443 F. Supp. 2d 121 (D. Mass. 2006) ...................................................................... 13

Joyce v. Town of Dennis,
2010 WL 1383178 (D. Mass. March 30, 2010) ........................................................ 13

Lafayette Place Assocs. v. Boston Redevelopment Auth.,
427 Mass. 509 n.29 (1998) ............................................................................... 13, 14

Lane v. Commonwealth,
401 Mass. 549 (1988) ............................................................................................ 15

Lantner v. Carson,
374 Mass. 606 (1978) ............................................................................................ 14

Linkage Corp. v. Trs. of Boston Univ.,
425 Mass. 1 (1997) ................................................................................................ 15

M. O'Connor Contracting, Inc. v. City of Brockton,
61 Mass. App. Ct. 278 n.8 (2004) ..................................................................... 13, 14

Page(s)

*Mass. Candy & Tobacco Distribs., Inc. v. Golden Distribs., Ltd.*,
   852 F. Supp. 63 (D. Mass. 1994) ............................................................................ 18

*Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
   552 F.3d 47 (1st Cir. 2009) .................................................................................... 17

*Park Drive Towing, Inc. v. City of Revere*,
   442 Mass. 80 (2004) ................................................................................................ 14

*Peabody N.E., Inc. v. Town of Marshfield*,
   426 Mass. 436 (1998) .............................................................................................. 15

*Raytheon Co. v. Cont'l Cas. Co.*,
   123 F. Supp. 2d 22 (D. Mass. 2000) ...................................................................... 18

*Riverdale Enters., Inc. v. Shell Oil Co.*,
   41 F. Supp. 2d 56 (D. Mass. 1999) ........................................................................ 18

*Rockwell v. Cape Cod Hosp.*,
   26 F.3d 254, (1st Cir. 1994) ................................................................................... 14

*Sensing v. Outback Steakhouse of Fla., LLC*,
   575 F.3d 145 (1st Cir. 2009) ............................................................................... 4, 5

*Spence v. Boston Edison Co.*,
   390 Mass. 604 (1983) .............................................................................................. 14

*T. Bedrosian, L.L.C. v. Costanza*,
   10 Mass. L. Rep. 459 (Mass. Super. 1999) ............................................................ 13

*T. Bedrosian, LLC v. Town of Mendon*,
   24 Mass. L. Rep. 344, 8 (Mass. Super. 2008) ................................................... 13, 14

*Transco Prods. Inc. v. Performance Contracting, Inc.*,
   38 F.3d 551 (Fed. Cir. 1994) .................................................................................... 8

*United States of Am., Inc. v. MacKenzie*,
   449 Mass. 832 (2007) ................................................................................................ 6

*Zila, Inc. v. Tinnell*,
   502 F.3d 1014 (9th Cir. 2007) ................................................................................. 20

## Statutes

28 U.S.C. § 2201 ............................................................................................................ 18

35 U.S.C. § 119(a) ........................................................................................................... 6

Page(s)

Mass. Gen. Law Ch. 121A .................................................................................................. 14

Mass. Gen. Law Ch. 121B .................................................................................................. 14

Mass. Gen. Law Ch. 231A .............................................................................................. 18, 19

Mass. Gen. Law Ch. 75, § 14A .......................................................................................... 14

Mass. Gen. Law Ch. 93A ............................................................. 4, 5, 12, 13, 14, 15, 16, 18

**<u>Rules</u>**

Fed. R. Civ. P. 30(b)(6) ....................................................................................................... 9

Fed. R. Civ. P. 56(c) ............................................................................................................ 4

## I.      INTRODUCTION

Plaintiffs Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. ("Max Planck Society"), Max-Planck-Innovation GmbH ("Max Planck Innovation," and, together with Max Planck Society, "Max Planck"), and Alnylam Pharmaceuticals, Inc. ("Alnylam," and together with Max Planck, "Plaintiffs") submit this opposition to the Motion for Summary Judgment on Counts VII, XV, XVII, and XVIII of Plaintiffs' First Amended Complaint filed by University of Massachusetts ("UMass").

UMass argues that Plaintiffs' claims against UMass "have nothing to do with the core dispute" in this case.  (Mem. at 1.)  This is not true.  The "core dispute" is over the incorporation of material from Max Planck Society's solely owned Tuschl II invention into the Tuschl I patent applications, and the Tuschl I patent applications' claim of priority to the first Tuschl II patent application, European Serial Number 00126325.0 (the "Tuschl II '325 application").  Plaintiffs' claims against UMass at issue here involve UMass's exploitation of that priority claim to assert an improper ownership interest in the Tuschl II invention.  Plaintiffs' claims against UMass are thus inextricably tied to the "core dispute."

In its license agreement with Sirna Therapeutics, Inc. ("Sirna"), UMass purported to license Sirna to the Tuschl II '325 application as a "priority document" to the Tuschl I applications.  Sirna, in turn, exercised that purported license grant by sublicensing third parties to the *entire Tuschl II patent estate*.  UMass's wrongful conduct thus deprived Alnylam of sublicensing opportunities that belonged solely to Alnylam as the exclusive licensee of the Tuschl II applications.  It also served UMass's goal of creating confusion in the marketplace over the ownership of the inventions claimed in the Tuschl II patent estate.  This exploitation of the priority claim by UMass evidences the harm that Plaintiffs have suffered and will continue to suffer as a result of the refusal by Whitehead Institute for Biomedical Research ("Whitehead"), with UMass's knowing consent and support, to withdraw the Tuschl I applications' priority claim to the Tuschl II '325 application.  This is a clear and powerful reason why Whitehead

should be ordered to withdraw the priority claim, which is an integral part of the "core dispute" in this case.

