UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MAX-PLANCK-GESELLSCHAFT ZUR
FÖRDERUNG DER WISSENSCHAFTEN
E.V., MAX-PLANCK-INNOVATION
GMBH, and ALNYLAM
PHARMACEUTICALS, INC.,

                Plaintiffs,

v.

WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH,
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY, and BOARD OF
TRUSTEES OF THE UNIVERSITY OF
MASSACHUSETTS,

                Defendants.

Civil Action No.  09-CV-11116-PBS

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
MAX PLANCK'S MOTION TO COMPEL PRODUCTION OF
COMMUNICATIONS INVOLVING WOLF GREENFIELD**

i

# TABLE OF CONTENTS

I.    MAX PLANCK WAIVED ITS RIGHT TO MAKE THIS MOTION. ......................... 7

    A.    Max Planck's Motion is Untimely ................................................................. 7

    B.    Max Planck Should have Raised its Joint Client Argument When It
        Previously Sought these Documents ............................................................. 9

II.   MAX PLANCK DID NOT HAVE AN ATTORNEY CLIENT RELATIONSHIP
    WITH WOLF GREENFIELD ....................................................................... 10

III.  MAX PLANCK CANNOT ESTABLISH A JOINT CLIENT RELATIONSHIP WITH
    WHITEHEAD ............................................................................................. 14

    A.    Whitehead and Max Planck Never Had a Common Interest on a Matter in
        which Wolf Greenfield Provided Representation. ...................................... 14

    B.    Other Relevant Factors Also Establish that Whitehead and Max Planck Did
        Not Have a Joint Client Relationship ......................................................... 16

    C.    There Can Be No Waiver Where Whitehead Lacked Knowledge of or Did
        Not Consent to the Joint Client Relationship .............................................. 17

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86 (1st Cir. 1996) .........................................8

*Bass Public Ltd. Co. v. Promus CS., Inc.*, 868 F. Supp. 615 (S.D.N.Y. 1994).............................18

*Beasley v. Avery Dennison Corp.*, Civil Action No. AS-04-CA-0866 FB (NN), 2006 U.S. Dist. LEXIS 74033 (W.D. Tex. Oct. 4, 2006) ............................................................................15

*Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4 (1st Cir. 1987)........................................10

*Choate v. National R.R. Passenger Corp.*, 132 F.Supp.2d 569 (E.D. Mich. 2001).........................8

*Eureka Inv. Corp. N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C. Cir. 1984).......................18

*FDIC v. Ogden Corp.*, 202 F.3d 454 (1st Cir. 2000).............................................................14, 16

*Fireman's Ins. Co. v. Todesca Equip. Co.*, 310, F.3d 32 (1st Cir. 2002) .....................................10

*Hillerich & Bradsby Co. v. MacKay*, 26 F. Supp. 2d 124 (D.D.C. 1998) .....................................15

*In re Teleglobe Commn's Corp.*, 493 F.3d 345 (3rd Cir. 2007) ......................................................9

*Int'l Strategies Group Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1 (St. Cir. 2007) ...............11, 12

*Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 167 F. Supp. 2d 108 (D. Mass. 2001) ("*MEEI*")..........................................................................................................15, 16

*Merck Eprova AG v. ProTherma, Inc.*, 670 F. Supp. 2d 201 (S.D.N.Y. 2009)............................15

*Modern Cont'l/Obayashi v. Occupational Safety & Health Review Comm'n*, 196 F.3d 274 (1st Cir. 1999) .............................................................................................................8

*Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir.1988) ..............10

*Sheinkopf v. Stone*, 927 F.2d 1259 (1st Cir. 1991) .....................................................................12

*Singh v. Superintending Sch. Comm.*, 593 F. Supp. 1315 (D. Me. 1984)....................................10

*Sky Valley Ltd. P'ships v. ATX Valley, Ltd.*, 150 F.R.D. 648 (N.D. Cal. 1993) ............................16

*Suntrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196 (E.D. Mich. 2002) ...........................8, 9

*Taylor v. Sturgell*, 553 U.S. 880 (2008)..................................................................................2, 10

**STATE CASES**

*Beacon Oil Co. v. Perelis*, 263 Mass 288 (1928)..........................................................................15

*Devaux v. Am. Home Assurance Co.*, 387 Mass. 814 (1983) ........................................................11

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 72(a) ..........................................................................................10

Mass. R. Prof. R. 1.7(b), cmt. 12(c)................................................................................................9

Restatement (Third) of the Law Governing Lawyers § 75, cmt e ....................................................9

## INTRODUCTION

Plaintiff Max Planck[1] seeks to compel production of all privileged communications between Wolf, Greenfield & Sacks, PC ("Wolf Greenfield") and its client, Defendant Whitehead Institute for Biomedical Research ("Whitehead"), and all communications involving Wolf Greenfield and Whitehead's co-defendants pursuant to a common interest, all on the ground that Max Planck and the Defendants were "joint clients" of Wolf Greenfield. [2]

Max Planck's motion should be denied because (1) Max Planck waived any right to the documents sought by delaying for nearly a year in bringing this motion and by failing to raise the "joint client" argument when it previously moved to compel production of many of the same documents last January; (2) Max Planck was not represented by Wolf Greenfield, and the Court's contrary decision in the *Wolf Greenfield* suit, which was obtained by Max Planck on an incomplete record, may not be used against Defendants here; and (3) Whitehead and Max Planck were not, in any case, "joint clients" that would entitle Max Planck to privileged communications involving a dispute as to which Max Planck knew it was adverse to Whitehead.

