UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN e.V., a corporation organized under the laws of Germany; MAX-PLANCK-INNOVATION GMBH, a corporation organized under the laws of Germany; and ALNYLAM PHARMACEUTICALS, INC., a Delaware corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation; BOARD OF TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, a Massachusetts corporation,<br><br>        Defendants. | Civil Action No. 2009-11116-PBS |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST WHITEHEAD AND UMASS**

2318801

**INTRODUCTION**

Defendants' Opposition confirms that the priority claim in the Tuschl I applications to the Tuschl II '325 application is improper as a matter of federal patent law. Defendants do not raise a single word in defense of the declarations that Whitehead submitted to the USPTO on behalf of Drs. Zamore, Bartel, and Sharp purporting to claim priority to the Tuschl II '325 application. Nor can they. It is undisputed that Drs. Zamore, Bartel and Sharp are not entitled to claim priority to the Tuschl II '325 application under 35 U.S.C. § 119. Defendants also ignore that Dr. Tuschl's duty of candor to the USPTO led him to withdraw his own claim of priority to the Tuschl II '325 application—which is the work of a different inventive entity. Defendants do not identify any obligation, contractual or otherwise, that would trump Dr. Tuschl's duty of candor to the USPTO and prevent him from withdrawing a priority claim he deemed improper. Wrong on the merits, Defendants attempt to shield the improper priority claim from judicial scrutiny, asserting that the Court somehow may not grant Plaintiffs partial summary judgment on this issue. This priority claim is at the heart of the claims in this case, and it is without question a proper issue for partial summary judgment under Fed. R. Civ. P. 56.

Defendants' Opposition also confirms that their counterclaims against Max Planck based on its successful *Goldstein* petition to the USPTO fail. Max Planck did not, as a matter of law, engage in any actionable conduct when it petitioned the USPTO to revoke the power of attorney it had previously granted to Wolf Greenfield. Wolf Greenfield was already legally and ethically obligated to withdraw from Tuschl I prosecution in light of the conflicts between its joint clients, Max Planck and Whitehead, as this Court has already found in the related *Wolf Greenfield* case. In their Opposition, Defendants do not present any facts, law, or argument that should cause this Court to reconsider its well-reasoned decision.

Finally, Defendants cannot state claims for tortious interference. In the face of Plaintiffs' summary judgment motion, Whitehead has withdrawn its claims for tortious interference. UMass's claims also fail as a matter of law. UMass does not dispute that it cannot prove that it incurred any damages, which is a required element of a tortious interference claim.

# ARGUMENT

A. **The Priority Claim to the Tuschl II '325 Application is Legally Improper**

   1. **Defendants Cannot Shield The Improper Priority Claim From Summary Judgment**

Because the priority claim to the Tuschl II '325 application is improper under federal patent law, Defendants' first line of defense is to try to shield this issue from judicial scrutiny. Defendants contend that Plaintiffs are not entitled to summary judgment on this issue because "the propriety of the priority claim is not the issue raised by the pleadings." Opp. at 6. Defendants are wrong. Under Rule 56 of the Federal Rules of Civil Procedure, a party may "ask[] for partial summary judgment upon one issue in one of its claims." *France Stone Co. v. Charter Township of Monroe*, 790 F. Supp. 707, 710 (E.D. Mich. 1992); Fed. R. Civ. P. 56(a) ("A party seeking to recover upon a claim . . . may . . . move . . . for a summary judgment in the party's favor upon all **or any part thereof.**" (emphasis added)). The impropriety of the priority claim to the Tuschl II '325 application is indisputably an issue in Plaintiffs' claims against Whitehead. Thus, it is a proper issue for partial summary judgment.

