# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN E.V., a corporation organized under the laws of Germany; MAX-PLANCK-INNOVATION GMBH, a corporation organized under the laws of Germany; and ALNYLAM PHARMACEUTICALS, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, a Delaware corporation; BOARD OF TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, a Massachusetts corporation, <br><br> Defendants. | Civil Action No. 2009-11116-PBS <br><br> Leave to file granted on November 29, 2010 |

**REPLY MEMORANDUM IN SUPPORT OF MAX PLANCK'S MOTION TO COMPEL PRODUCTION OF COMMUNICATIONS INVOLVING WOLF GREENFIELD UNDER JOINT CLIENT RULE**

## I.   INTRODUCTION

Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. ("Max Planck Society") and Max-Planck-Innovation GmbH ("Max Planck Innovation," collectively with Max Planck Society, "Max Planck," and together with Alnylam Pharmaceuticals, Inc., "Plaintiffs") respectfully submit this reply memorandum in support of their motion for an order compelling the production of all communications involving Wolf, Greenfield & Sacks, PC ("Wolf Greenfield") relating to the prosecution of the Tuschl I patent applications during the period when Max Planck was a joint client of Wolf Greenfield.

The basis for Max Planck's motion is straightforward: (i) Max Planck and Defendants were joint clients, simultaneously, of Wolf Greenfield in connection with the prosecution of the Tuschl I patent applications; and (ii) under Massachusetts law, communications between Defendants and Wolf Greenfield on the subject of the prosecution of the Tuschl I patent applications are not privileged as against Max Planck.[1]

Contrary to Defendants' assertions in their opposition brief, Max Planck did not waive the right to compel Defendants to produce these communications but acted promptly after the Court determined that Wolf Greenfield was, indeed, Max Planck's counsel.  Defendants offer no evidence or justification for this Court to change its determination, and the evidence demonstrates that the co-owners of the Tuschl I applications were, in fact, joint clients of Wolf Greenfield.  These points are addressed below.

---

[1] *See* Mass. Evid. Guide § 502(d)(5) ("The attorney-client privilege does not apply to . . . a communication relevant to a matter of common interest between or among two or more clients if the communication was made by any one of them to an attorney retained or consulted in common, when offered in an action between or among any of the clients."); *Beacon Oil Co. v. Perelis*, 263 Mass. 288, 293 (1928) (defendant's communications with patent counsel who was jointly representing defendant and plaintiff were not privileged against plaintiff); *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,* 167 F. Supp. 2d 108, 115 (D. Mass. 2001), *aff'd in relevant part*, 412 F.3d 215, 225-28 (1st Cir. 2005) (same).

## II.     ARGUMENT

### A.     Max Planck did not waive its right to compel production of communications involving Wolf Greenfield

Defendants' initial argument is that Max Planck waived its right to make this motion by not having brought it earlier.  Max Planck anticipated this argument in its opening memorandum. (Dkt. #456, at pp. 12-14.)  As Max Planck pointed out, it brought this motion two weeks after this Court established the predicate for this motion in holding that Wolf Greenfield was Max Planck's counsel in connection with the prosecution of the Tuschl I applications.  (September 14, 2010 Memorandum and Order at 14, 20 (D.I. # 108), *Max-Planck-Gesellschaft zur Förderung der Wissenschaften e.V. v. Wolf, Greenfield & Sacks, PC*, Civil Action No. 1:09-11168-PBS (the "*Wolf Greenfield*" case).  The existence of an attorney-client relationship between Max Planck and Wolf Greenfield is at the core of the Wolf Greenfield lawsuit, which, of course, is also before this same Court.  Defendants' argument is that, rather than litigate this issue initially in the case in which that issue was central—the Wolf Greenfield lawsuit—Max Planck should have filed two separate sets of briefs making the same argument to the same Court.

