**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MAX-PLANCK-GESELLSCHAFT ZUR FÖRDERUNG DER WISSENSCHAFTEN E.V., MAX-PLANCK-INNOVATION GMBH, and ALNYLAM PHARMACEUTICALS, INC., | ) ) ) ) ) ) |
| Plaintiffs, | ) CIVIL ACTION NO. 09-CV-11116-PBS ) |
| v. | ) ) |
| WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, MASSACHUSETTS INSTITUTE OF TECHNOLOGY, and BOARD OF TRUSTEES OF THE UNIVERSITY OF MASSACHUSETTS, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM AND ORDER**

February 7, 2011

Saris, U.S.D.J.

Plaintiffs Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. ("Max Planck") and Alnylam Pharmaceuticals, Inc. ("Alnylam") have sued defendants Whitehead Institute for Biomedical Research ("Whitehead"), Massachusetts Institute of Technology ("MIT"), and the Board of Trustees of the University of Massachusetts ("UMass") over the intellectual property rights to certain inventions in the field of "RNA interference." The

parties have filed cross-motions for partial summary judgment.

The plaintiffs request that the Court find as a matter of law that the priority claim within U.S. Utility Patent Application No. 09/821,832 ("the Tuschl I application" or "the '832 application") to European Patent application 00126325.0 ("the '325 application"), is improper. Plaintiffs also request that this Court find that there is no genuine issue of material fact with respect to the defendants' counterclaims based on plaintiffs' Goldstein petitions and defendants' counterclaims for tortious interference against the plaintiffs, and that these counterclaims be dismissed.[1]

---

[1] Specifically, Max Planck requests summary judgment on the following counterclaims:
- With regard to the Goldstein petitions: Defendant Whitehead's Answer & Counterclaims to the First Amended Complaint, First Counterclaim, ¶ 38(a), (b) (breach of contract against Max Planck), Second Counterclaim, ¶ 46(a), (b) (breach of the implied covenant of good faith and fair dealing against Max Planck) and Third Counterclaim (interference with advantageous business relations against Alnylam) and Answer to First Amended Complaint and Counterclaim of the University of Massachusetts, Count I, ¶ 29(b), (c) (breach of contract against Max Planck), Count II (breach of the implied covenant of good faith and fair dealing against Max Planck) and Count III (tortious interference with contractual and advantageous relations against Alnylam)).
- With regard to tortious interference: Defendant Whitehead's Answer & Counterclaims to the First Amended Complaint, Third Counterclaim (interference with advantageous business relations against Alnylam) and Answer to First Amended Complaint and Counterclaim of the University of Massachusetts, Count III (tortious interference with contractual and advantageous relations against Alnylam), and Count IV (tortious interference with advantageous relations against

Defendant UMass moves for summary judgment on the grounds that there is no genuine issue of material fact to be determined with regards to Counts VII and XVII of plaintiffs' First Amended Complaint, asserting violations of Chapter 93A, Count XV, alleging unjust enrichment, and Count XVIII, seeking a declaratory judgment.

The plaintiffs' motion is **<u>DENIED</u>**.  Defendants' motion is **<u>ALLOWED</u>**.

## I. Background

This case pertains to two patent applications in the field of "RNA interference."  The underlying facts of this case have been explained in several prior opinions of this Court, and familiarity with those facts is presumed.  <u>See</u> <u>Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Whitehead Institute for Biomedical Research</u>, 650 F.Supp.2d 114 (D.Mass. 2009); <u>Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC</u>, 661 F.Supp.2d 125 (D.Mass. 2009); <u>Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, PC</u>, No. 09-11168, 2010 WL 3553988 (D. Mass. Sept. 14, 2010).

---

Alnylam and Max Planck).

## II. Legal Standard

Summary judgment is appropriate when "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed.R.Civ.P. 56(c)). To succeed on a motion for summary judgment, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990); see also Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has made such a showing, the burden shifts to the non-moving party, who "'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" Barbour, 63 F.3d at 37 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The non-moving party must establish that there is "sufficient evidence favoring [its position] for a jury to return a verdict [in its favor]. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). The Court must "view the facts in the light most

favorable to the non-moving party, drawing all reasonable inferences in that party's favor." <u>Barbour</u>, 63 F.3d at 36 (citation omitted).

"Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." <u>Estate of Hevia v. Portrio Corp.</u>, 602 F.3d 34, 40 (1st Cir. 2010) (citing <u>Blackie v. Maine</u>, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.")).

**III. Max Planck's Motion for Summary Judgment**

**A. The Priority Claim**

The first legal issue raised by the plaintiffs is the propriety of the priority claim, in the Tuschl I '832 application, filed in March 2001, to the Tuschl II '325 European application, which was abandoned in 2001, two years before the Umass-Sirna Agreement in 2003. Alternatively, as defendants would state it, the issue is whether Whitehead acted in bad faith in refusing to remove that priority claim from Tuschl I when Max Planck demanded that it do so. Plaintiffs make two separate arguments with regard to the priority claim. They first argue that the Tuschl I application cannot properly claim priority to the '325 application, and that even Dr. Tuschl's original agreement to that priority claim does not make it proper. In the

alternative, they argue that even if the original priority claim was valid, it can no longer be considered valid because Dr. Tuschl has withdrawn his consent. The contention is that because none of the Tuschl I inventors still pressing the priority claim are also Tuschl II inventors, Tuschl I no longer has a valid basis upon which to claim the priority date of the '325 application.

The first issue, whether the initial claim of priority was valid, turns on the proper interpretation of the law governing priority claims to foreign patent applications. Specifically, the statute states:

> (a) An application for patent for an invention filed in this country by any person who has, or whose legal representatives or assigns have, previously regularly filed an application for a patent for the same invention in a foreign country which affords similar privileges in the case of applications filed in the United States or to citizens of the United States, or in a WTO member country, shall have the same effect as the same application would have if filed in this country on the date on which the application for patent for the same invention was first filed in such foreign country, if the application in this country is filed within twelve months from the earliest date on which such foreign application was filed; but no patent shall be granted on any application for patent for an invention which had been patented or described in a printed publication in any country more than one year before the date of the actual filing of the application in this country, or which had been in public use or on sale in this country more than one year prior to such filing.