UMass's arguments for summary judgment all miss the mark.  At the center of UMass's motion is its fundamental misreading of the license between UMass and Sirna.  Under the plain terms of that license, UMass unambiguously (and wrongfully) licensed Sirna to the Tuschl II '325 application.  UMass retreats to extrinsic evidence in an attempt to avoid reading the license according to its plain terms, but UMass's reliance on extrinsic evidence fails as a matter of law.  Setting aside UMass's labored construction of the license, there are material issues of fact in dispute that preclude summary judgment.  The parties dispute whether Plaintiffs were harmed by UMass's license to Sirna.  The parties also dispute whether UMass was unjustly enriched by its license to Sirna.  There is a dispute over the necessity of a declaration of rights with respect to the Tuschl II '325 application.  To the extent that the Court finds the license between UMass and Sirna ambiguous, there is a dispute over whether UMass licensed Sirna to the Tuschl II '325 application.  Similarly, to the extent that the Court finds UMass's knowledge and support of Sirna's statements to third parties regarding the scope of its license from UMass material, there is a dispute of fact between the parties on this issue, as well.  In sum, UMass simply disregards the evidence of record demonstrating that UMass's wrongful conduct in purporting to license the Tuschl II '325 application to Sirna has harmed Plaintiffs by depriving them of economic opportunities in the Tuschl II patent estate that belong to Plaintiffs alone.  UMass's Motion for Summary Judgment is without merit and should be denied.

## II.    FACTUAL BACKGROUND

This case arises from the prosecution of two separate sets of patent applications that are directed to different inventions based on research performed by different inventive entities.  The Tuschl I applications are co-assigned to Max Planck Society, Whitehead, Massachusetts Institute of Technology ("MIT") and UMass.  The Tuschl II applications are assigned solely to Max Planck Society.  The first Tuschl II patent application, the Tuschl II '325 application, was filed on December 1, 2000.  In 2001, Whitehead, MIT, UMass and Max Planck Society entered into

an agreement to jointly license the Tuschl I and Tuschl II inventions as a patent package for research purposes. (Fiacco Decl. Ex. H.)[1]  In July 2003, Max Planck Society entered into a second agreement with Whitehead and MIT (but not UMass) to jointly license the Tuschl I and Tuschl II inventions as a patent package for therapeutic purposes. (*Id.* Ex. Y.)  Alnylam was granted an exclusive license to the Tuschl II applications, as well as an exclusive license to Whitehead, MIT and Max Planck Society's entire interests in the Tuschl I applications, for therapeutic purposes. (*Id.* Ex. I.)

In February 2001, Whitehead asked for Max Planck's permission to combine the Tuschl I and Tuschl II applications. (Ex. 22.)  Max Planck refused, but allowed Whitehead to incorporate into the specification of a Tuschl I application a description of significant aspects of the Tuschl II invention and to claim priority in the Tuschl I applications to the Tuschl II '325 application. (Ex. 21 at 216:18-23, 230:15-231:11.)  Max Planck allowed Whitehead to do so with the understanding that the Tuschl I and Tuschl II inventions would be patented separately.  In May 2004, Whitehead and MIT confirmed in writing that the Tuschl II inventive subject matter included in the Tuschl I applications will not be used to support Tuschl I claims and that the commercial value of the Tuschl II invention will be reserved for Max Planck's Tuschl II applications. (Ex. 1 at ALN0016234.)[2]

Beginning in 2007, the Tuschl I applications' priority claim to the Tuschl II '325 application has led the United States Patent and Trademark Office ("USPTO") to reject pending Tuschl II claims on obviousness-type double patenting grounds.  The USPTO examiner has relied on the priority claim in the Tuschl I applications to interpret the Tuschl I claims as encompassing the Tuschl II invention.  Max Planck has thus requested, repeatedly, that Whitehead withdraw the Tuschl I applications' priority claim to the Tuschl II '325 application,

---

[1] All references to "Fiacco Decl." herein are to the Declaration of Barbara A. Fiacco in Support of University of Massachusetts' Motion for Summary Judgment on Counts VII, XV, XVII, and XVIII.

[2] All citations herein in the format of "Ex. _" are to those Exhibits attached to the Declaration of Alan J. Heinrich submitted in support of this opposition.

consistent with Whitehead's prior representations and assurances to Max Planck that the commercial value of the Tuschl II invention will be reserved for Max Planck's Tuschl II applications. (Ex. 2 at ¶ 19.) Whitehead has refused to do so, without providing Plaintiffs with any coherent reason for its refusal. (Ex. 3 at 190:4-10; 162:21-164:11.) In fact, discovery has revealed that prosecution counsel for the Tuschl I applications informed Whitehead that she was aware of no compelling reason for maintaining the priority claim. (Ex. 4 at WHITEHEAD-00010965.)

Meanwhile, in September 2003, UMass entered into a licensing agreement with Sirna (the "Sirna License"). (Fiacco Decl. Ex. O.) Discovery in this case has revealed that UMass purported to grant Sirna a license to Max Planck's solely owned Tuschl II '325 application. Sirna, in turn, has exercised that grant by purporting to sublicense third parties, such as Allergan, Inc. ("Allergan") and Protiva Biotherapeutics, Inc. ("Protiva"), to the Tuschl II '325 application and the Tuschl II patents and applications which claim priority to it—in effect, *the entire Tuschl II estate*. This has deprived Alnylam of sublicensing opportunities that properly belong to Alnylam alone. *See infra* at Section B.3. UMass's false claim of ownership in the Tuschl II invention thus deprived Alnylam of the value of its exclusive license to the Tuschl II patent estate. To date, UMass has received nearly ███████ for the rights granted under the Sirna License. (Edwards Decl. Ex. A at 34-35 & nn. 75-78.)[3] These facts form the basis of Max Planck and Alnylam's claims against UMass for unjust enrichment and unfair competition (Mass. Gen. Laws c. 93A), which UMass now seeks to dismiss on summary judgment. UMass's misuse of the priority claim to the Tuschl II '325 application to assert an ownership interest in the Tuschl II invention itself also underscores the harm that Max Planck and Alnylam have suffered and will continue to suffer as a result of Whitehead's refusal to withdraw that priority claim, which is a core issue in this case.