As a threshold matter, Max Planck's motion is untimely. This motion comes nine months after fact discovery closed and nearly a year after Max Planck was first on notice that Defendants were withholding communications with Wolf Greenfield on the ground of the attorney-client privilege. Max Planck has been claiming, since it sued Wolf Greenfield on June 26, 2009, that it has an attorney client relationship with the firm. Yet Max Planck never moved – until now – to

---

[1] Alnylam does not seek these documents because it is not entitled to them, as they are privileged against Alnylam. It is undisputed that Alnylam never had an attorney-client relationship with Wolf Greenfield.

[2] Neither UMass nor MIT assert that they had an attorney-client relationship with Wolf Greenfield, and Max Planck does not argue, much less show, that they did. Thus, Max Planck's motion utterly fails to show a joint client relationship involving UMass and MIT. Its motion seeking UMass and MIT's document is, in essence, a poorly disguised rehash of its prior motion to compel production of all common interest communications.

compel production of documents involving Wolf Greenfield on a "joint client" theory. Moreover, many of the documents Max Planck seeks are a subset of the documents Max Planck sought to compel production of last January by attacking Defendants' common interest assertion. But in that motion, Max Planck failed to assert a "joint client" theory as basis for production of the documents. Max Planck should be precluded from seeking those same documents through a new motion.

Max Planck's motion should also be denied on the merits. The motion is premised on the finding of an attorney client relationship between Wolf Greenfield and Max Planck by the Court in its September 14, 2010 Memorandum and Order in *Max-Planck-Gesellschaft zur Forderungder Wissenschaften e.V. v. Wolf Greenfield & Sacks, P.C.*, Civil Action No. 1:09-11168-PBS ("*Wolf Greenfield* case"). But because Defendants were not parties to that suit, fundamental principles of due process preclude that case from being used against Defendants here. *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008). Beyond that opinion, Max Planck presents no evidence here to establish an attorney-client relationship with Wolf Greenfield, and thus, it has failed to meet its burden to compel production. In any event, Max Planck's reliance on the Court's decision is misplaced. There is now pending before the Court in *this* case Max Planck's motion for summary judgment asserting that Wolf Greenfield was Max Planck's counsel. But that motion has not been decided, and Defendants have presented extensive rebuttal evidence on this issue, including evidence recently produced by Plaintiffs that was never disclosed in the *Wolf Greenfield* case. At a minimum, this rebuttal evidence creates genuine issues of material fact as to whether an attorney-client relationship existed between Max Planck and Wolf Greenfield.

Finally, even if Wolf Greenfield did represent Max Planck, Max Planck cannot establish

that it had joint client relationship with Whitehead.  Under applicable law, Whitehead's lack of

knowledge of any attorney-client relationship between Max Planck and Wolf Greenfield, as well

as Whitehead's non-consent to a joint client relationship, preclude the finding of a "joint client"

relationship.  Moreover, this Court has already held that Max Planck and Whitehead had

divergent, not common, interests on the subject matter of the communications Max Planck now

seeks to obtain.  Judge Dein held that Max Planck and Whitehead had divergent legal interests

regarding the scope of the Tuschl I patent applications starting in late 2003 – before Wolf

Greenfield's engagement with Whitehead even began.  Max Planck did not appeal that ruling

and it cannot now attack it collaterally by filing a new motion.

## FACTUAL BACKGROUND

This dispute arises out of the prosecution of the Tuschl I applications, applications co-

owned by Whitehead, UMass, MIT and Max Planck.  In September 2001 the co-owners entered

into the Joint Marketing and Joint Invention Agreement ("2001 Agreement").  Ex. 1.[3]  The

agreement delegated to Whitehead patent management responsibility for the Tuschl I

applications and provides for licensing the applications for research reagent and internal research

use.  *Id.*  Two years later, on July 30, 2003, Max Planck, Whitehead, and MIT – but not UMass –

entered into a Joint Invention and Joint Marketing Agreement for RNAi Therapeutic Purposes

("2003 Agreement") to jointly license the applications for therapeutic purposes.  Ex 2.  Again,

under this agreement, the co-owners delegated to Whitehead the responsibility of managing the

---

[3] References to "Ex." are to the exhibits attached to the Declaration of James L. Tuxbury, filed in support of this Opposition.

Tuschl I applications.  Max Planck, Whitehead and MIT licensed their therapeutic rights in the Tuschl I applications to Alnylam.

The genesis of the current dispute began around the time of the 2003 Agreement, when Plaintiffs learned that UMass had received a substantial offer from Alnylam's main competitor, Sirna, for a license to UMass's rights in the Tuschl I applications.  *See* Ex. 3.  Soon after UMass actually licensed its therapeutic rights in the Tuschl I applications to Sirna, Max Planck and Alnylam began demanding that Whitehead remove from the Tuschl I application the priority claim and certain data that Max Planck had previously agreed should be included in the Tuschl I patent application.  Dkt. No. 152 (FAC) ¶¶ 48-51; Dkt. No. 22 (Am. Erselius Aff.), ¶ 19.