Whitehead has been using the priority claim to the Tuschl II '325 application to usurp Max Planck's Tuschl II invention for the Tuschl I co-owners. As a result of the improper priority claim, the USPTO is construing the Tuschl I claims to encompass the Tuschl II invention, leading to rejections of Tuschl II claims. Relying on the fact that the Tuschl I applications claim priority to the Tuschl II '325 application, the Tuschl II examiner has stated that the Tuschl I claims "are *first defined* by" the Tuschl II '325 application. (Declaration of Sandra L. Haberny, Dkt. # 446 ("Haberny") Ex. 34 at 14 (emphasis added).) Further, Whitehead has incorporated "[t]he *entire teachings* of the [Tuschl II '325 application]" into the Tuschl I applications. (Quina Ex. 39 at ¶ 0001) (emphasis added).

The impropriety of the priority claim is thus raised throughout Plaintiffs' First Amended Complaint ("FAC") and is at the heart of Plaintiffs' claims against Whitehead. *See, e.g.*, FAC at ¶¶ 45, 47-49, 51, Dkt # 152. For example, Plaintiffs have asserted a claim for a declaratory

judgment that the Defendants may not include the inventive subject matter "of the Tuschl II inventors in their applications for patent protection for their property rights in the Tuschl I invention." *Id.*, ¶ 125. Through the priority claim, Defendants are doing just that. As a result, the propriety of the priority claim is directly at issue in Plaintiffs' declaratory judgment claim.

Similarly, Plaintiffs have asserted claims against Whitehead for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty for its improper prosecution of the Tuschl I applications. *Id.*, ¶¶ 88, 94, 99. This includes Whitehead's wrongful refusal to remove this priority claim, which is part of Whitehead's "strategy to promote the allowance of a Tuschl I application containing the Tuschl II material," thereby threatening "the very existence of the entire Tuschl II family." *Id.*, ¶ 88(e).

Charging that Plaintiffs "mischaracterize the legal standard," Defendants contend that the issue is whether "there is a reasonable basis for claiming" priority to the Tuschl II '325 application. Opp. at 7 (quoting 06/02/10 Hearing at 90-91). This argument does not support Defendants' position. By definition, Whitehead cannot have a "reasonable basis" for a priority claim that is improper as a matter of law. Moreover, Whitehead has failed to raise a single word in defense of the claim of priority in the declarations that Whitehead submitted to the USPTO on behalf of Drs. Zamore, Bartel and Sharp. Whitehead does not dispute that Drs. Zamore, Bartel and Sharp have no legal right to claim priority to the Tuschl II '325 application. Max Planck did not file the Tuschl II '325 application on their behalf as their legal representative or assign, and hence the claim to priority in these declarations is legally improper under 35 U.S.C. § 119. *See* Opening Brief at 10-14. Whitehead's failure to mount any defense for these declarations in its Opposition further confirms its lack of any "reasonable basis" for the priority claim.

Defendants inexplicably refer to this as a "red herring." Opp. at 8. In fact, it is anything but a "red herring" that Whitehead has filed declarations with the USPTO that contain a legally indefensible claim of priority to the Tuschl II '325 application. Whitehead has a duty to correct these declarations, which remain of record in the USPTO, yet it has not done so—and it has

offered no excuse or explanation for its conduct. Whitehead's inability to mount any defense for the priority claim asserted in these declarations is the epitome of bad faith.

> 2. **Dr. Tuschl Did Not Grant Whitehead Any Rights To Tuschl II And Did Not Contract Away His Duty Of Candor To The USPTO**

The sole basis on which Defendants attempt to support the priority claim is a previous declaration of Dr. Tuschl in the Tuschl I prosecution. Dr. Tuschl, however, subsequently corrected that declaration by withdrawing his claim of priority to the Tuschl II '325 application, pursuant to his duty of candor to the USPTO. Opening Brief at 13-14; *see* 37 C.F.R. § 1.56. Simply put, the Tuschl II '325 application was the joint invention of Tuschl, Elbashir and Lendeckel. As such, Dr. Tuschl could not himself, alone, claim priority to their joint invention in the Tuschl I applications, which do not name Elbashir and Lendeckel as co-inventors. Opening Brief at 13-14. *See Vogel v. Jones*, 486 F.2d 1068, 1072 (CCPA 1973). Defendants do not dispute that Dr. Tuschl withdrew his priority claim pursuant to his duty of candor, nor do Defendants challenge the reasonableness of Dr. Tuschl's inequitable conduct concerns.