Rather than impose this burden on the Court and the concomitant expense on each side's clients, Max Planck chose to litigate the issue of its relationship with Wolf Greenfield in the first instance in the lawsuit to which Wolf Greenfield was a party.  Max Planck now simply seeks to obtain the information that it is legally entitled to receive as a client of Wolf Greenfield.  This is squarely within the four corners of what the Court envisioned when it inquired as to the impact of  Max Planck's partial summary judgment motion in the Wolf Greenfield case on the present lawsuit among the Tuschl I co-owners:

> What's the spill-out if I found there was an attorney-client relationship?  Have there been documents that have been non-disclosed because of privilege? … But the issue is, what I'm trying to get at is whether or not it's going to have a practical ramification.  Do I need to decide this in a way before I do the trial?  What if I said there was an attorney-client relationship, does that then mean that certain documents get disclosed?

(Aug. 9, 2010 hearing transcript in the *Wolf Greenfield* case, p. 27:13-25.)

Defendants cite four cases in support of their waiver argument.  (Opp. at p. 8.)  Each is readily distinguishable from this case.  In *Modern Cont'l/Obayashi v. Occupational Safety & Health Review Comm'n*, 196 F.3d 274, 280-81 (1st Cir. 1999), which Max Planck discussed and distinguished in its opening memorandum (at p. 14), the First Circuit simply held that the administrative law judge had discretion to deny a motion to compel further responses to discovery requests, which was brought months after the responses and after the close of discovery.  The Court gave limited review to the judge's discovery order and affirmed because the party seeking discovery did not act diligently based on information known to it.  Neither circumstance is present here.  In *Suntrust Bank v. Blue Water Fiber, L.P.*, 210 F.R.D. 196, 200-01 (E.D. Mich. 2002), the court denied a motion to compel that was brought 18 months after the close of discovery, on the eve of trial, where "the moving party had all the information it needed to timely file the discovery motion," which, again, is not the situation here.

In *Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 92-94 (1st Cir. 1996), the First Circuit held that the trial court was within its discretion to grant a motion for summary judgment notwithstanding a request for further discovery under Federal Rule of Civil Procedure 56(f), where the party opposing the motion had not initially requested further discovery and, in any event, had not acted diligently in discovery in a variety of ways, which the court describes in its opinion.  The opinion in *Choate v. National Railroad Passenger Corp.*, 132 F. Sup. 2d 569, 574 (E.D. Mich. 2001), is to the same effect: the court denied additional discovery in response to a motion for summary judgment, when the court had previously held that "any further requests for an extension of any of the dates ... will not be considered by this court."  (Ellipses in original.)

Defendants contend that reopening discovery would be prejudicial to them because it could delay the trial and impose further discovery costs.  Defendants' concern rings hollow.  No trial date has even been set, and in the last few months, both Defendants and Plaintiffs have filed a number of motions with the Court that have yet to be resolved, and which could alter the case

- 3 -

significantly or result in further discovery.[2]   Indeed, Whitehead has purported to invoke the termination clause of the inter-institutional agreements, which would nullify any ability by Defendants to obtain the equitable relief they seek under their counterclaims.[3]   (Dkt. ## 80, 82.)

**B.     Max Planck had an attorney-client relationship with Wolf Greenfield**

Defendants' second argument in response to Max Planck's motion is that Defendants are entitled to relitigate this Court's decision in the Wolf Greenfield litigation that Wolf Greenfield and Max Planck had an attorney-client relationship.   Defendants here are simply repeating—in some instances, verbatim—arguments that they made in their memorandum in opposition to Plaintiffs' partial motion for summary judgment, pages 12-15 (Dkt. # 498), and motion to strike Plaintiffs' statements of Facts #28 and 29 (Dkt. # 473).   Max Planck has already responded to these arguments, and will not repeat its responses in this Reply but rather will direct the Court to the portion of its prior briefs where Max Planck already has discussed Defendants' arguments.[4]

- Defendants' due process argument (Opp. 10-11) is addressed at page 6 of Plaintiffs' reply in support of their motion for partial summary judgment (Dkt. # 504) (the "Summary Judgment Reply").   As Plaintiffs explained, Plaintiffs are not arguing that Defendants are estopped from relitigating the issue of the Wolf Greenfield/Max Planck attorney-client relationship.   Plaintiffs simply maintain that Defendants have provided no reason for this Court to change its prior decision.