35 U.S.C. § 119(a).  Plaintiffs argue that, under this statutory language, any claim of priority that Tuschl I makes to the '325 application is improper.

Defendants, for their part, contend that the validity of the original priority claim is a matter not before this Court because it was not raised in the First Amended Complaint, and that the real question is whether Whitehead acted in bad faith, under the 2001 and 2003 Agreements, in refusing to remove the priority claim from the Tuschl I application at Max Planck's request in 2004.  They argue that Whitehead's refusal to remove the priority claim from Tuschl I did not exhibit bad faith because Dr. Tuschl had assigned his rights to the Tuschl I invention partially to Whitehead, and under the 2001 and 2003 Joint Invention and Joint Marketing Agreements, Whitehead bore the responsibility of unilaterally managing the Tuschl I prosecution.  Defendants argue that Whitehead therefore had no responsibility to remove the priority claim at Max Planck's request, and did not do so because UMass had already licensed its rights in Tuschl I to Sirna Therapeutics, which had relied on the existence of the priority claim in that licensing agreement.

In support of their argument that § 119(a) does not support the validity of the priority claim, plaintiffs cite Boston Scientific Scimed, Inc. v. Medtronic Vascular, Inc., 497 F.3d 1293 (Fed. Cir. 2007).  In that case, an organization filed a European patent application for an invention, and then later

7

became affiliated with an American inventor. That inventor tried to claim priority to the European application, but the Federal Circuit ruled that, because the organization had not been acting on the American's behalf at the time the application was filed, the priority claim was improper under § 119(a). Specifically, the court held that "a foreign application may only form the basis for priority under section 119(a) if that application was filed by either the U.S. applicant himself, or by someone acting on his behalf at the time the foreign application was filed." Id. at 1297-98.

Here, plaintiffs argue, Max Planck filed the '325 application prior to its agreement with the Tuschl I inventors Drs. Zamore, Bartel and Sharp; Max Planck therefore could not have done so on behalf of those inventors, who thus have no claim of priority to the '325 application under Scimed, which states that "§ 119 gives rise to a right of priority that is personal to the United States applicant." Id. at 1297 (quoting Vogel v. Jones, 486 F.2d 1068, 1072 (CCPA 1973)). Defendants counter that Scimed held that § 119(a) "requires that a nexus exist between the inventor and the foreign applicant at the time the foreign application was filed," id. at 1297, and that such a nexus clearly existed in this case, given that Max Planck filed the '325 application on Dr. Tuschl's behalf, and Dr. Tuschl was a Tuschl I inventor. This argument is persuasive.

The next issue is whether § 119(a) requires the European

8

applicant to file its application on behalf of <u>all</u> the inventors who attempt to claim priority to that application, or merely one of them. <u>Scimed</u> does not address this question. Both parties cite <u>Reitz v. Inoue</u>, 39 U.S.P.Q.2d 1838 (Bd. Pat. App. & Interf., 1995) in favor of their positions. In <u>Reitz</u>, the issue was whether an inventor was entitled to the benefit of the filing date of a Japanese patent when the inventive entities on the two applications were different. Specifically, in that case, Reitz argued that Inoue was not entitled to the benefit of the Japanese patent because only Inoue was listed in the foreign application, whereas Inoue and another inventor were named on the domestic application. The court found that Inoue was entitled to claim priority to the foreign application, because

> the proposition that the inventive entity must be the
> same in both the foreign and the corresponding U.S.
> application in order to obtain benefit [under Section
> 119] can no longer be accepted, if it ever was, as a
> hard and fast rule in view of the liberalization of the
> requirements for filing a U.S. application as joint
> inventors wrought by the 1984 amendment of 35 U.S.C.
> Section 116.

<u>Reitz</u>, 39 U.S.P.Q.2d at 1840.[2]  Because § 119(a) cannot be

---

[2] The 1984 amendment referenced here "allow[ed] inventors to
apply for a patent jointly even though (I) they did not
physically work together or at the same time, (II) each did not
make the same type or amount of contribution, or (III) each did
not make a contribution to the subject matter of every claim of
the patent." 35 U.S.C. § 116; <u>see also</u> 130 Cong. Rec. H10525
(daily ed. Oct. 1, 1984), <u>reprinted in</u> 1984 U.S.C.C.A.N. 5827,
5834.

treated as having a same inventive entity requirement as a "hard and fast rule," the defendants again have the better argument as to how that section should apply to the facts of this case.

The parties have also argued over the question of whether Dr. Tuschl's personal withdrawal of his priority claim vitiates the nexus and renders the Tuschl I priority claim invalid. However, whether Dr. Tuschl can unilaterally withdraw his claim to priority without violating the parties' agreements is a question of fact, implicating the coassignment of Dr. Tuschl's right to Whitehead, the 2001 and 2003 Agreements, and the original agreement to cross-claim for priority. Dr. Tuschl claims that he withdrew the priority claim in 2006 because of concerns about allegations of inequitable conduct that could be triggered by his claim of priority, because the inventive entity of the Tuschl 1 applications does not include the entire inventive entity of the '325 application. However, this about-face is not backed up by any caselaw regarding inventive entities, and a jury could find that this is a pretext. As discussed in my prior opinion, the undisputed facts in the record show that the priority claim resulted from negotiations between Whitehead and Max Planck regarding the management of the Tuschl I and Tuschl II applications. "Whitehead and Max-Planck ultimately agreed to prosecute them separately, but claim priority to each other's applications." <u>Max-Planck</u>, 650 F.Supp.2d at 119. This agreement was confirmed in writing. <u>See</u> Ex. 8 to Granahan Aff.

[Docket No. 36].  Dr. Tuschl's unilateral withdrawal of the
priority claim is arguably a breach of this agreement.  It also
potentially violates the 2001 and 2003 Joint Invention
Agreements, because withdrawing the priority claim would affect
the prosecution of Tuschl I (a task assigned to Whitehead under
those Agreements).  The propriety of Dr. Tuschl's withdrawing the
priority claim therefore implicates several factual issues,
because personally withdrawing his priority claim may result in
breach of various contractual obligations by Max Planck, and
because that breach could itself have been justified by a
material breach by Whitehead.