---

[3] All references to "Edwards Decl." herein are to the Declaration of Mark G. Edwards submitted in support of this opposition.

### III.   ARGUMENT

#### A.   Standard Of Review

"Summary judgment is only appropriate where 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"   *Sensing v. Outback Steakhouse of  Fla., LLC*, 575 F.3d 145, 152 (1st Cir. 2009); *see also* Fed. R. Civ. P. 56(c).   The court must view the evidence in the light most favorable to the nonmoving party and resolve all reasonable inferences in that party's favor.   *Sensing,* 575 F.3d at 153.   "Where the record contains inconsistencies 'that favor in some lights the defendants and in others the plaintiff,' as long as the 'plaintiff's evidence is both cognizable and sufficiently strong to support a verdict in her favor, the factfinder must be allowed to determine which version of the facts is most compelling.'"   *Id.*

#### B.   UMass Is Not Entitled To Summary Judgment On Plaintiffs' Chapter 93A Claims (Counts VII and XVII)

Count XVII of Plaintiffs' First Amended Complaint ("FAC") states a claim against UMass under Chapter 93A for UMass's unfair and deceptive acts in wrongfully licensing Max Planck's Tuschl II '325 application to Sirna.[4]   UMass raises four arguments for summary judgment on this claim.   First, UMass argues that it did not license the Tuschl II '325 application to Sirna.   Second, UMass argues that it did not know or support Sirna's statements to third parties regarding the scope of its license from UMass.   Third, UMass argues that Plaintiffs did not suffer any loss of money or property from UMass's licensing the Tuschl II '325 application to Sirna.   Finally, UMass argues that it is not subject to suit under Chapter 93A.   With respect to Count VII of the FAC, which states a claim against both UMass and Whitehead under Chapter 93A for wrongfully harming the Tuschl II applications through the prosecution of the Tuschl I applications, UMass's only argument is that it is not subject to suit under Chapter 93A.   In

---

[4] The Court previously dismissed Plaintiffs' Chapter 93A claim to the extent it concerned matters unrelated to the Sirna licensing issues that are the subject of UMass's present motion. *See* Dkt. #390 at ¶ 2.

making these arguments, UMass ignores the plain language of the Sirna License, disregards contrary evidence, and misconstrues the law.  UMass is not entitled to summary judgment on Counts VII and XVII.

### 1.    UMass Licensed The Tuschl II '325 Application To Sirna

Under the plain terms of the Sirna License, UMass unambiguously licensed Sirna to the Tuschl II '325 application.  The Sirna License grants an exclusive license to Sirna, with the right to sublicense, under certain defined "Patent Rights."  (Fiacco Decl. Ex. O at § 2.1.)  These "Patent Rights" are defined in Section 1.9 ███████████████████████████████████████ ██████████████████████████████████████ (*Id.* at § 1.9.)  The Tuschl I nonprovisional applications claim priority on their face to the Tuschl II '325 application.  (*See, e.g.*, Fiacco Decl. Ex. A.)  Indeed, Exhibit A to the Sirna License, "List of Patent Rights," expressly calls out the Tuschl II '325 application as a priority document of the Tuschl I PCT application.  (*Id.* Ex. O at 25.)  UMass's contention that "Tuschl II applications are not included in that list" in Exhibit A is thus demonstrably incorrect.  (Mem. at 8.) ████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████. (Ex. 5 at 65:19-66:23)  Thus, the express terms of the Sirna License purported to grant Sirna a license to the Tuschl II '325 application.  This is far from a "circuitous, complex, and counterintuitive interpretation of the UMass-Sirna Agreement," as UMass protests.  (Mem. at 8.)  On the contrary, this interpretation is compelled by the unambiguous language of the Sirna License.

Even if UMass were correct—which it is not—that the ██████████████████████████ ████████████████████████████████ refers only to "the patent owner-licensor's right to claim priority to earlier-filed applications," UMass is wrong to suppose that it had "an unfettered right" to convey the right to claim priority to the Tuschl II '325 application to Sirna.  (Mem. at 9-10.)  UMass had no such right.  As a matter of U.S. patent law, to claim priority to an earlier-filed application, the foreign application must be for the "same invention" as the later U.S. application.  35 U.S.C. § 119(a).  Thus, even under UMass's logic, by purporting to convey to

Sirna the right to claim priority to the Tuschl II '325 application, UMass was purporting to grant rights to the Tuschl II invention itself.

UMass also attempts to escape the plain language of the Sirna License by resorting to extrinsic evidence, citing out of context deposition testimony of Bharat Chowrira, Howard Robin, Chester Bisbee and Lisa Decker.  (Mem. at 10-11.)  However, extrinsic evidence cannot be used to vary the unambiguous terms of a contract.  *Gen. Convention of the New Jerusalem in the United States of Am., Inc. v. MacKenzie*, 449 Mass. 832, 835-36 (2007).  Thus, UMass's reliance on extrinsic evidence fails at the outset.  In any event, the testimony of these witnesses does not support UMass's position.

For example,



(Fiacco Decl. Ex. V at 66:14-23.)