Specifically, on November 18, 2003, Max Planck made clear that its interests in the prosecution of the Tuschl I and Tuschl II patent families differed significantly from the interests of the other co-owners: Whitehead, UMass and MIT.  Ex. 4.  Max Planck directed Whitehead to a November 13, 2003 letter from Max Planck's counsel, Dr. Wolfgang Weiss, as support for Max Planck's request that certain material in the Tuschl I applications be removed.  *Id.*

On May 11, 2010, Magistrate Judge Dein confirmed the divergent legal interests between Max Planck and Whitehead, holding that following the November 18, 2003 facsimile to Whitehead, "the defendants shared a common legal interest relating to the contents of the Tuschl I applications that was adverse to the interests of Max Planck and Alnylam."  Ex. 5 (May 11 Decision) at 15.  Plaintiffs did not appeal this holding, and they are bound by it.

After the divergence of the legal interests between Max Planck, on the one hand, and Whitehead, MIT, and UMass, on the other, Whitehead retained Wolf Greenfield as its patent counsel to prosecute the Tuschl I patent applications.  Ex. 6 (Lockhart Aff) ¶¶ 2-3.  Whitehead advised the co-owners to give Wolf Greenfield authorization to conduct the prosecution as

directed by Whitehead pursuant to the express terms of the 2001 and 2003 Agreements.  Exs. 7

& 8.  Whitehead is the only co-owner that entered into an engagement letter with Wolf

Greenfield.  Ex. 9.

Under the 2001 and 2003 Agreements, the other co-owners were allowed to give

comments to Whitehead about the Tuschl I filings.  Exs. 1 & 2.  From 2004 to the present,

pursuant to its contractual obligations under the 2001 and 2003 Agreements, Whitehead

instructed Wolf Greenfield to provide copies of proposed Tuschl I application filings to all the

co-owners and some licensees.  Ex.10 (Gerber Dep. (11/11/09)) at 48:16-50:9.  When the co-

owners provided comments on the draft filings, Whitehead made the final decision about

whether to accept or reject them.  Ex. 11 (Mullins Dep. (11/21/09)) at 179:22-24.

The dispute over the scope of the Tuschl I patent applications and the manner of

prosecuting them continued from late 2003 until the present.  On several occasions, Max Planck

demanded that Whitehead remove the shared information and the claim of priority to the Tuschl

II European application from the Tuschl I applications.  Dkt. No. 22 (Amend. Erselius Aff.) ¶¶

18-19.  Wolf Greenfield, acting at Whitehead's direction, consistently rejected Max Planck's

proposed changes in the Tuschl I patent applications.  *Id.*

On June 26, 2009 – after over a year of planning – Plaintiffs filed this lawsuit against

Whitehead, MIT, and UMass. Dkt No. 1.  On the same day, Max Planck sued Wolf Greenfield,

alleging that it had an attorney-client relationship with Wolf Greenfield.  Fact discovery in this

case began in September 2009.  During depositions, Whitehead consistently asserted privilege

and prevented testimony that sought to elicit the substance of confidential communications

between Whitehead and its counsel, Wolf Greenfield.  *See e.g.*, Ex. 12 (Lockhart Dep (11/24/09)

at 31:5-8.  When a privilege was asserted, Plaintiffs did not object to such privilege instructions

on the ground that Whitehead and Max Planck were "joint clients."  In fact, Plaintiffs' counsel

intentionally phrased questions to avoid implicating Whitehead's privileged communications

with Wolf Greenfield. *See e.g., id.* at 147:1-8 ("I don't want you to tell me anything that you

spoke with your client about.").

On December 16, 2009, Whitehead produced a privilege log listing confidential attorney-

client communications between Wolf Greenfield and Whitehead.  Heinrich Decl., Ex. 1; Ex. 13.

The privilege log also reflected that Whitehead was withholding other communications with

Wolf Greenfield, and MIT or UMass based on the common interest doctrine.  *Id.*

On January 15, 2010, Plaintiffs filed a motion to compel the production of documents

that had been withheld on the basis of the common interest privilege.  Dkt. No. 139.  Many of the

Whitehead documents, and all the UMass and MIT documents, that Plaintiffs now seek were the

subject of that prior motion.  In the prior motion, Plaintiffs argued that the documents were

improperly withheld because there was no common interest among the co-defendants and there

was no evidence that the communications were for legal purposes.  Dkt. No. 140 at 12-14.  It did

not argue that those documents had to be produced because Max Planck had an attorney-client

relationship with Wolf Greenfield or that Max Planck was a "joint client" with Whitehead, even

though Max Planck contended at the time that it was a client of Wolf Greenfield.  *Id.* at 16 n.36.