Instead, Defendants contend that "Dr. Tuschl possessed no legal right to withdraw the priority claim," on the ground that "Whitehead itself had a co-assignment from Dr. Tuschl." Opp. at 9-10. However, Dr. Tuschl's co-assignment to Whitehead was for the *Tuschl I* inventions. Dr. Tuschl never granted Whitehead any rights in the *Tuschl II* inventions, which are solely assigned to Max Planck. Thus, Dr. Tuschl's co-assignment to Whitehead for the Tuschl I inventions did not convey to Whitehead any interest in the Tuschl II '325 inventions or the applications containing them, including any interest in Dr. Tuschl's "personal" right to claim priority to that application. *Boston Sci. Scimed,* 497 F.3d at 1297 ("[Section] 119 gives rise to a right of priority that is personal to the United States applicant.") Whitehead simply has no rights in the Tuschl II '325 application, and its argument to the contrary makes no sense.

Moreover, the very premise of Defendants' argument is flawed. Dr. Tuschl's co-assignment to Whitehead for the Tuschl I invention cannot trump his duty of candor to the USPTO. Indeed, patent applicants cannot contract away such a duty. Thus, Defendants'

suggestion that "Dr. Tuschl possessed no legal right" to correct what he viewed as a material error in his own declaration on file with the USPTO is without merit.

### 3. Parties Cannot Consent To A Legally Improper Priority Claim

Defendants also argue that Max Planck initially consented to the priority claim. Opp. at 10. However, consent cannot override federal patent law, which sets forth the requirements for a priority claim to a foreign application. 35 U.S.C. § 119(a). Neither Drs. Zamore, Bartel and Sharp nor their assignees are entitled to claim priority to the Tuschl II '325 application, and hence the declarations that Whitehead submitted to the USPTO on their behalf purporting to assert such a claim are legally improper. Dr. Tuschl withdrew his priority claim in a corrected declaration pursuant to his duty of candor to the USPTO. Thus, there is no legal basis for the priority claim and any argument concerning "consent" is simply irrelevant.

### 4. UMass's License To Sirna Has No Bearing On The Priority Claim

Finally, Defendants make the tortured argument that 35 U.S.C. § 261 somehow prevents Whitehead from correcting the priority claim, contending that UMass's licensee Sirna Therapeutics is somehow a "bona fide purchaser." Opp. at 11-12. Section 261 protects a bona fide purchaser of an "assignment, grant, or conveyance" of a patent or application. 35 U.S.C. § 261, ¶ 4. Section 261 does not apply to a priority claim in a patent application, much less to a legally improper priority claim. *See id.* Defendants' apparent suggestion that § 261 granted Sirna a vested interest in a Tuschl I application with a priority claim that fails as a matter of federal patent law is frivolous. Indeed, the law is clear that a priority claim cannot be "traded or sold as a commodity." *Scimed Life Sys.*, 468 F. Supp. 2d at 66. By definition, then, there cannot be a "bona fide purchaser" of a priority claim under § 261.

To the extent that Defendants are claiming that Sirna was a "bona fide purchaser" of an interest in the Tuschl II '325 application itself, this would only serve to underscore Defendants' bad faith. Defendants were well aware—and expressly acknowledged in the 2001 Research Use Agreement—that the Tuschl II '325 application is the sole property of Max Planck. (Haberny Ex. 1 at 1.) Nevertheless, by exploiting the improper priority claim, UMass actually purported to

license the Tuschl II '325 application to Sirna, and was unjustly enriched thereby. *See* Plaintiffs' Opposition to UMass Motion for Summary Judgment at 10-12, Dkt # 431. UMass can hardly use its own improper usurpation of rights in the Tuschl II '325 application through its license to Sirna to justify the priority claim to that application in the Tuschl I applications.