---

[2] For example, the Court has not yet made a decision on the privilege claims that are the subject of Plaintiffs' pending motion to compel production of documents and testimony improperly withheld on the basis of an improper assertion of a "common interest."  (Dkt. #139) For this reason, as well, Defendants' request that the Court not even consider the impact of its own decision on a motion that the Court has yet to decide (Opp. at pp. 9-10) should be denied.

[3] Defendants argue, in a footnote, that Alnylam would no longer be able to share counsel with Max Planck.  (Opp. at p. 9, n.6.)  Defendants cite no evidence whatsoever for the theory that parties who cannot access the same documents cannot share common counsel.  Indeed, under the terms of the parties' confidentiality agreement and protective order, clients cannot have any access at all to "Highly Confidential" information.  (Dkt. # 89-2, ¶ 7.)  There is no reason why counsel for Max Plank cannot review documents on behalf of Max Planck, without sharing those documents with Alnylam.

[4] In addition to the following, Max Planck also refers the Court to pages 7-8 and 15-18 of Plaintiffs' memorandum in support of their motion for partial summary judgment (Dkt. # 444).

- Defendants' argument that Max Planck's delegation of prosecutorial responsibilities to Whitehead means that Max Planck is unable to meet the test for an implied attorney-client relationship under *De Vaux v. American Home Assurance Co.*, 387 Mass. 814 (1983) (Opp. at pp. 11, 17), is addressed at pages 7-8 of the Summary Judgment Reply.  As Max Planck explained, independent of the inter-institutional agreements, Max Planck requested that Wolf Greenfield provide legal services, and Wolf Greenfield provided them.  At Max Planck's request, Wolf Greenfield prosecuted the Tuschl I applications, filed the 2005 Information Disclosure Statement, and provided to Max Planck documents at Max Planck's request, including a legal memorandum on obviousness.  Defendants' argument that Max Planck never received an invoice from Wolf Greenfield (Opp. at p. 17) is irrelevant: pursuant to Max Planck's license agreement with Alnylam, Alnylam paid these fees on Max Planck's behalf.  (Response to Defendants' Additional Statement of Facts, filed in connection with Plaintiffs' partial summary judgment motion, Dkt. # 514 (sealed) ("Response to DSAF").)  Whitehead approved of this arrangement in the 2003 Therapeutic Use Agreement.  *Id*.

- Defendants' argument that there is additional evidence to refute the Court's determination that Wolf Greenfield was Max Planck's lawyer (Opp. pp. 11-14) is addressed at pages 8-10 of the Summary Judgment Reply, as well as in Plaintiff's Response to DSAF.  As Plaintiffs pointed out, the examples of supposedly "new" information either were already before the Court in the Wolf Greenfield litigation or are completely irrelevant.  For example, many of the communications to which Defendants point as an acknowledgement by Max Planck that Wolf Greenfield was Whitehead's lawyer are not references to Wolf Greenfield at all but are references to Patricia Granahan during the time when she was Whitehead's in-house patent counsel.  (Response to DSAF at ¶¶52, 55, 57-59.)  Defendants also rely on statements acknowledging that Wolf Greenfield was *also* Whitehead's counsel, which in no way negates the fact that Max Planck was Wolf Greenfield's joint client.  The fact that Defendants see the need to

contort the evidence so that it fits the mold of their argument belies their stated confidence in their litigation position.