The parties have also raised the question of whether Tuschl
I and Tuschl II are the "same invention" for purposes of the
"same invention" requirement in 35 U.S.C. §119(a).  This dispute
is curious, because until recently the parties have been
insisting to the PTO that Tuschl I and Tuschl II actually embody
two different inventions.  Therefore the fact that both claim
priority to the same European application is problematic in light
of §119(a)'s requirement that an application can claim priority
to a foreign patent application "for the same invention."

With regard to this requirement, the Federal Circuit has
stated, "Under section 119, the claims set forth in a United
States application are entitled to the benefit of a foreign
priority date if the corresponding foreign application supports

the claims in the manner required by section 112, ¶ 1."[3]  <u>In re</u>

<u>Gosteli</u>, 872 F.2d 1008, 1010 (Fed. Cir. 1989).  The court further

stated that the "reference to 'invention' in section 119 clearly

refers to what the claims define, not what is disclosed in the

foreign application."  <u>Id.</u>

As the prior opinion in this case pointed out, "Whitehead,

MIT, and Max Planck appear to agree that Tuschl II is a 'species'

claim that is allowable after the issuance of the 'genus' claim."

<u>Max-Planck</u>, 650 F.Supp.2d at 122.  A genus claim is a claim to a

general category of invention, in this case the process of RNA

interference and its components; a species claim is a more

specific iteration of or improvement on the "genus" invention.

Tuschl I, here the genus invention, claims, among other things:

"1. Isolated RNA of from about 21 to 23 nucleotides that mediates

RNA interference of an mRNA to which it corresponds.  2. Isolated

RNA of claim 1 that comprises a terminal 3' hydroxyl group."

'832 Application, Ex. 6 to Granahan Aff.  The Tuschl II '325

species application claims, among other things:

> 1. Isolated double-stranded RNA molecule, wherein each
> RNA strand has a length from 19-23 nucleotides, wherein

---

[3] The requirements of 35 U.S.C. § 112, ¶ 1 are as follows:
"The specification shall contain a written description of the
invention, and of the manner and process of making and using it,
in such full, clear, concise, and exact terms as to enable any
person skilled in the art to which it pertains, or with which it
is most nearly connected, to make and use the same, and shall set
forth the best mode contemplated by the inventor of carrying out
his invention."

said RNA molecule is capable of target-specific nucleic acid modifications.  2. The RNA molecule of claim 1 wherein at least one strand has a 3'-overhang from 1-5 nucleotides. . . . 5. The RNA molecule of any one of claims 2-4, wherein the 3'-overhang is from 1-3 nucleotides.  6. The RNA molecule of any one of claims 2-5, wherein the 3'-overhang is stabilized against degradation.

'325 Application, Ex. 7 to Granahan Aff.  In the context of prior art anticipation, it is a rule of thumb that "species anticipates genus, but genus does not necessarily anticipate species." Janice M. Mueller, An Introduction to Patent Law 126 (2d ed. 2006).

It bears noting that the parties appear to be trying to have their patent cake and eat it too, by arguing the invention is the same for purposes of Section 119(a) but different for purposes of avoiding double patenting.  Without a Markman-type hearing and better briefing, the Court does not undertake to determine based on this record whether at least one of the claimed inventions in Tuschl I and Tuschl II is "the same" for purposes of section 119(a).  In any event, the PTO's ruling cannot be challenged in this action.

**B. Defendants' Counterclaims Based on Max Planck's Goldstein Petition**

Whitehead has asserted counterclaims against Max Planck and Alnylam relating to Max Planck's alleged violation of the 2001 Research Use Agreement and the 2003 Therapeutic Use Agreement. Specifically, Whitehead accuses Max Planck of breach of contract

and breach of the covenant of good faith and fair dealing, and Alnylam of interference with advantageous business relations, all arising from Max Planck's <u>Goldstein</u> petition before the USPTO to revoke its power of attorney from Wolf Greenfield, the law firm hired by Whitehead to manage the Tuschl I application. Max Planck now moves for summary judgment in its favor on these counterclaims.

The analysis of this issue is complicated by the fact that this Court recently issued an opinion in the related case <u>Max-Planck-Gesellschaft Zur Foerderung der Wissenschaften E.V. v. Wolf Greenfield & Sacks, P.C.</u>, No. 09-11168, 2010 WL 3553988 (D. Mass., 2010). In that case, Max Planck sued Wolf Greenfield for legal malpractice based on the proposition that, in light of the divergent interests of Max Planck and the defendants in this action, Wolf Greenfield's continued representation of Max Planck in the Tuschl I prosecution presented an improper conflict of interest. In the resulting opinion, this Court found that an attorney-client relationship existed between Max Planck and Wolf Greenfield, but that Max Planck was time-barred from any recovery. Max Planck now argues that because of the Court's holding that Wolf Greenfield's representation of Max Planck involved an attorney-client relationship, Max Planck is entitled to summary judgment on defendants' claims that Max Planck's <u>Goldstein</u> petition constituted a violation of the 2001 and 2003 Agreements.

14

Defendants argue that, pursuant to principles of due process, the findings in the <u>Wolf Greenfield</u> case should not be binding on defendants because they were not parties to that case. The due process issue is a red herring, however, because the <u>Wolf Greenfield</u> opinion is not dispositive of the contract claims at issue in this case. The <u>Wolf Greenfield</u> opinion dealt solely with the question of whether an attorney-client relationship existed for purposes of the legal malpractice suit at issue in that action. It did not make any findings about the propriety of the <u>Goldstein</u> petition under the Agreements, nor did it make findings with regard to waiver of conflict of interest or the scope of any such waiver. Indeed, the issue of waiver was not pressed in the <u>Wolf Greenfield</u> action. Similarly, Max Planck's arguments about Massachusetts Rule of Professional Conduct 1.7 are inapposite; regardless of what Wolf Greenfield's ethical duties may have been under the Rule, those duties do not bear on Max Planck's contractual obligations to Whitehead and UMass. The issues of attorney-client relationship adjudicated in <u>Wolf Greenfield</u> and the contract law claims at issue here, while related, require independent analysis.