(*Id*. Ex. U at 67:12-13.) Chester Bisbee, former head of UMass's Technology Transfer Office, merely testified that UMass never characterized the scope of its rights because "[d]ue diligence is the responsibility of the licensee."   (*Id*. Ex. W at 40:23-24.)   Lisa Decker's testimony is contradictory.  She first testified that she was involved in UMass's negotiations with Sirna that led to the Sirna License (Ex. 6 at 25:4-7), then she reversed course and testified that she was not involved (*id*. at 27:3-5), but in any event, she claims to recall nothing.  (*Id*. at 25:4-27:19.)

The extrinsic evidence does, however, confirm that the parties to the Sirna License were sophisticated and that the agreement was heavily negotiated.

(Ex. 7 at 62:5-19; Ex. 5 at 42:8-18.)   Bisbee and Hemi Chopra (another former employee of the UMass Technology Transfer Office) both testified that the terms of the Sirna License were negotiated back and forth between Sirna and UMass for months. (Ex. 8 at 131:14-

132:11; Ex. 9 at 39:17-40:14, 42:20-43:1.)  This was hardly a boilerplate license agreement that Sirna or UMass could plausibly claim not to have read before signing.  It was no accident, and it surely did not escape the notice of these sophisticated parties, that UMass licensed Sirna to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ expressly including the Tuschl II '325 application. (Fiacco Decl. Ex. O at § 1.9 & 25-26.)

Next, UMass argues that construing the Sirna License to include a license to the Tuschl II '325 application "makes no sense" because the Tuschl II '325 application was abandoned. (Mem. at 11.)  This argument is specious.  The Tuschl II '325 application is the basis for the entire family of Tuschl II patent applications.  "[A] continuing application and the application on which it is based are considered part of the same transaction constituting one continuous application."  *Transco Prods. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 556-57 (Fed. Cir. 1994.)  Moreover, The Tuschl II '325 application has substantial value as a priority application, as evidenced by Sirna's subsequent licensing of the entire Tuschl II patent estate to Allergan and Protiva based on this very priority claim to the Tuschl II '325 application.  This litigation is also a testament to the value of that priority claim.  If the Tuschl II '325 application was valueless and incapable of being licensed, it is inconceivable that Whitehead would continue to reject Plaintiffs' requests that the priority claim be removed from the Tuschl I applications.

Finally, UMass's argument that it "could not have affected the grant of a license" to the Tuschl II '325 application because it was solely owned by Max Planck Society (Mem. at 12) misses the point.  UMass's conduct was wrongful precisely because it purported to license Max Planck's solely owned Tuschl II '325 application and was unjustly enriched thereby.  UMass knowingly misrepresented that it had rights in the Tuschl II '325 application in order to usurp for itself opportunities that rightfully belonged to Plaintiffs.  As alleged in the FAC and explained below, UMass's wrongful conduct has harmed Plaintiffs.

**2.      It Is Immaterial Whether UMass Was Aware Of Sirna's Presentations And Licensing Activities**

UMass asserts that "there is not a shred of evidence that UMass knew or participated in" Sirna's presentations to third parties that "confused the marketplace about the scope of Sirna's patent rights." (Mem. at 12.)  It is not surprising that UMass seeks to avoid any association with these presentations:  UMass does not dispute, nor can it, that ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████ *See, e.g.*, Exs. 10-12.) ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (*Id.*)

However, it is immaterial whether UMass was actually aware of Sirna's presentations.  In either case, a reasonable jury can easily infer that UMass's wrongful conduct in purporting to license Sirna to the Tuschl II '325 application led to Sirna's use of that application to sow confusion in the marketplace as to Sirna's rights (or lack thereof) in the Tuschl II estate.  For similar reasons, it is immaterial whether UMass was aware of Sirna's license agreements with Allergan and Protiva (discussed below).  In either case, UMass's wrongful conduct in purporting to license Sirna to the Tuschl II '325 application resulted in Sirna's licensing Allergan and Protiva to the Tuschl II patent estate, to the detriment of Plaintiffs.

Even if UMass's awareness of Sirna's presentations and licensing activities were relevant, the facts are in dispute on this issue.  For example, the Sirna License requires Sirna to ████████████████████████████████████████████████████████████ (Fiacco Decl. Ex. O at § 2.2.(c).) ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████ (Ex. 13 at F-2; Ex. 14 at Exhibit G.)   Based on this contractual obligation, a reasonable jury could easily and reasonably infer that UMass was aware of Sirna's presentations and licensing activities.

UMass points to the testimony of Dr. Maraganore, Alnylam's corporate designee pursuant to Fed. R. Civ. P. 30(b)(6), and argues that Dr. Maraganore cited no specific evidence that UMass was aware of or supported Sirna's alleged presentations to third parties. (Mem. at 12.) What UMass fails to mention is that Dr. Maraganore was prohibited from viewing documents designated Highly Confidential pursuant to the protective order in this case. This includes the Sirna License, which UMass designated as Highly Confidential, Sirna's presentations to third parties, and other evidence. UMass's reliance on alleged deficiencies in Dr. Maraganore's testimony is subterfuge.

### 3. UMass Was Unjustly Enriched, To Plaintiffs' Detriment, Under The Sirna License

In an attempt to trivialize the harm Plaintiffs have suffered as a result of UMass's licensing of the Tuschl II '325 application to Sirna, UMass again resorts to the red herring of the abandonment of the Tuschl II '325 application. (Mem. at 6.) UMass argues that Plaintiffs could not have suffered loss of money or property from the licensing of an abandoned patent. (*Id.*) UMass is wrong. The entire Tuschl II patent estate claims priority to, and hence is based on, the Tuschl II '325 application. Accordingly, the Tuschl II '325 application continues to have substantial value, as evidenced by this very lawsuit. UMass and its licensee Sirna were unjustly enriched, to Plaintiffs' detriment, as a result of UMass's wrongful licensing of this valuable intellectual property to Sirna.