On May 11, 2010, Magistrate Judge Dein ruled on Plaintiffs' motion to compel and

confirmed the divergent legal interest between Max Planck and Defendants,  holding that "the

Defendants shared a common legal interest relating to all contents of the Tuschl I applications

that was adverse to the interests of Max Planck's and Alnylam." Ex. 5 at 15.  She also found that

Defendants engaged in confidential communications with Wolf Greenfield about these divergent

interests and that those communications were intended to be confidential from Max Planck and Alnylam.[4]  *Id.*  Plaintiffs did not appeal, challenge or otherwise question these findings.

## ARGUMENT

### I.    MAX PLANCK WAIVED ITS RIGHT TO MAKE THIS MOTION.

#### A.    Max Planck's Motion Is Untimely.

For nearly a year, Whitehead has consistently asserted the attorney-client privilege and refused to provide testimony and documents relating to communications with Wolf Greenfield. *See, e.g.*, Ex. 12 (Lockhart Dep (11/24/09)) at 31:5-8. Similarly UMass and MIT have asserted privilege under the common interest doctrine. Heinrich Decl. Ex. 1. Yet Max Planck has waited until now to file a motion to compel production of documents on a ground that Max Planck was aware of on the day it filed its complaint right before July 4th weekend in 2009. Max Planck's motion comes nine months after original fact discovery closed; six months after supplemental fact discovery on other issues ended; and four months after expert discovery ended. It also comes after the parties have already filed summary judgment motions, exchanged exhibits lists, trial exhibit objections, jury instructions, and motions *in limine*, and after the parties' pre-trial memorandum.

Max Planck's motives in delaying are transparent. By indefinitely deferring trial with *seriatim* discovery motions Max Planck hopes to inflict the final death knell on the Tuschl I applications. Such prejudicial delay, intended solely to harass Defendants and harm the Tuschl I applications, should not be countenanced.

---

[4] Judge Dein ordered production on the limited ground that MIT had not established it was represented by independent counsel. Defendants have appealed that ground and put evidence into the record, including an affidavit from MIT's counsel, that conclusively shows MIT did receive independent representation.

Discovery disputes must be brought to the attention of the court promptly, certainly before the close of the discovery period. *See Modern Cont'l/Obayashi v. Occupational Safety & Health Review Comm'n*, 196 F.3d 274, 280-81 (1st Cir. 1999) (upholding denial of motion to compel as untimely where moving party waited two weeks after close of discovery to file); *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) (same – one month delay). "Failure to promptly enforce discovery rights may be construed by the court as a waiver of the right to enforce such rights." *Suntrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196, 200-01 (E.D. Mich. 2002) (denying motion to compel filed on "eve of trial").

Max Planck has no excuse for filing this motion to compel at this late stage of the litigation. Max Planck has been on notice of the privilege claims relevant here since at least November 2009, and certainly by December 2009 when privilege logs were produced. Max Planck gives lip service to the need to present discovery disputes promptly by claiming that it comes just two weeks after the Court's September 14 Memorandum and Order in the *Wolf Greenfield* case.[5] But that excuse lacks credibility. Not only is the Court's decision in the *Wolf Greenfield* case not binding on Defendants, the facts and arguments underlying that decision have been known and available to Max Planck since the start of this litigation. Plaintiffs have asserted since day one that Max Planck had an attorney client relationship with Wolf Greenfield; they simply elected not to pursue that theory in this case. *See Choate v. National Railroad Passenger Corp.*, 132 F. Supp. 2d 569, 574 (E.D. Mich. 2001) ("Requests for remedies for abuse of discovery shall be promptly brought to the attention of the court by appropriate motion.

---

[5] The fact that Max Planck waited this long to file a motion on this theory confirms what Defendants have consistently maintained: that Max Planck's purported "belief" of an attorney-client relationship with Wolf Greenfield is nothing more than a post hoc, litigation-inspired strategy concocted by creative attorneys.

Failure to promptly enforce discovery rights may be construed by the court as a waiver of the right to enforce such rights.").

Re-opening discovery – yet again – would be prejudicial to Defendants. First, the additional delay could push a date for trial beyond the point at which the last of the original Tuschl I applications will go abandoned due to Max Planck's refusal to cooperate in the prosecution. Moreover, additional discovery would impose further unjustified discovery costs upon Defendants.[6] Given this motion comes <u>nearly a year</u> after Max Planck was aware that privileged communications were being withheld, and since Max Planck had all the information needed to make this motion that entire time, this Court should deny the motion. *See Suntrust*, 210 F.R.D. at 200-01 (collecting denials of tardy discovery motions, "especially where the moving party had all the information it needed to timely file").

### B.   Max Planck Should Have Raised Its Joint Client Argument When It Previously Sought these Documents.

Max Planck should also be precluded from seeking the documents under its new "joint client" theory because it failed to raise this argument before the Magistrate Judge when it previously argued for a waiver of privilege of many of the same documents. The documents Max Planck previously sought encompassed a subset of the Whitehead documents it seeks here

---

[6] The extensive delay inherent that would result from granting Max Planck access to Whitehead's privileged documents would include the fact that Alnylam would no longer be able to share counsel with Max Planck and would have to retain new trial counsel. While Max Planck argues that it should have access to Whitehead's privileged documents under a "joint client" theory, its co-plaintiff Alnylam does not, and cannot, make a similar claim. Under the law of joint client waiver, the consent of <u>both</u> clients is required to disclose "joint client" privileged communications to a third party. *See* Restatement (Third) of the Law Governing Lawyers § 75, cmt. e ("One co-client does not have authority to waive the privilege with respect to another co-client's communications to their common lawyer."); *In re Teleglobe Communications Corp.*, 493 F.3d 345, 379-80 (3rd Cir. 2007). The same lawyer would be unable to represent two clients, one of whom has access to certain documents, and one of whom does not, as it would be impossible to segregate the privileged information from the lawyer's mental processes. *See* Mass. R. Prof. R. 1.7(b), cmt. 12(c).