In sum, the Court can and should grant Plaintiffs partial summary judgment that the priority claim in the Tuschl I applications to the Tuschl II '325 is improper as a matter of law.

B. **Defendants' Counterclaims Based on Plaintiffs' Successful *Goldstein* Petition Fail as a Matter of Law**

1. **There Is No Due Process Issue**

Defendants' "due process" argument is directed at a straw man. It is not Plaintiffs' position that the *Wolf Greenfield* decision has "preclusive effect" against Defendants. Opp. at 12. Plaintiffs are simply raising here the same successful arguments that Max Planck made in the *Wolf Greenfield* case. Defendants have had the opportunity to defend against those arguments in their Opposition. Defendants also argue that Plaintiffs do not present any "evidence of record" on this issue. Opp. at 12-13. That is simply false. Plaintiffs have incorporated by reference their evidence—all of which has already been "filed in the district court" in *Wolf Greenfield*, served on Defendants, and made "of record" in this Court's docket. Due process does not require Plaintiffs to burden the Court with duplicative filings.

2. **Max Planck Never Waived Its Right To Conflict-Free Representation**

Defendants contend that by entering into the 2001 Research Use and 2003 Therapeutic Use Agreements, Max Planck "necessarily waived" its right to conflict-free legal representation in the Tuschl I prosecution. Opp. at 14. With no analysis, Defendants purport to rely on Massachusetts Rule of Professional Conduct 1.7 for support. *Id.* However, Rule 1.7 recognizes a waiver of a conflict of interest among joint clients only after "each client consents after consultation," which must include an "explanation of the implications of the common representation and the advantages and risks involved." Mass. R. Prof. C. 1.7. It is undisputed that no such consultation occurred here. Moreover, under Rule 1.7, conflicts cannot be waived if

a lawyer's representation of a client will be "directly adverse to another client." *Id.* at cmt. 5. Here, Wolf Greenfield became "directly adverse" to Max Planck, thus requiring withdrawal.

Not only were the requirements for a valid conflict waiver not met, Max Planck did not agree to waive conflict-free representation in the Tuschl I prosecution under the parties' agreements in any event. Whitehead has "primary"—but not sole or absolute—responsibility for managing the Tuschl I prosecution, and it is undisputed that Whitehead does so "on behalf of all of the [Tuschl I] co-owners," including Max Planck. (11/21/09 Deposition of Martin Mullins at 33:2-9, Supplemental Declaration of Sandra L. Haberny ("Haberny Supp.") Ex. 1). The agreements further provide that Max Planck has the right to participate in the Tuschl I prosecution and that Whitehead must give "good faith consideration" to Max Planck's comments and advice. (Haberny Ex. 4 at § 1(a)(iii), (iv).) Nothing in the agreements could be deemed a waiver of conflict-free representation, much less a waiver that would comply with Rule 1.7.

> 3. **The Court Correctly Found An Attorney-Client Relationship Between Wolf Greenfield And Max Planck**

In a carefully reasoned decision, the Court correctly found that Wolf Greenfield and Max Planck had an attorney-client relationship under *De Vaux v. American Home Assurance Co.*, 387 Mass. 814 (1983). 9/14 Order. Defendants' attempts to pick apart the Court's decision fail.

Defendants' primary argument is that, because Whitehead had a contractual responsibility for engaging and dealing with Wolf Greenfield, Max Planck could not also have been Wolf Greenfield's client. Opp. at 13-15. This argument is without merit. It is undisputed that the co-owners agreed to file the Tuschl I patent applications jointly, and that each retained an ownership interest in the patent applications. Thus, each of them had a reasonable expectation that the prosecuting attorney would jointly represent them. *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 211-12 (S.D.N.Y. 2009) ("there is no dispute that Bayer and Merck intended to file joint patent applications and that Bayer engaged FLH to prosecute those applications. It was therefore reasonable for Bayer and Merck to understand that they were joint clients of FLH even though Bayer alone dealt with FLH."). This is also reflected in Max

Planck's power of attorney to Wolf Greenfield to "conduct all business in the [USTPO]" for the Tuschl I applications on Max Planck's behalf, and the other evidence that the Court considered.