### C.    Max Planck and Whitehead were joint clients of Wolf Greenfield

Defendants' third argument is that Whitehead and Max Planck were never joint clients of Wolf Greenfield.  (Opp. at pp. 14-17.)  Defendants' primary argument is that by late 2003, Whitehead, UMass, and Massachusetts Institute of Technology ("MIT") shared a common interest in connection with the prosecution of the Tuschl I applications, which meant that they could not be joint clients.   The decision in *Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 167 F. Supp. 2d 108 (D. Mass. 2001), *mandamus denied and order vacated on different grounds*, 25 Fed. Appx. 825 (1st. Cir. 2001), *aff'd in relevant part after judgment*, 412 F.3d 215 (1st Cir. 2005) ("*MEEI*"), which Defendants attempt to distinguish (Opp. at pp. 15-16), is squarely on point and refutes Defendants' argument that a disagreement among joint clients destroys the joint client relationship.

In *MEEI*, QLT Phototherapeutics, Inc. ("QLT") retained counsel on behalf of itself, Massachusetts General Hospital ("MGH"), and Massachusetts Eye & Ear Infirmary ("MEEI") to prosecute a set of patent applications.  During the course of prosecution, a dispute arose among the parties concerning the inventorship of inventions claimed in the applications.  *Id.* at 111.  The parties attempted to address the dispute by splitting aspects of the invention through the filing of continuation applications through joint counsel.  *Id.* at 111-13.  Ultimately, this did not resolve the dispute, and MEEI filed its own continuation application naming its own scientists as inventors.  *Id.* at 113.  Following a further dispute over licensing, MEEI filed a lawsuit.  *Id.*

MEEI filed a motion to compel documents being withheld by QLT on the basis of an attorney-client privilege, and QLT argued, among other things, that MEEI did not share an attorney-client relationship with the patent counsel retained by QLT, *id.* at 116-17, and "that MEEI and QLT did not share a common interest ... because MEEI and QLT disagreed over the inventorship of the ... application."  *Id.* at 125 (ellipses added).  The court rejected those

arguments, holding that MEEI was, in fact, a joint client of the patent counsel retained by QLT and that "despite the inventorship disagreement," MEEI and QLT "shared a common legal interest in the preparation and prosecution of the ... application." *Id.*  In later affirming the district court's discovery ruling, the First Circuit observed that "[t]he irony that the ensuing discovery shows just how polarized the two parties' interests may already have been is not material to the inquiry."  412 F.3d 215, 226.

The dispute between the parties in *MEEI* parallels the dispute between the parties in this case.  As in *MEEI*, a dispute arose between Max Planck, on one hand, and the other co-owners of the Tuschl I applications, on the other, concerning the contents of the applications.  As in *MEEI*, the parties attempted to resolve the dispute—in MEEI, this was through continuation applications, and in this case, it was through the Nelsen-Pratt letter and the 2005 IDS.  As in *MEEI*, the efforts to resolve the dispute failed, and the parties ended up in litigation.  And as in *MEEI*, the fact that the parties had a dispute, which they ultimately were unable to resolve, does not defeat Max Planck's assertion that Wof Greenfield was Max Planck's counsel or that the parties were joint clients.

Defendants argue that "[a]fter 2003, Max Planck no longer had an interest in the strongest possible Tuschl I application—as the owners in *MEEI* had—but instead believed, along with Alnylam, that in order to strengthen their exclusive interest in the Tuschl II applications, they would work together to limit the scope of any Tuschl I patent."  (Opp. at p. 16.)  Defendants cite no evidence supporting this proposition, and it is flatly untrue.  Max Planck is a co-owner of Tuschl I and Alnylam is a licensee, and both will benefit from a strong Tuschl I application just as the other co-owners will.  The undisputed evidence is that Max Planck believes that removal of the Tuschl II information from the Tuschl I applications and withdrawal of the priority claim will lead to the strongest possible Tuschl II *and Tuschl I* applications and eventually patents. *See, e.g.,* Deposition of Jörn Erselius, taken 12/4/2009, pp. 51:19-52:6 ("withdrawing the priority claim to the European patent application and taking out the Tuschl II data from Tuschl I and, well, because "it was our strong belief" that the inclusion of the priority claim and the Tuschl II

data in Tuschl I "harm Tuschl II as well as Tuschl I"); Deposition of Dr. John Maraganore, taken 11/19/2009, pp. 64:24-65:14 ("it is important to us that both a strong Tuschl I and a strong Tuschl II exist").[5]

### D.   Whitehead understood that the co-owners of the Tuschl I applications were co-clients of Wolf Greenfield

Finally, Defendants assert that Whitehead never consented to and was unaware of a joint client relationship with Max Planck.  (Opp. at pp. 17-19.)  The only evidence that Defendants cite is the testimony in 2009 by Martin Mullins, vice president of Whitehead, given during his deposition in this case.  The contemporaneous documentary evidence is to the contrary.