As such, the essential questions here are whether a party can contractually waive its right to non-conflicted representation, whether Max Planck did so in the 2001 and 2003 Agreements, and whether the filing of the <u>Goldstein</u> petition constituted a violation of those Agreements. It is not uncommon

for parties, especially sophisticated ones, to prospectively waive legal conflicts of interest by agreement. See, e.g., Acushnet Co. v. Coaters, Inc., 972 F.Supp. 41, 70 (D. Mass. 1997) (finding that liable parties in a CERCLA action "were free to forego pressing for judicial resolution of their conflicting interests and to agree that their common interest in presenting a unified position . . . so far outweighs their conflicting interests among themselves that they are better served by foregoing pursuit of conflicts and acting together").

The issue, more specifically, is whether Max Planck's agreement to allow Whitehead to prosecute the Tuschl I patent, with Max Planck retaining only the "reasonable opportunity to comment and advise on patent attorneys to be used," was an implicit, prospective waiver of any conflict of interest between Max Planck and Whitehead's choice of prosecution counsel. "Implied consent [to conflicted representation] requires an informed client. A court can say that a client's actions can support solely the conclusion that the client has consented, but only in the limited circumstance that it is indisputably clear that the client was aware of the conflict." CenTra, Inc. v. Estrin, 538 F.3d 402, 419 (6th Cir. 2008).

Here, Max Planck was aware of the potential for conflict when it entered into the 2001 and 2003 Agreements. More importantly, it was aware of an existing conflict at the time that it exercised its Power of Attorney in favor of Wolf

Greenfield on March 31, 2004.  Max Planck did so even in light of the existing disagreement between itself and Whitehead about the inclusion of the Tuschl II data in the Tuschl I specification, a disagreement that came to a head in light of UMass' licensing of its rights to Tuschl I to Sirna in September of 2003.  As Chief Magistrate Judge Dein put it in her May 11, 2010 decision, "by late 2003, the defendants shared a common legal interest relating to the contents of the Tuschl I applications that was adverse to the interests of Max Planck and Alnylum."  Mem. of Decision and Order 15 [Docket No. 355].  The undisputed evidence is that Max Planck was aware of the conflict when it consented to representation by Wolf Greenfield, and entering into the 2001 and 2003 Agreements may have further constituted waiver of certain conflict of interest claims.

However, there are disputed facts about the representations made by Whitehead as to its commitment not to prosecute claims reciting 3' overhangs, representations that it emphasized in the so-called Nelson/Pratt letter in 2004.  The presence of the 3' information in the Tuschl I claims significantly complicates this issue.  Any waiver of conflicts by Max Planck likely was predicated on the understanding that the Tuschl I applications would not claim the 3' overhang, and the scope of any such waiver is therefore an unresolved question of fact.  Consequently, I make no finding here with regard to waiver.

It is also unclear as a factual matter whether Max Planck's

filing of the Goldstein petition constitutes a breach of the covenant of good faith and fair dealing under the 2001 and 2003 Agreements. Specifically, defendants have presented communications by Max Planck and its attorneys that suggest that the legal ethics complaints at the heart of the Wolf Greenfield case were merely pretextual, and part of a broader litigation strategy to impede the prosecution of Tuschl I. This evidence creates a genuine issue of material fact as to whether all parties were honoring their obligations under the 2001 and 2003 Agreements. As such, summary judgment on defendants' counterclaims based on the Goldstein petition is inappropriate.

### C. Defendants' Tortious Interference Claims

Next, Max Planck argues that it should be granted summary judgment on defendants' tortious interference claims in light of defendants' admissions that they have not, as yet, suffered actual or measurable pecuniary damages. There is ample language in the case law to the effect that pecuniary harm is a necessary element of a tortious interference claim. See, e.g., Ayash v. Dana-Farber Cancer Institute, 443 Mass. 367, 822 N.E.2d 667, 690 (Mass. 2005) (listing as one element of an intentional interference claim "that the plaintiff suffered economic harm as a result of the defendant's conduct"). The more specific question presented by this case, however, and not resolved by such language, is whether anticipated pecuniary harm is

sufficient to make out a claim.  Cf. Adams v. Watson, 10 F.3d
915, 921 (1st Cir. 1993) ("Our review of the pertinent
authorities satisfies us that the proposed second amended
complaint alleges particularized future economic injury
sufficient to support Article III standing.").

In several of the cases Max Planck cites, no economic harm
had been alleged at all.  See, e.g., Tech Plus, Inc. v. Ansel, 59
Mass. App. Ct. 12, 18-19, 793 N.E.2d 1256, 1262-63 (Mass. App.
Ct. 2003) (finding that plaintiffs, while they did potentially
suffer reputational damage as a result of defendants' activities,
could not recover on intentional interference claims because they
had received all the commissions they were due and conceded that
no pecuniary loss was at stake); Valdez v. Domeniconi, 6 Mass. L.
Rep. 501 (Mass. Super. Ct. 1997) (granting summary judgment
against plaintiff on tortious interference claim where plaintiff
claimed only that he had suffered severe emotional distress, not
economic damages); Ratner v. Noble, 137, 138-39, 617 N.E.2d 649,
650 (Mass. App. Ct. 1993) (holding that where plaintiff alleged
only reputational harm and no pecuniary damage, she could not
recover for tortious interference claim).  These cases do not
address the question of whether a plaintiff's allegations that he
will suffer pecuniary harm, but has not yet, are sufficient to
make out the claim.

Defendants cite to the more archaic, but nonetheless
instructive, case of Beekman v. Marsters, 195 Mass. 205, 80 N.E.

19

817 (Mass. 1907). <u>Beekman</u> states that if "the plaintiff proves that the defendant unlawfully interferes or threatens to interfere with his business or his rights under a contract, and further makes out in proof that damages will not afford an adequate remedy, equity will issue an injunction." <u>Beekman</u>, 80 N.E. at 821; <u>cf.</u> <u>M. Steinert & Sons Co. v. Tagen</u>, 207 Mass. 394, 93 N.E. 584 (Mass. 1911).