First, the Sirna License has provided UMass with a substantial payday. Sirna has paid UMass ███████ in license fees and milestone payments and an additional ███████ in license maintenance fees through 2009. (Edwards Decl. Ex. A at ¶ 99.) Sirna also issued to UMass shares of Sirna common stock worth ███████ at the time, which UMass later sold for ███████ (*Id.*) Sirna may owe UMass as much as ███████ in additional ███████ ███████ milestone payments and may be required to issue to UMass additional shares of Sirna common stock worth ███████ (*Id.*) The Sirna License also entitles UMass to ███████ ███████ (Fiacco Decl. Ex. O at §§ 1.11, 4.7.) These ███████

███████ of compensation were given to UMass in exchange for a license that included rights to the Tuschl II '325 application.  Part of this compensation thus rightfully belongs to Max Planck and Alnylam, as the sole owner and exclusive licensee, respectively, of the Tuschl II patent estate.

Second, Sirna itself has taken full advantage of UMass's purported grant of rights to the Tuschl II '325 application.   In February 2005, Sirna entered into a Strategic Alliance Agreement with Protiva (the "Sirna-Protiva Agreement").  (Ex. 14 at 1.)  Section 4.1 of the agreement granted Protiva an exclusive license under the "Sirna Technology."  (*Id.* at § 4.1(a).)  "Sirna Technology" is defined to include "Sirna Patent Rights," which in turn is defined to include the patent applications listed in Exhibit G to the Sirna-Protiva Agreement, and any priority documents, divisionals, continuations, and continuation-in-part applications of the applications listed on Exhibit G.  (*Id.* at §§ 1.50, 1.51.)  One of the patent applications explicitly listed in Exhibit G is the Tuschl II '325 application.  (*Id.* at Exhibit G.)  Consequently, not only did Sirna purport to grant Protiva a license to the Tuschl II '325 application,  it also granted rights to any priority documents, divisional, continuations, and continuation-in-part applications of that application, which includes the entire Tuschl II patent estate.  In exchange for this license, Protiva agreed to an upfront payment of up to $1 million and future royalties.  (*Id.* at § 5.)



Similarly, ██████████████████████████████████ ████████████████████████ (Ex. 13 at 1.) ████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████ (*Id.* at §§  4.1, 1.43.) ████████ ████████████████████████ (*Id.* at F-2.)  The entire Tuschl II patent estate claims priority to the Tuschl II '325 application.  Thus, Sirna purported to sublicense Allergan, as well, to the entire Tuschl II patent estate.  ████████████████████████ ██████████████████████████████████████ (*Id.* at § 5.)

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████████████  (Ex. 5 at 90:3-7, 117:5-9.)

Because Sirna has, thanks to UMass, purported to sublicense rights to the Tuschl II patent applications that Sirna never possessed, Alnylam should have received a portion of the licensing revenue that Sirna collected from Allergan and Protiva. (Edwards Decl. Ex. A at ¶ 114; *see also id.* at ¶¶ 115-118.) Indeed, Alnylam has been actively seeking sublicensees for the Tuschl II applications. (Ex. 15 at 664:17-665:12.) One potential sublicensee it approached was Allergan. (*Id.* at 684:6-685:13; Ex. 16 at 53:16-54:4, 74:17-22; Ex. 17 at ALN0115828.) Allergan informed Alnylam that it did not believe that it needed a license to the Tuschl II patent estate. (Ex. 15 at 685:9-13, 689:23-690:16.) Unbeknownst to Alnylam, Allergan had already entered into the agreement with Sirna that purported to grant Allergan rights to the entire Tuschl II patent estate. (Compare *id.* at 685:9-19 and 689:23-690:16 with Ex. 13.) As Dr. Maraganore explained:

> I think it's possible that, in addition to Allergan and Protiva and to some extent opportunities that we might have had with Merck for a broader relationship – or, for that matter, opportunities with Glaxo SmithKline, which ended up doing a partnership with Sirna – these all relate to, you know, the confusion, purposeful misrepresentation of intellectual property that was made by Sirna during that period of time, which we now understand had more to it than we understood at the time.

(Ex. 15 at 665:2-12.)

In sum, by wrongfully purporting to license Sirna to the Tuschl II '325 application, UMass has deprived Alnylam of sublicensing opportunities and has damaged Max Planck's and Alnylam's interests in the Tuschl II patent estate, to their financial detriment.

### 4.    UMass Is Subject To Suit Under Chapter 93A

As UMass acknowledges, (Mem. at 14 n.8), "no court has held that [governmental entities] are exempt from Chapter 93A claims so long as they are 'acting in a business context,' functioning in 'trade or commerce' as the statute requires." *City of Revere v. Boston/Logan Airport Assocs., LLC*, 416 F. Supp. 2d 200, 210-11 (D. Mass. 2005) (holding that defendant stated a Chapter 93A claim against City because interaction was commercial in nature and facts alleged could entitle defendant to relief); *see also T. Bedrosian, L.L.C. v. Costanza*, 10 Mass. L. Rep. 459 (Mass. Super. 1999) (denying motion to dismiss Chapter 93A claim against the Town of Hopedale where it was involved in "trade or commerce" by agreeing to provide water for a subdivision in exchange for payment). In fact, this Court has explicitly held that governmental entities are subject to liability under Chapter 93A where they are acting in a business context. *City of Revere v. Boston/Logan Airport Assocs., LLC*, 443 F. Supp. 2d 121, 128-29 (D. Mass. 2006).[5] Moreover, liability under Chapter 93A requires that the defendant be a "person" engaged in trade or commerce. While the definition of person in the statute does not expressly include governmental entities, "only a 'person' may bring suit under c. 93A and governmental entities have been considered to have standing to do so."[6] *M. O'Connor Contracting, Inc. v. City*