9

again and it encompassed *all of* the UMass and MIT documents it now seeks for a second time under this new theory. *See* Dkt No.140. Max Planck was required to present all the grounds that it intended to assert to compel production of these documents – including the "joint client" theory – in its January 15 motion. *See Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) ("Parties must take before the magistrate, 'not only their "best shot" but all of their shots.' ") (*quoting Singh v. Superintending Sch. Comm.*, 593 F. Supp. 1315, 1318 (D. Me. 1984)); *see also Fireman's Ins. Co. v. Todesca Equip. Co.*, 310, F.3d 32, 28 (1st Cir. 2002).

Recognizing that it should have raised the issue earlier, Max Planck claims that it was not obligated to do so because successive motions should be governed by a different standard than appeals to the District Court under Rule 72(a). *See* Pls. Mem. at 13 n.8. Max Planck's argument makes no sense. A party must present all grounds for a motion to the Magistrate Judge in the first instance otherwise that argument is lost. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir.1988) ("We hold categorically that an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.").

## II.    MAX PLANCK DID NOT HAVE AN ATTORNEY CLIENT RELATIONSHIP WITH WOLF GREENFIELD.

The crux of Max Planck's motion is that it was a "joint client" with Whitehead because it had an attorney client relationship with Wolf Greenfield. Pls. Mem. at 1. But Max Planck has not put any evidence into the record establishing that it had an attorney-client relationship with Wolf Greenfield. Instead, it relies solely on the Court's September 14 Memorandum and Order in the *Wolf Greenfield* case. As a matter of fundamental due process, however, the *Wolf Greenfield* decision can have absolutely no impact on Defendants here. *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008) ("The application of claim and issue preclusion to nonparties… runs up

against the deep-rooted historic tradition that everyone should have his own day in court."). Plaintiffs are required to separately litigate, *in this case*, all issues relating to Wolf Greenfield's alleged representation. Because Max Planck has not even attempted to meet its burden, Max Planck's motion should be denied.

Max Planck's reliance on the *Wolf Greenfield* decision is also misplaced for a number of substantive reasons.[7] First, under the 2001 and 2003 Agreements Max Planck delegated to Whitehead the job of managing the prosecution of the Tuschl I patent applications, and gave Whitehead final decision making authority over that prosecution. Exs.1 & 2. By doing so, Max Planck is unable to meet the three-part test for an implied attorney-client relationship set forth in *Devaux v. American Home Assurance Co.*, 387 Mass. 814 (1983). Max Planck's contractual surrender of the power to manage prosecution nullifies two of the three *Devaux* prongs, and strongly supports a finding of no attorney-client relationship. See Dkt. No. 477 at 16-18 (Defendants' Opposition to Summary Judgment) (hereinafter "SJ Opp. Br."). *See also Int'l Strategies Group Ltd. v. Greenberg Traurig, LLP*, 482 F.3d 1, 11 (1st Cir. 2007) (no attorney-client relationship as *a matter of law* under *Devaux* test where investor chose to allow bank to control litigation).

Second, the evidence in this case, including documents newly produced by Plaintiffs, strongly undermines Max Planck's assertion that it held a true belief of an attorney client relationship with Wolf Greenfield, as well as the objective reasonableness of any such belief.

---

[7] Defendants' Opposition to Plaintiffs' Partial Motion for Summary Judgment and supporting papers present extensive facts and argument that cast serious doubt on Max Planck's claim of an attorney client relationship with Wolf Greenfield. Dkt. Nos. 477-479. Rather than repeating all of that information, Defendants refer the Court to those submissions for additional facts and argument in further support of the positions identified here. Because of the overlap, Defendants submit that it may be most efficient for the Court to consider their opposition briefing to the summary judgment motion before addressing the instant motion.

*See Sheinkopf v. Stone*, 927 F.2d 1259, 1265 (1st Cir. 1991) (Under Massachusetts law, a putative client's belief that an attorney-client relationship existed must be "objectively reasonable under the totality of the circumstances."). Max Planck, as well as its licensee Alnylam, consistently and repeatedly affirmed or failed to correct assertions that Wolf Greenfield was *Whitehead's* attorney. *See e.g.,* Exs. 14 & 15; c*ompare ISG*, 482 F.3d at 9 (finding *Devaux* test was not met *as a matter of law*, in part, because the purported client had made just two such statements.). Moreover, Max Planck's and Alnylam's attorney invoices clearly show that Max Planck's claim that it was a "client" of Wolf Greenfield in late 2008, for the first time, was a litigation-inspired strategy to manufacture an attorney-client relationship where none existed. *See e.g.,* Exs. 17, 18; *see also* SJ Opp. Br. at 18-20.