The only patent-related case Defendants cite on this issue is *Sun Studs, Inc. v. Applied Theory Assocs.*, 772 F.2d 1557 (Fed. Cir. 1985). Opp. at 17-18. There, the court found that there was no attorney-client relationship between an inventor and his employer's patent counsel because the inventor relinquished his entire interest in the patent application to his employer. *Id.* at 1568. Here, in contrast, Max Planck has not relinquished any ownership but instead remains a co-owner of the Tuschl I applications, and Whitehead must exercise its prosecution responsibilities "on behalf of all of the co-owners," not just itself. (Haberny Supp. Ex. 1 (Mullins Dep. at 33:2-9.)) The Court correctly distinguished *Sun Studs* on just this ground. 9/14 Order at 10. *Sun Studs* provides "no guidance with respect to the issue of joint representation for co-owners of patent rights" *Merck Eprova AG,* 670 F. Supp. 2d at 212. In contrast, "where two parties are jointly prosecuting a patent application, they are commonly considered to be joint clients." *Id.*; *see also Mass. Eye & Ear Infirmary v. QLT Phototherapeutics,* 167 F. Supp. 2d 108, 115 (D. Mass. 2001), *aff'd in relevant part*, 412 F.3d 215 (1st Cir. 2005) ("*MEEI*") (same).

Defendants also contend that the Court was "mistaken" in finding that Max Planck requested and received legal services from Wolf Greenfield when Wolf Greenfield drafted and filed the July 11, 2005 IDS pursuant to Max Planck's request. Opp. at 21. Defendants erroneously claim that "Max Planck discussed changes with Whitehead," not with Wolf Greenfield. *Id.* at 22. The record confirms the Court's finding. For example, Wolf Greenfield responded directly to Max Planck's request, stating "we are in the process of generating an [IDS] for submission to the [USPTO]," and then sent a draft directly to Max Planck. Quina Exs. 49, 30. Max Planck commented on the draft directly to Wolf Greenfield, which in turn revised the IDS in response to Max Planck's comments. *Id.*, Exs. 30, 42 at WHITEHEAD-00021941. Wolf Greenfield then sent this revised IDS to Max Planck "for review prior to general distribution" to the other co-owners, in order to "work out an acceptable version with [Max Planck] first." *Id.* Defendants' criticisms of the Court's ruling on this issue is refuted by the record.

Defendants do not and cannot contest the Court's finding that "Wolf Greenfield did provide the co-assignees of the Tuschl I applications with legal services through its prosecution of the patent applications before the USPTO." 9/14 Order at 12. As the Court correctly decided, the evidence is undisputed on this pivotal issue. *Id.* at 12-13. Despite this, Defendants contend that Max Planck did not have a "reasonable belief" that Wolf Greenfield was its attorney. Opp. at 18-19. As supposed support, Defendants argue that Max Planck referred to Wolf Greenfield as "Whitehead's counsel" on several occasions. Opp. at 18-19. Defendants, however, misleadingly point to several communications that do not refer to Wolf Greenfield at all, but instead to Patricia Granahan, Whitehead's *in-house* patent counsel. Response to DSAF at ¶¶52, 55, 57-59. More fundamentally, the evidence—which was before the Court in the *Wolf Greenfield* case—merely reflects Plaintiffs' recognition that Whitehead selected Wolf Greenfield as the co-owners' attorney and that Wolf Greenfield was counsel to Whitehead as well as the other co-owners. The several references to Wolf Greenfield as Whitehead's counsel simply do not negate an attorney-client relationship between Wolf Greenfield and Max Planck. *See, e.g.*, *MEEI*, 167 F. Supp. 2d at 119, 120-21 (plaintiff had attorney-client relationship with prosecution counsel even though plaintiff referred to prosecution counsel as "[Defendant's] patent counsel").