For example, a June 2004 email exchange between Irene Abrams of MIT, Lita Nelsen of MIT, and John Pratt of Whitehead concerning Dr. Phil Zamore's assignment of his inventorship interest in the Tuschl I application to UMass contradicts Mr. Mullins' post-litigation characterization of the parties' relationship.  In the exchange, the parties are discussing the attorney who should analyze the propriety of the assignment.  Ms. Nelsen says, "I will have Irene look into this with [lead Tuschl I prosecution counsel at Wolf Greenfield] Helen Lockhart and get her opinion on it.  We can also ask Brenda Jarrell *(who is our attorney, rather than representing all parties)*."  (Haberny Decl. Ex. 1 (emphasis added).)  Ms. Abrams responds that she will "ask Helen Lockhart for her opinion - *although she also represents U Mass since they are a co-owner of the patent*."  (*Id.* (emphasis added).)  Thus, both Ms. Nelsen and Ms. Abrams

---

[5] As Plaintiffs have explained in their Motion for Summary Judgment, the priority claim in the Tuschl I applications to the Tuschl II '325 application is improper as a matter of law and jeopardizes the enforceability of any Tuschl I patents that may ultimately issue.  (Dkt. # 444 at 10-15)  For this reason, in January 2006, Dr. Tuschl withdrew his own priority claim to the Tuschl II '325 application in the Tuschl I applications.  (*Id.*)  In its reply in support of its Motion for Preliminary Injunction, UMass oddly charges that it is a "new, litigation-inspired argument that Tuschl believed he needed to withdraw the foreign priority claim to avoid accusations of inequitable conduct."  (Dkt. # 477 at 9.)  UMass's charge is contradicted by the express language of the contemporaneous January 2006 transmittal accompanying Dr. Tuschl's corrected declaration, which noted that Dr. Tuschl was withdrawing his priority claim to the Tuschl II '325 application precisely in order to "avoid any allegations of inequitable conduct," given that the "subject matter disclosed in European application no. 00126325.0 was invented by a different inventive entity than the present application."  (Dkt. # 446-29).  UMass badly distorts the record.

understood that Dr. Lockhart represented all of the Tuschl I co-owners, not just Whitehead alone, in contrast to MIT's separate counsel Brenda Jarrell.  Notably, Mr. Pratt of Whitehead did not correct their understanding of Dr. Lockhart's role.

The fact that Ms. Abrams understood that Dr. Lockhart represented all of the Tuschl I co-owners, and not simply Whitehead alone, is particularly significant given that, at precisely this time, Ms. Abrams was working with Dr. Lockhart on the Tuschl I applications *on behalf of Whitehead itself*.  In May 2004, Tom Ittleson, then the Director of the Intellectual Property Office at Whitehead, sent an email to Helen Lockhart at Wolf Greenfield, which he copied to others at MIT, telling Dr. Lockhart that she should "look to *Irene Abrams representing Whitehead* for guidance regarding prosecuting" the "jointly owned Whitehead/MIT/UMass/Max Plank RNAi patent portfolio that is *managed by Whitehead*."  (Haberny Decl. Ex. 2 (emphasis added).)  Mr. Ittleson does not suggest that Dr. Lockhart was solely Whitehead's attorney, and both Ms. Abrams and Ms. Nelsen in fact understood that this was not the case.