The concept that future particularized economic damages can be adequate for purposes of obtaining equitable relief is applicable here. The defendants note that, due to the delay in issuing Tuschl I applications, payments under UMass' licensing agreement with Sirna Therapeutics, Inc., have been postponed. Further, Defendants point out a number of cases in which Massachusetts courts have treated tortious interference claims under the banner of equity. <u>See, e.g.</u>, <u>Davis Bros. Fisheries Co. v. Pimentel</u>, 322 Mass. 499, 78 N.E.2d 93 (Mass. 1948). Defendants' prayers for relief in their counterclaims, in addition to requesting damages, also request the remedy of specific performance, "an equitable remedy that requires some attention to the relative benefits and burdens that the parties may enjoy or suffer as compared with a legal remedy in damages." <u>Texas v. New Mexico</u>, 482 U.S. 124, 131 (1987). Given that the case law suggests that the tort of tortious interference may implicate an equitable remedy, the defendants' lack of measurable past damages does not entitle plaintiffs to summary judgment.

## IV. UMass' Motion for Summary Judgment

UMass' motion for summary judgment addresses several claims made by Max Planck dealing with UMass' licensing of its Tuschl I rights to Sirna Therapeutics in September 2003. Specifically, at issue in this motion are Max Planck's claims in Count XVII that UMass wrongfully licensed rights in the EP '325 Application to Sirna in the 2003 License Agreement and thereby violated M.G.L. c. 93A, Massachusetts' consumer protection statute, and that the License Agreement unjustly enriched UMass. Max Planck also argues that UMass and Whitehead violated Chapter 93A by wrongfully harming the Tuschl II applications through the prosecution of the Tuschl I applications (Count VII). UMass argues that summary judgment should be awarded in its favor on the Chapter 93A claims because it is not subject to suit under that law, and that it should be awarded summary judgment on the merits in any event because the License Agreement did not purport to license rights in the '325 patent application to Sirna.

### A. Applicability of Chapter 93A

UMass argues that it is not subject to suit under Chapter 93A because the statute does not waive sovereign immunity explicitly, nor do its terms necessarily imply waiver. The question of sovereign immunity must be resolved as a threshold matter. "Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of [a state's] consent to be sued in any court

21

define that court's jurisdiction to entertain the suit.'"
F.D.I.C. v. Meyer, 510 U.S. 471, 475 (1994) (quoting United
States v. Sherwood, 312 U.S. 584, 586 (1941)); see also Seminole
Tribe of Florida v. Florida, 517 U.S. 44, 72-72 (1996) ("The
Eleventh Amendment restricts the judicial power under Article
III[.]").  While subject matter jurisdiction is not usually
gained by consent or waiver, sovereign immunity is waivable.  See
Port Authority Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 305
(1990).  Such waiver will be given effect "only where stated by
the most express language or by such overwhelming implication
from the text as [will] leave no room for any other reasonable
construction."  Id. (internal quotation marks and citations
omitted).

Under Massachusetts law, the state and its subdivisions are
immune from suit absent legislative waiver of immunity; since the
passage of the Massachusetts Tort Claims Act in 1978, the SJC has
held that "immunity is in still in effect unless consent to suit
has been 'expressed by the terms of a statute, or appears by
necessary implication from them.'"  Bain v. City of Springfield,
424 Mass. 758, 762-63, 678 N.E.2d 155, 159 (1997) (quoting C & M
Constr. Co. v. Commonwealth, 396 Mass. 390, 392, 486 N.E.2d 54,
56 (1985)); see also DeRoche v. Massachusetts Com'n Against
Discrimination, 447 Mass. 1, 12-13, 848 N.E.2d 1197, 1206 (2006)
("Absent statutory language that indicates by express terms a
waiver of sovereign immunity, the Legislature's intent to subject

22

the Commonwealth to liability may be found only when such an

intent is clear by necessary implication from the statute's

terms.").

"Whether a governmental entity is ever amenable to suit

under c. 93A remains an open issue" under Massachusetts law.  M.

O'Connor Contracting, Inc. v. City of Brockton, 61 Mass. App. Ct.

278, 284 n.8, 809 N.E.2d 1062, 1067 n.8 (2004).  As the O'Connor

court explained,

> The question is controversial because c. 93A contains
> no explicit indication that governmental entities are
> to be liable under its provisions.  Both § 11 and § 9
> of c. 93A require that the defendant be a "person"
> engaged in trade or commerce.  "Person" is defined in
> the statute as including "natural persons,
> corporations, trusts, partnerships, incorporated or
> unincorporated associations, and any other legal
> entity."  Although the term "person" ordinarily is not
> construed as including the State or its political
> subdivisions, uncertainty exists because only a
> "person" may bring suit under c. 93A and governmental
> entities have been considered to have standing to do
> so.

Id. (citations omitted).  UMass' argument that the Massachusetts

Supreme Judicial Court had resolved this "uncertainty" in an

earlier case is not well taken.  The Court stated: "Cases . . .

in which the public entity may act as a plaintiff in a c. 93A

action are not apposite.  One who deals with a public entity, as

for instance in providing it with goods or services, may very

well be engaged in trade or commerce without the entity being so

engaged as well."  Lafayette Place Associates v Boston

Redevelopment Authority, 427 Mass. 509, 536 n.29, 694 N.E.2d 820,

836 n.29 (1998).  This line of reasoning relates to the issue of whether a government entity is engaged in trade or commerce, not whether it is a "person" under the law and therefore subject to suit.