---

[5] Contrary to UMass's assertion, the decision in *Joyce v. Town of Dennis*, Civil Action No. 08-10277-NMG, 2010 WL 1383178 (D. Mass. March 30, 2010), did not "effectively" overrule *City of Revere v. Boston/Logan Airport Assocs., LLC*, 443 F. Supp. 2d 121 (D. Mass. 2006), and in fact did not even cite that case. *Joyce* did *not* rule that governmental entities are not subject to suit under Chapter 93A, but rather merely noted that Massachusetts courts have not yet definitively resolved the issue. *Id.* at 9. The primary basis for the *Joyce* court's grant of summary judgment in favor of the municipal defendant on plaintiff's Chapter 93A claim was that the court had already found that the municipal defendant violated a separate statute that covered the defendant's exact conduct at issue, and hence declined to construe Chapter 93A to "accomplish an identical task." *Id.*

[6] UMass incorrectly asserts that this reasoning was rejected by the Supreme Judicial Court in *Lafayette Place Assocs. v. Boston Redevelopment Auth.*, 427 Mass. 509, 536 n.29 (1998). UMass fails to quote the second sentence of the footnote, which is necessary to an understanding of the quoted language "Cases . . . in which a public entity may act as a plaintiff in a c. 93A action, are not apposite. One who deals with a public entity, as for instance in providing it with goods or services, may very well be engaged in trade or commerce without the entity being so engaged as well." The SJC proceeded to hold that the governmental defendant in

*of Brockton*, 61 Mass. App. Ct. 278, 284 n.8 (2004); *T. Bedrosian, LLC v. Town of Mendon*, 24 Mass. L. Rep. 344, at *8 (Mass. Super. 2008) (same); *see also City of Boston v. Aetna Life Ins. Co.*, 399 Mass 569, 575 (1987) (holding that if there was a standing requirement in Mass. G.L. c. 93A, § 11, Boston met the test of being a "person engaged in the conduct of any trade or commerce"); *Spence v. Boston Edison Co.*, 390 Mass. 604, 616 (1983) (affirming denial of motion to dismiss Boston Housing Authority—a governmental entity—claim under Chapter 93A); *Lantner v. Carson*, 374 Mass. 606, 611 (1978) (words used in one place in a statute are to be given the same meaning when found in other places in the statute).

Next, UMass argues that, even if it were subject to suit under Chapter 93A, it was not engaged in trade or commerce as required by the statute, but rather engaged in a governmental function, mandated by the legislature. (Mem. at 16.) UMass claims that its technology transfer function is mandated by the Legislature, citing Mass. G.L. c. 75, § 14A, which states that "the trustees . . . *may* enter into contracts with corporations, foundations, other entities, and individuals concerning inventions, discoveries, research, or other work product, including patents . . . ." (Emphasis added). This statute, however, is merely permissive, it is not mandatory.[7] *See*

*Layfayette Place Assocs.* was not engaged in "trade or commerce," and hence was not subject to suit under Chapter 93A. The SJC did *not* hold that a governmental entity that was, in fact, engaged in trade or commerce should be immune from suit under Chapter 93A.

[7] The cases cited by UMass are distinguishable. In *M. O'Connor Contracting, Inc. v. City of Brockton*, 61 Mass. App. Ct. 278, 284-85 (2004), the plaintiff did not contest that its Chapter 93A claim arose from defendant's performance of a governmental function. Moreover, the case involved an arbitration award for punitive damages under Chapter 93A, which the court found particularly troubling when assessed against a public entity. *Id.* at 285. *Park Drive Towing, Inc. v. City of Revere*, 442 Mass. 80 (2004), involved a dispute between a towing company and the city. The court found that the city was not engaged in trade or commerce because its interaction with the towing company was incidental to its primary function of maintaining public order in the streets. *Id.* at 86. UMass's primary function is education and research. Licensing technology to private companies for profit is not incidental to these functions in the way that towing vehicles off the street is incidental to maintaining public order in the streets. In *Lafayette Place Assocs. v. Boston Redevelopment Auth.*, 427 Mass. 509, 536 (1998), the court found that "[t]here simply cannot be any doubt that the parties' dealings took place in the context of the pursuit of the urban renewal and redevelopment goals of c. 121A and c. 121B." The court specifically called out Mass. G.L. c. 121A, § 2, which is a declaration of public necessity for redevelopment of land, as a legislatively proscribed mandate. *Id.* at 535.

*Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 258 & n.3 (1st Cir. 1994) (finding Massachusetts statute did not mandate action, emphasizing the use of the permissive word "may" in the statute); *Barranco v. Milford Hous. Auth.*, 408 Mass. 502, 507 (1990) ("ordinarily we recognize the word 'may' as a permissive term which 'does not impose a mandate but simply authorizes an act'").

UMass also argues that if the Legislature had intended Chapter 93A to subject the Commonwealth to suit, it would have included it in the Massachusetts Tort Claims Act ("MTCA"), or it would have provided similar procedural protections in Chapter 93A.  (Mem. at 15.)  This argument is again misguided.  "[T]he enactment of [the MTCA] did not bar the development and application of common law principles governing the liability of public employers in areas to which [the MTCA] does not apply."  *Lane v. Commonwealth*, 401 Mass. 549, 551 (1988).