Specifically, from the time Whitehead engaged Wolf Greenfield in 2004 until December 2008, Max Planck, as well as its licensee, Alnylam, consistently and repeatedly affirmed or failed to correct assertions that Wolf Greenfield was *Whitehead's* attorney. That changed on December 10, 2008 when Erselius stated – *for the first time since Wolf Greenfield was retained in 2004* – that it was Wolf Greenfield's client. Ex. 16. Recent discovery has revealed however, a month before that letter was sent ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 17 at ALN0196433, and ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 18 at MP0010390. In other words, Max Planck's assertion that it was a client of Wolf Greenfield arose not from Max Planck's *belief* that it had an attorney-client relationship with the firm, but rather from its outside counsel's advice that Max Planck could *claim* a relationship.

Third, contrary to the Court's September 14 Memorandum and Order's finding there is a genuine issue of material fact as to whether Max Planck ever requested *individualized* legal

advice from Wolf Greenfield relating to the Tuschl I patent prosecution. The Court relied upon the fact Wolf Greenfield provided copies of PTO filings to Max Planck and solicited comments. Ex. 19 at 10. But these materials were provided *at the direction of Whitehead* to Max Planck, MIT, UMass, and Alnylam, as well as each of those entities' attorneys, as required by the 2001 and 2003 agreements. Ex. 12. Wolf Greenfield only accepted and considered comments of the other co-owners because Whitehead – Wolf Greenfield's client – told them to do so. *Id.* at 64:3-65:3 ("The Whitehead is my client, so I take direction from them."); *see also* SJ Opp. Br. 20-22.

In the *Wolf Greenfield* case, the Court also cited the fact that "in 2004 Max-Planck requested that Wolf Greenfield file an 'Information Disclosure Statement'" as "undisputed" evidence that Max Planck asked Wolf Greenfield for individualized legal advice. Ex. 19 at 11. But the Court was mistaken. Max Planck requested that *Whitehead* – not Wolf Greenfield – file its proposed IDS. The draft IDS was sent by Max Planck's counsel, Rothwell Figg, and to John Pratt at Whitehead on June 4. Max Planck's counsel wrote to Whitehead, "My clients [Max Planck] have indicated that they want this IDS to be filed in the jointly owned Tuschl application." Ex. 20 at 2; *see also* SJ Opp. Br. at 21.

Fourth, the evidence does not support a finding, on summary judgment, that Max Planck in fact received legal advice from Wolf Greenfield. *See* Ex. 19 at 12. In the *Wolf Greenfield* case, the Court found that Wolf Greenfield's filing of the 2005 IDS was "concrete" proof that legal advice was given. *Id.* at 13. But as discussed above, the record shows that Max Planck asked Whitehead to file the IDS and discussed changes with Whitehead pursuant to the comment provisions in the 2001 and 2003 agreements. Importantly, it was Whitehead that finally approved an IDS (in a different form than requested by Max Planck) and directed Wolf Greenfield to file

13

it. *See* Ex. 12 (Lockhart Dep. (11/24/09) at 62:13-14 ("I took my direction to file that IDS from

the Whitehead."); *see also* SJ Opp. Br. at 22-24.

     <u>Finally</u>, the fact that Max Planck was receiving legal advice on Tuschl I matters from as

many as six different law firms, as well as from in-house counsel at Alnylam, suggests that Max

Planck's belief of an attorney client relationship with Wolf Greenfield was not "objectively

reasonable." *See e.g.*, Ex. 21.

## III.    MAX PLANCK CANNOT ESTABLISH A JOINT CLIENT RELATIONSHIP WITH WHITEHEAD.

### A.    Whitehead and Max Planck Never Had a Common Interest on a Matter in which Wolf Greenfield Provided Representation.

     Apart the failure to establish an attorney client relationship with Wolf Greenfield, Max

Planck cannot establish a "joint client" relationship with Whitehead.[8]  To establish a joint client

relationship, Max Planck must establish a "common interest" with Whitehead on a matter in

which Wolf Greenfield represented both Max Planck and Whitehead.[9]  *See FDIC v. Ogden*

*Corp.*, 202 F.3d 454, 461(1st Cir. 2000).  "The term 'common interest' typically entails an

*identical (or nearly identical)* legal interest." *Id.* at 461 (emphasis added).

     But in this case, Judge Dein has already held, a finding that Max Planck did not appeal,

that "it is undisputed that by late 2003, the Defendants shared a common legal interest relating to

all contents of the Tuschl I applications that was adverse to the interests of Max Planck's and

Alnylam." Ex. 5 at 15.  This was well before Wolf Greenfield was even retained by Whitehead.

---

[8] As noted above, Max Planck does not even argue, much less show, that UMass or MIT has an attorney-client relationship with Wolf Greenfield.  But for the same reasons discussed in this section, Max Planck cannot show it had a "common interest" with UMass or MIT required for a "joint client" relationship.