Defendants also attempt to negate this attorney-client relationship by arguing that Max Planck did not expressly claim to be a client for several years. *See* Opp. at 18-19. This is also without merit. "[I]t is not necessary to expressly request confidential legal assistance when that request is implied. Rather, it is enough that the overall tenor … indicates that it is a request for legal advice or services." *MEEI*, 167 F. Supp. 2d at 117.

Defendants stretch further by relying on attorney invoices indicating that Max Planck's separate counsel was researching conflict of interest issues in the fall of 2008. The entries reflect legal research carried out in the drafting of a Goldstein Petition to remove Max Planck's conflicted attorney, Wolf Greenfield. *See, e.g.*, MP0010389 (Haberny Supp. Ex. 40) ("Discuss *In re Goldstein* with USPTO."); ALN0196405 (Haberny Supp. Ex. 41) ("Conference with Dr. Shuster regarding *In re Goldstein* Petition … Research and analyze *In re Goldstein* case and

related regulations and caselaw."). Lawyers research the law. The fact that Max Planck's separate counsel was researching the law on attorney-client conflict issues does not in any way undermine the reasonableness of Max Planck's belief that Wolf Greenfield was its attorney.

Finally, Defendants try to minimize Max Planck's power of attorney to Wolf Greenfield, relying on *Int'l Strategies Group Ltd. v. Greenberg Traurig, LLP* ("*ISG*"), 482 F.3d 1 (1st Cir. 2007). The power of attorney in *ISG* granted nothing more than "the limited agency right to transfer any recovered ISG funds to an interest-bearing escrow account." *Id.* at 12. The court also found that the plaintiff did not request, and the attorney did not render, any legal services to the plaintiff. *Id.* at 9, 10. In contrast, Max Planck executed a broad power of attorney authorizing Wolf Greenfield to "conduct all business" before the USPTO on its behalf, and also requested and received legal services from Wolf Greenfield, as the Court correctly found.

In sum, Defendants' attempt to hold Max Planck liable for its *Goldstein* petition fails, as Wolf Greenfield was already obligated to withdraw from representing Max Planck.

C.  **UMass's Tortious Interference Claims Should Be Dismissed**

In the face of Plaintiffs' Summary Judgment Motion, Whitehead dismissed its tortious interference claims. UMass should have done the same.

UMass relies on cases holding that a plaintiff who establishes all of the required elements of a claim for tortious interference—including actual damages—may be entitled to equitable relief where damages cannot be accurately calculated. *See Beekman v. Marsters*, 195 Mass. 205 (1907) (injunctive relief available for tortious interference claim where there were actual damages but they could not be accurately calculated); *Davis v. New England Ry. Publ'g Co.*, 203 Mass. 470 (1909) (same). Here, in contrast, UMass has conceded that "no damages have been incurred to this point" by UMass. UF at ¶¶ 31-32. Because damages are a required element, UMass's tortious interference claims should be dismissed. *See Valdez v. Domeniconi*, 6 Mass. L. Rep. 501 (Mass. Super. Ct. 1997). ("Since [plaintiff's] attorney has conceded that [plaintiff] will not be able to prove monetary or economic loss as a result of any loss of business, [plaintiff] will be unable to prove a required element of his tortious interference claims.").

Listed below:
Respectfully submitted,

MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN e.V.; MAX-PLANCK-INNOVATION GmbH; AND ALNYLAM PHARMACEUTICALS, INC.

By their attorneys

*/s/ Thomas F. Maffei*
Thomas F. Maffei (BBO 313220)
Scott McConchie (BBO 634127)
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, Massachusetts 02110
(617) 542-9900

Of counsel
Morgan Chu (70446) pro hac
David I. Gindler (117824) pro hac
Michael H. Strub, Jr. (153828) pro hac
Alan J. Heinrich (212782) pro hac
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010

Dated: October 19, 2010

*/s/ Thomas F. Maffei*
Thomas F. Maffei

## Certificate of Service

I, Thomas F. Maffei, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on October 19, 2010.

                                                */s/ Thomas F. Maffei*
                                                Thomas F. Maffei