In their brief, Defendants rely exclusively on the opinion by the District of Columbia Circuit in *Eureka Investment Corporation v. Chicago Title Ins. Co.*, 743 F.2d 932 (D.C. Cir. 1984).  In that case, Eureka Investment Corporation, N.V. ("Eureka") sought to convert one of its buildings into condominiums.  Under Washington D.C. law, the tenants of the building had protections from conversion under the Rental Housing Act ("Section 602").  *Id*. at 935.  Chicago Title Insurance Co. ("CTI") had issued Eureka a policy that insured against losses arising from attempted enforcement of Section 602 rights.

The law firm Fried, Frank, Harris, Shriver, & Kampelman ("Fried Frank") had a "longstanding representation of Eureka in all aspects of the condominium conversion, including the negotiation of the insurance policy."  *Id.* at 936.  When the tenants brought legal proceedings to enjoin the conversion, Fried Frank continued to represent Eureka and also represented CTI "in their common interest in defeating tenant claims."  *Id*.  Subsequently, Eureka settled the tenant's claims over CTI's objection, CTI refused to reimburse Eureka, and Eureka consulted with Fried Frank about possible remedies against CTI.  *Id*.  CTI filed a motion to compel the production "of

documents relating to Eureka's consultation with Fried, Frank about legal action against CTI." *Id*. The district court ordered the production of documents "that related to the tenant dispute or were prepared with a view toward litigation with the tenants" but denied discovery of documents concerning "Eureka's possible claims against CTI." *Id.* The Court of Appeals affirmed, finding that both Eureka and Fried Frank clearly understood that their communications concerning claims against CTI would be privileged as against CTI. *Id*. at 937-38.

The facts of *Eureka Investment* are clearly different from those at issue in this case. In this case, all four co-owners retained Wolf Greenfield to prosecute the Tuschl I applications, and the communications that Max Planck is seeking relate to the prosecution of the co-assigned Tuschl I applications. Moreover, Max Planck is not seeking litigation related communications between Whitehead and its litigation counsel, Williams & Connolly LLP or Hanify & King, P.C. Such communications—similar to those in *Eureka*—are privileged.

## III.   CONCLUSION

The legal principle on which Max Planck bases this motion is black-letter law. "The attorney-client privilege protects joint client communications from discovery by third parties. Among the joint clients, however, the privilege may not be used either to restrict access to, or to preclude use of communications between the attorney and the clients that relate to those matters in which they had a common interest and about which they collectively consulted the attorney." *In re Brownsville General Hosp., Inc.*, 380 B.R. 385, 389-90 (Bankr. W.D. Pa. 2008) (quoting 1 Paul R. Rice, *Attorney-Client Privilege in the United States* § 4:33 (2d ed. 2007) (stating federal law regarding attorney-client privilege).) Max Planck respectfully requests that the Court order Wolf Greenfield, Whitehead, MIT and UMass to produce all communications involving Wolf Greenfield relating to the Tuschl I applications, from the beginning of the joint representation in March of 2004, at least until the USPTO granted Max Planck's Goldstein petition on September 3, 2009, including all documents reflected in the entries from Defendants' privilege logs identified in Exhibit 1 to the Declaration of Alan J. Heinrich (Dkt. # 459-1).

Respectfully submitted,

Max-Planck-Gesellschaft zur Förderung der
Wissenschaften e.V.; Max-Planck-Innovation
GmbH; and Alnylam Pharmaceuticals, Inc.

Of counsel

By their attorneys,

Morgan Chu (70446) pro hac
David I. Gindler (117824) pro hac
Michael H. Strub, Jr. (153828) pro hac
Alan J. Heinrich (212782) pro hac
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010

  _/s/ Thomas F. Maffei_____
Thomas F. Maffei (BBO 313220)
Scott McConchie (BBO 634127)
GRIESINGER, TIGHE & MAFFEI, LLP
176 Federal Street
Boston, Massachusetts 02110
(617) 542-9900

Dated:  November 29, 2010


### Certificate of Service

I, Thomas F. Maffei, hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
on November 29, 2010.


  _/s/ Thomas F. Maffei_____
       Thomas F. Maffei