### 1. Trade or Commerce v. Legislative Purpose

There is one circumstance in which it is clear that Chapter 93A does not apply; the Massachusetts Supreme Judicial Court has stated that "a municipality is <u>not</u> liable under G.L. c. 93A when it is not acting in a business context, that is, when it is not engaged in trade or commerce."  <u>Park Drive Towing, Inc. v. City of Revere</u>, 442 Mass. 80, 86, 809 N.E.2d 1045, 1050-51 (2004) (internal quotation marks omitted; emphasis added).  The "trade or commerce" inquiry, in turn, involves "the nature of the transaction, the character of the parties involved and [their] activities . . . and whether the transaction was motivated by business . . . reasons."  <u>Id.</u> (quoting <u>Boston Hous. Auth. v. Howard</u>, 427 Mass. 537, 538-39, 695 N.E.2d 192 (1998)) (alterations in original).  It is established that "a party is not engaging in 'trade or commerce' as defined by G.L. c. 93A when its actions are motivated by legislative mandate."  <u>Park Drive Towing</u>, 442 Mass. at 86, 809 N.E.2d at 1051; <u>see also</u> <u>O'Connor</u>, 61 Mass. App. Ct. at 284, 809 N.E.2d at  1067 ("Putting aside the broader question whether c. 93A may be read as waiving governmental immunity in <u>any</u> circumstances, at a minimum it is

well established that governmental entities are not amenable to suit under c. 93A when they have engaged in governmental activity rather than trade or commerce.").

In this case, UMass argues that it was acting pursuant to legislative mandate and performing a governmental function. Specifically, UMass cites Mass. Gen. Laws ch. 75, § 14A (1996), which states:

> Notwithstanding any provision of law to the contrary, the trustees shall prescribe and enforce such regulations as they may deem necessary, may enter into contracts with corporations, foundations, other entities, and individuals concerning inventions, discoveries, research, or other work product, including patents, trademarks, copyrights, trade secrets, and any other intellectual property, developed under the terms of a sponsored agreement entered into by the university or involving the use of university funds . . . including the transfer of rights involving such work product, the amount of the respective shares in the proceeds therefrom, and provision for the resolution of any and all disagreements involving the same.

The statutory language belies UMass' position. The use of the terms "shall" and "may" in such close proximity suggests that entering into contracts is permissive rather than mandatory; if the legislature had intended for that power to be obligatory, it would have used the word shall, as it did earlier in the same sentence.

Furthermore, the entering of contracts solely for profit does not fit the traditional mold of "government activity." The cases UMass cites only underscore this distinction. One relates to a housing authority's contract to develop land. See Lafayette

Place Assocs v. Boston Redevelopment Auth., 427 Mass. 509, 535-36, 694 N.E.2d 820, 836 (1998). Another deals with a town's contract to supply water. See T. Bedrosian, LLC v. Town of Mendon, 24 Mass. L. Rptr. 344, 2008 WL 3315861, at *4 (Mass. Super. 2008). In both cases, and in others UMass cites, government entities entered into contracts to facilitate a specific service provision.

If accumulating wealth that could be used for some unspecified public purpose (such as paying professors, maintaining campus buildings, or reducing the cost of tuition) were enough to qualify an action as "governmental activity" outside the realm of trade or commerce, then no governmental entity would ever be engaged in trade or commerce for purposes of Chapter 93A. This would render the state courts' distinction between trade and commerce and government activity meaningless.

### 2. Sovereign Immunity Under Chapter 93A

Having established that UMass was engaged in trade or commerce, the application of Chapter 93A is still uncertain. One federal court has found that Chapter 93A applies when a governmental entity is engaged in trade or commerce. See City of Revere v. Boston/Logan Airport Associates, LLC. 443 F.Supp.2d 121, 129 (D. Mass. 2006) ("A municipality is subject to liability under Chapter 93A where it is 'acting in a business context[.]'") (quoting Park Drive Towing, Inc. v. City of Revere, 442 Mass. 80,

86, 809 N.E.2d 1045, 1051 (2004)).  However, in that case the
sovereign immunity waiver question was not dispositive, because
the Court found the City not liable under Chapter 93A for other
reasons.  The parties have cited no case, and the Court could not
find one, where the state or a subdivision thereof was held
liable under Chapter 93A.[4]  To date, the Massachusetts courts
have only specified that Chapter 93A does <u>not</u> apply when
governmental entities are <u>not</u> engaged in trade or commerce.

As such, I turn now to the question of whether UMass
qualifies as a "person" under Chapter 93A and whether
Massachusetts' sovereign immunity exempts it from suit in federal
court in the event that UMass is engaged in trade or commerce.
The two questions are really flip sides of the same coin, because
the underlying issue is whether Chapter 93A serves as a waiver of
sovereign immunity.

Again, to be found to have waived sovereign immunity, state
legislation must either be explicit on the point, or waiver must
be found by "necessary implication from [the terms of a
statute]."  <u>Bain</u>, 424 Mass. at 763, 678 N.E.2d at 159.
Chapter 93A contains no explicit waiver of sovereign immunity.
<u>See</u> <u>Bretton v. State Lottery Com'n</u>, 41 Mass. App. Ct. 736, 738,

_____

[4] <u>T. Bedrosian, LLC v. Costanza</u>, 10 Mass. L. Rptr. 459, 1999
WL 792214 (Mass. Super.), upon which plaintiffs rely, stated only
that the question was undecided and declined to dismiss a Chapter
93A claim against a municipality on sovereign immunity grounds.
<u>See</u> <u>id.</u> at *1 ("A complaint should not be dismissed merely
because it asserts a new theory of liability.").

673 N.E.2d 76, 78 (1996) ("Chapter 93A contains no explicit indication that governmental entities are to be liable under its provisions.") (quoting <u>United States Leasing Corp. v. Chicopee</u>, 402 Mass. 228, 232, 521 N.E.2d 741, 744 (1988)).  Massachusetts courts have not ruled on the question of whether Chapter 93A constitutes an implicit waiver of sovereign immunity.

It is certainly plausible, based on a facial reading of the definitions section of the statute, that the term "person" could include the Commonwealth and its subdivisions; indeed, "person" is defined to include "any other legal entity," which seems notably broad in its reach.  Mass. Gen. Laws ch. 93A, § 1(a). However, because an implied waiver of sovereign immunity must be very clear, a facial reading of the statute cannot end the inquiry.