To determine whether a party is liable under Chapter 93A "first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.'" *Linkage Corp. v. Trs. of Boston Univ.*, 425 Mass. 1, 22-23 (1997).  The interactions at issue in this case between Plaintiffs and UMass involve competition in the siRNA patent licensing market, and thus are commercial in nature.  "Trade" and "commerce" under Section 11 refer to actions that take place in a business context.  *Begelfer v. Najarian*, 381 Mass. 177, 190 (1980). The courts use several factors to evaluate whether an action took place in a business context including: (1) the nature of the transaction; (2) the character of the parties involved; (3) the activities engaged in by the parties; (4) whether similar transactions have been undertaken in the past; (5) whether the transaction was motivated by business or personal reasons; and (6) whether the entity played an active part in the transaction.  *Id.* at 191.  Nonprofit corporations have been

---

This statutory language bears little resemblance to the statute permitting UMass to enter into technology licenses.  The statute involved in *T. Bedrosian, LLC v. Town of Mendon*, 24 Mass. L. Rep. 344, at *1 (Mass. Super. 2008) is similarly distinguishable, as it stated that the water commissioner "**shall** fix just and equitable prices and rates for the use of water . . . ."  (Emphasis added).

held liable under the statute when they have "inserted [themselves] into the marketplace in a way that makes it only proper that [they] be subject to rules of ethical behavior and fair play." *Linkage Corp.*, 425 Mass. at 24 n.34, 26-27.  The same reasoning should apply to UMass here. *Cf. Baumgardner v. City of Boston*, 304 Mass. 100, 102 & 110 (1939) (city voluntarily engaging in a commercial enterprise permitted by statute—garbage disposal—held liable for negligence; rule exempting municipalities from liability for acts in a governmental enterprise did not apply).

UMass and Plaintiffs were competitors in the siRNA patent licensing market, each seeking to license their technology on the most economically advantageous terms.  UMass engaged in an unfair method of competition and an unfair and deceptive act by seeking to maximize the profit from its transaction with Sirna through misrepresenting its ownership interest in the Tuschl II '325 application.  UMass acted as a typical business seeking to license its technology—it solicited interest in companies that might want to license that technology and followed up by sending letters to see if anyone would pay money for a license.  (Ex. 8 at 31:8-18.)  By virtue of UMass's receipt of equity in Sirna and its right to royalties, UMass has an economic interest in Sirna's success and its ability to operate freely in the siRNA field.  (Ex. 9 at 110:1-10; Ex. 6 at 81:24-82:9.)  UMass's 30(b)(6) witness confirmed this obvious fact:

> Q. [I]t is the university's business that Sirna succeed, because Sirna has royalty and other payment obligations to U. Mass.; right?
>
> A. We would like them to succeed, yes.
>
> Q. Because that way U. Mass. can generate additional revenues; right?
>
> A. Correct.

(Ex. 18 at 76:3-10.)  Far from being a legislative mandate, UMass admits, through its 30(b)(6) witness, that it does not consider licensing out its technologies to be part of its "business" as a research institution.  (*Id.* at 75:15-76:2.)  As such, it should not escape liability for its wrongful use of the priority claim to assert an actual ownership interest in the Tuschl II invention.

### C.   UMass Is Not Entitled To Summary Judgment On Plaintiffs' Unjust Enrichment Claim Against UMass (Count XV)

"In Massachusetts, a claim for unjust enrichment does not require consideration, but there must be 'unjust enrichment of one party and unjust detriment to another party.'" *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 57 (1st Cir. 2009).   UMass rests its argument for summary judgment on two points:   (1) that UMass was not unjustly enriched because it did not license the Tuschl II '325 application to Sirna; and (2) that Plaintiffs did not suffer an unjust detriment.   UMass is wrong on both counts.

As explained in Section B above, under the plain language of the Sirna License, UMass purported to license Sirna to the Tuschl II '325 application.   *See supra* at Section B.1.   In exchange, UMass has received ███████████ from Sirna, part of which can be attributed to the purported grant of rights to the Tuschl II '325 application.   *Id.* at Section B.3.   UMass is not and never was an owner of the Tuschl II '325 application, and thus it had no justifiable basis for receiving consideration for licensing this priority patent application to Sirna.

Both Max Planck and Alnylam suffered an unjust detriment as a result of UMass's false claim of ownership in the Tuschl II '325 application.   *See supra* at Section B.3.   Part of the consideration received by UMass from Sirna rightly belonged to Max Planck as the sole owner of the Tuschl II '325 application, and Alnylam, as the exclusive licensee.   *Id.*   Moreover, UMass's misrepresentation of its ownership interest allowed Sirna to license the entire Tuschl II estate to Allergan and Protiva, thus depriving Alnylam of sublicensing opportunities.   *Id.*   The compensation received by Sirna belongs partially to Alnylam and Max Planck.   Thus, Plaintiffs suffered an unjust detriment.

**D.    UMass Is Not Entitled To Summary Judgment On Plaintiffs' Declaratory Judgment Claim Against UMass (Count XVIII)**

UMass makes three arguments for dismissing Plaintiffs' declaratory judgment claim on summary judgment.  First, it argues that this claim is derivative of Plaintiffs' unjust enrichment and Chapter 93A claims, which fail as a matter of law.[8]  (Mem. at 18.)  For the reasons set forth above, these claims do not fail as a matter of law.  Moreover, UMass does not articulate how this claim is derivative of Plaintiffs' unjust enrichment or Chapter 93A claims in any event.  "[A] party seeking declaratory judgment need not demonstrate an actual impairment of rights."  *City of Boston v. Keene Corp.*, 406 Mass. 301, 304 (1989).  To have standing, the plaintiff must have "a definite interest in the matters in contention in the sense that his rights will be significantly affected by a resolution of the contested point."  *Bonan v. Boston*, 398 Mass. 315, 320 (1986).  Here, Max Planck and Alnylam, as the sole owner and exclusive licensee of the Tuschl II '325 application, have a definite interest in a declaration concerning UMass's ability to transfer rights in that application.  Such a declaration will limit UMass's and Sirna's ability to misrepresent their rights to the Tuschl II invention to potential collaborators or investors, usurping opportunities that belong to Plaintiffs alone.