[9] Again, Max Planck principally relies on the Court's September 14 Memorandum and Order for providing a joint client relationship with Whitehead.  But as addressed earlier, due process precludes the Court's September 14 Memorandum and Order being used against Defendants in this case.

Thus this unappealed ruling is now law of the case and bars any claim that Max Planck and any

of the Defendants, including Whitehead, were "joint clients."

Max Planck's singular reliance upon the language of the 2001 and 2003 Agreements to

show a "common interest" is telling. Pls. Mem. at 7. Plaintiffs could not point to any evidence

during the actual prosecution of the Tuschl I patent applications to support a common interest

claim between Whitehead and Max Planck. That is because after late 2003 there was none; the

interests of Max Planck and Whitehead with respect to the scope of the Tuschl I patent

applications were completely divergent.

The few cases that Max Planck cites in support of the general proposition that co-owners

of a patent may have a common interest are easily distinguished.[10] Pls. Mem. at 6-7. First, none

of those cases involved parties who had a clear divergence of legal interest regarding the scope

of the patent application prior to the engagement the alleged joint counsel. Here, this Court has

already found such a divergence of interest existed between Whitehead and Max Planck before

Wolf Greenfield was engaged by Whitehead. Moreover, in not one of the cases did the parties

have a contractual arrangement, like the one here, that delegated all management and final

decision making authority to one of the parties. Finally, none of the parties claiming a joint

attorney client relationship in the cases cited by Max Planck had its own patent counsel

providing advice on the applications.

Max Planck's specific reliance on *Massachusetts Eye and Ear Infirmary v. QLT*

*Phototherapeutics, Inc.*, 167 F. Supp. 2d 108 (D. Mass. 2001) ("*MEEI*") to argue that a common

---

[10] *Hillerich & Bradsby Co. v. MacKay*, 26 F. Supp. 2d 124, 128 (D.D.C. 1998); *Beasley v. Avery Dennison Corp.*, Civil Action No. AS-04-CA-0866 FB (NN), 2006 U.S. Dist. LEXIS 74033 (W.D. Tex. Oct. 4, 2006); *Merck Eprova AG v. ProTherma, Inc.*, 670 F. Supp. 2d 201 (S.D.N.Y. 2009); *Beacon Oil Co. v. Perelis*, 263 Mass 288 (1928).

interest exists is similarly misplaced.  In *MEEI*, the parties all had an interest in a strong patent. 167 F. Supp. 2d at 125.  The inventorship dispute identified by Max Planck was ancillary to, and did not impact, the parties' continued conduct in the patent prosecution. *Id.*.  By contrast, the dispute in this case over the shared data and foreign priority claim has consumed and divided the Tuschl I prosecution since late 2003.  After 2003, Max Planck no longer had an interest in the strongest possible Tuschl I application – as the owners in *MEEI* had – but instead believed, along with Alnylam, that in order to strengthen their exclusive interest in the Tuschl II applications, they would work together to limit the scope of any Tuschl I patent. *See e.g.*, Ex. 22 (███████

████████████████████████████████████████

███████████████████).  Finally, the divergence of common interests in this case occurred before any joint client relationship even began, so the *MEEI* discussion on terminating a common interest is inapposite.

**B.    Other Relevant Factors Also Establish that Whitehead and Max Planck Did Not Have a Joint Client Relationship.**

Besides a lack of any common interest in a representation by Wolf Greenfield, the other factors courts consider in deciding whether a "joint client" relationship exists establish there was no such joint client relationship between Max Planck and Whitehead.  "In determining whether parties are 'joint clients,' courts may consider multiple factors, including but not limited to matters such as payment arrangements, allocation of decision-making roles, requests for advice, attendance at meetings, frequency and content of correspondence, and the like." *Ogden Corp.*, 202 F.3d at 461; *see also Sky Valley Ltd. P'ships v. ATX Valley, Ltd.*, 150 F.R.D. 648, 652 (N.D. Cal. 1993) (listing factors including "whether and to what extent the  party also consulted or had access to any other lawyers…with respect to the subject matter.").  Examination of these factors confirms there was no joint client relationship.

Under the parties' agreements, Max Planck delegated to Whitehead the sole responsibility for managing the prosecution of the Tuschl I patent applications and final decision-making authority. Max Planck could not - and did not - direct the conduct of Wolf Greenfield, and therefore could not seek legal advice from Wolf Greenfield. Moreover, since the beginning of Wolf Greenfield's engagement, Whitehead has had hundreds of confidential one-on-one communications with Wolf Greenfield in which legal advice was requested and provided. *See* Plaintiffs' Ex. 1. By contrast Max Planck has had none. Similarly, Whitehead had many one-on-one meetings with Wolf Greenfield in which legal advice was requested or received. Max Planck was represented or received legal advice on Tuschl I matters from at least six different law firms as well as in-house counsel at Alnylam. Ex. 21. Plaintiffs have produced a privilege log in this case that contains thousands of confidential communications with dozens of lawyers – but not one of those communications was with a lawyer from Wolf Greenfield. *See, e.g., id.* Finally, Whitehead was solely responsible for paying invoices from Wolf Greenfield. Exs. 1 & 2. There is no evidence in the record that Max Planck ever received an invoice from Wolf Greenfield or paid any Wolf Greenfield bills. Ex. 23 (Erselius Dep. (12/5/09)) at 510:1-12; 510:24-511:2.