Generally, in Massachusetts legislation, the term "person" does not include governmental entities.  <u>See</u> Mass. Gen. Laws c.4, § 7 ("In construing statutes the following words shall have the meanings herein given, unless a contrary intention clearly appears: . . . 'Person' or 'whoever' shall include corporations, societies, associations and partnerships."); <u>Woods Hole v. Town of Falmouth</u>, 74 Mass. App. Ct. 444, 447, 907 N.E.2d 1124, 1126 (2009) ("As has been many times observed, this definition does not encompass governmental agencies, municipalities, or municipal corporations.") (internal quotation marks and citation omitted). In some chapters of the Massachusetts General Laws, the

Legislature has explicitly defined "person" to include the Commonwealth. See, e.g., Mass. Gen. Laws c. 151B, § 1 ("The term 'person' includes one or more individuals, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and the commonwealth and all political subdivisions, boards, and commissions thereof.").

In Chapter 93A, however, while the Legislature did write a unique definitions section (meaning the Chapter 1, § 7 definition of "person" does not apply), and thus implied an intention to broaden the definition of "person," the use of the phrase "any other legal entity" leaves the scope of that broadening unclear. Mass. Gen. Laws c. 93A, § 1(a). The fact that the Legislature went out of its way to define "person" more broadly than usual is some evidence in favor of the argument that Chapter 93A constitutes waiver of sovereign immunity, but that it did not go so far as to expressly include the Commonwealth in the definition (which it has done elsewhere in the Massachusetts General Laws) is equally weighty evidence against that conclusion.

Given the requirement that waiver be found by "necessary implication," Bain, 424 Mass. at 763, 678 N.E.2d at 159 (emphasis added), the use of the phrase "any other legal entity" in the definition of "person" is not a sufficient basis on which to find that the Legislature intended to waive sovereign immunity in Chapter 93A. As the SJC has noted, in the absence of express waiver, "we consider whether governmental liability is necessary

to effectuate the legislative purpose." Todino v. Town of
Wellfleet, 448 Mass. 234, 238, 860 N.E.2d 1, 5 (2007).

In Todino, the court found implied waiver of sovereign
immunity with regard to a government employer's obligation to pay
interest on payments to incapacitated employees where the statute
at issue "provides expressly that payments shall be made by a
municipality or district," and the court further noted that
"recovery of interest is necessarily implied by the potent
language of [GL c. 41,] § 111F that requires timely payments and
prohibits any reduction of pay." Id.; see also Bates v. Director
of Office of Campaign and Political Finance, 436 Mass. 144, 174,
763 N.E.2d 6, 27 (2002) (finding implied waiver of sovereign
immunity in clean elections law and stating that the "power to
bind the Commonwealth to payments of public funds by the process
of certification is required 'by necessary implication' from the
clean elections law; the certification process, and the
director's role in it, has no meaningful function without the
obligation for payment") (citation omitted).

Here, by contrast to these cases, Chapter 93A is not
rendered "ineffective" by excluding the Commonwealth from
liability. Bates, 436 Mass. at 174, 763 N.E.2d at 27. To be
sure, the Legislature's purpose of protecting consumers is
broadly stated in the law's basic proscription of "unfair methods
of competition and unfair or deceptive acts or practices in the
conduct of any trade or commerce." Mass. Gen. Laws c.93A, § 2(a)

(emphasis added).  But unlike the statutes at issue in <u>Todino</u> and
<u>Bates</u>, Chapter 93A is not premised on governmental entities'
obligations to make payments, and this difference is a critical
one.  The use of the phrase "any other legal entity" does not
require an implication of government liability, and as such this
Court will not imply a waiver of sovereign immunity.  <u>Cf.</u>
<u>Hannigan v. New Gamma-Delta Chapter of Kappa Sigma Fraternity,</u>
<u>Inc.</u>, 367 Mass. 658, 659, 327 N.E.2d 882, 883 (1975) (stating
that while judicial abrogation of sovereign immunity is possible
in the state courts, "it is preferable that the Legislature
should have a reasonable opportunity to accomplish by statute
this change in the law").

The <u>O'Connor</u> court was apt to note the problems raised by
the fact that governmental entities have been found to be
"persons" when acting as plaintiffs, but not defendants.  The
usual canon of construction is that words appearing in two places
in a statute should be interpreted consistently.  <u>See</u> <u>Lantner v.</u>
<u>Carson</u>, 374 Mass. 606, 611, 373 N.E.2d 973, 976 (1978) (applying
this rule to the phrase "in the conduct of any trade or commerce"
in Chapter 93A).  However, the cases finding governmental
entities to have standing to sue under Chapter 93A have not
discussed the sovereign immunity issue as applicable to the
state; often the debate has turned on questions of standing of a
municipality, and have dealt with the standing question somewhat
cursorily.  <u>See, e.g.</u>, <u>City of Boston v. Aetna Life Ins. Co.</u>, 399

31

Mass. 569, 574-75, 506 N.E.2d 106, 109-110 (1987) ("If there is a standing requirement involved in § 11, it is that the plaintiff must be a 'person who engages in the conduct of any trade or commerce.' Surely, the City meets this test."). It is not ideal for the term "person" to have two different implications within the statute; nonetheless, it is preferable to finding a waiver of sovereign immunity based largely on judicial resolution of a different question. Sovereign immunity is too important of a right to be waived in any way but directly (if not explicitly) by the statute's terms, and as already noted, Chapter 93A does not require a "necessary implication" of waiver.

In light of the above conclusions, Max Planck's Chapter 93A claims must fail as a matter of law, since UMass is not subject to suit under that statute.

## B. Unjust Enrichment[5]

---

[5] As I ruled in my last opinion, this claim may be time barred:

> "To the extent Max Planck's claims of unjust enrichment rest even in part on the breach of contract allegations, they are not time-barred. To the extent the claims against Whitehead are conversion-based, however, they are barred by the three years limitation period.
>     All of the claims against UMass are governed by a three year statute of limitations. Mass. Gen. L. Ch. 258, § 94; Wong v. Univ. of Mass., 438 Mass. 29, 36, 777 N.E.2d 161, 167 (2002). Therefore regardless of the nature of the claim in Count VI, it is time-barred."