---

[8]  UMass suggests, without citing any authority, that the Massachusetts declaratory judgment statute  may  not apply in federal court. (Mem. at 18.)  Nothing in the statute indicates that the ordinary rules of supplemental jurisdiction do not apply.  Moreover, claims under the statute have been successfully brought in federal court.  *See Raytheon Co. v. Cont'l Cas. Co.*, 123 F. Supp. 2d 22, 30-31 (D. Mass. 2000); *Riverdale Enters. Inc. v. Shell Oil Co.*, 41 F. Supp. 2d 56, 68 (D. Mass. 1999); *Mass. Candy & Tobacco Distribs., Inc. v. Golden Distribs., Ltd.*, 852 F. Supp. 63, 68-69 (D. Mass. 1994).  Even if the federal declaratory judgment statute was the only means by which Plaintiffs could secure a declaration of their rights, the requirements are similar to those of the Massachusetts statute, and for the reasons set forth above, those requirements are met.  *See Riverdale Enters., Inc.*, 41 F. Supp. 2d at 62-63 (comparing the federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Massachusetts Declaratory Judgment Act, Mass. G.L. c. 231A).

Second, UMass argues that this claim should be dismissed as a matter of judicial discretion.  (Mem. at 19.)   UMass asserts that a declaration of rights is unjustified because neither UMass nor Sirna contend that UMass licensed the Tuschl II '325 application to Sirna and the application was abandoned.  (*Id.*)  As explained above, there is ample evidence that UMass did license the Tuschl II '325 application to Sirna, and the abandonment of the Tuschl II '325 application is immaterial.  The purpose of the declaratory judgment statute "is to remove, and to afford relief from, uncertainty and insecurity with respect to rights, duties, status and other legal relations, and *it is to be liberally construed and administered*."   Mass. G.L. c. 231A, § 9 (emphasis added).  The Court has discretion to refuse to enter a declaratory judgment if the judgment "would not terminate the uncertainty or controversy giving rise to the proceedings or for other sufficient reasons."  Mass. G.L. c. 231A, § 3.  Here, the priority claim in the Tuschl I applications to the Tuschl II '325 application is being exploited by UMass and Sirna to claim ownership in the Tuschl II invention.  A declaration that Max Planck Society is the sole owner of the Tuschl II '325 application, and that consequently UMass could not license or otherwise transfer any rights in the Tuschl II '325 application to Sirna or any third party as a matter of law, would prevent this exploitation from continuing.

Finally, UMass argues that the Court cannot adjudicate inventorship of pending Tuschl II patent applications, and any ruling with respect to the issued Tuschl II patents must await adjudication of UMass's correction of inventorship counterclaim.  (Mem. at 19.)  Plaintiffs are not seeking an adjudication of inventorship.  Nor are Plaintiffs asking for a ruling with respect to the issued Tuschl II patent applications.  As is clear from Plaintiffs' First Amended Complaint, Plaintiffs are seeking a declaration only with respect to the Tuschl II '325 application.  Moreover, UMass's argument that the federal patent statute only authorizes district courts to

adjudicate inventorship of issued patents is inapposite.  (Mem. at 19.)  Federal patent law would

not preempt state law in this situation since U.S. patent policy is not implicated by a declaration

of ownership rights to a European patent application.  *See Zila, Inc. v. Tinnell*, 502 F.3d 1014

(9th Cir. 2007).   Therefore, it would be entirely appropriate for this Court to issue a declaration

of rights with respect to the Tuschl II '325 application.

## IV.    CONCLUSION

UMass ignores the plain terms of the Sirna License, which purported to grant Sirna a

license to Max Planck's Tuschl II '325 application.   UMass's wrongful conduct unjustly

enriched UMass and deprived Plaintiffs of economic opportunities that rightfully belonged to

Plaintiffs alone.   UMass's arguments for summary judgment on Counts VII, XV, XVII, and

XVIII of Plaintiffs' FAC fail and UMass's motion for summary judgment should be denied.

## <u>REQUEST FOR ORAL ARGUMENT</u>

Pursuant to Local Rule 7.1(d), Plaintiffs request oral argument on this motion.

Respectfully submitted,

Max-Planck-Gesellschaft zur Förderung der
Wissenschaften e.V.; Max-Planck-Innovation
GmbH; and Alnylam Pharmaceuticals, Inc.

Of counsel

By their attorneys,

Morgan Chu (70446) pro hac
David I. Gindler (117824) pro hac
Michael H. Strub, Jr. (153828) pro hac
Alan J. Heinrich (212782) pro hac
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010

  _/s/ Thomas F. Maffei_____
Thomas F. Maffei (BBO 313220)
Scott McConchie (BBO 634127)
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, Massachusetts 02110
(617) 542-9900

Dated:  September 3, 2010

**Certificate of Service**

I, Thomas F. Maffei, hereby certify that a true copy of the above document was served upon the attorney of record for each of Defendants Whitehead Institute of Biomedical Research and the University of Massachusetts on September 3, 2010.

_/s/ Thomas F. Maffei_
Thomas F. Maffei