**C.    There Can Be No Waiver Where Whitehead Lacked Knowledge of or Did Not Consent to the Joint Client Relationship.**

Finally, even if the Court were to find an attorney client relationship between Max Planck and Wolf Greenfield, it cannot find a joint client relationship because Whitehead never consented to, and was unaware of, such a joint relationship with Max Planck. Since the time Whitehead first engaged Wolf Greenfield it has consistently believed that its communications with Wolf Greenfield were intended to be confidential against the rest of the world. *See* Ex. 11 (Mullins Dep.(11/21/09)) at 208:9-12 ("And I consider that when I have a conversation with

17

Helen Lockhart, that it is a privileged conversation to Whitehead."); *compare Bass Public Ltd. Co. v. Promus Companies, Inc.*, 868 F. Supp. 615, 620 (S.D.N.Y. 1994) ("Where there is a joint attorney-client privilege, there is no expectation that confidential information will be withheld from joint clients."). There is no evidence that Whitehead ever consented to a joint client relationship with Max Planck, or that Whitehead shared its privileged communications with Max Planck. *See* Ex. 11 (Mullins Dep. (11/21/09)) at 284:9-10 ("I didn't discuss privileged information with Max Planck or Alnylam."). To the extent that Wolf Greenfield may have inadvertently entered into an attorney-client relationship with Max Plank, Whitehead's attorney-client privilege with Wolf Greenfield should not be implicated.

The D.C. Circuit's decision in *Eureka Inv. Corp. N.V. v. Chicago Title Ins. Co.*, 743 F.2d 932, 937-38 (D.C. Cir. 1984) is instructive here. There, the law firm Fried, Frank represented Eureka on a number of matters including a dispute it had with tenants related to a potential condo conversation. Chicago Title Ins. ("CTI") insured Eureka and began to work with Fried, Frank on Eureka's litigation with tenants. The Court found a joint client relationship developed in that matter. Simultaneously, Fried Frank began advising Eureka on potential claims against CTI. Even though a joint client relationship existed, the Court affirmed the District Court's decision to prevent CTI from obtaining documents between Eureka and Fried, Frank. In doing so, the Court noted:

> Given Eureka's expectations of confidentiality and the absence of any policy favoring disclosure to CIT, Eureka should not be deprived of the privilege even if as CTI suggests, the asserted attorney-client relationship should not have been created...As Wigmore's second principle expressly states, counsel's failure to avoid a conflict of interest should not deprive the client of the privilege.

*Id.* at 937-38.

Similarly here, the Court noted in its September 14 Memorandum and Order that "[t]he appropriate course of action once Wolf Greenfield became aware of the conflicting instructions from its joint client, Whitehead and Max Planck, would have been to withdraw from the Tuschl I patent prosecution." Ex. 19 at 20. But the fact of the matter is that Wolf Greenfield did not withdraw and continued to provide confidential legal advice to Whitehead in what Whitehead believed to be a single attorney-client relationship. Whitehead should not be deprived of its privilege when it had every reason to believe that its communications with Wolf Greenfield were confidential against all parties. *See* Ex. 11 (Mullins Dep. (11/21/09)) at 208:9-12 ("And I consider that when I have a conversation with Helen Lockhart, that it is a privileged conversation to Whitehead."). Otherwise Max Planck would receive an unjustified windfall, gaining access to Whitehead's communications with its counsel even though Whitehead always believed and treated those communications as confidential against all parties. *See* Heinrich Decl. Ex. 1.

## CONCLUSION

For the reasons stated above, Max Planck's Motion to Compel Production of Communications with Wolf Greenfield should be denied.

Respectfully submitted,

Dated:  October 15, 2010

**UNIVERSITY OF MASSACHUSETTS**
By its attorneys,

*/s/Donald Ware*
Donald R. Ware (BBO No. 516260)
   Special Assistant Attorney General
Barbara A. Fiacco (BBO No. 633618)
   Special Assistant Attorney General
Foley Hoag LLP
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
(617) 832-1000

Deirdre Heatwole, Esq. (BBO No. 228245)
  Interim General Counsel
Jean Marie Kelley, Esq. (BBO No. 265540)
  Associate Counsel
  University of Massachusetts
  33 South Street - 4th Floor
  Shrewsbury, MA  01545
  (774) 455-7303

**WHITEHEAD INSTITUTE FOR
BIOMEDICAL RESEARCH**
By its attorneys,

*/s/ Christopher Morrison*
HANIFY & KING, P.C. (BBO 651335)
One Beacon Street, 21st Floor
Boston, MA 02108-3107
(617) 434-0400
Fax: (617) 423-0498
cmm@hanify.com

Glenn J. Pfadenhauer (*admitted pro hac vice*)
David C. Kiernan (*admitted pro hac vice*)
James L. Tuxbury (*admitted pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, DC 20005
(202) 434-5000

20

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and electronic copies will be sent to those indicated as non-registered participants on this 15th day of October, 2010.

                                        ____/s/ Christopher Morrison_____
                                        Christopher M. Morrison