The parties have not raised the statute of limitations issue here, so I have addressed the merits of the unjust enrichment issue. The actual agreement occurred in 2003, but part of the

UMass also moves for summary judgment on Max Planck's unjust enrichment claim, arguing that UMass was not unjustly enriched and that Max Planck suffered no unjust detriment as a result of the 2003 License Agreement between UMass and Sirna Therapeutics. The merits of this dispute turn largely on the question of whether the License Agreement is properly understood as having licensed the rights to Tuschl II to Sirna. Specifically, UMass granted Sirna a license "to use and practice the Patent Rights in the Field," where "Patent Rights" was defined in the definitions portion of the Agreement as

> the United States patent applications listed on Exhibit A and any priority documents . . . to the extent the claims are directed to subject matter specifically described therein, as well as any patents issued on these patent applications and any reissues or reexaminations of those patents, and any foreign counterparts to those patents and patent applications.

License Agreement ¶¶ 2.1, 1.9, Ex. O to Declaration of Barbara Fiacco in Support of University of Massachusetts's Motion for Summary Judgment. Exhibit A to the License Agreement does not list the '325 Application as a separate item in the list of patent rights; however, it does list the Tuschl I Patent Cooperation Treaty International Patent Application No. PCT/US01/10188 ("PCT Application"), and states that the PCT application is "based on priority of United States Patent

_____

claim may still be viable if UMass is still collecting royalties from Sirna under the License Agreement.

Application Nos. 60/193,594 and 60/265,232 and European Patent
Application No. 00126325.0."  In other words, it simply, and
accurately, lists the two American provisional applications (the
'594 and '232 applications) and the European '325 application as
priority documents for the Tuschl I PCT application.

The issue boils down to whether "priority" under 35 U.S.C. §
119(a) constitutes ownership of the substantive invention, or
whether it merely allows the holder of the priority claim to
utilize the date of filing of the foreign patent application as
the constructive filing date of his own American application for
purposes of prior art determinations.  A 1972 Senate Report on
Section 119(a) explains, "The right of priority enables a party
first filing an application for a patent in any of the convention
countries to file applications within 1 year in other convention
countries and have the later applications treated as if they were
filed on the same date as the first application."  S. Rep. No.
92-954, at 2 (1972).

Other sources confirm this understanding that the priority
right is not a grant of a substantive right, but is rather just
the right to utilize the earlier filing date for the "same
invention."  See Herbert F. Schwartz & Robert J. Goldman, Patent
Law and Practice §2.III.D.9 (6th ed. 2008) ("An applicant can
claim the benefit of the filing date of an application filed
abroad. . . . [T]he benefit of the filing date (referred to as
'priority') from the first application for an invention filed in

34

any member country can be claimed in a U.S. application as long as it is filed within one year of the first application."); Janice M. Mueller, <u>An Introduction to Patent Law</u> 423 (2d ed. 2006) ("Obtaining this benefit means that, in the words of the statute, the U.S. application 'shall have the same effect' as the same application would have if actually filed in the United States on the foreign filing date. In practice, this means that the USPTO will treat the application as if filed on the foreign priority date for purposes of examining it against the prior art."); <u>In re Gosteli</u>, 872 F.2d 1008, 1010 (Fed. Cir. 1989).

In this case, then, the claims in the Tuschl I "genus" application can claim priority to the '325 application,[6] if the claims from Tuschl I are found therein, but that priority right does not grant substantive rights in the Tuschl II '325 application to the extent that the two inventions are different—meaning it would not include any right to any claims in Tuschl II that are not in Tuschl I. Therefore, the 2003 License Agreement did not purport to license rights in the Tuschl II invention to Sirna, only its priority date to the extent the claimed inventions were the same.

Max Planck alleges that Sirna's purported ownership of rights to the Tuschl II invention, and specifically its sublicensing of those rights to Protiva and Allergan, nonetheless

---

[6] This application has long since been abandoned.

caused harm to Max Planck and Alnylam in the form of lost business opportunities. Sirna may be a proper defendant if its advertised ownership of the Tuschl II invention is false. However, there is no evidence that UMass purported to convey ownership of Tuschl II to Sirna or participated in Sirna's alleged misrepresentations about any such ownership.

That said, an unjust enrichment claim does not necessarily require fault on the part of the defendant. See Brandt v. Wand Partners, 242 F.3d 6, 16 (1st Cir. 2001) ("Brandt appears to be right that under Massachusetts law unjust enrichment does not always require a finding of wrongdoing by the defendant. There are cases, albeit addressed to a somewhat different problem (mutual mistake), that hold that wrongdoing is not required so long as retention of the benefit would be unjust.") (citing White v. White, 346 Mass. 76, 190 N.E.2d 102, 104 (1963); National Shawmut Bank of Boston v. Fidelity Mut. Life Ins. Co., 318 Mass. 142, 61 N.E.2d 18, 22 (1945); Keller v. O'Brien, 425 Mass. 774, 683 N.E.2d 1026, 1029-33 (1997)). Instead, the elements of an unjust enrichment claim are: "First, a benefit or enrichment was conferred upon the defendant . . . ; second, the retention of that benefit or enrichment resulted in a detriment to [the plaintiff]; and, third, there are circumstances which make the retention of that benefit ... unjust." Brandt, 242 F.3d at 16.

Having decided that UMass did not purport to license rights in the Tuschl II patent estate to Sirna, the Court must determine

36

whether it would be unjust for UMass to retain the license fees that Sirna paid. There was nothing improper or inherently unjust in the 2003 License Agreement. The impropriety (and accompanying potential injustice) arose with Sirna's alleged sublicensing the Tuschl II patent estate, to which it had no rights, to Protiva and Allergan. While it would be arguably unjust for UMass to retain any supplemental income it receives as a result of those sublicenses, there is no evidence as to what income UMass has derived or stands to derive specifically therefrom.

### C. Declaratory Judgment

With regard to Max Planck's request for declaratory judgment on the ownership of the Tuschl II '325 application, there is no evidence that UMass licensed the '325 application to Sirna (as opposed to solely the priority date of that application), and UMass agrees that it does not own the Tuschl II '325 application. The point is uncontested by UMass and thus a declaratory judgment is unwarranted.

**ORDER**

Plaintiffs' Motion for Partial Summary Judgment against Whitehead and Umass (Docket No. 443) is **DENIED**.

UMass' motion for summary judgment (Docket No. 400) is **ALLOWED**.

/s/ PATTI B. SARIS
PATTI B. SARIS

United States District Judge